# 17-3481(L)
# 17-3918(Con)

## United States Court of Appeals
## For The Second Circuit

TWEED-NEW HAVEN AIRPORT AUTHORITY,
*Plaintiff-Appellant*

CITY OF NEW HAVEN
*Plaintiff-Appellant*

v.

GEORGE JEPSEN, in his official capacity as
Attorney General for the State of Connecticut,
*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR CONNECTICUT (HARTFORD)

**JOINT APPENDIX VOLUME I OF II (PAGES JA1–251)**

HUGH I. MANKE, ESQ.
JOHN C. KING, ESQ.
CHRISTOPHER A. KLEPPS, ESQ.
Updike, Kelly & Spellacy, P.C.
100 Pearl Street
P.O. Box 231277
Hartford, CT 06103
860-548-2600
*Attorneys for Plaintiff-Appellant*

DREW S. GRAHAM, ESQ.
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
*Attorney for Defendant-Appellee*

# TABLE OF CONTENTS

District Court Docket Sheet .......................................................................JA1

Plaintiff's Complaint dated November 24, 2015 [ECF # 1].....................JA11

Defendant's Answer dated February 5, 2016 [ECF#12] ..........................JA23

Memorandum of Decision on Defendant's Motion to Dismiss
dated December 9, 2016 [ECF#53] ..........................................................JA28

Joint Trial Memorandum/Joint Stipulation of Facts dated
March 10, 2017 [ECF # 59] ......................................................................JA50

Affidavit of Tom Reich dated March 13, 2017 [ECF # 61] .....................JA73

Affidavit of Tim Larson dated March 13, 2017 [ECF # 62] ....................JA79

Affidavit of Charles Kurtz dated March 10, 2017 [ECF # 63].................JA86

Affidavit of Robert M. Furey dated March 10, 2017 [ECF # 64] ............JA91

Plaintiff's Post-Trial Brief dated May 19, 2017 [ECF # 73] ....................JA95

Defendant's Post-Trial Brief dated May 19, 2017 [ECF # 74] ..............JA130

Memorandum of Decision dated September 30, 2017 [ECF # 78] ........JA171

Notice of Appeal dated October 27, 2017 [ECF # 81] ...........................JA219

Trial Transcript Excerpts dated March 22, 2017 ...................................JA221

APPEAL,CLOSED,EFILE,REFCNF,SALM

# U.S. District Court
## District of Connecticut (New Haven)
## CIVIL DOCKET FOR CASE #: 3:15-cv-01731-RAR

Tweed-New Haven Airport Autority v. Jepsen
Assigned to: Judge Robert A. Richardson
Referred to: Judge Sarah A. L. Merriam (Settlement)
Cause: 28:2201 Declaratory Judgment

Date Filed: 11/24/2015
Date Terminated: 09/30/2017
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Tweed-New Haven Airport Authority**     represented by     **John Charles King**
Updike, Kelly & Spellacy, P.C.
One State St., Po Box 231277
Hartford, CT 06123-1277
860-548-2600
Email: jking@uks.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher A Klepps**
Updike, Kelly & Spellacy, PC-Htfd
100 Pearl St., 17th Floor
P.O. Box 231277
Hartford, CT 06123-1277
860-548-2600
Fax: 860-548-2680
Email: cklepps@uks.com
*ATTORNEY TO BE NOTICED*

**Hugh I. Manke**
Updike, Kelly & Spellacy, P.C.
One Century Tower
265 Church St.
New Haven, CT 06510
203-786-8301
Fax: 203-772-2037
Email: hmanke@uks.com
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Plaintiff**

**City of New Haven**     represented by     **John Rose , Jr.**
City of New Haven - Office of Corporation Counsel
165 Church Street 4th Floor
New Haven, CT 06510

**JA1**

203-946-7951
Fax: 203-946-7942
Email: jrose@newhavenct.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**George Jepsen**                                    represented by   **Drew S. Graham**
*in his official capacity as Attorney General*                         Office of The Attorney General
*for the State of Connecticut*                                         55 Elm St., Third Floor Annex
                                                                       Hartford, CT 06106
                                                                       860-808-5090
                                                                       Fax: 860-808-5384
                                                                       Email: drew.graham@ct.gov
                                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/24/2015 | 1 | COMPLAINT *for Declaratory Judgment* against George Jepsen ( Filing fee $400 receipt number 0205-3813059.), filed by Tweed-New Haven Airport Autority. (Attachments: # 1 Civil Summons)(King, John) (Entered: 11/24/2015) |
| 11/24/2015 | 2 | Corporate Disclosure Statement by Tweed-New Haven Airport Authority. (King, John) (Entered: 11/24/2015) |
| 11/24/2015 |  | Request for Clerk to issue summons as to George Jepsen. (King, John) (Entered: 11/24/2015) |
| 11/24/2015 |  | Judge Vanessa L. Bryant added. (Campbell, A) (Entered: 11/25/2015) |
| 11/24/2015 | 3 | Order on Pretrial Deadlines: Motions to Dismiss due on 02/24/2016. Amended Pleadings due by 1/23/2016; Discovery due by 5/25/2016; Dispositive Motions due by 6/24/2016. Signed by Clerk on 11/24/2015.(Grady, B.) Modified on 11/25/2015 to correct signature (Grady, B.). (Entered: 11/25/2015) |
| 11/24/2015 | 4 | ELECTRONIC FILING ORDER - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER: Signed by Judge Vanessa L. Bryant on 11/24/2015.(Grady, B.) (Entered: 11/25/2015) |
| 11/24/2015 | 5 | ORDER RE: Judge's Chambers Practices. Counsel are directed to read and comply with the Chambers Practices and Standing Orders prior to filing any document. So ordered. Signed by Judge Vanessa L. Bryant on 11/24/2015.(Grady, B.) (Entered: 11/25/2015) |
| 11/24/2015 | 6 | STANDING PROTECTIVE ORDER: Signed by Judge Vanessa L. Bryant on 11/24/2015.(Grady, B.) (Entered: 11/25/2015) |
| 11/25/2015 | 7 | NOTICE TO COUNSEL: Counsel initiating or removing this action is responsible for serving all parties with attached documents and copies of 1 Complaint filed by Tweed-New Haven Airport Authority, 4 Electronic Filing Order, 3 Order on Pretrial Deadlines, 6 Protective Order, 5 Order Re: Chambers Practices, 2 Corporate Disclosure Statement filed by Tweed-New Haven Airport Authority. Signed by Clerk on 11/25/2015.(Grady, B.) (Entered: 11/25/2015) |
| 11/25/2015 | 8 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *George Jepsen* with answer to complaint due within *21* days. Attorney *John Charles |

| | | King* *Updike, Kelly & Spellacy, P.C.* *One State St., Po Box 231277* *Hartford, CT 06123-1277*. (Grady, B.) (Entered: 11/25/2015) |
|---|---|---|
| 12/29/2015 | 9 | SUMMONS Returned Executed by Tweed-New Haven Airport Authority. George Jepsen served on 12/18/2015, answer due 1/8/2016. (King, John) (Entered: 12/29/2015) |
| 12/30/2015 | 10 | MOTION for Extension of Time until February 8, 2016*to* Respond to Complaint 1 Complaint by George Jepsen. (Graham, Drew) (Entered: 12/30/2015) |
| 12/30/2015 | 11 | ORDER granting 10 MOTION for extension of time until 02/08/2016 to respond to 1 Complaint. Signed by Clerk on 12/30/2015. (Grady, B.) (Entered: 12/30/2015) |
| 12/30/2015 | | Answer deadline updated for George Jepsen to 2/8/2016. (Grady, B.) (Entered: 12/30/2015) |
| 02/05/2016 | 12 | ANSWER to 1 Complaint with Special Defenses by George Jepsen.(Graham, Drew) (Entered: 02/05/2016) |
| 02/05/2016 | 13 | REPORT of Rule 26(f) Planning Meeting. (Klepps, Christopher) (Entered: 02/05/2016) |
| 02/08/2016 | 14 | SCHEDULING ORDER: The Parties' 13 Rule 26(f) Report is approved, in part, and the Court sets the following case management deadlines. All discovery, including but not limited to depositions of expert witnesses, shall be completed by **06/01/2016**. Dispositive motions are due by **08/01/2016**. If no dispositive motions are filed, the joint trial memorandum ("JTM") is due by **09/01/2016**, and a bench trial will take place in the month of **October 2016** in Courtroom Three, 450 Main St., Hartford, CT before Judge Vanessa L. Bryant. If dispositive motions are filed, the JTM is due by **05/01/2017**, and a bench trial will take place in the month of **June 2017** in Courtroom Three, 450 Main St., Hartford, CT before Judge Vanessa L. Bryant. Dates for the presentation of evidence will be designated following the submission of the JTM. Counsel shall be prepared to present evidence on any day during the month that the bench trial is scheduled to take place. All motions in limine must be filed along with the JTM. All evidentiary objections raised in the JTM must be the subject of motions in limine supported by applicable Second Circuit precedent. The Court also requests that any courtesy copies sent to Chambers be printed from the docket and contain the header of the Court's electronic filing system. Signed by Judge Vanessa L. Bryant on 02/08/2016. (Thomas, R.) (Entered: 02/08/2016) |
| 02/09/2016 | 15 | ORDER REFERRING CASE to Magistrate Judge Sarah A. L. Merriam for Settlement Conference. Signed by Judge Vanessa L. Bryant on 02/09/2016. (Lewis, L.) (Entered: 02/09/2016) |
| 02/10/2016 | 16 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephonic Scheduling Conference set for 2/16/2016 at 11:30AM before Judge Sarah A. L. Merriam. This case has been referred to Judge Merriam for a settlement conference. She will hold a pre-conference telephone call with counsel on February 16, 2016 at 11:30AM. A firm date for the settlement conference will be set during that telephone call. The Court requires all named parties and any other persons necessary to achieve full settlement (e.g. insurance representatives) to attend the settlement conference in person. Therefore, counsel must consult with their clients and other necessary parties prior to the telephone call to determine any dates on which they will be unavailable in the next 90 days. Counsel should also have their own calendars available to facilitate scheduling. During the telephone call, counsel should be prepared to discuss what information needs to be exchanged and anything else that needs to be accomplished prior to the settlement conference for the conference to be productive. This telephone conference will not be rescheduled based on requests from counsel. If counsel is not available at the scheduled time, please arrange for coverage by another lawyer, who will have the necessary background knowledge to participate. Counsel for the plaintiff is |

JA3

| | | |
|---|---|---|
| | | requested to initiate this call. Once counsel for all parties are on the line, please contact chambers at 203-773-2022. (Nuzzi, T) (Entered: 02/10/2016) |
| 02/16/2016 | 17 | AMENDED NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephonic Scheduling Conference *RESET FROM 2/16/16 11:30AM* to **2/17/2016 10:00 AM** before Judge Sarah A. L. Merriam. This case has been referred to Judge Merriam for a settlement conference. She will hold a pre-conference telephone call with counsel on February 17, 2016 at 10:00AM. A firm date for the settlement conference will be set during that telephone call. The Court requires all named parties and any other persons necessary to achieve full settlement (e.g. insurance representatives) to attend the settlement conference in person. Therefore, counsel must consult with their clients and other necessary parties prior to the telephone call to determine any dates on which they will be unavailable in the next 90 days. Counsel should also have their own calendars available to facilitate scheduling. During the telephone call, counsel should be prepared to discuss what information needs to be exchanged and anything else that needs to be accomplished prior to the settlement conference for the conference to be productive. This telephone conference will not be rescheduled based on requests from counsel. If counsel is not available at the scheduled time, please arrange for coverage by another lawyer, who will have the necessary background knowledge to participate. Counsel for the plaintiff is requested to initiate this call. Once counsel for all parties are on the line, please contact chambers at 203-773-2022. (Katz, S.) (Entered: 02/16/2016) |
| 02/17/2016 | 18 | Minute Entry for proceedings held before Judge Sarah A. L. Merriam: Telephonic Scheduling Conference held on 2/17/2016. Counsel represented that in light of the claim presented in this matter, a case management conference would be more productive than a traditional settlement conference. Accordingly, a case management conference is scheduled for March 24, 2016. A separate calendar and order concerning this conference will issue forthwith. 25 minutes. (Katz, S.) (Entered: 02/17/2016) |
| 02/17/2016 | 19 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. In-Person Case Management Status Conference set for 3/24/2016 12:00 PM in Courtroom Five, 141 Church Street, New Haven, CT before Judge Sarah A. L. Merriam. (Katz, S.) (Entered: 02/17/2016) |
| 02/17/2016 | 20 | ORDER. In anticipation of the March 24, 2016, case management conference, by the close of business on March 21, 2016, the parties shall each file a status report addressing the status of the case, any anticipated disputes and/or potential for stipulations. This status report should include any information that counsel believe will be helpful to the Court's assessment of the claim and defenses in this matter. To the extent that any information requires ex parte submission, counsel may contact chambers to arrange for the submission of such material. Signed by Judge Sarah A. L. Merriam on 2/17/2016. (Katz, S.) (Entered: 02/17/2016) |
| 02/18/2016 | 21 | NOTICE of Appearance by John Charles King on behalf of Tweed-New Haven Airport Authority (King, John) (Entered: 02/18/2016) |
| 02/18/2016 | 22 | NOTICE of Appearance by Christopher A Klepps on behalf of Tweed-New Haven Airport Authority (Klepps, Christopher) (Entered: 02/18/2016) |
| 03/21/2016 | 23 | Joint STATUS REPORT by Tweed-New Haven Airport Authority. (Klepps, Christopher) (Entered: 03/21/2016) |
| 03/24/2016 | 24 | Minute Entry for proceedings held before Judge Sarah A. L. Merriam: Case Management Hearing held on 3/24/2016. Total Time 5 minutes(Court Reporter FTR.) (Nuzzi, T) (Entered: 03/24/2016) |

**JA4**

| 03/24/2016 | 25 | Minute Entry for proceedings held before Judge Sarah A. L. Merriam: In-Person Case Management Status/Settlement Conference held on 3/24/2016. The parties discussed ways in which to narrow the issues and to achieve an efficient resolution of this declaratory judgment action. The parties are encouraged to contact the Court to schedule a status or settlement conference in the event that similar discussions would be productive in the future. 45 minutes. (Katz, S.) (Entered: 03/24/2016) |
|---|---|---|
| 04/04/2016 | 26 | NOTICE of Appearance by John Rose, Jr on behalf of City of New Haven (Rose, John) (Entered: 04/04/2016) |
| 04/04/2016 | 27 | MOTION to Intervene *of Right or for Permissive intervention (Rule 24 FRCP)* by City of New Haven.Responses due by 4/25/2016 (Rose, John) (Entered: 04/04/2016) |
| 04/04/2016 | 28 | Intervenor COMPLAINT , filed by City of New Haven.(Rose, John) (Entered: 04/04/2016) |
| 04/14/2016 | 29 | ORDER. During the Court's March 24, 2016, In-Person Case Management Status/Settlement Conference (Doc. ##19, 25), the parties discussed the option of consenting to the jurisdiction of United States Magistrate Judge Robert A. Richardson, in order to expedite a potential bench trial in this matter. To the extent that all parties consent to the jurisdiction of Judge Richardson for all further proceedings, the parties should complete the attached Notice, Consent and Reference of a Civil Action to a Magistrate Judge and return the form to the Clerk of Court. Signed by Judge Sarah A. L. Merriam on 4/14/2016. (Katz, S.) (Entered: 04/14/2016) |
| 04/18/2016 | 30 | ORDER granting 27 Motion to Intervene. Signed by Judge Vanessa L. Bryant on 04/18/2016. (Thomas, R.) (Entered: 04/18/2016) |
| 04/20/2016 | 31 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. The Court schedules a Telephonic Conference for **04/21/2016 at 05:00 PM** before Judge Vanessa L. Bryant. The Court would like to discuss intervention and consent to the jurisdiction of a magistrate judge. The parties are ordered to call Chambers at 860-240-3123 with all parties on the line. In the alternative, the parties may call Chambers to distribute a dial-in number to the Court. (Thomas, R.) (Entered: 04/20/2016) |
| 04/25/2016 | 32 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. The Court schedules a Telephonic Conference for **04/28/2016 at 12:00 PM** before Judge Vanessa L. Bryant. The parties are ordered to call Chambers at 860-240-3123 with all parties on the line. In the alternative, the parties may call Chambers to distribute a dial-in number to the Court. (Thomas, R.) (Entered: 04/25/2016) |
| 05/03/2016 | 33 | CONSENT to Jurisdiction by US Magistrate Judge by City of New Haven, George Jepsen, Tweed-New Haven Airport Authority. Case reassigned to Magistrate Judge Robert A. Richardson. This matter has been transferred to a magistrate judge. All non-efiled submissions should be filed at the seat of court where the magistrate judge presides. The case number will remain the same, but must be followed by the magistrate judge's initials (RAR).<br>Signed by Judge Vanessa L. Bryant on 4/28/16.(Johnson, D.) (Entered: 05/04/2016) |
| 05/04/2016 | 34 | SCHEDULING ORDER: In accordance with the parties' request in Dkt. # 23 Joint Status Report, the discovery deadline is extended to 7/1/2016. Bench Trial is set to begin 11/15/2016 10:00 AM in West Courtroom, 450 Main St., Hartford, CT before Judge Robert A. Richardson. All other deadlines remain as set. Signed by Judge Robert A. Richardson on 5/4/2016. (Hanna, J) (Entered: 05/04/2016) |
| 05/04/2016 | | Set Deadlines/Hearings: Discovery due by 7/1/2016. Bench Trial set to begin 11/15/2016 10:00 AM in West Courtroom, 450 Main St., Hartford, CT before Judge Robert A. |

JA5

| | | |
|---|---|---|
| | | Richardson. (Hanna, J) (Entered: 05/04/2016) |
| 05/25/2016 | 35 | ORDER: Status conference is scheduled for 6/1/2016 at 10:30 AM in Chambers Room 258, 450 Main St., Hartford CT before Judge Richardson. Signed by Judge Robert A. Richardson on 5/25/2016. (Hanna, J) (Entered: 05/25/2016) |
| 05/25/2016 | | Set Deadlines/Hearings: Status Conference is set for 6/1/2016 10:30 AM in Chambers Room 258, 450 Main St., Hartford, CT before Judge Robert A. Richardson. (Hanna, J) (Entered: 05/25/2016) |
| 05/26/2016 | 36 | NOTICE: Due to a change in the court's calendar, the status conference set for 6/1/16 will now be at **10:00 AM** in Chambers Room 258, 450 Main St., Hartford, CT. Please note the change. Signed by Judge Robert A. Richardson on 5/56/2016. (Hanna, J) (Entered: 05/26/2016) |
| 05/26/2016 | | Set Deadlines/Hearings: Status Conference originally set for 6/1/2016 10:30 AM in Chambers Room 258, 450 Main St., Hartford, CT before Judge Robert A. Richardson will now begin at 10:00 AM. (Hanna, J) (Entered: 05/26/2016) |
| 05/27/2016 | 37 | NOTICE of Appearance by Hugh I. Manke on behalf of Tweed-New Haven Airport Authority (Manke, Hugh) (Entered: 05/27/2016) |
| 06/01/2016 | 38 | Minute Entry for proceedings held before Judge Robert A. Richardson: Status Conference held on 6/1/2016. Total time: 30 minutes. (Klebes, K) (Entered: 06/01/2016) |
| 06/30/2016 | 39 | MOTION to Dismiss by George Jepsen.Responses due by 7/21/2016 (Graham, Drew) (Entered: 06/30/2016) |
| 06/30/2016 | 40 | Memorandum in Support re 39 MOTION to Dismiss filed by George Jepsen. (Graham, Drew) (Entered: 06/30/2016) |
| 07/14/2016 | 41 | MOTION for Extension of Time to File Response/Reply as to 39 MOTION to Dismiss until 8/1/2016 by Tweed-New Haven Airport Authority. (Klepps, Christopher) (Entered: 07/14/2016) |
| 07/18/2016 | | ORDER granting 41 Plaintiff's Motion for Extension of Time until 8/1/16 to file his Response/Reply to Defendant's Motion to Dismiss. Signed by Judge Robert A. Richardson on 7/18/16. (Klebes, K) (Entered: 07/18/2016) |
| 07/19/2016 | | Set/Reset Deadlines as to 39 MOTION to Dismiss . Responses due by 8/1/2016 (Blue, A.) (Entered: 07/19/2016) |
| 07/27/2016 | 42 | Consent MOTION for Extension of Time to File Response/Reply as to 39 MOTION to Dismiss until 08/08/2016 by Tweed-New Haven Airport Authority. (Klepps, Christopher) (Entered: 07/27/2016) |
| 07/27/2016 | 43 | ORDER granting 42 Plaintiff's Motion for Extension of Time until 8/8/16 to file his Response/Reply as to 39 Defendant's Motion to Dismiss. Signed by Judge Robert A. Richardson on 7/27/16. (Klebes, K) (Entered: 07/27/2016) |
| 07/28/2016 | | Set/Reset Deadlines as to 39 MOTION to Dismiss . Responses due by 8/8/2016 (Blue, A.) (Entered: 07/28/2016) |
| 08/08/2016 | 44 | Memorandum in Opposition re 39 MOTION to Dismiss filed by Tweed-New Haven Airport Authority. (Klepps, Christopher) (Entered: 08/08/2016) |
| 08/22/2016 | 45 | Memorandum in Support re 39 MOTION to Dismiss filed by George Jepsen. (Graham, Drew) (Entered: 08/22/2016) |
| 09/14/2016 | 46 | ORDER Setting hearing on 39 Motion to Dismiss: Oral Argument is set for 9/28/16 at 1:00 P.M. in the West Courtroom, 450 Main Street, Hartford, CT before Judge Robert A. |

JA6

| | | |
|---|---|---|
| | | Richardson. Signed by Judge Robert A. Richardson on 9/14/16. (Klebes, K) (Entered: 09/14/2016) |
| 09/15/2016 | 47 | ORDER Setting Hearing on 39 Motion to Dismiss: Motion Hearing set for 9/29/2016 at 10:00 AM in West Courtroom, 450 Main St., Hartford, CT before Judge Robert A. Richardson. Signed by Judge Robert A. Richardson on 9/15/16. (Klebes, K) (Entered: 09/15/2016) |
| 09/15/2016 | 48 | ORDER: The hearing for oral arguments scheduled for September 28, 2016 at 1:00 P.M. 46 is rescheduled for September 29, 2016 at 10:00 A.M. 47 before Judge Robert A. Richardson. Signed by Judge Robert A. Richardson on 9/15/16. (Klebes, K) (Entered: 09/15/2016) |
| 09/29/2016 | 49 | Minute Entry. Proceedings held before Judge Robert A. Richardson: taking under advisement 39 Motion to Dismiss; Motion Hearing held on 9/29/2016 re 39 MOTION to Dismiss filed by George Jepsen. Total Time: 1 hour and 30 minutes(Court Reporter Falzarano Reporting.) (Blue, A.) (Entered: 09/29/2016) |
| 11/01/2016 | 50 | Joint MOTION for to Modify Scheduling Order Order by George Jepsen. (Graham, Drew) (Entered: 11/01/2016) |
| 11/02/2016 | 51 | ORDER granting 50 the parties' Joint Motion to Modify the Scheduling Order and rescheduling the Bench Trial currently scheduled for November 15, 2016 at 10:00 AM to February 15, 2017 at 10:00 AM. Signed by Judge Robert A. Richardson on 11/2/16. (Klebes, K) (Entered: 11/02/2016) |
| 11/03/2016 | | Set Deadlines/Hearings: Bench Trial set for 2/15/2017 at 10:00 AM in West Courtroom, 450 Main St., Hartford, CT before Judge Robert A. Richardson. (Klebes, K) (Entered: 11/03/2016) |
| 11/03/2016 | 52 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Bench Trial set for 2/15/2017 at 10:00 AM in West Courtroom, 450 Main St., Hartford, CT before Judge Robert A. Richardson. (Klebes, K) (Entered: 11/03/2016) |
| 12/09/2016 | 53 | ORDER denying Defendant's 39 Motion to Dismiss. See attached ruling, 22 pages. Signed by Judge Robert A. Richardson on 12/9/16. (Klebes, K) (Entered: 12/09/2016) |
| 01/12/2017 | 54 | Consent MOTION for Extension of Time until 3/22/2017 to extend trial date from 2/15/17 by Tweed-New Haven Airport Authority. (Klepps, Christopher) (Entered: 01/12/2017) |
| 01/17/2017 | 55 | ORDER: A telephonic status conference is scheduled for 1/26/17 at 4:00 pm to discuss the parties' consent motion for extension of time (Dkt. # 54) until 3/22/17 to extend the trial date and to discuss other details relevant to the upcoming bench trial. Signed by Judge Robert A. Richardson on 1/17/17. (Klebes, K) (Entered: 01/17/2017) |
| 01/17/2017 | | Set Deadlines/Hearings: Telephonic Status Conference set for 1/26/2017 at 4:00 PM in Chambers Room 258, 450 Main St., Hartford, CT before Judge Robert A. Richardson. (Klebes, K) (Entered: 01/17/2017) |
| 01/26/2017 | 56 | Minute Entry for proceedings held before Judge Robert A. Richardson: Status Conference held on 1/26/2017. Total time: 20 minutes. (Klebes, K) (Entered: 01/26/2017) |
| 01/27/2017 | 57 | ORDER granting 54 Motion for Extension of Time to extend bench trial date from 2/15/17 to 3/22/17. The joint trial memorandum shall be due on or before 3/1/17. The date for a final pre-trial conference will be posted after the parties have submitted their joint trial memorandum. Signed by Judge Robert A. Richardson on 1/27/17. (Klebes, K) (Entered: 01/27/2017) |

JA7

| | | |
|---|---|---|
| 01/27/2017 | | Set Deadlines/Hearings: Trial Brief due by 3/1/2017. Bench Trial set for 3/22/2017 at 10:00 AM in West Courtroom, 450 Main St., Hartford, CT before Judge Robert A. Richardson. (Klebes, K) Modified on 01/27/17 to edit date of deadline (Fernandez, C.). (Entered: 01/27/2017) |
| 01/27/2017 | 58 | Docket Entry Correction. Trial Brief due by 3/1/2017. Bench Trial set for 3/22/2017 at 10:00 AM in West Courtroom, 450 Main St., Hartford, CT before Judge Robert A. Richardson. (Fernandez, C.) (Entered: 01/27/2017) |
| 03/10/2017 | 59 | Joint STIPULATION re 58 Docket Annotation *Joint Trial Memorandum* by Tweed-New Haven Airport Authority. (Klepps, Christopher) (Entered: 03/10/2017) |
| 03/13/2017 | 60 | ORDER: A pretrial conference is scheduled for 3/15/17 at 1:00 pm with Judge Richardson. Signed by Judge Robert A. Richardson on 3/13/17. (Klebes, K) (Entered: 03/13/2017) |
| 03/13/2017 | | Set Deadlines/Hearings: Pretrial Conference set for 3/15/2017 at 1:00 PM in Chambers Room 258, 450 Main St., Hartford, CT before Judge Robert A. Richardson. (Klebes, K) (Entered: 03/13/2017) |
| 03/13/2017 | 61 | AFFIDAVIT re 59 Stipulation Signed By Tom Reich filed by Tweed-New Haven Airport Authority. (Klepps, Christopher) (Entered: 03/13/2017) |
| 03/13/2017 | 62 | AFFIDAVIT re 59 Stipulation Signed By Tim Larson filed by Tweed-New Haven Airport Authority. (Klepps, Christopher) (Entered: 03/13/2017) |
| 03/13/2017 | 63 | AFFIDAVIT re 59 Stipulation Signed By Charles Kurtz filed by Tweed-New Haven Airport Authority. (Klepps, Christopher) (Entered: 03/13/2017) |
| 03/13/2017 | 64 | AFFIDAVIT re 59 Stipulation Signed By Robert Furey filed by Tweed-New Haven Airport Authority. (Klepps, Christopher) (Entered: 03/13/2017) |
| 03/15/2017 | 65 | Minute Entry for proceedings held before Judge Robert A. Richardson: Pretrial Conference held on 3/15/2017. Total time: 20 minutes. (Klebes, K) (Entered: 03/15/2017) |
| 03/15/2017 | 66 | ORDER: The bench trial scheduled for 3/22/17 at 10:00 am will take place in Courtroom 1. Signed by Judge Robert A. Richardson on 3/15/17. (Klebes, K) (Entered: 03/15/2017) |
| 03/22/2017 | 67 | Minute Entry for proceedings held before Judge Robert A. Richardson: Begun and Bench Trial completed on 3/22/2017. Total Time: 5 hours and 5 minutes(Court Reporter Falzarano Reporters.) (Blue, A.) (Additional attachment(s) added on 3/23/2017: # 1 REPLACEMENT PDF) (Blue, A.). (Entered: 03/23/2017) |
| 03/22/2017 | 68 | Marked Exhibit and Witness List by City of New Haven, George Jepsen, Tweed-New Haven Airport Authority. (Blue, A.) (Entered: 03/23/2017) |
| 03/23/2017 | 69 | Docket Entry Correction re 67 Begun and Bench Trial - Completed re: REPLACEMENT PDF (Blue, A.) (Entered: 03/23/2017) |
| 03/23/2017 | 70 | ORDER: Simultaneous post trial briefs are due by 5/9/17. The parties have until 5/16/17 to request oral argument. Signed by Judge Robert A. Richardson on 3/23/17. (Klebes, K) (Entered: 03/23/2017) |
| 05/02/2017 | 71 | ORDER: The defendant has requested an oral continuance of the deadline for the submission of the parties' simultaneous post trial briefs until 5/19/17. Plaintiff has made his position clear on this matter. The motion is granted. The parties have until 5/26/17 to request oral argument. Signed by Judge Robert A. Richardson on 5/2/17. (Klebes, K) (Entered: 05/02/2017) |
| 05/19/2017 | 72 | Proposed Findings of Fact and Conclusions of Law by City of New Haven. (Rose, John) (Entered: 05/19/2017) |

**JA8**

| | | |
|---|---|---|
| 05/19/2017 | 73 | TRIAL MEMO *Post-Trial Brief* by Tweed-New Haven Airport Authority. (Attachments: # 1 Exhibit A)(Klepps, Christopher) (Entered: 05/19/2017) |
| 05/19/2017 | 74 | TRIAL MEMO *Post Trial Brief* by George Jepsen Estimated trial time March 22, 2017. (Graham, Drew) (Entered: 05/19/2017) |
| 05/31/2017 | 75 | ORDER: Oral argument is set for 7/19/17 at 2:00 pm. Signed by Judge Robert A. Richardson on 5/31/17. (Klebes, K) (Entered: 05/31/2017) |
| 05/31/2017 | 76 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Oral argument set for 7/19/2017 at 2:00 PM in West Courtroom, 450 Main St., Hartford, CT before Judge Robert A. Richardson. (Klebes, K) (Entered: 05/31/2017) |
| 07/19/2017 | 77 | Minute Entry for proceedings held before Judge Robert A. Richardson: Oral argument held on 7/19/2017. Total Time: 2 hours and 37 minutes. (Klebes, K) (Entered: 07/19/2017) |
| 09/30/2017 | 78 | Memorandum of Decision in favor of the defendant. Signed by Judge Robert A. Richardson on 09/30/2017.(Richardson, Robert) (Additional attachment(s) added on 10/3/2017: # 1 REPLACEMENT PDF) (Blue, A.). (Entered: 09/30/2017) |
| 09/30/2017 | 79 | JUDGMENT entered in favor of George Jepsen against Tweed-New Haven Airport Authority and the City of New Haven (Intervenor Plaintiff). <br><br> For Appeal Forms please go to the following website: http://www.ctd.uscourts.gov/forms/all-forms/appeals_forms <br> Signed by Judge Robert A. Richardson on 09/30/2017.(Richardson, Robert) (Entered: 09/30/2017) |
| 10/03/2017 | 80 | Docket Entry Correction re 78 Memorandum of Decision re Corrected pdf (Blue, A.) (Entered: 10/03/2017) |
| 10/27/2017 | 81 | NOTICE OF APPEAL as to 78 Order, 79 Judgment, by Tweed-New Haven Airport Authority. Filing fee $ 505, receipt number 0205-4583532. (Klepps, Christopher) (Entered: 10/27/2017) |
| 11/07/2017 | 82 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 81 Notice of Appeal. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Robin D. Tabora, Clerk. Documents manually filed not included in this transmission: none. (Bozek, M.) (Entered: 11/07/2017) |
| 11/17/2017 | 83 | MOTION for Extension of Time to file a Notice of Appeal 79 Judgment, by City of New Haven. (Rose, John) (Entered: 11/17/2017) |
| 11/30/2017 | 84 | ORDER granting 83 Motion for Extension of Time for the City of New Haven to file Notice of appeal. The issues involved in this appeal are important and the Court believes it would be beneficial if all of the parties involved had a full and meaningful opportunity to participate in the appeal. Therefore, for good cause shown, the Court grants the requested extension. The City of New Haven will be given a 14 day extension from the date of this order. Signed by Judge Robert A. Richardson on 11/30/2017. (Richardson, Robert) (Entered: 11/30/2017) |
| 12/03/2017 | 85 | TRANSCRIPT of Proceedings: Type of Hearing: Oral Argument. Held on 7/19/17 before Judge Robert A. Richardson. Court Reporter: Suzanne Benoit. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the |

| | | |
|---|---|---|
| | | court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 12/24/2017. Redacted Transcript Deadline set for 1/3/2018. Release of Transcript Restriction set for 3/3/2018. (Benoit, S.) (Entered: 12/03/2017) |
| 12/04/2017 | 86 | NOTICE by City of New Haven re 84 Order on Motion for Extension of Time,, (Rose, John) (Entered: 12/04/2017) |
| 12/04/2017 | 87 | NOTICE OF APPEAL as to 84 Order on Motion for Extension of Time, by City of New Haven. (Blue, A.) (Entered: 12/05/2017) |
| 12/06/2017 | 88 | USCA Appeal Fees received from City of New Haven: $ 505 receipt number CTXN00016155 re 81 Notice of Appeal filed by Tweed-New Haven Airport Authority (Potter, A.) (Entered: 12/06/2017) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/28/2018 17:42:14 | | |
| **PACER Login:** | cklepps2017 | **Client Code:** | 14057-L0181 |
| **Description:** | Docket Report | **Search Criteria:** | 3:15-cv-01731-RAR |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**JA10**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------

TWEED-NEW HAVEN AIRPORT :
AUTHORITY :  CIVIL ACTION NO.
  Plaintiff, :
    :
VS. :
    :
GEORGE JEPSEN, in his official :
capacity as Attorney General for the :
State of Connecticut :  NOVEMBER 24, 2015
  Defendant :

----------------------------------------------------

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff, Tweed-New Haven Airport Authority ("Authority" or "Plaintiff"), by and through its undersigned counsel, brings this action for a Declaratory Judgment and the costs of suit under the Supremacy Clause, Art. VI, cl. 2, of the United States Constitution against the Defendant (defined below) and, upon personal knowledge with respect to its own acts and upon information and belief with respect to all other matters, alleges in this Complaint as follows:

## SUMMARY OF CLAIMS

1.  This action is brought under the Supremacy Clause, Art. VI, cl. 2, of the United States Constitution.

2.  By this action the Authority seeks a Declaratory Judgment declaring that Connecticut General Statutes § 15-120j(c) is unconstitutional under Art. VI, cl. 2, of the United States Constitution.

1122812

**JA11**

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the claims alleged herein under 28 U.S.C. § 1331 because the issue of whether Connecticut General Statutes § 15-120j(c) is unconstitutional under Art. VI, cl. 2, of the United States Constitution raises a federal question.  This Court may issue a declaratory judgment in this action pursuant to 28 U.S.C. §§ 2201 and 2202.  The Court may decide issues of state law pursuant to its discretionary exercise of pendent jurisdiction.

4.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because a substantial portion of the events giving rise to the claims described herein have been carried out in this district and because the property subject to this action, the Tweed New Haven Airport (the "Airport" or "Tweed"), is situated in the district.

## THE PARTIES

5.      Plaintiff, Tweed-New Haven Airport Authority (the "Authority") is a public instrumentality and political subdivision of the State of Connecticut, pursuant to Connecticut General Statutes § 15-120i, et seq., and is located at 155 Burr Street in New Haven, Connecticut. The Authority, as a political subdivision of the State of Connecticut, has standing to challenge the constitutionality of Connecticut General Statutes § 15-120j(c).

6.      Defendant George Jepsen is the Attorney General for the State of Connecticut.  In his official capacity as Attorney General, Attorney Jepsen has a duty to enforce the laws of the State of Connecticut.

2

**JA12**

## GENERAL ALLEGATIONS

7.      The Supremacy Clause of the United States Constitution, Article VI, clause 2, invalidates state laws that interfere with federal law either because of an express federal statutory bar to interference or because the scope of federal law preempts any such interference or conflict.

8.      The United States has preempted the field of aviation, including, but not limited to, the areas of airport management and efficiency, air traffic control, safety, navigational facilities and flight operations. 49 U.S.C. §§ 40101, 40102, 40103, 44502, 44715, 44721, 47101, 47107 *et seq.*

9.      The United States government has exclusive sovereignty of airspace and airport regulation within the United States. 49 U.S.C. § 40103(a).

10.      The United States government has exclusive sovereignty of airport layout plans and alterations to the airport or any of its facilities within the airport boundaries. 49 U.S.C. § 47107(a)(16).

11.      This action arises out of a restriction on the length of and improvements to the primary runway at the Airport, Runway 2/20, as imposed by Connecticut General Statutes § 15-120j(c).

*A.   The Authority and the Airport*

12.      The Authority is the lessee and operator of the Airport located at 155 Burr Street in New Haven, Connecticut.  The Authority is the Airport sponsor for purposes of Federal Aviation Administration (the "FAA") funding and oversight. Pursuant to Connecticut General Statutes § 15-120i, et seq., the Authority is a public instrumentality and political subdivision of the State of Connecticut authorized to manage the Airport.  The Airport property is owned by the City of New Haven ("New Haven") and leased to the Authority.

**JA13**

13.     The Airport is situated in both East Haven and New Haven.  The Airport's main runway runs north/south.  This main runway is referred to as "Runway 2/20."  Runway 2 is the south end and Runway 20 is the north end.  The municipal boundary runs approximately down the center of Runway 2/20, with East Haven to the east and New Haven to the west.

14.     The Airport is among the public-use airports included in the National Plan of Integrated Airport Systems.  The Airport is classified by FAA as a primary commercial service airport in that it provides regularly scheduled passenger air service and, as such, holds a Part 139 certification.

15.     The Authority has accepted tens of millions of dollars in grants from the FAA for construction and maintenance of facilities at the Airport and for mitigation of any adverse effects on the neighborhoods and the environment surrounding the Airport.

16.     Whenever the Authority accepts federal funds, it agrees to various grant assurances which, inter alia, require compliance with a long list of federal statutes and regulations directed to airport facilities and operations.

17.     The Airport consists of numerous structures, including an airport terminal, an administration building, hangars and offices leased to a fixed base operator, an air rescue and fire safety facility, a control tower, and two runways with related taxiways.

18.     All of these structures are within the Airport's boundaries and are part of the Airport Layout Plan (the "ALP").  The ALP is approved by the FAA which maintains full control over any modifications to the ALP, including limitations on runway length.

19.     The length of Runway 2/20 is currently approximately 5,600 linear feet.

**JA14**

20.     A Master Plan is required by the FAA for each Part 139 airport like Tweed outlining future plans for upgrading airport facilities.  Tweed has a Master Plan.

21.     After extensive public hearings, the updated Master Plan for the Airport was approved by the State of Connecticut (the "State") and by the FAA in 2002 identifying future capital improvements at the Airport.  Extending the length of Runway 2/20 to 7,200 linear feet has been a part of the Authority's Master Plan for thirteen years.

22.     In 2009, the State, through Public Act 09-7, amended Connecticut General Statutes § 15-120j by adding subsection (c) which provides: "Notwithstanding the provisions of subsections (a) and (b) of this section, Runway 2/20 of the airport shall not exceed the existing paved runway length of five thousand six hundred linear feet."

23.     The adoption of  subsection (c) of Connecticut General Statutes § 15-120j is a direct attempt by the State to control the ALP by precluding improvements incorporated in the approved Master Plan which was approved by the State and the FAA.

24.     The current length of Runway 2/20 of 5,600 linear feet remains too short for almost all commercial aircraft to operate regularly scheduled service in a safe and commercially reasonable manner.

25.      There is one commercial airline providing service to Tweed from Philadelphia with four scheduled flights per day in each direction and passenger capacity of no more than 39 passengers on each flight.  The length of the runway has a direct bearing on the weight load and passenger capacity that can be safely handled on any given flight.

26.     Current scheduled commercial service at the Airport is entirely provided by a single type of aircraft.  The Authority understands that this type of aircraft will be phased out in the near future and replaced with an aircraft that will require a longer runway than the current Runway 2/20.

27.     Accordingly, regularly scheduled commercial service at the Airport is not only jeopardized at the moment but also may be terminated in the future if the length of Runway 2/20 is not extended.

28.     Numerous airlines have notified the Authority that they would like to bring regularly scheduled service to the Airport, but that they cannot do so until Runway 2/20 is lengthened.

29.     Since 2009, the Airport has failed to attract a single new scheduled commercial carrier.  Service remains low, less than 35,000 enplanements per year.  The length of the runway is a key factor in the low service levels and the Airport's failure to attract new scheduled carriers.

30.     The Authority has executed assurances as part of the federal Airport Improvement Grant process that, inter alia, require the airport owner or operator to make the airport as self-sustaining as possible.  To accomplish that goal, it is necessary for the Authority to generate additional revenue by increasing the level of regularly scheduled commercial service and general aviation usage at the Airport by, among other things, extending Runway 2/20.

31.     Runway 2/20 needs to be extended not only to attract new air service and move the Airport closer to financial self-sufficiency, but also to comply with federal safety regulations and FAA construction standards.  The current locations of the taxiways, which are integral to the aircraft landing and takeoff system, are not in compliance with federal regulations in terms of their distance from Runway 2/20.  This non-standard separation between the taxiways and the runway could be brought into compliance as part of the proposed runway extension project.

32.     The Authority has commenced planning on a runway extension project to increase the functional length of Runway 2/20 (the "Project"), within the existing boundaries of the Airport and the ALP on land that is currently part of the runway safety areas (the runway safety areas are packed earth areas, 1,000 feet in length, at the end of each end of the runway). The planning documents describe several alternatives for lengthening Runway 2/20 up to 7,000 linear feet and modifying related taxiways. The initial step in the Project is to perform an Environmental Assessment of the various layout and construction options.  The Authority has expended private funds to hire a consulting engineering firm which has produced elements of a preliminary  Environmental Assessment.

33.     The FAA has refused to provide funding to the Project and has also refused to review the alternative layouts presented in the preliminary Environmental Assessment while state law interferes with its exclusive jurisdiction.  FAA review of the preliminary Environmental Assessment is a necessary step in the Environmental Assessment process.  The Project cannot continue without an FAA-approved Environmental Assessment.

34.     The FAA's refusal to comment upon the preliminary Environmental Assessment and provide funding for the Project is a direct consequence of the existence of the illegal runway length limitation in Connecticut General Statutes §15-120j(c).

35.     The restriction imposed by Connecticut General Statutes § 15-120j(c) is, therefore: a) preventing the Authority from extending or otherwise improving Runway 2/20; b) interfering with the ALP in place at the Airport; c) interfering with implementation of the Authority's approved Master Plan; d) preventing the expansion of scheduled commercial service at Tweed; e) reducing the

7

**JA17**

Authority's ability to achieve financial self-sufficiency; and f) negatively affecting the Authority's compliance with federal safety regulations.

*The Federal Aviation Act and the FAA*

36.     The Federal Aviation Act (the "FAAct"), codified in Title 49 of the United States Code, was enacted to create a uniform and exclusive system of federal regulation in the field of air safety.

37.     The FAAct empowers the FAA to federalize and bring uniformity to all air navigation operations in the United States, including "landing areas" and "airports." 49 U.S.C. § 40102(a)(4)(A); 49 U.S.C. § 40102(a)(28).

38.     Congress created the FAA to administer the FAAct and vested in the FAA the exclusive authority to regulate the field of aviation safety. 49 U.S.C. § 40101 *et seq.*; 49 U.S.C. § 40103(a) and (b); 49 U.S.C. § 40113(a).

39.     The highest priority of the coverage of the FAAct and Congress' grant of exclusive jurisdiction over aviation to the FAA is aviation safety. 49 U.S.C. § 40101(a)(1).

40.     Under the FAAct, the United States government has asserted that it possesses and exercises complete and exclusive national sovereignty in the airspace of the United States. 49 U.S.C. § 40103(a)(1).

41.     As part of its exclusive jurisdiction over the airspace of the United States, aviation safety, airports and airport movements, the FAA regulates the length, placement, lighting, signage and surface composition of airport runways. The FAA does this in a number of ways, including the promulgation of a wide array of advisory circulars, manuals and regulations, including those found at Title 14 of the Code of Federal Regulations ("CFR").

8

**JA18**

42.     The FAAct and rules and regulations promulgated pursuant to it are not subject to usurpation or supplementation by state laws.

## B.   The Airline Deregulation Act

43.     In 1978, in order to further consolidate federal regulation of commercial aviation, Congress enacted the Airline Deregulation Act (Pub. L. No. 95-504, 92 Stat. 1705 (1978)) (codified at Title 49 of the United States Code) (the "ADA").

44.     The ADA expanded federal control of those airport operations which affect the price, routes and service within the national network of air carriers.

45.     The ADA declares that "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1).

46.      The ADA is not subject to usurpation or supplementation by state laws.

### The Airport and Airways Improvement Act

47.     In 1982, Congress enacted the Airport and Airways Improvement Act (Pub. L. No. 97-248, 96 Stat. 671 (1982)) (codified at 49 U.S.C. §§ 47101–47533) (the "AAIA") with the purpose of accelerating the upgrading of airports.

48.     The AAIA declares that the airport owner or operator may not make or allow any alteration in the airport or any of its facilities if the alteration does not comply with the approved ALP.

9

**JA19**

49.     The AAIA declares that "airport construction and improvement projects that increase the capacity of facilities . . . be undertaken to the maximum feasible extent so that safety and efficiency increase and delays decrease."  49 U.S.C. § 47101(a)(7).

50.     The AAIA declares that "artificial restriction on airport capacity" is not in the public interest and should not be tolerated.  49 U.S.C. § 47101(a)(9).

51.     The AAIA is not subject to usurpation or supplementation by state laws.

<u>**COUNT ONE – DECLARATORY JUDGMENT**</u>
(against the State of Connecticut)

52.     The Authority incorporates the allegations in paragraphs 1 through 51 of this Complaint as if fully set forth herein.

53.     This is a claim for declaratory relief pursuant to the Declaratory Judgment Act, 29 U.S.C. § 2201 *et seq*.

54.     Article VI, clause 2 of the United States Constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

55.     The FAAct, ADA and AAIA embody and provide overwhelming evidence of Congressional intent to prohibit the exercise of state or local regulation of aviation, airport layout plans, airport safety and airport service capacity, including, but not limited to, the length of airport runways.

**JA20**

56.     Runway length is a critical and federally regulated component of aviation safety and airport service capacity.

57.     By restricting the length of Runway 2/20, Connecticut General Statutes § 15-120j(c) attempts to regulate aviation safety and the service capacity at the Airport, a field occupied by the United States Government.

58.     Connecticut General Statutes § 15-120j(c) imposes restrictions that make it impossible for the Authority to comply with federal law, including, but not limited to, the FAAct, ADA and AAIA.

59.     Connecticut General Statutes § 15-120j(c) frustrates the essential federal purpose of the FAAct, ADA and AAIA.

60.     Connecticut General Statutes § 15-120j(c) impermissibly usurps the FAAct, ADA, AAIA and other applicable federal regulations by attempting to regulate the length of Runway 2/20.

61.     Accordingly, Connecticut General Statutes § 15-120j(c) is in actual conflict with the Airport's Project and with federal regulations pertaining to aviation, airport layout plans, air safety and the service capacity of airports, including, but not limited to, the FAAct, ADA and AAIA, and violates the Supremacy Clause of the United States Constitution because it impermissibly regulates areas within the exclusive jurisdiction of the federal government.  Thus, an actual justiciable controversy exists which may be determined by a declaratory judgment of this Court.

62.     Any enforcement of Connecticut General Statutes § 15-120j(c) is an illegal usurpation of federal jurisdiction in violation of the Supremacy Clause, Art. VI, cl. 2, of the United States Constitution.

63.     There is no other procedure or remedy or action by which the parties may seek appropriate relief and resolution of the disputed issue.

64.     The Authority therefore asks the Court for an Order declaring that Connecticut General Statutes § 15-120j(c) violates the Supremacy Clause of the United States Constitution.

### RELIEF SOUGHT

WHEREFORE, Plaintiff respectfully requests the following relief:

That the Court issue an Order declaring:

   a.   that Connecticut General Statutes § 15-120j(c) violates the Supremacy Clause of the United States Constitution and is therefore unconstitutional and invalid; and

   b.   Such further relief as the Court deems just in law and equity.

Dated in New Haven, Connecticut, this 24th day of November, 2015.

                        PLAINTIFF,
                        TWEED-NEW HAVEN AIRPORT AUTHORITY


                        By:_____
                            JOHN C. KING (ct09570)
                            HUGH I. MANKE (ct05250)
                            CHRISTOPHER A. KLEPPS (ct29463)
                            UPDIKE, KELLY & SPELLACY, P.C.
                            100 Pearl Street
                            Hartford, CT  06123
                            Tel. No. (860) 548-2600
                            jking@uks.com
                            hmanke@uks.com
                            cklepps@uks.com

12

**JA22**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TWEED-NEW HAVEN AIRPORT       :
        *Plaintiff*       :       CASE NO:   3:15cv01731 (VLB)
               :
    v.       :
               :
GEORGE JEPSEN, in his official capacity       :
As Attorney General for the State of       :
Connecticut       :
        *Defendant*       :       FEBRUARY 5, 2016

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES

    **1-2.**   Admitted.

    **3.**     Denied.  Defendant disputes the Court's subject matter jurisdiction over Plaintiff's claims as they are barred by the Eleventh Amendment to the United States Constitution.

    **4.**     Should the Court have subject matter jurisdiction over Plaintiff's claims, Defendant admits that venue is proper.

    **5.**     As to that portion of Paragraph 5 of Plaintiff's Complaint alleging that "Plaintiff, Tweed-New Haven Airport Authority is a public instrumentality and political subdivision of the State of Connecticut, pursuant to Connecticut General Statutes § 15-120i, et seq., and is located at 155 Burr Street in New Haven, Connecticut," it is admitted.  Defendant denies that Plaintiff has standing or capacity to challenge the constitutionality of Conn. Gen. Stat. § 15-120j(c).

    **6.**     Admitted.

**JA23**

7-11.  Paragraphs 7-12 of Plaintiff's Complaint state propositions of law and do not require a response.

12.    As to that portion of Paragraph 12 of Plaintiff's Complaint alleging that "[t]he Authority is the Airport sponsor for purposes of Federal Aviation Administration (the 'FAA') funding and oversight," Defendant is without sufficient information upon which to form a belief and leaves Plaintiff to its proof.  As to the remaining allegations contained in Paragraph 12, they are admitted.

13-21. As to the allegations contained in Paragraphs 13-21 in Plaintiff's Complaint, Defendant is without sufficient information upon which to form a belief and leaves Plaintiff to its proof.

22.    Admitted.

23.    Denied.

24-34. As to the allegations contained in Paragraphs 24-30 in Plaintiff's Complaint, Defendant is without sufficient information upon which to form a belief and leaves Plaintiff to its proof.

35.    Denied.

36-41. Paragraphs 36-42 in Plaintiff's Complaint state propositions of law and do not require a response.

42.    Defendant is without sufficient information upon which to form a belief and leaves Plaintiff to its proof.

43-46. Admitted.

47-50. Paragraphs 47-50 in Plaintiff's Complaint state propositions of law and do not require a response.

51.     Defendant is without sufficient information upon which to form a belief and leaves Plaintiff to its proof.

COUNT ONE – DECLARATORY JUDGMENT

52.     Defendant incorporates its answers to the allegations contained in Paragraphs 1-51 of Plaintiff's Complaint as if fully set forth herein.

53.     Admitted.

54.     Paragraphs 54 in Plaintiff's Complaint states a proposition of law and does not require a response.

55-57. Defendant is without sufficient information upon which to form a belief and leaves Plaintiff to its proof.

58.     Denied.

59.     Denied.

60.     Denied.

62.     Denied.

63.     Defendant is without sufficient information upon which to form a belief and leaves Plaintiff to its proof.

64.     Denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The Court lacks subject matter jurisdiction over Plaintiff's claims because they are barred by the Eleventh Amendment to the United States Constitution.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff lacks standing or capacity to challenge the constitutionality of Conn. Gen. Stat. § 15-120j(c).

DEFENDANT
GEORGE JEPSEN,
in his official capacity as Attorney
General for the State of Connecticut

GEORGE JEPSEN
ATTORNEY GENERAL

BY: _____
Drew S. Graham
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
Tel:  (860) 808-5090
Fax:  (860) 808-5384
Federal Bar No.  ct16741
E-mail:  drew.graham@ct.gov

## CERTIFICATION

I hereby certify that a copy of the foregoing Answer was sent by certified mail to the following on this 5th day of February, 2016:

John C. King, Esq.
Hugh I. Manke, Esq.
Christopher A. Klepps, Esq.
Updike, Kelly & Spellacy, P.C.
100 Pearl Street
Hartford, CT 06123
P: (860) 548-2600
jking@uks.com
hmanke@uks.com
cklepps@uks.com

Drew S. Graham
Assistant Attorney General

JA27

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
TWEED-NEW HAVEN AIRPORT      :
AUTHORITY,                   :
                             :
    Plaintiff,               :
                             :
v.                           : CASE NO. 3:15cv01731 (RAR)
                             :
GEORGE JEPSEN, IN HIS        :
OFFICIAL CAPACITY AS ATTORNEY :
GENERAL FOR THE STATE OF     :
CONNECTICUT                  :
                             :
    Defendant.               :
```

<u>**RULING ON DEFENDANT'S MOTION TO DISMISS**</u>

Plaintiff, Tweed-New Haven Airport Authority, brings this action seeking declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* (Dkt. # 1). Defendant, State of Connecticut Attorney General George Jepsen, in his official capacity, moves to dismiss the action for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, and failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6). (Dkt. # 39). For the following reasons, defendant's motion to dismiss is denied.

<u>**FACTUAL BACKGROUND**</u>

The following facts are taken from plaintiff's Complaint for Declaratory Relief ("complaint"), and are presumed true for

1

**JA28**

the purposes of the pending motion.  Plaintiff, Tweed-New Haven
Airport Authority ("Tweed") is a public instrumentality and
political subdivision of the State of Connecticut, pursuant to
Connecticut General Statutes § 15-120i, et seq.  (Dkt. # 1, at ¶
5).  The City of New Haven owns the Airport property and leases
it to the Airport Authority.  (Id., at ¶ 12).  The Airport is
situated in both East Haven and New Haven.  (Id., at ¶ 13).  The
Airport's main runway runs north/south and is referred to as
"Runway 2/20."  (Id., at ¶ 13).  The runway is approximately
5,600 linear feet, with Runway 2 at the South end and Runway 20
at the North end.  (Id., at ¶¶ 13, 19).

The Airport is among the public use airports included in
the National Plan of Integrated Airport Systems.  (Id., at ¶
14).  The Airport is classified by the Federal Aviation
Administration ("FAA") as a primary commercial service airport
and it holds a Part 139 certification to provide regularly
scheduled passenger air service.  (Id., at ¶ 14).  The Airport
Authority has accepted tens of millions of dollars in grants
from the FAA for construction and maintenance of facilities, the
acceptance of which requires compliance with a long list of
federal statutes and regulations.  (Id., at ¶¶ 15, 16).

The Airport consists of numerous structures, including an
airport terminal, an administration building, hangars and
offices leased to a fixed base operator, an air rescue and fire

2

**JA29**

safety facility, a control tower, and two runways with related taxiways.  (Id., at ¶ 17).  All of these structures are part of the Airport Layout Plan ("ALP"), and any modifications of the ALP require the approval of the FAA.  (Id., at ¶ 18).  The FAA requires that each airport with a 139 certification develop a Master Plan.  (Id., at ¶ 20).  Tweed has a Master Plan for the Airport, which identifies future improvements for the Airport, and which was approved by the State of Connecticut and by the FAA in 2002.  (Id., at ¶¶ 20, 21).

In 2009, the State of Connecticut, through Public Act 09-7, amended Connecticut General Statutes § 15-120j by adding subsection (c), which provides: "[n]otwithstanding the provisions of subsections (a) and (b) of this section, Runway 2/20 of the airport shall not exceed the existing paved runway length of five thousand six hundred linear feet."  (Id., at ¶ 22).  The current length of Runway 2/20, at 5,600 linear square feet, "remains too short for almost all commercial aircraft to operate regularly scheduled service in a safe and commercially reasonable manner."  (Id., at ¶ 24).

Currently scheduled commercial service at the Airport is provided by a single type of aircraft, and the Authority understands that this type of aircraft will be phased out in the near future and replaced with an aircraft that will require a longer runway than the current Runway 2/20.  (Id., at ¶ 26).

3

**JA30**

Thus, "regularly scheduled service at the airport is not only jeopardized at the moment but also may be terminated in the future if the length of Runway 2/20 is not extended." (<u>Id.</u>, at ¶ 26).

Numerous airlines have notified the plaintiff that they would like to bring regularly scheduled service to the Airport, but that they cannot do so until Runway 2/20 is lengthened. (<u>Id.</u>, at ¶ 28).  The Airport has not attracted any new commercial carriers since 2009 and service remains low.  (<u>Id.</u>, at ¶ 29).  The length of Runway 2/20 is a "key factor" in both of these circumstances.  <u>Id.</u>

The Authority has started planning a runway extension project to increase the functional length of Runway 2/20, including using private funds to hire a consulting engineering firm to conduct a preliminary Environmental Assessment.  (<u>Id.</u>, at ¶ 32).  However, the FAA has refused to provide funding for the project or to review the alternative layouts presented in the preliminary Environmental Assessment while there is a state law that limits the length of Runway 2/20.  (<u>Id.</u>, at ¶ 33).

Plaintiff alleges that "[b]y restricting the length of Runway 2/20, Connecticut General Statutes §15-120j(c) attempts to regulate aviation safety and the service capacity at the Airport, a field occupied by the United States Government." (<u>Id.</u>, at ¶ 57).  Plaintiff adds that "[a]ny enforcement of

4

**JA31**

Connecticut General Statutes §15-120j(c) is an illegal usurpation of federal jurisdiction in violation of the Supremacy Clause, Art. VI, cl. 2, of the United States Constitution. (Id., at ¶ 62).

## LEGAL STANDARD

A Rule 12(b)(1) motion seeks dismissal for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). "When considering a motion to dismiss for lack of subject matter jurisdiction . . ., a court must accept as true all material factual allegations in the complaint. Shipping Fin. Servs. Corp v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998). However, "[t]he burden of proving jurisdiction is on the party asserting it." Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996).

Specifically, "[t]he party asserting subject matter jurisdiction has the burden of proving, by a preponderance of the evidence, that the court has subject matter jurisdiction." Augienello v. F.D.I.C., 310 F. Supp. 2d 582, 587–88 (S.D.N.Y. 2004). On a Rule 12(b)(1) motion, "the court may resolve disputed jurisdictional factual issues by reference to evidence outside the pleadings." Id. at 588.

A Rule 12(b)(6) motion seeks dismissal for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). "When considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all factual allegations in the

5

**JA32**

complaint and draws inferences from these allegations in the light most favorable to the plaintiff." Kinney v. Connecticut, 622 F. Supp. 2d 1, 5 (D. Conn. 2009)(citations omitted). "Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted." Id.

## DISCUSSION

### A.   Article III Standing

The defendant argues in its reply brief that the plaintiff fails to satisfy traditional Article III standing requirements because it fails to allege a non-hypothetical injury. (Dkt. # 45 at 4-6).

Article III, § 2 of the United States Constitution restricts federal courts to deciding "'Cases' and 'Controversies.'" Lujan v. Defs. of Wildlife, 504 U.S. 555, 559 (1992). The "case-or-controversy requirement is satisfied only where a plaintiff has standing." Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 273 (2008). "Three elements comprise the 'irreducible constitutional minimum' of standing: (1) the plaintiff must have suffered an injury-in-fact—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the challenged conduct; and (3) it must be

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev., 651 F.3d 218, 228 (2d Cir. 2011), aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 133 S. Ct. 2321, 186 L. Ed. 2d 398 (2013).

"The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan, 504 U.S. at 561. However, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Id.

In arguing that the plaintiff fails to satisfy the elements of Article III standing, the defendant focuses specifically on the injury in fact requirement. See Dkt. # 45 at 4-5.  In support of its argument, the defendant cites Benjamin v. Malcolm, 803 F.2d 46 (2d Cir. 1986), in which detainees claimed that overcrowded prison conditions in a detention facility operated by the City of New York violated their constitutional rights.  The Court found that the City had standing because it faced a "direct injury."  Id. at 54.  The Court noted that the City would face contempt sanctions for noncompliance with an existing court order, the City also would be forced to spend

7

**JA34**

millions of dollars for additional prison space, and faced the
threat of a major riot at the detention facility due to the
overcrowded conditions.  Id.

The defendant also cites Rogers v. Brockette, 588 F.2d
1057, 1059 (5th Cir. 1979) and Branson Sch. Dist. RE-82 v.
Romer, 161 F.3d 619 (10th Cir. 1998), in support of the
proposition that an injury in fact cannot be hypothetical.  In
Rogers, 588 F.2d at 1057, a school district brought an action
against the state and others challenging the constitutionality
of a state statute which required certain school districts to
participate in subsidized breakfast program.  In determining
whether the plaintiffs satisfied Article III standing, the Fifth
Circuit stated that a federal court may not resolve
'hypothetical or contingent questions.'"  Id. at 1063.

In Branson, 161 F.3d at 630, the Tenth Circuit held that
three Colorado school districts had standing to challenge an
amendment to the Colorado Constitution which altered the terms
of the trust in which Colorado places school land for the
benefit of public schools.  Plaintiff alleged that the revisions
injected a series of conflicting interests into the management
of the school lands trust.  The court held that the school
districts had alleged a "sufficient actual and particularized
injury to their legal interests."  Id. at 631.

The Court finds, contrary to the defendant's argument, that Tweed has demonstrated a direct injury that is both actual and imminent.  During oral argument, the plaintiff asserted that it had a judicially cognizable injury and cited a variety of examples, including chronically low service levels, specific lost business opportunities, and an inability to comply with federal grant requirements. (*See* also Dkt. # 1, ¶¶ 28-31).  Thus, the Court finds that the plaintiff has alleged a concrete and direct injury, including the current and future loss of business and an inability to comply with federal grant requirements.  The plaintiff has also shown that this injury is both actual and imminent, because the plaintiff is already experiencing its effects.  As a result, the Court finds that the plaintiff has satisfied its burden of establishing Article III standing.

### B. Eleventh Amendment Immunity

The defendant argues that the Court lacks subject matter jurisdiction over this lawsuit under the Eleventh Amendment of the United States Constitution and the principles of sovereign immunity. In this respect, the defendant argues that the plaintiff's claim does not fall within one of the exceptions to sovereign immunity.  (Dkt. # 40 at 6-13).  The plaintiff responds that it's claim falls under the Ex parte Young exception to the Eleventh Amendment.  (Dkt # 44 at 4-10).

The principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III of the Constitution.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984).  Under the Eleventh Amendment, a state is immune from suits in federal court brought by its own citizens, and such immunity extends to officers acting on behalf of the state, and to state agencies.  *See* Deadwiley v. New York State Office of Children & Family Servs., 97 F. Supp. 3d 110, 115 (E.D.N.Y. 2015).  There are only three exceptions to this rule: (1) a state may waive its Eleventh Amendment defense; (2) Congress may abrogate the sovereign immunity of the states by acting pursuant to a grant of Constitutional authority; or (3) under the doctrine of Ex Parte Young, 209 U.S. 123 (1908), the Eleventh Amendment does not bar a suit against a state official when the suit seeks relief that is properly characterized as prospective.  Deadwiley, 97 F. Supp. 3d at 115.  "A plaintiff may use Ex Parte Young to seek injunctive or declaratory relief, but the relief must address an ongoing or threatened violation of federal law and be prospective only."  Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n, 632 F. Supp. 2d 185, 187 (D. Conn. 2009) (citations omitted); *see also* Friends of the East Hampton Airport, Inc. v. Town of East Hampton, 841 F.3d 133, 144 (2d Cir. 2016).

JA37

The doctrine of Ex Parte Young "ensures that state officials do not employ the Eleventh Amendment as a means of avoiding compliance with federal law" and it is "regarded as carving out a necessary exception to Eleventh Amendment immunity." Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993).  Thus, "[r]ather than defining the nature of Eleventh Amendment immunity, Young and its progeny render the Amendment wholly inapplicable to a certain class of suits." Id.  In determining whether plaintiff's claim falls under the Ex parte Young exception, the Court "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 645 (2002).[1]

Plaintiff asserts that its claim "fits squarely within the Ex Parte Young exception," because it alleges that Connecticut General Statutes § 15-120j(c) violates the Supremacy Clause of the United States Constitution by impermissibly regulating areas within the exclusive jurisdiction of the federal government.

---

[1] The Court does not address the defendant's arguments regarding whether the State waived its Eleventh Amendment immunity or whether Congress abrogated the sovereign immunity of the state by acting pursuant to a grant of Constitutional authority, because the plaintiff makes no such claims.  The plaintiff argues solely that its claim falls under the Ex parte Young exception to sovereign immunity.

(Dkt. # 44 at 6).  Plaintiff also asserts that it does not seek money damages or any other type of retroactive relief, but instead seeks prospective relief.  (Dkt. # 44 at 7).

Citing Goodspeed, 632 F. Supp. 2d at 187 (D. Conn. 2009), the defendant argues that plaintiff's claim does not address an ongoing or threatened violation of federal law.  More specifically, the defendant argues that Tweed has not alleged that the state has threatened or is about to commence an enforcement action against it.  (Dkt. # 45 at 3).

In Goodspeed, the plaintiff airport had inland wetlands on its property.  The plaintiff wanted to remove or cut down trees that were within 75 feet of the wetlands because it believed that the trees were obstructions to navigable airspace as defined by federal regulations promulgated under the Federal Aviation Act.  The plaintiff had the option of requesting a permit from the East Haddam Inland Wetlands and Watercourses Commission ("IWWC") but the plaintiff did not want to risk a potential adverse decision by submitting to that process. Therefore, the plaintiff brought an action against the IWWC and the Commissioner of the Connecticut Department of Environmental Protection for a declaration that the Connecticut Inland Wetlands and Watercourses Act ("IWWA") and the Connecticut Environmental Protection Act ("CEPA") were preempted by federal aviation law.  The district court granted the Commissioner's

motion to dismiss on the basis of the Eleventh Amendment,
because the plaintiff "failed to allege that the Commissioner
[was] involved in an ongoing violation of federal law or [had]
threatened an enforcement action . . . ." Id. at 188.

Specifically, the district court in Goodspeed dismissed the
case as to the Commissioner because the Commissioner explicitly
stated that she had no plans to bring suit: "Unlike the IWWC,
which has represented to the Court that it would take action
against Goodspeed if it proceeded to cut or remove trees in or
near the inland wetlands without a permit . . . the Commissioner
has threatened no such action . . . ." Id. at 188. Indeed, as
the court noted, the Commissioner had consistently maintained
that it would evaluate the plaintiff's actions and determine
whether an enforcement action was even appropriate after the
plaintiff trimmed or cut down the trees, based on the extent of
the trimming and the location of the trees. The court further
noted that the plaintiff had previously trimmed trees on its
property without the Commissioner taking any action. Id.

The Court finds that Goodspeed is distinguishable from the
present case. The defendant in the present case is more akin to
the IWCC, which was not dismissed on Eleventh Amendment grounds,
than it is to the Commissioner in Goodspeed, who was dismissed.
The defendant in the current case, like the IWCC, has at least

13

**JA40**

implied that it will bring suit if Tweed violates Connecticut General Statutes § 15-120j.

The defendant has given no indication that it does not intend to bring suit. Despite the fact that this case has been pending since November of 2015, when the defendant was asked during oral argument if it would bring suit if the plaintiff violated Connecticut General Statutes § 15-120j, the defendant responded that it did not know.  Connecticut General Statutes § 15-120j was amended to specifically restrict the runway length of Airport 2/20.  (Dkt. # 1 at 22).  It seems counterintuitive that the legislature would make such a specific and exacting statutory change if the state did not intend to enforce it. Therefore, the Court disagrees that plaintiff's allegations "are as conjectural as those alleged in Goodspeed."  (Dkt. # 45 at 3).

Additionally, the defendant argues that the plaintiff fails to allege a "substantial and nonfrivolous" violation of federal law.  (Dkt. # 45 at 2).  The plaintiff alleges that Connecticut General Statutes is preempted by the Federal Aviation Act ("FAAct"), the Airline Deregulation Act ("ADA"), and the Airline and Airways Improvement Act ("AAIA").  (Dkt. # 44 at 2).  The Court finds, as discussed in greater detail in Section D of the Court's decision, that Connecticut General Statutes § 15-120j is at least impliedly preempted by the FAAct, because Congress

14

**JA41**

intended to fully occupy the field of airline safety.  (See Dkt. # 1 at 8).  Therefore, the plaintiff's alleged violation of federal law is not frivolous.

Thus, the Court finds that the plaintiff satisfies the requirements of the Ex Parte Young doctrine by alleging an ongoing or threatened violation of federal law and relief that is properly characterized as prospective.

### C.   Political Subdivision

Defendant argues that the plaintiff, as a political subdivision of the state, lacks standing to sue the state. (Dkt. # 40 at 13).  In response, plaintiff argues that despite its status as a political subdivision, "[t]he prohibition on a political subdivision's ability to sue the state does not apply to Supremacy Clause challenges which seek to vindicate the "collective" or "structural" protections afforded by the Supremacy Clause.  (Dkt.  44 at 10).

The defendant cites a variety of cases in support of the proposition that a political subdivision of the state lacks standing to sue that state.  (Dkt. # 40 at 13-16).  In City of Trenton v. New Jersey, 262 U.S. 182, 192 (1923), the Court found that political subdivisions constituted mere creatures of the state, and held that the city could not invoke the Fourteenth Amendment Due Process Clause to prevent New Jersey from enforcing a state law which imposed licensing fees for diverting

water from the Delaware River.  In <u>Williams v. Mayor</u>, 289 U.S. 36, 38-40 (1933), the Court held that two cities could not invoke the Fourteenth Amendment Equal Protection Clause to prevent Maryland from exempting a railroad from all local taxes.

The defendant suggests that the Second Circuit has "adopted a *per se* rule that political subdivisions lack standing to sue their creator states," citing <u>Aguayo v. Richardson</u>, 473 F.2d 1090 (2d Cir. 1973), in which the Second Circuit held that the city lacked standing to assert constitutional claims related to individual liberties.  (Dkt. # 40 at 14).  The defendant also cites <u>New York v. Richardson</u>, 473 F.2d 923 (2d Cir. 1973), in which the Second Circuit held that political subdivisions could not challenge a state statute under the Fourteenth Amendment. Finally, the defendant cites <u>Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank</u>, 136 F.3d 1360 (9th Cir. 1998), in which the Ninth Circuit held that a political subdivision lacked standing to sue its parent state based on a Supremacy Clause claim.

The plaintiff attempts to distinguish all of these cases by arguing that these cases only address a political subdivision's ability to seek redress through the Contract Clause and the Fourteenth Amendment, and that they say nothing about plaintiff's standing to bring a claim under the Supremacy Clause.  The plaintiff asserts that the Second Circuit has not

established a *per se* rule that political subdivisions lack standing to sue a state, but that the Second Circuit has merely "reached the unremarkable conclusion that a political subdivision lacks standing to bring a Fourteenth Amendment claim against the state." (Dkt. # 44 at 13). The plaintiff states that the Supreme Court has never held that a political subdivision lacks standing to bring a Supremacy Clause claim against the state in reference to an unconstitutional state statute. (Dkt. # 44 at 11).

The plaintiff notes that the Fifth, Tenth and Eleventh Circuits allow political subdivisions to maintain Supremacy clause claims against their parent states. (Dkt. # 44 at 14). The plaintiff argues that the Ninth Circuit's treatment of this issue is the "outlier not the rule," in that the Ninth Circuit is the only Circuit to bar Supremacy Clause challenges. (Dkt. # 44 at 18).

During oral argument, both parties conceded that there is no case directly on point in the Second Circuit. Nonetheless, the Court is persuaded by the plaintiff's arguments. Since the defendant fails to cite any Second Circuit cases supporting the premise that a political subdivision lacks standing to sue its parent state based upon a Supremacy Clause claim, and the Supreme Court has not ruled directly on the issue and has certainly not adopted a *per se* rule on the issue, the Court is

**JA44**

not convinced that the plaintiff lacks standing to sue the state based upon its status as a political subdivision.[2]

D.   **Preemption**

Finally, defendant claims that plaintiff has failed to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because Connecticut General Statutes § 15-120j(c) is not preempted by FAAct, the ADA, or the AAIA.  (Dkt. # 40 at 16).  Plaintiff responds that it has adequately pled that the Statute is preempted by one or more of the three federal statutes.  (Dkt. # 44 at 20).  During oral argument the parties conceded that if the Court finds that §15-120j(c) is preempted by any one of the three federal statutes, the defendant's motion to dismiss should be denied.

"It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." Hillsborough Cty., Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 712 (1985) (citations omitted).  "Federal preemption of state law can be express or implied."  Goodspeed Airport LLC v.

---

[2] *See* Josh Bendor, Municipal Constitutional Rights: A New Approach, 31 Yale L. & Pol'y Rev. 389 (2013), suggesting that the Supremacy Clause properly constrains state power over municipalities.

E. Haddam Inland Wetlands & Watercourses Comm'n, 634 F.3d 206, 209 (2d Cir. 2011) (citations omitted).

"In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, 'where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." New York SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010). "The key to the preemption inquiry is the intent of Congress." Id.

The plaintiff alleges that §15-120j(c) is impliedly preempted by the FAAct because the FAAct regulates the entire field of airline safety and also because §15-120j(c) impedes the FAAct's objectives. (Dkt. # 44 at 21). Thus the plaintiff alleges field preemption and conflict preemption, both of which are types of implied preemption. (Dkt. # 44 at 26).[3]

Plaintiff argues that Congress occupies and regulates the entire field of airline safety, citing to a recent case in which it made similar allegations against the Town of East Haven. In

---

[3] The plaintiff does not argue that the FAAct expressly preempts §15-120j(c), so the Court will limit its discussion to implied preemption.

Tweed-New Haven Airport Auth. v. Town of East Haven, Conn., 582
F. Supp. 2d 261 (D. Conn. 2008), Tweed-New Haven Airport
Authority brought an action against the Town of East Haven,
seeking a declaratory judgment that the Town's regulations,
which interfered with the Airport's "runway project," were
preempted by federal law.

The district court found that "Congress intended to occupy
and regulate the field of airline safety." Id. The Court held
that the FAAct impliedly preempted the East Haven defendants'
regulations because "Congress intended to regulate, i.e., to
fully occupy the field of airline safety within which field the
Runway Project lies." Id. at 267. In reaching its conclusion,
the Court quoted relevant parts of the FAAct:

> Under the FAAct, "the United States has asserted that it
> possesses and exercises 'complete and exclusive national
> sovereignty in the airspace of the United States.'"
> United States v. City of New Haven, 447 F.2d 972, 973
> (2d Cir.1971) (quoting the FAAct, 49 U.S.C. § 1508(a),
> as amended 49 U.S.C. § 40103(a)). The FAAct defines
> navigable airspace as "including airspace needed to
> ensure safety in the takeoff and landing of aircraft."
> 49 U.S.C. 40102(32); see also City of New Haven, 447
> F.2d at 973. "This power extends to grounded planes and
> airport runways." Id. (citing 14 C.F.R. §§ 91.123 and
> 139.329). Thus, by the passage of the FAAct, Congress
> intended to occupy the entire field of airline safety,
> including runways.

Id. at 268 (citations omitted). The court's findings in Tweed
New Haven Airport Authority v. Town of East Haven provide strong
support for plaintiff's argument that the FAAct impliedly

preempts Connecticut General Statutes § 15-120j(c).  Section 15-
120j(c) attempts to regulate runway length, which is a component
part of the field of airline safety, and is therefore part of a
field completely occupied by the federal government.

    The plaintiff also alleges that Connecticut General
Statutes § 15-120j(c) is in actual conflict with the FAAct.
(Dkt. # 44 at 26).  The defendant argues that the plaintiff
"alleges insufficient facts from which the Court can infer that
the impossibility of compliance, and therefore conflict
preemption, exists in regard to the FAAct."  (Dkt. # 40 at 27).
The Court agrees.  The plaintiff fails to provide any specific
examples of a direct conflict between a federal law and a state
law.[4]

    The Court finds, considering the facts in the light most
favorable to the plaintiff, that plaintiff's allegations give
rise to the inference that Connecticut General Statutes § 15-
120j(c) is impliedly preempted by the FAAct under a theory of
field preemption.  Accordingly, the Court need not address
whether § 15-120j(c) is preempted by the ADA or the AAIA.

**CONCLUSION**

    For the reasons set forth herein, defendant's motion to
dismiss is DENIED.

---

[4] When asked during oral argument to provide specific examples of a direct
conflict between Connecticut General Statutes § 15-120j(c) and a federal law,
the plaintiff did not provide a direct answer.

**JA48**

SO ORDERED at Hartford, Connecticut, this 9th day of
December, 2016.

_____/s/_____
Robert A. Richardson
United States Magistrate Judge

**JA49**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

-----------------------------------------------------

| | | |
|---|---|---|
| TWEED-NEW HAVEN AIRPORT | : | |
| AUTHORITY | : | CIVIL ACTION NO. 3:15-cv-01731-RAR |
|     Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| GEORGE JEPSEN, in his official | : | |
| capacity as Attorney General for the | : | |
| State of Connecticut | : | MARCH 10, 2017 |
|     Defendant | : | |

-----------------------------------------------------

## JOINT TRIAL MEMORANDUM

The Plaintiff Tweed-New Haven Airport Authority (the "Authority" or "Tweed"),
operator of Tweed-New Haven Regional Airport (the "Airport"), Intervening Plaintiff the
City of New Haven (the "City") and the Defendant Attorney George Jepsen in his Official
Capacity as Attorney General for the State of Connecticut, hereby submit this Joint Trial
Memorandum in advance of trial.

## I.      TRIAL COUNSEL

1. The trial counsel for the Authority are:

John C. King (ct09570)
Hugh I. Manke (ct05250)
Christopher A. Klepps (ct29463)
Updike, Kelly & Spellacy, P.C.
100 Pearl Street
Hartford, CT 06123
Tel. No. (860) 548-2600
Fax No. (860) 548-2680
jking@uks.com
hmanke@uks.com
cklepps@uks.com

1501650

**JA50**

2.  Trial counsel for the City of New Haven is:

John Rose, Jr. (ct04228)
Corporation Counsel
City of New Haven
165 Church Street / 4th Floor
New Haven, CT 06510
Tel. No. (203) 946-7951
Fax No. (203) 946-7942
jrose@newhavenct.gov

3.  Trial counsel for the Defendant is:

Drew S. Graham (ct16741)
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
Tel. No. (860) 808-5090
Fax No. (860) 808-5384
drew.graham@ct.gov

## II.   STIPULATIONS OF FACT

The parties certify that they have made a good-faith attempt to determine whether there are any material facts that are not in dispute.  The parties state that the following material facts are undisputed:

1.      The Authority is a public instrumentality and political subdivision of the State of Connecticut, pursuant to Connecticut General Statutes § 15-120i, et seq., and is located at 155 Burr Street in New Haven, Connecticut.

2.      On July 1, 1997, the Connecticut General Assembly created the Authority by Public Act 97-271, which was signed into law by Governor John Rowland on June 26, 1997 and codified as Connecticut General Statutes § 15-120i, et seq.

3.      Pursuant to Connecticut General Statutes § 15-120i(a), "[t]here is created a body politic and corporate to be known as the 'Tweed-New Haven Airport Authority'.

2

Said authority shall be a public instrumentality and political subdivision of this state and the exercise by the authority of the powers conferred by sections 15-120g to 15-120o, inclusive, shall be deemed and held to be the performance of an essential public and governmental function.  The Tweed-New Haven Airport Authority shall not be construed to be a department, institution or agency of the state."  Pursuant to Connecticut General Statutes § 15-120j(a)(1), the Authority is a public instrumentality and political subdivision of the State of Connecticut authorized to manage the Airport.

4.      Defendant George Jepsen is the Attorney General for the State of Connecticut.  In his official capacity as Attorney General, Attorney Jepsen has a duty to enforce the laws of the State of Connecticut.

5.      The City of New Haven is a municipal corporation, vested by the laws of the State of Connecticut with the right to sue and be sued.

6.      Tim Larson is the Executive Director of the Tweed-New Haven Airport Authority.  Affidavit of Tim Larson ¶ 3 ("Larson Aff.").  As Executive Director, Mr. Larson supervises the professional management company, AFCO AvPorts Management, LLC ("AvPorts") which operates the Airport under a contract with the Authority.  Mr. Larson also reports to a board of directors comprised of individuals appointed by the mayors of East Haven and New Haven and the South Central Regional Council of Governments. Larson Aff. ¶ 4.

7.      The Airport property is owned by the City of New Haven and leased to the Authority pursuant to the terms of a Lease and Operating Agreement, dated July 1, 1998.  See Lease and Operating Agreement, Exhibit 1; Larson Aff. ¶ 6.

1501650

8.      The airport is located in an environmentally sensitive area, adjacent to coastal wetlands, in a 100-year Flood Plain and partially within residential neighborhoods.  <u>See</u> Redacted Memorandum to the Administrator from Eduardo A. Angeles, Associate Administrator for Airports at the Federal Aviation Administration, and prepared by Gail Lattrell, Community Planner for the Federal Aviation Administration, dated January 22, 2015, Exhibit B.

9.      The length of Runway 2/20 is currently approximately 5,600 linear feet. In 2009, the State of Connecticut (the "State"), through Public Act 09-7, amended Connecticut General Statutes § 15-120j by adding subsection (c) which provides: "Notwithstanding the provisions of subsections (a) and (b) of this section, Runway 2/20 of the airport shall not exceed the existing paved runway length of five thousand six hundred linear feet."  Larson Aff. ¶ 7.

10.     The Airport is among the public-use airports included in the National Plan of Integrated Airport Systems.  <u>See</u> National Plan of Integrated Airport Systems 2007-2011, Appendix A, Exhibit 2; Larson Aff. ¶ 8.

11.     The Airport is situated in both the Town of East Haven and the City of New Haven.  The municipal boundary runs approximately North/South down the center of Runway 2/20, with East Haven to the East, and New Haven to the West.  <u>See</u> The Tweed-New Haven Airport Layout Plan, Exhibit 3; Larson Aff. ¶ 9.

12.     The Airport consists of numerous structures, including an airport terminal building and an air-rescue and fire-safety facility, Runway 2/20, which runs essentially North/South on the site, crosswind Runway 14/32, which runs Northwest/Southeast, and a number of taxiways.  <u>See</u> Aerial Photograph of Airport, Exhibit 4; Larson Aff. ¶ 10.

1501650

13.     All of these structures are within the Airport's boundaries and are part of the Airport Layout Plan (the "ALP").  The ALP is approved by the FAA which maintains full control over any modifications to the ALP, including limitations on runway length. See 49 U.S.C. § 47107; The Tweed-New Haven Airport Layout Plan, Exhibit 3; Larson Aff. ¶¶ 11, 23.

14.     The Airport is classified by the United States Department of Transportation Federal Aviation Administration ("FAA") as a primary, commercial service airport in that it provides regularly scheduled commercial passenger air service.  Given this classification, the Airport is currently required to, and does, hold an operating certificate under FAA Regulation Part 139 (14 C.F.R. Part 139), which currently requires the Airport to have runway safety areas on its main runway acceptable to the FAA.  Larson Aff. ¶ 12.

15.     The Airport is a certificated airport under 49 U.S.C. § 44706.  14 C.F.R. Part 139 establishes the rules governing the certification and operation of airports serving scheduled passenger-carrying operations of an air carrier operating aircraft configured for more than 9 passenger seats.  As a Part 139 certified airport, the Authority is required to operate and maintain the Airport to specified standards contained in FAA Advisory Circulars.  In addition, as a recipient of federal aid under the FAA Airport Improvement Program ("AIP"), the Airport is obligated to comply with AIP grant assurances which require conformance with the standards in FAA Advisory Circulars.  Affidavit of Charles Kurtz ¶ 5 ("Kurtz Aff."); 14 C.F.R. § 139.1(a)(1).

16.     A Master Plan is required by the FAA for each Part 139 airport like Tweed outlining future plans for upgrading airport facilities.  Tweed has a Master Plan.

1501650

**JA54**

Tweed's updated Master Plan for the Airport was approved by the State and by the FAA in 2002 identifying future capital improvements at the Airport. Extending the length of Runway 2/20 up to 7,200 linear feet has been a part of the Authority's Master Plan since 2002. See The Tweed-New Haven Airport Master Plan, Exhibit 6; Larson Aff. ¶ 13.

17. There is one commercial airline providing service to Tweed from Philadelphia with four scheduled flights per day in each direction and passenger capacity of no more than 37 passengers on each flight. The length of the runway has a direct bearing on the weight load and passenger capacity that can be safely handled on any given flight. Larson Aff. ¶ 14.

18. Since 2009, the Airport has failed to attract a single new scheduled commercial carrier. Service remains low, with fewer than 35,000 enplanements per year. In Tom Reich's experience,[1] and based upon his knowledge of the Authority and the Airport, the length of the runway is a significant factor in the low service levels at the Airport. Affidavit of Tom Reich ¶ 20 ("Reich Aff.").

19. Weight penalties are imposed on aircraft for safety reasons. A longer Runway 2/20 could reduce or potentially eliminate those weight penalties which are imposed on existing flights at the Airport. Larson Aff. ¶ 15.

20. Current scheduled commercial service at the Airport is entirely provided by a single type of aircraft, the Bombardier DH8-100 (the "Dash 8") operated by Piedmont Airlines as American Eagle. Larson Aff. ¶ 16; Reich Aff. ¶ 18.

21. Moreover, Runway 2/20, because of its length, does not allow takeoff of the Dash 8 aircraft at maximum capacity. Generally, the maximum amount of passengers allowed on the Dash 8 for takeoff at the Airport is 33 passengers, despite

---

[1] See Paragraph 46.

1501650

the Dash 8 having capacity for 37 passengers.  However, under certain weather conditions the maximum allowance can occasionally be one or two passengers higher or up to five or more fewer.  Reich Aff. ¶ 19.

22.     Lengthening of Runway 2/20 would allow the Dash 8 and other larger aircrafts to potentially service the Airport, hold more passengers and service additional destinations.  Larson Aff. ¶ 17.

23.     The Authority has commenced planning on a runway extension project to increase the functional length of Runway 2/20 (the "Project"), within the existing boundaries of the Airport and the ALP (as shown on the FAA approved ALP), on land that is currently part of the runway safety areas.  The planning documents describe several alternatives for lengthening Runway 2/20 to up to 6,601 linear feet and modifying related taxiways.  The initial step in the Project is to perform an Environmental Assessment of the various layout and construction options.  The Authority has expended private funds to hire Hoyle, Tanner & Associates, Inc. ("HTA"), a consulting engineering firm, which has produced chapters one through three of an Environmental Assessment ("Preliminary Environmental Assessment").  See Purpose and Need and Alternatives Analysis Runway 2-20 Improvement Project, Exhibit 6; Larson Aff. ¶ 18; Kurtz Aff. ¶ 8; Affidavit of Robert Furey ¶¶ 8–9 ("Furey Aff.").

24.     The Authority proposes to pave a portion of the Runway 2/20 runway safety areas ("RSAs").  This paved section would be considered a runway extension.  See Exhibit B.

1501650

25.     Robert M. Furey is a Senior Vice President at Hoyle, Tanner & Associates, Inc. located at 150 Dow Street, Manchester, New Hampshire 03101.  Furey Aff. ¶ 3.  Mr. Furey is an engineering consultant for the Authority.  Furey Aff. ¶ 4.

26.     Mr. Furey has personal knowledge regarding the Preliminary Environmental Assessment at the Airport and the Environmental Assessment process.  Furey Aff. ¶ 6.

27.     Hoyle, Tanner & Associates, Inc. specializes in airport planning, design and construction administration and has performed engineering work for the Authority since 1999.  Furey Aff. ¶ 5.

28.     Federal review and comment is necessary for any construction project located within the ALP.  One of the initial steps in any such project under the applicable federal regulations is to submit an Environmental Assessment to the Federal Aviation Administration.  Furey Aff. ¶ 7.

29.     At the inception of the Project, Hoyle, Tanner & Associates, Inc. looked at a number of alternatives for lengthening Runway 2/20 ranging from 6,601 linear feet up to 7,000 linear feet.  The ultimate document submitted to the FAA included only runway alternatives that were no longer than 6,601 linear feet.  Furey Aff. ¶ 10.

30.     In 2014, Hoyle, Tanner & Associates, Inc. completed the first three chapters of an Environmental Assessment; see Purpose and Need and Alternatives Analysis Runway 2-20 Improvement Project, Exhibit 6; which describes the constraints on air service caused by the current runway length, the potentially resulting economic instability for the Authority and the alternatives with regard to the runway and taxiways.  Furey Aff. ¶ 12.

1501650

31.     The customary procedure is to submit a Preliminary Environmental Assessment to the FAA for review and comment before drafting the full Environmental Assessment.  Furey Aff. ¶ 13.

32.     The FAA has declined to review and comment on the content of the Preliminary Environmental Assessment for more than two years.  Furey Aff. ¶ 14.

33.     The FAA has not provided funding to the Project and has not reviewed the alternative layouts presented in the Preliminary Environmental Assessment.  FAA review of the Preliminary Environmental Assessment is a necessary step in the Environmental Assessment process.  Larson Aff. ¶ 19.

34.     The FAA is not proceeding with review of the Environmental Assessment in part because the Authority is in violation of several federal grant assurances and regulations.  See Letter from Richard Blumenthal, et al., to Michael P. Huerta, et al., dated December 14, 2014 (Exhibit 9); Letter from Michael P. Huerta, Administrator of the Federal Aviation Administration, to Richard Blumenthal dated April 14, 2015 (Exhibit 10) ("Huerta Letter").

35.     The FAA's decision not to respond to the Authority's request for review of the Preliminary Environmental Assessment is a direct consequence of, inter alia, the existence of the runway length limitation in Connecticut General Statutes §15-120j(c).  Larson Aff. ¶ 21; Huerta Letter.

36.     Whenever the Authority accepts federal funds, it agrees to various grant assurances which, inter alia, require compliance with a long list of federal statutes and regulations directed to airport facilities and operations.  Non-compliance by an airport

1501650

such as Tweed can result in enforcement action by the FAA.  See 49 U.S.C. §§ 47101 et seq.; Larson Aff. ¶ 22.

37.    FAA Advisory Circular 150/5300-13A, Airport Design, establishes criteria for the separation of runways and parallel taxiways.  The runway to taxiway separation distance is a function of the Airport Reference Code.  The FAA approved ALP for the Airport identifies the primary runway, Runway 2/20, as a C-III runway.  The designation C-III includes aircraft with approach speeds of 121 knots or more but less than 141 knots, and wingspans greater than 79 feet but less than 118 feet.  Kurtz Aff. ¶ 6.

38.    The interactive runway design standard matrix (Table 3-5) in FAA Advisory Circular 150/5300-13A specifies that the runway centerline to parallel taxiway centerline for C-III aircraft is 400 feet.  See Table 3-5. Runway Design Standards Matrix, Exhibit 11; Kurtz Aff. ¶ 7.

39.    The current locations and dimensions of the taxiways, which are integral to the aircraft landing and takeoff system, are not in compliance with federal regulations in terms of their distance from Runway 2/20.  This non-standard separation between the taxiway and the runway could be brought into compliance as part of the proposed runway extension project.  Kurtz Aff. ¶ 9; E-mail from John Merck to Diane Jackson dated July 27, 2016, Exhibit 12 ("Merck Memo").

40.    Hoyle, Tanner & Associates, Inc. prepared drawings depicting improvements to Taxiways A, F and G at the Airport.  The primary safety improvement alternative is to extend the runway with a taxiway centerline separation to the required distance of 400 feet, in accordance with FAA Advisory Circular 150/5300-13A, Table 3-5.  This would provide the Airport and FAA with safer runway and taxiway ground

1501650

maneuvering as well as greater separation between active takeoff and landing operations and aircraft which are either holding short or maneuvering adjacent to the runway.  Furey Aff. ¶ 11.

41.    The alternatives identified in the Preliminary Environmental Assessment prepared by HTA include the extension of the parallel taxiway.  A full length parallel taxiway is required for runways with instrument approach procedures with visibility minimums below one mile.  The existing Runway 2/20 Instrument Landing System approach has visibility minimums of 3/4 mile.  Construction of the parallel taxiway at the standard 400 foot runway centerline to taxiway centerline separation would bring the airport into compliance with FAA standards.  Kurtz Aff. ¶ 10.

42.    Although there is no enforcement action pending by the FAA against the Authority due to the non-standard separation between the taxiway and the runway, the FAA has issued notice to the Authority that it is not in compliance with all of the requirements of C.F.R. Part 139, the Airport Certification Manual and the Airport Operating Certificate.  The FAA expects the Authority to achieve the standard 400 foot separation between Taxiway A and Runway 2/20 and the 400 foot separation has been included as an alternative in the Preliminary Environmental Assessment.  See Merck Memo, Exhibit 12; Purpose and Need and Alternatives Analysis Runway 2-20 Improvement Project dated June 2, 2014, Exhibit 6; Kurtz Aff. ¶ 11.

43.    The Airport is not in compliance with FAA design standards due to the non-standard taxiway geometry.  The FAA has given the Authority until May 6, 2021 to redesign and reconstruct its taxiways, including realignment of Taxiway A, to bring the

1501650

Airport into compliance with federal design standards.  See Merck Memo at 1, Exhibit 12.

44.     There is no current or pending FAA enforcement action against the Authority for noncompliance with any FAA safety standard applicable to 49 U.S.C. Part 139 airports or any standard contained in FAA Advisory Circular 150/5300-13A.

45.     Tom Reich, the Director of Air Service Development at AFCO AvPorts Management, LLC, has provided marketing services to the Tweed-New Haven Airport and for other airports around the country.   He was previously employed as a market analyst for Independence Air and as the Manager of Market Planning for Colgan Air's United Express and US Airways Express branded operations.  Reich Aff. ¶¶ 3–5.

46.     Mr. Reich has provided marketing services for the Airport since December 2011.  Reich Aff. ¶ 6.

47.     During the time that he has provided marketing services for the Airport, Mr. Reich has been in close touch with approximately ten different airlines with regard to the possibility of those airlines bringing service to the Airport.  Reich Aff. ¶ 7.

48.     From 2012 through 2016, Mr. Reich attended the Airports Council International – North America JumpStart Air Service Development Conference, where airlines and airport administrators convene annually.  Mr. Reich has met with numerous airline representatives at the JumpStart conferences with regard to the possibility of those airlines bringing service to the Airport, and has remained in steady contact with airline representatives throughout the years, even outside of JumpStart conferences. Reich Aff. ¶ 8.

1501650

49.     In Mr. Reich's experience, there are three primary factors that determine whether or not an airline chooses to provide service to a given destination: (1) market size, (2) equipment performance and (3) economic viability.  Reich Aff. ¶ 9.

50.     One analysis, completed by AvPorts, shows that the South-Central Connecticut market is the largest "catchment area" in the United States in terms of existing passenger demand without nonstop flights to Orlando, Florida.  Reich Aff. ¶ 10; AvPorts Catchment Area Map and Analysis of Domestic Markets for Orlando International Airport for year ended June 30, 2015, Exhibit 9.

51.     Based on Mr. Reich's experience, the overriding issue with respect to an airline choosing to provide service to a new destination is economic viability.  Runway length is an integral part of an airline's economic viability analysis due to the weight restrictions a shorter runway can cause and the resulting limit to the number of passengers that can be carried on the flight.  Reich Aff. ¶ 11.

52.     The lighter an aircraft is, the less runway it needs to get airborne safely. This basic principle of flight is the driving force behind weight restrictions that are placed on aircraft when a runway is not long enough for that aircraft to safely takeoff at its maximum allowable takeoff weight.  Simply put, by carrying less weight, an aircraft needs less runway to takeoff safely.  Lengthening a runway could eliminate safety concerns and could reduce the need for these weight restrictions at a given airport, allowing an aircraft to carry more passengers while increasing profit potential of the flight to an acceptable level for the airline.  Reich Aff. ¶ 12.

53.     In Mr. Reich's experience, weight restrictions can impose economic impediments at airports, such as the Airport, with short runways.  The Airport has the

1501650

13th shortest runway out of 348 airports where commercial service is provided. According to an AvPorts analysis, the 12 airports with shorter runways do not have as large of a catchment area as the Airport.  The Airport has the shortest runway in the nation for catchment areas with 1,000,000 or more people.  Reich Aff. ¶ 13.

54.    Each plane has a designated weight limit for a given runway length. Reich Aff. ¶ 14.

55.    Allegiant Air, LLC has prepared this type of economic analysis for the Airport and has declined to service the Airport because "runway 02/20 is too short for Allegiant to comfortably operate regularly scheduled commercial service."  See Letter from Allegiant Air, LLC to Michael P. Huerta dated December 21, 2015, Exhibit 10.  Mr. Reich has prepared the same kind of analysis for airlines as well.  Reich Aff. ¶ 15

56.    In the deregulated airline world, the FAA cannot require airlines to provide service where it is not profitable for an airline to do so.  Reich Aff. ¶ 16

57.    Over the last five years marketing the Airport, Mr. Reich has been unable to convince a new airline to commence service at Tweed.  Reich Aff. ¶ 17.

58.    Over the past eight years the Authority has been operating the Airport at a loss which has required annual subsidies from the State in the amount of $1,500,000 and from the City in the amount of $325,000.  The subsidy from the State was reduced to $1,480,000 for fiscal year 2016–2017.  Larson Aff. ¶ 24.

59.    Notwithstanding marketing efforts, the Authority has not received a commitment from any airline to provide service at the Airport if the statutory length restriction on Runway 2/20 is removed.

1501650

60.     In 2009, a Memorandum of Agreement ("MOA") was established among the City of New Haven, the Town of East Haven, the Authority and certain members of the General Assembly.  Memorandum of Agreement, Exhibit C.

61.     The MOA limits Runway 2/20 to the existing paved runway length of 5,600 feet.  The MOA also limits daily commercial departures to 30 and annual enplanements to 180,000.  See MOA, Exhibit C.

62.     Section III of the MOA references a bill for adoption in the 2009 Legislative Session that limited the length of the runway, increased the number of members of the Authority's Board of Directors to be appointed by the Town of East Haven and increased the payment in lieu of taxes to the Town of East Haven and City of New Haven related to the Airport property.  Section III also called for additional appropriations for the Authority in the two fiscal year budgets being considered in the 2009 Legislative Session and the defeat of a bill in the 2009 Legislative Session that would have reduced the capital bond commitment of the State to the Airport.  The bill reducing the capital bond authorization was defeated and the restriction on the runway and the change in board membership in the designated bill were adopted, but the payment in lieu of taxes portion of the bill was not adopted and $1.5 million of additional appropriations were approved, whereas the MOA called for $2 million.  The items that were not adopted in the 2009 Legislative Session have not been adopted by subsequent General Assembly action.

63.     Section IV of the MOA provides in pertinent part: "[T]his Agreement may be terminated by written notice by either the City or the Town in the event . . . (c) the

1501650

State of Connecticut fails to enact the Legislative Initiatives contained in Section III of this Agreement in the 2009 Legislative Session."

64.     To date, the City of New Haven has not taken steps to invalidate the MOA. The Authority does not have the power, pursuant to the MOA, to unilaterally terminate the MOA.

65.     The Connecticut Coastal Management Act discourages "the substantial expansion of existing airports within the coastal boundary . . . ."  See Connecticut General Statutes § 22a-92(c)(1)(H); Exhibit B.  As stated in Paragraph 23 of this Joint Stipulation, the planned extension of Runway 2/20 is within the existing boundaries of the Airport and the ALP, on land that is currently part of the runway safety areas.

66.     Two permits from the Connecticut Department of Energy and Environmental Protection ("DEEP") were previously issued to the Authority for the construction of runway safety areas. One, the tidal permit, specifically states: "At no time shall the permittee modify the surfaces of the RSAs including paving."  The second permit, for disturbing wetlands and water quality, requires a modification to the permit from the DEEP if the safety areas are altered.

67.     The FAA has indicated to the Authority that if it wishes to continue with its proposed runway extension project, the Authority[2] must develop a joint action plan with DEEP addressing the agency's concerns identified in the two previously issued permits. See Huerta Letter, Exhibit 8.

---

[2] The parties agree that the reference to "the City of New Haven" in paragraph 3 of the Huerta Letter is incorrect, and that the correct reference should have been to the Authority.

1501650

68.     If General Statutes § 15-120j(c) is removed or invalidated, the Authority intends to file an application seeking DEEP approval to remove the conditions in the permits mentioned above.

69.     Lengthening of Runway 2/20 would require the Authority to ensure that all new approach surfaces are clear for approaching aircraft.  The Authority is currently in the process of ensuring that such surfaces are clear for a 6,601 foot runway.  Larson Aff. ¶ 25.

70.     The normal approval process for a runway extension requires: (a) careful planning, including review of feasible alternatives; (b) proper environmental analysis, consistent with federal regulations; and (c) sufficient funding, including federal, state and/or local sources.

71.     The Airport Improvement Program ("AIP") provides about $3.5 billion annually versus an estimated need of over $40 billion over the next five years. Accordingly, dollars must be allocated to the highest national priorities that are eligible and justified.

72.     The Authority received approximately $24 million from the FAA in 2008 for its runway safety area project and has received over $40 million from the FAA in the past twenty years.  See Exhibit B.

73.     Projects utilizing federal funding must be both eligible and justified at the time of the investment (FAA Order 5100.38D).  In addition, runway extensions must be shown to be cost-effective and justifiable, per Executive Order 12893, *Principles for Federal Infrastructure Investments*.

1501650

## III.    FACTS AND LEGAL ISSUES IN DISPUTE

1.      Whether Connecticut General Statutes § 15-120j(c)'s restriction on the length of Runway 2/20 is preempted, whether expressly or impliedly, by the Federal Aviation Act, codified in Title 49 of the United States Code.

2.      Whether Connecticut General Statutes § 15-120j(c)'s restriction on the length of Runway 2/20 is preempted, whether expressly or impliedly, by the Airline Deregulation Act (Pub. L. No. 95-504, 92 Stat. 1705 (1978)) (codified at Title 49 of the United States Code).

3.      Whether Connecticut General Statutes § 15-120j(c)'s restriction on the length of Runway 2/20 is preempted, whether expressly or impliedly, by the Airport and Airways Improvement Act (Pub. L. No. 97-248, 96 Stat. 671 (1982)) (codified at 49 U.S.C. §§ 47101–47533).

4.      Whether Tweed-New Haven Airport Authority has and will suffer an injury as a result of Connecticut General Statutes § 15-120j(c).

## IV.    EXHIBITS

The parties have stipulated to the following as full exhibits at trial, except for Plaintiff's Exhibit 13.  The parties expressly reserve the right to assert arguments as to the relevancy and the weight to be ascribed to these exhibits.

**Tweed-New Haven Airport Authority's Exhibits:**

1.      Lease and Operating Agreement by and between the City of New Haven and the Tweed-New Haven Airport Authority.

2.      National Plan of Integrated Airport Systems 2017-2021 and Appendix A.

1501650

**JA67**

3.	The Federal Aviation Administration Approval of Airport Layout Plan and Federal Funding of Runway Safety Area and Taxiway Improvements for the Tweed-New Haven Airport dated March 15, 2002.

4.	Aerial Photograph of the Airport.

5.	The Tweed-New Haven Airport Master Plan dated February 2002.

6.	Purpose and Need and Alternatives Analysis Runway 2-20 Improvement Project dated June 2, 2014.

7.	Letter from Richard Blumenthal, et al., to Michael P. Huerta, et al., dated December 14, 2014.

8.	Letter from Michael P. Huerta, Administrator of the Federal Aviation Administration, to Richard Blumenthal dated April 14, 2015.

9.	AvPorts Catchment Area Map and Analysis of Domestic Markets for Orlando International Airport for year ended June 30, 2015.

10.	Letter from Allegiant Air, LLC to Michael P. Huerta dated December 21, 2015.

11.	Table 3-5. Runway Design Standards Matrix from FAA Advisory Circular 150/5300-13A.

12.	E-mail from John Merck, Civil Engineer / Project Manager and Airport Certification Safety Inspector for the Federal Aviation Administration, to Diane Jackson, et al., dated July 27, 2016 and attachments.

13.	Expert Report prepared by John DeCoster, Senior Consultant for Trillion Aviation, dated February 22, 2017 (Identification only).

1501650

**JA68**

**Defendant Attorney George Jepsen's Exhibits**

      A.     Letter from Randall S. Fiertz, Director of Airport Compliance and Field Operations for the Federal Aviation Administration, to Mark Volchek, Chairman of the Tweed-New Haven Airport Authority, dated March 20, 2009.

      B.     Redacted Memorandum to the Administrator from Eduardo A. Angeles, Associate Administrator for Airports at the Federal Aviation Administration, and prepared by Gail Lattrell, Community Planner for the Federal Aviation Administration, dated January 22, 2015.

      C.     Memorandum of Agreement between the City of New Haven, the Town of East Haven, the Tweed-New Haven Airport Authority and certain members of the General Assembly dated March 16, 2009.

**IV.    LIST OF WITNESSES**

      A.     The Authority may call the following fact witnesses at trial:

1.     Tim Larson
       Executive Director
       Tweed-New Haven Airport Authority
       155 Burr Street
       New Haven, Connecticut 06512

2.     Tom Reich
       Director of Air Service Development
       AFCO AvPorts Management, LLC
       45025 Aviation Drive, Suite 100
       Dulles International Airport
       Dulles, VA 20166

1501650

3.      Robert M. Furey
        Senior Vice President
        Hoyle, Tanner & Associates, Inc.
        150 Dow Street, Manchester, NH 03101

4.      Charles Kurtz
        Vice President, Engineering & Development
        AFCO AvPorts Management, LLC
        45025 Aviation Drive
        Suite 100
        Dulles International Airport
        Dulles, VA 20166


        The Authority will call the following expert witness at trial:


1.      John DeCoster
        Senior Vice President
        Trillion Aviation
        4301 W. William Cannon Dr.
        Suite B-150, #293
        Austin, TX 78749


        B.      The City does not intend to call any witnesses at trial.

        C.      The Defendant does not intend to call any witnesses at trial.


## V.      ELECTION FOR TRIAL BY MAGISTRATE


        The parties have consented to this case being tried by the Honorable Robert A.

Richardson, United States Magistrate Judge for the District of Connecticut.


21

Dated: March 10, 2017

RESPECTFULLY SUBMITTED,            DEFENDANT
PLAINTIFF                          GEORGE JEPSEN
TWEED-NEW HAVEN AIRPORT            ATTORNEY GENERAL
AUTHORITY


By: /s/ Christopher A. Klepps
JOHN C. KING (ct09570)            BY: /s/ Drew S. Graham
HUGH I. MANKE (ct05250)               Drew S. Graham
CHRISTOPHER A. KLEPPS (ct29463)       Assistant Attorney General
UPDIKE, KELLY & SPELLACY, P.C.        55 Elm Street
100 Pearl Street                      P.O. Box 120
Hartford, CT  06123                   Hartford, CT 06141-0120
Tel. No. (860) 548-2600               Tel:  (860) 808-5090
Fax No. (860) 548-2680                Fax:  (860) 808-5384
jking@uks.com                         Federal Bar No.  ct16741
hmanke@uks.com                        E-mail:  drew.graham@ct.gov
cklepps@uks.com



INTERVENING PLAINTIFF
CITY OF NEW HAVEN


By: /s/ John Rose, Jr.
John Rose, Jr.
City of New Haven – Office of Corporation Counsel
165 Church Street
New Haven, CT 06510
Tel. No. (203) 946-7951
Fax No. (203) 946-7942
jrose@newhavenct.gov

1501650

**JA71**

**<u>CERTIFICATION</u>**

THIS IS TO CERTIFY that on March 10, 2017, a copy of the foregoing was electronically filed.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  The undersigned did cause to be sent, by U.S. Mail, first-class, postage prepaid, a copy of the foregoing to all counsel and pro-se parties that do not have access to the Court's electronic filing system.


  /s/ Christopher A. Klepps      
Christopher A. Klepps, Esq.
Updike, Kelly & Spellacy, P.C.

1501650

**JA72**

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

---------------------------------------------------------

TWEED-NEW HAVEN AIRPORT  :
AUTHORITY   :    CIVIL ACTION NO. 3:15-cv-01731-RAR
     Plaintiff,   :
                  :
VS.   :
                  :
GEORGE JEPSEN, in his official  :
capacity as Attorney General for the  :
State of Connecticut   :    MARCH 13, 2017
     Defendant   :

---------------------------------------------------------

### AFFIDAVIT OF TOM REICH

The undersigned, having been duly sworn, deposes and says as follows:

    1.     I am over the age of eighteen (18) years and believe in the obligation of an oath.

    2.     I have personal knowledge of the facts set forth in this affidavit.

    3.     I am the Director of Air Service Development at AFCO AvPorts Management, LLC.

    4.     Previously, I was employed as a market analyst for Independence Air and as the Manager of Market Planning for Colgan Air's United Express and US Airways Express branded operations.

    5.     I have provided marketing services to the Tweed-New Haven Airport (the "Airport") and for other airports around the country.

    6.     I have provided marketing services for the Airport since December 2011.

1459941

7.     During the time that I have provided marketing services for the Airport, I have been in close touch with approximately ten different airlines with regard to the possibility of those airlines bringing service to the Airport.

8.     From 2012 through 2016, I attended the Airports Council International – North America JumpStart Air Service Development Conference, where airlines and airport administrators convene annually.  I have met with numerous airline representatives at the JumpStart conferences with regard to the possibility of those airlines bringing service to the Airport, and have remained in steady contact with airline representatives throughout the years, even outside of JumpStart conferences.

9.     In my experience, there are three primary factors that determine whether or not an airline chooses to provide service to a given destination: (1) market size, (2) equipment performance and (3) economic viability.

10.     One analysis, completed by AvPorts, shows that the South-Central Connecticut market is the largest "catchment area" in the United States in terms of existing passenger demand without nonstop flights to Orlando, Florida.  See AvPorts Catchment Area Map and Analysis of Domestic Markets for Orlando International Airport for year ended June 30, 2015, Exhibit 9.

11.     Based on my experience, the overriding issue with respect to an airline choosing to provide service to a new destination is economic viability.  Runway length is an integral part of an airline's economic viability analysis due to the weight restrictions a shorter runway can cause and the resulting limit to the number of passengers that can be carried on the flight.

12.     The lighter an aircraft is, the less runway it needs to get airborne safely. This basic principle of flight is the driving force behind weight restrictions that are placed on aircraft when a runway is not long enough for that aircraft to safely takeoff at its maximum allowable takeoff weight.  Simply put, by carrying less weight, an aircraft needs less runway to takeoff safely.  Lengthening a runway could eliminate safety concerns and could reduce the need for these weight restrictions at a given airport, allowing an aircraft to carry more passengers while increasing profit potential of the flight to an acceptable level for the airline.

13.     In my experience, weight restrictions can impose economic impediments at airports, such as the Airport, with short runways.  The Airport has the 13th shortest runway out of 348 airports where commercial service is provided.  According to an AvPorts analysis, the 12 airports with shorter runways do not have as large of a catchment area as the Airport.  The Airport has the shortest runway in the nation for catchment areas with 1,000,000 or more people.

14.     Each plane has a designated weight limit for a given runway length.

15.     Allegiant Air, LLC has prepared this type of economic analysis for the Airport and has declined to service the Airport because "runway 02/20 is too short for Allegiant to comfortably operate regularly scheduled commercial service."  See Letter from Allegiant Air, LLC dated December 21, 2015, Exhibit 10.  I have prepared the same kind of analysis for airlines as well.

16.     In the deregulated airline world, the FAA cannot require airlines to provide service where it is not profitable for an airline to do so.

1459941

17.     Over the last five years marketing the Airport, I have been unable to convince a new airline to commence service at Tweed.

18.     Current scheduled commercial service at the Airport is entirely provided by a single type of aircraft, the Bombardier DH8-100 (the "Dash 8") operated by Piedmont Airlines as American Eagle.

19.     Moreover, Runway 2/20, because of its length, does not allow takeoff of the Dash 8 aircraft at maximum capacity.  Generally, the maximum amount of passengers allowed on the Dash 8 for takeoff at the Airport is 33 passengers, despite the Dash 8 having capacity for 37 passengers.  However, under certain weather conditions the maximum allowance can occasionally be one or two passengers higher or up to five or more fewer.

20.     Since 2009, the Airport has failed to attract a single new scheduled commercial carrier.  Service remains low, with fewer than 35,000 enplanements per year.  In my experience, and based upon my knowledge of the Authority and the Airport, the length of the runway is a significant factor in the low service levels at the Airport.

21.     Further affiant sayeth naught.

Tom Reich

Subscribed and sworn before me
This _13_ day of March, 2017

Notary Public
Commissioner of the Superior Court



1459941

**JA77**

## CERTIFICATION

THIS IS TO CERTIFY that on March 13, 2017, a copy of the foregoing was electronically filed.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  The undersigned did cause to be sent, by U.S. Mail, first-class, postage prepaid, a copy of the foregoing to all counsel and pro-se parties that do not have access to the Court's electronic filing system.

 /s/ Christopher A. Klepps
Christopher A. Klepps, Esq.
Updike, Kelly & Spellacy, P.C.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---

| | | |
|---|---|---|
| TWEED-NEW HAVEN AIRPORT AUTHORITY | : | CIVIL ACTION NO. 3:15-cv-01731-RAR |
| Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| GEORGE JEPSEN, in his official | : | |
| capacity as Attorney General for the | : | |
| State of Connecticut | : | MARCH __, 2017 |
| Defendant | : | |

---

**AFFIDAVIT OF TIM LARSON**

The undersigned, having been duly sworn, deposes and says as follows:

1.      I am over the age of eighteen (18) years and believe in the obligation of an oath.

2.      I have personal knowledge of the facts set forth in this affidavit.

3.      I am the Executive Director of the Tweed-New Haven Airport Authority (the "Authority").

4.      As Executive Director, I supervise the professional management company, AFCO AvPorts Management, LLC (AvPorts) which operates the Airport under a contract with the Authority.  I also report to a board of directors comprised of individuals appointed by the mayors of East Haven and New Haven and the South Central Regional Council of Governments.

5.      The Authority is a public instrumentality and political subdivision of the State of Connecticut, pursuant to Connecticut General Statutes § 15-120i, et seq., and is located at 155 Burr Street in New Haven, Connecticut.

1453127

**JA79**

6.      The Airport property is owned by the City of New Haven and leased to the Authority pursuant to the terms of a Lease and Operating Agreement, dated July 1, 1998.  Portions of the Airport lie within the territorial boundaries of East Haven. Pursuant to Connecticut General Statutes § 15-120i, et seq., the Authority is a public instrumentality and political subdivision of the State of Connecticut authorized to manage the Airport.  See Lease and Operating Agreement, Exhibit 1.

7.      The length of Runway 2/20 is currently approximately 5,600 linear feet.  In 2009, the State, through Public Act 09-7, amended Connecticut General Statutes § 15-120j by adding subsection (c) which provides: "Notwithstanding the provisions of subsections (a) and (b) of this section Runway 2/20 of the airport shall not exceed the existing paved runway length of five thousand six hundred linear feet."

8.      The Airport is among the public-use airports included in the National Plan of Integrated Airport Systems.  See National Plan of Integrated Airport Systems 2017-2021, Appendix A, Exhibit 2.

9.      The Airport is situated in both the Town of East Haven and the City of New Haven.  The municipal boundary runs approximately North/South down the center of Runway 2/20, with East Haven to the East, and New Haven to the West.  See The Tweed-New Haven Airport Layout Plan, Exhibit 3.

10.     The Airport consists of numerous structures, including an airport terminal building and an air-rescue and fire-safety facility, Runway 2/20, which runs essentially North/South on the site, crosswind Runway 14/32, which runs Northwest/Southeast, and a number of taxiways.  See Aerial Photograph of Airport, Exhibit 4.

1453127

11.     All of these structures are within the Airport's boundaries and are part of the Airport Layout Plan (the "ALP"). The ALP is approved by the FAA. See The Tweed-New Haven Airport Layout Plan, Exhibit 3.

12.     The Airport is classified by the United States Department of Transportation Federal Aviation Administration ("FAA") as a primary, commercial service airport in that it provides regularly scheduled commercial passenger air service. Given this classification, the Airport is currently required to, and does, hold an operating certificate under FAA Regulation Part 139 (14 CFR Part 139), which currently requires the Airport to have Runway Safety Areas on its main runway acceptable to the FAA.

13.     A Master Plan is required by the FAA for each Part 139 airport like Tweed outlining future plans for upgrading airport facilities. Tweed has a Master Plan. Tweed's updated Master Plan for the Airport was approved by the State of Connecticut (the "State") and by the FAA in 2002 identifying future capital improvements at the Airport. Extending the length of Runway 2/20 up to 7,200 linear feet has been a part of the Authority's Master Plan since 2002. See The Tweed-New Haven Airport Master Plan, Exhibit 5.

14.     There is one commercial airline providing service to Tweed from Philadelphia with four scheduled flights per day in each direction and passenger capacity of no more than 37 passengers on each flight. The length of the runway has a direct bearing on the weight load and passenger capacity that can be safely handled on any given flight.

15.     Weight penalties are imposed on aircraft for safety reasons. A longer Runway 2/20 could reduce or potentially eliminate those weight penalties which are imposed on existing flights at the Airport.

16.     Current scheduled commercial service at the Airport is entirely provided by a single type of aircraft, the Bombardier DH8-100 (the "Dash 8") operated by Piedmont Airlines as American Eagle.

17.     Lengthening of Runway 2/20 would allow the Dash 8 and other larger aircrafts to potentially service the Airport, hold more passengers and service additional destinations.

18.     The Authority has commenced planning on a runway extension project to increase the functional length of Runway 2/20 (the "Project"), within the existing boundaries of the Airport and the ALP, on land that is currently part of the runway safety areas. The planning documents describe several alternatives for lengthening Runway 2/20 to up to 6,601 linear feet and modifying related taxiways. The initial step in the Project is to perform an Environmental Assessment of the various layout and construction options. The Authority has expended private funds to hire Hoyle, Tanner & Associates, Inc., a consulting engineering firm, which has produced a preliminary Environmental Assessment. See Purpose and Need and Alternatives Analysis Runway 2-20 Improvement Project dated June 2, 2014, Exhibit 6.

19.     The FAA has not provided funding to the Project and has not reviewed the alternative layouts presented in the Preliminary Environmental Assessment. FAA review of the preliminary Environmental Assessment is a necessary step in the Environmental Assessment process.

1453127

**JA82**

20.     The FAA is not proceeding with review of the Environmental Assessment in part because the Authority is in violation of several federal grant assurances and regulations.  See Letter from Richard Blumenthal, et al., to Michael P. Huerta, et al., dated December 14, 2014 (Exhibit 7); Letter from Federal Aviation Administrator Michael P. Huerta to Richard Blumenthal dated April 14, 2015 (Exhibit 8) ("Huerta Letter").  The violation first mentioned in the Huerta Letter relates to the Authority's inability to lengthen Runway 2/20 due to Connecticut General Statutes § 15-120j(c). See Huerta Letter (Exhibit 8).

21.     The FAA's decision not to respond to the Authority's request for review of the preliminary Environmental Assessment  is a direct consequence of, inter alia, the existence of the runway length limitation in Connecticut General Statutes §15-120j(c).

22.     Whenever the Authority accepts federal funds, it agrees to various grant assurances which, inter alia, require compliance with a long list of federal statutes and regulations directed to airport facilities and operations.  Non-compliance by an airport such as Tweed can result in enforcement action by the FAA.  See 49 U.S.C. §§ 47101 et seq.

23.     The Authority's ALP is approved by the FAA which maintains full control over any modifications to the ALP, including limitations on runway length.  See 49 U.S.C. § 47107.

24.     Over the past eight years the Authority has been operating the Airport at a loss which has required annual subsidies from the State in the amount of $1,500,000 and from the City in the amount of $325,000.  The subsidy from the State was reduced to $1,480,000 for fiscal year 2016–2017.

1453127

25.    The Authority is currently in the process of ensuring that all new approach surfaces are clear for a 6,601 foot runway.

26.    Further affiant sayeth naught.

_____
Tim Larson

Subscribed and sworn before me
This _13_ day of March, 2017

_____
Notary Public
Commissioner of the Superior Court

1453127

6

**JA84**

## **CERTIFICATION**

THIS IS TO CERTIFY that on March 13, 2017, a copy of the foregoing was electronically filed.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  The undersigned did cause to be sent, by U.S. Mail, first-class, postage prepaid, a copy of the foregoing to all counsel and pro-se parties that do not have access to the Court's electronic filing system.

  /s/ Christopher A. Klepps_____
Christopher A. Klepps, Esq.
Updike, Kelly & Spellacy, P.C.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------------------------
TWEED-NEW HAVEN AIRPORT           :
AUTHORITY                         :     CIVIL ACTION NO. 3:15-cv-01731-RAR
        Plaintiff,                :
                                  :
                                  :
VS.                               :
                                  :
                                  :
GEORGE JEPSEN, in his official    :
capacity as Attorney General for the  :
State of Connecticut              :     MARCH __, 2017
        Defendant                 :
-----------------------------------------------------
```

## AFFIDAVIT OF CHARLES KURTZ

The undersigned, having been duly sworn, deposes and says as follows:

1.      I am over the age of eighteen (18) years and believe in the obligation of an oath.

2.      I have personal knowledge of the facts set forth in this affidavit.

3.      I am a project manager at Tweed-New Haven Regional Airport (the "Airport") for work performed pursuant to federal improvement grants.

4.      I have a bachelor's of science degree in mechanical engineering and have worked for AvPORTS for over forty years.

5.      The Airport is a certificated airport under 49 U.S.C. § 44706.  14 C.F.R. Part 139 establishes the rules governing the certification and operation of airports serving scheduled passenger and air carriers operating aircraft configured for more than nine passenger seats.  As a Part 139 certified airport, the Authority is required to operate and maintain the Airport to specified standards contained in FAA Advisory Circulars.  In addition, as a recipient of federal aid under the FAA Airport Improvement

1457422

**JA86**

Program ("AIP"), the Airport is obligated to comply with AIP grant assurances which require conformance with the standards in FAA Advisory Circulars.

6.      FAA Advisory Circular 150/5300-13A, Airport Design, establishes criteria for the separation of runways and parallel taxiways.  The runway to taxiway separation distance is a function of the Airport Reference Code.  The FAA approved Airport Layout Plan ("ALP") for the Airport identifies the primary runway, Runway 2/20 as a C-III runway.  The designation C-III includes aircraft with approach speeds of 121 knots or more but less than 141 knots, and wingspans greater than 79 feet but less than 118 feet.

7.      The interactive Runway design standard matrix (Table 3-5) in FAA Advisory Circular 150/5300-13A specifies that the runway centerline to parallel taxiway centerline for C-III aircraft is 400 feet.  See Table 3-5. Runway Design Standards Matrix, Exhibit 11.

8.      The Authority has commenced planning on a project to increase the functional length of Runway 2/20 (the "Project"), within the existing boundaries of the Airport (as shown on the FAA approved ALP) on land that is currently part of the runway safety areas.  The planning documents describe several alternatives for lengthening Runway 2/20 to up to 6,601 linear feet and modifying related taxiways.  The initial step in the Project is to perform an Environmental Assessment of the various layout and construction options.  The Authority has expended its own funds to hire Hoyle, Tanner & Associates, Inc., a consulting engineering firm, which has produced chapters one through three of an Environmental Assessment.  See Purpose and Need and Alternatives Analysis Runway 2-20 Improvement Project dated June 2, 2014, Exhibit 6.

2

1457422

**JA87**

9.      The current locations and dimensions of the taxiways, which are integral to the aircraft landing and takeoff system, are not in compliance with federal regulations in terms of their distance from Runway 2/20. This non-standard separation between the taxiway and the runway could be brought into compliance as part of the proposed runway extension project.

10.     The alternatives identified in the Environmental Assessment prepared by HTA include the extension of the parallel taxiway. A full length parallel taxiway is required for runways with instrument approach procedures with visibility minimums below one mile. The existing Runway 2/20 Instrument Landing System (ILS) approach has visibility minimums of 3/4 mile. Construction of the parallel taxiway at the standard 400 foot runway centerline to taxiway centerline separation would bring the airport into compliance with FAA standards.

11.     Although there is no enforcement action pending by the FAA against the Authority due to the non-standard separation between the taxiway and the runway, the FAA has issued notice to the Authority that it is not in compliance with all of the requirements of CFR Part 139, the Airport Certification Manual and the Airport Operating Certificate. The FAA expects the Authority to achieve the standard 400 foot separation between Taxiway A and Runway 2/20 and the 400 foot separation has been included as an alternative in the Preliminary Environmental Assessment. See E-mail from John Merck, Civil Engineer / Project Manager and Airport Certification Safety Inspector for the Federal Aviation Administration, to Diane Jackson, et al., dated July 27, 2016 and attachments, Exhibit 12; Purpose and Need and Alternatives Analysis Runway 2-20 Improvement Project dated June 2, 2014, Exhibit 6.

3

**JA88**

12.    Further affiant sayeth naught.

_____
Charles Kurtz

Subscribed and sworn before me
This 10ᵗʰ day of March, 2017

_____
Notary Public
Commissioner of the Superior Court

KRISTINE MARIE CAMPANALE
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 11/30/2021

4

1457422

**JA89**

## **CERTIFICATION**

THIS IS TO CERTIFY that on March 13, 2017, a copy of the foregoing was electronically filed.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  The undersigned did cause to be sent, by U.S. Mail, first-class, postage prepaid, a copy of the foregoing to all counsel and pro-se parties that do not have access to the Court's electronic filing system.


 /s/ Christopher A. Klepps_____
Christopher A. Klepps, Esq.
Updike, Kelly & Spellacy, P.C.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------------------------
TWEED-NEW HAVEN AIRPORT            :
AUTHORITY                          :      CIVIL ACTION NO. 3:15-cv-01731-RAR
      Plaintiff,                   :
                                   :
VS.                                :
                                   :
GEORGE JEPSEN, in his official     :
capacity as Attorney General for the :
State of Connecticut               :      MARCH /0, 2017
      Defendant                    :
-----------------------------------------------------
```

## AFFIDAVIT OF ROBERT M. FUREY

The undersigned, having been duly sworn, deposes and says as follows:

     1.     I am over the age of eighteen (18) years and believe in the obligation of an oath.

     2.     I have personal knowledge of the facts set forth in this affidavit.

     3.     I am a Senior Vice President at Hoyle, Tanner & Associates, Inc. located at 150 Dow Street, Manchester, New Hampshire 03101.

     4.     I am an engineering consultant for the Tweed-New Haven Airport Authority (the "Authority").

     5.     Hoyle, Tanner & Associates, Inc. specializes in airport planning, design, and construction administration and has performed engineering work for the Authority since 1999.

     6.     I have personal knowledge regarding the matters addressed herein

     7.     Federal review and comment is necessary for any construction project located within the Airport Layout Plan.  One of the initial steps in any such project under

1488737

**JA91**

the applicable federal regulations is to submit an Environmental Assessment to the Federal Aviation Administration.

8.     The Authority has commenced planning on a runway extension project to increase the functional length of Runway 2/20 (the "Project"), within the existing boundaries of the Airport and the Airport Layout Plan on land that is currently part of the runway safety areas.  The planning documents describe several alternatives for lengthening Runway 2/20 and modifying related taxiways.

9.     The initial step in the Project is to perform an Environmental Assessment of the various layout and construction options.  The Authority hired Hoyle, Tanner & Associates, Inc. in 2014 to handle this planning phase of the Project.

10.     At the inception of the Project, Hoyle, Tanner & Associates, Inc. looked at a number of alternatives for lengthening Runway 2/20 ranging from 6,601 linear feet up to 7,000 linear feet.  The ultimate document submitted to the Federal Aviation Administration (FAA) included only runway alternatives that were no longer than 6,601 linear feet.

11.     Hoyle Tanner & Associates, Inc. also prepared drawings depicting improvements to Taxiways A, F and G at the Airport.  The primary safety improvement alternative is to extend the runway with a taxiway centerline separation to the required distance of 400 feet, in accordance with FAA Advisory Circular 150/5300-13A, Table 3-5.  This would provide the Airport and FAA with safer runway and taxiway ground maneuvering as well as greater separation between active takeoff and landing operations and aircraft which are either holding short or maneuvering adjacent to the runway.

1488737

12.     In 2014, Hoyle, Tanner & Associates, Inc. completed the first three

chapters of an Environmental Assessment ("Preliminary Environmental Assessment");

see Purpose and Need and Alternatives Analysis Runway 2-20 Improvement Project

dated June 2, 2014, Exhibit 6; which describes the constraints on air service caused by

the current runway length, the potentially resulting economic instability for the Authority

and the alternatives with regard to the runway and taxiways.

13.     The customary procedure is to submit a Preliminary Environmental

Assessment to the FAA for review and comment before drafting the full Environmental

Assessment.

14.     The FAA has declined to review and comment on the content of the

Preliminary Environmental Assessment for more than two years.

15.     Further affiant sayeth naught.


_____
                                    Robert M. Furey


Subscribed and sworn before me
This _10th_ day of ~~February~~ ___, 2017
                MARCH

_____
Notary Public
~~Commissioner of the Superior Court~~


            FRAN WEAVER, Notary Public
        My Commission Expires August 24, 2021


3

1488737

## <u>CERTIFICATION</u>

THIS IS TO CERTIFY that on March 13, 2017, a copy of the foregoing was electronically filed.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  The undersigned did cause to be sent, by U.S. Mail, first-class, postage prepaid, a copy of the foregoing to all counsel and pro-se parties that do not have access to the Court's electronic filing system.


  /s/ Christopher A. Klepps
Christopher A. Klepps, Esq.
Updike, Kelly & Spellacy, P.C.


**JA94**

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

------------------------------------------------------

TWEED-NEW HAVEN AIRPORT      :
AUTHORITY      :     CIVIL ACTION NO. 3:15-cv-01731-RAR
       Plaintiff,      :
       :
VS.      :
       :
GEORGE JEPSEN, in his official      :
capacity as Attorney General for the      :
State of Connecticut      :     MAY 19, 2017
       Defendant      :

------------------------------------------------------

## PLAINTIFF'S POST-TRIAL BRIEF

The plaintiff, Tweed-New Haven Airport Authority ("Tweed"), respectfully submits this post-trial brief. As operator of the Tweed-New Haven Airport (the "Airport"), Tweed has brought a declaratory judgment action against the defendant, Attorney George Jepsen in his Official Capacity as Attorney General for the State of Connecticut, seeking a declaration that Connecticut General Statutes § 15-120j(c) violates the Supremacy Clause of the United States Constitution.[1] A bench trial was held on March 22, 2017 before the Honorable Robert A. Richardson.

The evidence establishes that Tweed has suffered numerous injuries as a result of General Statutes § 15-120j(c)'s restriction on the length of Runway 2/20, the primary runway at the Airport. Specifically, Tweed has proven that the current length of the runway, and the statute's prohibition on extending the runway, has caused: (1) irreconcilable conflict with a Federal Aviation Administration ("FAA") and state approved

---

[1] Article VI, clause 2 of the United States Constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

project by virtue of the mere existence of the statute (Section III. A. i. herein); (2) current chronically low service levels resulting in inadequate revenue and financial instability at the Airport (Section III. A. ii. herein); (3) lost business opportunities, i.e., Tweed's inability to attract new commercial service to the Airport (Section III. A. iii. herein); and (4) an inability for Tweed to comply with federal grant requirements (Section III. A. iv. herein).  In addition, commercial airline changes in aircraft size currently underway will soon result in there being no commercial service at Tweed unless the runway is extended (Section III. A. v. herein).  Thus, Tweed has standing to bring this declaratory judgment action.

Furthermore, General Statutes § 15-120j(c) is preempted by the Federal Aviation Act ("FAAct"), 49 U.S.C. § 40101 et seq., the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713, and the Airport and Airway Improvement Act ("AAIA"), 49 U.S.C. § 47101 et seq. (Section III. B. i., ii., and iii. herein).  This Court should therefore rule in favor of Tweed and issue an order that General Statutes § 15-120j(c) violates the Supremacy Clause of the United States Constitution and is therefore unconstitutional and invalid.

## I.      PROCEDURAL HISTORY

Tweed filed this declaratory judgment action on November 24, 2015.  On June 30, 2016, the defendant moved to dismiss Tweed's Complaint contending, inter alia, that Tweed lacked Article III standing because it failed to allege a sufficient injury.  *See* ECF # 39 and 40.  This Court denied the Motion to Dismiss on December 9, 2016, holding that Tweed had demonstrated a "direct injury that is both actual and imminent." *See* Memorandum of Decision at 9 [ECF # 53].  Specifically, this Court found that

1543861

2

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

Tweed's allegations regarding low services levels at the Airport, its current and future loss of business and Tweed's inability to comply with federal grant requirements established judicially cognizable injuries. *Id.* This Court also held that General Statutes § 15-120j(c) is at least impliedly preempted by the FAAct because the statute impermissibly regulates runway length, which is a "component part of the field of airline safety, and is therefore part of a field completely occupied by the federal government." *Id.* at 20–21. The Court did not reach the issue of whether General Statutes § 15-120j(c) is preempted by either the ADA or AAIA. *Id.* at 21.

A bench trial was held on March 22, 2017. The trial largely pertained to the injuries that Tweed has suffered as a result of General Statutes § 15-120j(c)'s limitation on the length of Runway 2/20. The parties submitted a lengthy stipulation of facts, as well as numerous exhibits. *See* ECF # 59, 61–64. Further, Tweed provided testimony from Robert Furey, a Senior Vice President at Hoyle, Tanner & Associates, Inc., regarding the layout of the Airport, the status of Tweed's proposed runway extension project and Tweed's inability to move forward with that project while General Statutes § 15-120j(c) remains in force. Tweed also presented expert testimony from John DeCoster, Senior Consultant for Trillion Aviation. Mr. DeCoster provided detailed and un-rebutted testimony regarding the various injuries being suffered by Tweed as a result of the statute, as well as the strong likelihood of increased commercial service at Tweed if the statute is nullified and Tweed is able to extend the runway. Mr. DeCoster's expert report was also admitted as a full exhibit. The evidence definitively proves that Tweed has suffered various injuries as a result of General Statutes § 15-120j(c)'s

1543861

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

unconstitutional restriction on the length of Runway 2/20, and that Tweed will continue to be injured in the future as long as the statute remains in force.

The defendant did not call any witnesses.  The defendant attempted to obtain affidavits from certain FAA employees pursuant to 49 CFR § 9.15 to testify as fact witnesses, but the FAA denied that request.  However, the defendant did not produce any expert witness testimony, and his failure to do so is unrelated to his attempt to obtain affidavits from FAA employees.  Federal law <u>prohibits</u> FAA employees from testifying as expert witnesses.  *See* 49 CFR § 9.9(c).  Accordingly, even if the FAA acquiesced to the defendant's request and produced employees to provide factual testimony, those employees would not have been permitted to offer any expert opinions.  As a result, Tweed's evidence is uncontradicted.

## II.    LEGAL PRINCIPLES

The primary issues are whether Tweed has standing to bring this declaratory judgment action challenging the constitutionality of General Statutes § 15-120j(c) and whether said statute is preempted under Article VI, clause 2 of the United States Constitution.

With regard to the issue of standing, the phrase "case of actual controversy" in the Declaratory Judgment Act[2] refers to the types of "cases" and "controversies" that are justiciable under Article III.  *MedImmune, Inc. v. Gentech, Inc.*, 549 U.S. 118, 126–27 (2007).  To be justiciable, a dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests" and the plaintiff must seek "specific

---

[2] 28 U.S.C. § 2201(a) provides, in relevant part: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

1543861

relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 127 (internal quotation marks omitted).

It is important to note that the Declaratory Judgment Act was enacted to enable parties to adjudicate disputes <u>before</u> they suffer great harm. *See In re Combustion Equipment Associates, Inc.*, 838 F.2d 35, 36 (2d Cir. 1988); *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 381 (S.D.N.Y. 2007). The key inquiry is whether the facts alleged, considering all of the circumstances, "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc.*, 549 U.S. at 127 (*quoting Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). "This inquiry is one of degree and affords the district court great discretion in making a determination." *Russian Standard Vodka (USA), Inc.*, 523 F. Supp. 2d at 382 (*citing Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 90 F.3d 671, 675 (2d Cir. 1996)).

The United States Supreme Court has suggested that there is a lower standard to find a case or controversy in a declaratory judgment action. In *MedImmune, Inc. v. Gentech, Inc.*, the Court held that "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, <u>but</u> <u>nonetheless</u> <u>does</u> <u>not</u> <u>eliminate</u> <u>Article</u> <u>III</u> <u>jurisdiction</u>." *Id.* at 129 (emphasis added). Accordingly, the plaintiff was not

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

required to face legal action before bringing suit.  *Id.* at 137; *see also Steffel v. Thompson*, 415 U.S. 452, 480 (1974) ("the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity.") (*Rehnquist, J.,* concurring); *Goldman v. West*, 2007 WL 1989291, at *3 (S.D.N.Y. 2007) (recognizing that recent Supreme Court and Circuit Court decisions have "lower[ed] the bar for a plaintiff to bring a declaratory judgment action.").

## III.   ARGUMENT

### A.   <u>Tweed has standing because General Statutes § 15-120j(c)'s restriction on the length of Runway 2/20 has caused Tweed to suffer various injuries</u>

Tweed has been injured as a result of General Statutes § 15-120j(c).  The injuries are plain and obvious.  The defendant's arguments in opposition are strained and without any evidentiary support.  Furthermore, it is important to note that Tweed needs to prove only <u>one</u> legally cognizable injury in order to have standing.  *See Branson School Dist. RE-82 v. Romer*, 161 F.3d 619, 630–31 (10th Cir. 1998).

### i.   <u>Tweed is injured by virtue of the mere existence of General Statutes § 15-120j(c)</u>

Tweed has adduced considerable evidence about the injuries currently being inflicted upon it as a result of General Statutes § 15-120j(c), including limited enplanements, lost business opportunities, inadequate revenue and inability to comply with federal grant requirements.  Nevertheless, this Court should also consider the unique circumstances surrounding the issue of standing in a declaratory judgment action and Supremacy Clause case such as this.

The mere existence of the unconstitutional state statute injures Tweed because the statute prevents Tweed from extending the length of Runway 2/20, and Tweed

6

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

would face an enforcement action if it now attempted to extend the length of the runway.

Indeed, the legislature enacted a statute aimed specifically at restricting the length of

Runway 2/20.  As this Court stated, "[i]t seems counterintuitive that the legislature would

make such a specific and exacting statutory change if the state did not intend to enforce

it."  Memorandum of Decision at 14 [ECF # 53].  The defendant would surely concede

that Tweed would have standing to challenge the statute if Tweed began construction

on a runway extension project in contravention of the statute and the state brought an

enforcement action.  However, the Supreme Court has made clear that Tweed need not

extend the length of Runway 2/20 in the face of the statute and expose itself to

prosecution by the state in order to have standing.  *See MedImmune, Inc.*, 549 U.S. at

128–30.  In other words, Tweed's "inaction" in failing to violate the law cannot deprive it

of standing.  *Id.* at 129.  The statute's existence is sufficient to confer standing on

Tweed because Tweed is currently injured by its inability to proceed with an FAA and

state approved runway extension project.  This injury can be redressed by a decision

declaring General Statutes § 15-120j(c) unconstitutional.  *See In re Old Carco LLC*, 470

B.R. 688, 697 (S.D.N.Y. 2012). (Declaratory Judgment Act allows plaintiffs to seek

prospective declaratory relief rather than expose themselves to liability or injury).

Tweed also has the state statutory authority and mandate to "maintain and

improve Tweed-New Haven Airport as an important economic development asset for

the south central Connecticut region" and "to make plans and studies in conjunction with

the Federal Aviation Administration or other state or federal agencies."  *See* General

Statutes § 15-120j(a).  Pursuant to those mandates, Tweed obtained approval from the

FAA and the state of a Master Plan which calls for extending Runway 2/20 up to 7,200

1543861

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

linear feet.  *See* Pl. Exh. 5, Dwg. No. 2.  The Master Plan remains in place today.  The trial record indicates that the FAA views General Statutes § 15-120j(c) as being an impediment to carrying out that Master Plan provision and an encroachment on federal authority.  *See* Pl. Exh. 8; Def. Exh. A.  Given these facts, Tweed has established the requisite "case of actual controversy" to bring this declaratory judgment action.  Tweed is, in this case, the advocate for the supremacy of federal law.  Other than the FAA, there is no one else who could have standing to bring this case, and the FAA Administrator has made it clear that Tweed is on its own to remedy this conflict.  *See* Pl. Exh. 8.

> ii.     <u>The statute has directly led to inadequate revenue at the Airport and chronically low service levels</u>

Tweed has proven that the current length of Runway 2/20 and Tweed's inability to lengthen it in light of the statute have resulted in: (1) the Airport's dire financial condition, and (2) chronically low service levels.  Tweed has proven that it is operating at an annual loss and requires significant subsidies from the state and the City of New Haven in order to survive.  The current financial situation at the Airport is not sustainable and is due to the chronically low service levels at the Airport.  The low service levels are inextricably tied to the current length of Runway 2/20 and Tweed's inability to lengthen the runway.  These injuries can be redressed by invalidating the state statute.  The evidence establishes the following:

The length of Runway 2/20 is currently approximately 5,600 linear feet.  General Statutes § 15-120j(c) expressly provides that Runway 2/20 shall not exceed this length.  Stipulation of Facts at ¶ 9 ("Stipulation") [ECF # 59]; Affidavit of Tim Larson at ¶ 7 ("Larson Aff.") [ECF # 62].  The length of Runway 2/20 is atypical.  Runway 2/20 is the

1543861

Updike, Kelly & Spellacy, P.C. • 100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

thirteenth shortest runway out of 348 airports in the nation where commercial service is provided.  According to an analysis conducted by AFCO AvPorts Management, LLC ("AvPorts"), the twelve airports with shorter runways do not have as large of a catchment area as the Airport.  Thus, the Airport has the <u>shortest</u> runway in the nation for catchment areas with 1,000,000 or more people.  Stipulation at ¶ 53; Affidavit of Tom Reich at ¶ 13 ("Reich Aff.") [ECF # 61].

Due to the length of the runway, there is only one commercial airline providing service to Tweed.  Stipulation at ¶ 17; Larson Aff. at ¶ 14.  Current scheduled commercial service at the Airport is entirely provided by a single type of aircraft, the Bombardier DH8-100 (the "Dash 8") operated by Piedmont Airlines as American Eagle.  Stipulation at ¶ 20; Larson Aff. at ¶ 16; Reich Aff. at ¶ 18.  The <u>only</u> route flown by the Dash 8 out of Tweed is to Philadelphia.  Stipulation at ¶ 17; Larson Aff. at ¶ 14.  There are only four scheduled flights per day in each direction and passenger capacity of no more than thirty seven passengers on each flight.  Stipulation at ¶ 17; Larson Aff. at ¶ 14.

Service at the Airport remains low, with fewer than 35,000 enplanements per year.  Stipulation at ¶ 18; Reich Aff. at ¶ 20.  John DeCoster testified that "[t]he 35,000 enplanement level is <u>by far the lowest enplanement level that our company has dealt with</u>, as far as a commercial service airport, outside of essential air service cities.  It's an <u>extremely low number</u> and does not generally generate enough direct and indirect revenue[3] to make the airport economically or financially self-sustaining."  Trial Transcript

---

[3] Mr. DeCoster states in his report that, for commercial service, revenue is generated directly "through airline rates and charges and Passenger Facility Charges ("PFC's) and indirectly through car rental concessions, fuel flowage fees, advertising revenue, parking revenue, and other concessions such as food and beverage and vending."  Pl. Exh. 13 at 5.

1543861

dated 3/22/17 at 97 (emphasis added) ("Trial Tr.") (excerpts attached as **Exhibit A**). This evidence is uncontradicted.

The chronically low service levels are caused by the length of Runway 2/20, which does not permit the small, thirty-seven seat Dash 8 to takeoff from the Airport at full capacity and does not allow larger commercial aircraft to service the Airport. Generally, the maximum amount of passengers allowed on the Dash 8 for takeoff at the Airport is thirty three passengers.  However, under certain weather conditions the maximum allowance can occasionally be one or two passengers higher or up to five or more fewer.  Stipulation at ¶ 21; Reich Aff. at ¶ 19.  The length of the runway has a direct bearing on the weight load and passenger capacity that can be safely handled on any given flight.  Stipulation at ¶ 17; Larson Aff. at ¶ 14.

The low service levels have had a severe financial impact on the Airport.  Over the past eight years Tweed has been operating the Airport at a loss which has required annual subsidies from the state and the City of New Haven.  Since 2009, the Airport has experienced an average annual operating loss of $1,800,000.  Def. Exh. B.  Prior to 2012, the state was subsidizing the Airport in the amount of $2,000,000 per year.  *Id.*  In 2012, the subsidy was reduced to $1,500,000, and was reduced to $1,480,000 for fiscal year 2016–2017.  The City of New Haven has also provided annual subsidies to the Airport in the amount of $325,000.  Stipulation at ¶ 58; Larson Aff. at ¶ 24.

Mr. DeCoster testified that, without an increase in commercial service and general aviation activity provided by larger aircraft, state and local subsidies and the average annual operating loss for the Airport will increase.  Trial Tr. at 99–100.  Most

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

Updike, Kelly & Spellacy, P.C. • 100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

importantly, Tweed <u>cannot</u> attract new commercial service if the runway is not lengthened. *Id.* at 97 (emphasis added).

All of these serious problems are tied directly to the current length of Runway 2/20.  Mr. DeCoster testified that "[t]he lengthening of the runway is the absolute door opener in order to have a chance at improving the financial condition of the airport." *Id.* at 99.  He explained that, in order to increase revenue, the Airport has to "be able to accommodate larger aircraft safely with full payloads [and] aircraft that can go on longer stage length trips [i.e., to more distant locations]."[4] *Id.*  Further, Tweed needs to "be able to attract the larger business jets . . . that require a longer runway length." *Id.* None of this is even <u>possible</u> with the current runway length. *Id.*

Extending the runway would redress these injuries.  Mr. DeCoster's report states that, in order to attract additional or enhanced commercial service, "a runway length of 5,600 linear feet is not sufficient.  The design level of 6,601 linear feet will afford the opportunity for the Authority to safely handle all of the likely commercial and general aviation aircraft that would consider utilizing Tweed." Pl. Exh. 13 at 5–6.  Moreover, Mr. DeCoster states that the increased revenue that would accompany new commercial service would "likely result in the reduction of the local and state subsidies . . . ." *Id.* at 6.  Finally, Mr. DeCoster testified that additional service would "increase direct and indirect revenue and make a major impact on the [current] deficit" at the Airport.  Trial Tr. at 100.  The defendant did not proffer any rebuttal expert testimony to these points.

Tom Reich, the Director of Air Service Development at AvPorts, agrees with those sentiments.  Mr. Reich averred that, in his experience, the length of Runway 2/20

---

[4] Stage length refers to the distance an aircraft can fly without having to refuel.  Trial Tr. at 88–89.

1543861

is a significant factor in the current low service levels at the Airport.  Stipulation at ¶ 18; Reich Aff. at ¶ 20.  Furthermore, in Mr. Reich's experience, weight restrictions can impose economic impediments at airports, such as the Airport, with short runways. Stipulation at ¶ 53; Reich Aff. at ¶ 13.

Furthermore, the defendant has stipulated to the following: The lighter an aircraft is, the less runway it needs to get airborne safely.  This basic principle of flight is the driving force behind weight restrictions that are placed on aircraft when a runway is not long enough for that aircraft to safely takeoff at its maximum allowable takeoff weight. Simply put, by carrying less weight, an aircraft needs less runway to takeoff safely. Lengthening a runway could eliminate safety concerns and could reduce the need for these weight restrictions at a given airport, allowing an aircraft to carry more passengers while increasing profit potential of the flight to an acceptable level for the airline. Stipulation at ¶ 52; Reich Aff. at ¶ 12.

The injury suffered by Tweed is clear.  Enplanements are severely restricted at Tweed due to the length of Runway 2/20 and will not change significantly without a longer runway.  A longer runway would permit Tweed to accommodate new commercial service which would result in additional revenue for the Airport, alleviate its annual operating losses and significantly reduce state and local subsidies.

The defendant offered no evidence to the contrary.

iii.   <u>Tweed is unable to attract new commercial service to the Airport as a result of General Statutes § 15-120j(c)</u>

Tweed established that the length of Runway 2/20 is inextricably linked to the chronically low service levels at the Airport, as discussed above, and Tweed's inability to attract new commercial service.  The evidence adduced at trial proves that the length

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

12

of Runway 2/20 has already deterred at least one commercial air carrier from bringing service to Tweed, and that Tweed will be unable to attract new commercial service if Runway 2/20 is not lengthened.  Some of the evidence establishing this injury is repetitive, but it bears repeating.

Tweed suffers from chronically low service levels.  Stipulation at ¶ 18; Reich Aff. at ¶ 20; Trial Tr. at 97.  The Dash 8 is the only commercial aircraft providing service out of Tweed and flies only between Tweed and Philadelphia.  There are only four scheduled flights per day in each direction.  Stipulation at ¶ 17; Larson Aff. at ¶ 14.  In Mr. Reich's experience, and based upon his knowledge of Tweed and the Airport, the length of Runway 2/20 is a significant factor in the low service levels at the Airport.  Stipulation at ¶ 18; Reich Aff. at ¶ 20.  Lengthening Runway 2/20 would allow the Dash 8 and other larger aircraft to service the Airport, hold more passengers and service additional destinations.  Stipulation at ¶ 22; Larson Aff. at ¶ 17.

Despite marketing efforts and various attempts to attract new service, Tweed has failed to attract a single new scheduled commercial carrier since 2009.  Stipulation at ¶ 18; Reich Aff. at ¶ 20.  Mr. Reich has provided marketing services to the Airport since December 2011 and for other airports around the country.  Stipulation at ¶ 46; Reich Aff. at ¶ 6.  He was previously employed as a market analyst for Independence Air and as the Manager of Market Planning for Colgan Air's United Express and US Airways Express branded operations.  Stipulation at ¶ 45; Reich Aff. at ¶¶ 3–5.

During the six years that he has provided marketing services for the Airport, Mr. Reich has been in close touch with approximately ten different airlines with regard to the possibility of those airlines bringing service to the Airport.  Stipulation at ¶ 47; Reich Aff.

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

1543861

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

at ¶ 7.  From 2012 through 2016, Mr. Reich attended the annual Airports Council International – North America JumpStart Air Service Development Conference, where airlines and airport administrators convene.  At those conferences, Mr. Reich discussed with numerous airline representatives the possibility of those airlines bringing service to the Airport, and he has remained in steady contact with those representatives throughout the years, even outside of JumpStart conferences.  Stipulation at ¶ 48; Reich Aff. at ¶ 8.  However, notwithstanding these efforts, Mr. Reich has been unable to convince a new airline to commence service at Tweed.  Stipulation at ¶ 57; Reich Aff. at ¶ 17.

Tweed's inability to attract new commercial service is a direct result of the length of Runway 2/20 and Tweed's inability to lengthen it.  Quite simply, larger aircraft cannot operate at all out of Tweed due to the length of the runway and/or cannot operate safely with full payloads.

Based on Mr. Reich's experience, the overriding issue with respect to an airline choosing to provide service to a new destination is economic viability.  Runway length is an integral part of an airline's economic viability analysis due to the weight restrictions a shorter runway can cause and the resulting limit to the number of passengers that can be carried on a flight.  Stipulation at ¶ 51; Reich Aff. at ¶ 11.  In Mr. Reich's experience, weight restrictions can impose economic impediments at airports, such as the Airport, with short runways.  The Airport has the thirteenth shortest runway out of 348 airports in the nation where commercial service is provided.  The Airport has the shortest runway in the nation for catchment areas with 1,000,000 or more people.  Stipulation at ¶ 53; Reich Aff. at ¶ 13.

1543861

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

Mr. DeCoster testified that the length of Runway 2/20 is the primary reason why Tweed has failed to attract new commercial service.  He explained that Tweed cannot compete with other airports that have runways long enough to accommodate new commercial service.  Trial Tr. at 97–98.  Because of the current length of Runway 2/20 and Tweed's inability to lengthen it, Tweed cannot "even get a seat at the table" to negotiate with commercial air carriers because airlines are in a buyer's market and other airports in the same region as Tweed "have the facilities and the runway length that's necessary for [commercial airlines] to project a strong performance at that airport."  *Id.* at 98.  This makes sense.  Why would a commercial airline negotiate with Tweed to bring service to the Airport if Runway 2/20 is inadequate to permit the airline to operate economically and safely, and where there is a state statute expressly prohibiting Tweed from lengthening the runway?[5]

Still, despite having almost no negotiating power with its current runway length, Tweed has received real and substantial interest from Allegiant Air, LLC in terms of bringing commercial service to the Airport.  *See* Pl. Exh. 10.  Allegiant Air is a low cost commercial air carrier which offers nonstop jet service to more than 100 airports throughout the country.  *Id.*  In December 2015, Eric Fletcher, Allegiant's manager of airport planning, wrote to Michael Huerta, the administrator of the FAA, advising him that Allegiant is seeking to expand its network of airports and that it has identified Tweed as a potential Allegiant airport.  *Id.*  Mr. Fletcher states, however, that Allegiant's analysis of Tweed as a potential market cannot go forward <u>specifically</u> because "runway 2/20 is <u>too short</u> for Allegiant to comfortably operate regularly scheduled commercial

---

[5] Indeed, Mr. DeCoster testified that if an airport does not "have a runway capable of supporting the aircraft that airlines intend to fly to that airport, they will not consider that airport for service."  Trial Tr. at 61–62.

1543861

**JA109**

service" with its current fleet.  *Id.* (emphasis added).  Mr. Fletcher writes that Allegiant

would "<u>eagerly</u> reopen [its] analysis of [Tweed's] viability for regularly scheduled

commercial service" if Runway 2/20 is lengthened.  *Id.* (emphasis added).  Mr.

DeCoster agrees and testified that Tweed is a "prototypical market for Allegiant."  Trial

Tr. at 130.

One analysis, completed by AvPorts, shows that the South-Central Connecticut

market is the largest "catchment area" in the United States in terms of existing

passenger demand without nonstop flights to Orlando, Florida.  Stipulation at ¶ 50;

Reich Aff. at ¶ 10; Pl. Exh. 9.  The Airport is in the South-Central Connecticut market.

Mr. DeCoster testified that, if Allegiant brings service to Tweed, then Tweed could

compete with other regional airports, including JFK in New York City, with respect to

flights to Florida.  Trial Tr. at 130.

Being able to compete with other regional airports for commercial service is

paramount.  In the deregulated airline world, the FAA cannot require airlines to provide

service where it is not profitable for an airline to do so.  Stipulation at ¶ 56; Reich Aff. at

¶ 16.  Additionally, it goes without saying that an airline will not bring service to an

airport if it cannot safely takeoff and land on its runway, or if it cannot operate at an

acceptable profitability level due to payload hits resulting from a short runway.

The defendant argues that, notwithstanding all of the above, Tweed has not

suffered an injury as a result of General Statutes § 15-120j(c) because Tweed has not

obtained a firm commitment from an airline to bring service to the Airport if Runway 2/20

is lengthened.  This argument attempts to raise the bar for standing to an

unconscionable height.

Updike, Kelly & Spellacy, P.C. 100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

16

**JA110**

Courts do not set the bar nearly this high.  For example, in *In re Old Carco LLC*, 470 B.R. 688 (S.D.N.Y. 2012), the plaintiffs sought a declaration that a state statute was preempted by federal law.  Two of the plaintiffs were debtors in a Chapter 11 bankruptcy proceeding: Old Carco formerly manufactured automobiles and Old Carco Motors was a distributor to authorized dealers in the United States.  *Id.* at 693.  A third plaintiff, Chrysler Group LLC ("New Chrysler"), acquired the debtors' assets and liabilities pursuant to a purchase agreement.  *Id.*  Pursuant to that agreement, certain existing dealer agreements were not assumed by New Chrysler.  *Id.* at 693–94.  The Bankruptcy Court approved the purchase agreement and authorized the rejection of those dealer agreements.  *Id.*  The state of Kentucky subsequently enacted a statute aimed at protecting the rejected dealers which would have required New Chrysler to either forego selling its products within ten miles of a rejected dealer for ten years or offer to contract with the rejected dealers whose previous contracts were voided during the bankruptcy proceeding.  *Id.* at 697.

The plaintiffs brought suit alleging that federal preemption barred Kentucky's attorney general from enforcing the state statute.  *Id.* at 695.  The state of Kentucky challenged the plaintiffs' standing, contending that any injury was not yet realized because New Chrysler had not yet violated the statute.  The court rejected this argument because enforcement of the state statute "would cause New Chrysler to sustain an injury that could be redressed" by a decision invalidating the statute.  *Id.* at 697.  Further, the court noted that, under *MedImmune*, supra, a plaintiff can seek prospective declaratory relief rather than exposing itself to actual liability or injury before seeking remedial relief.  *Id.*

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

17

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

The court also rejected the state's argument that there was no injury because New Chrysler had not yet obtained firm contractual commitments from new dealerships in Kentucky.  *Id.* at 698.  In other words, the state claimed that New Chrysler needed to obtain a contractual commitment to sell its products to a new dealership and then apply for and be denied a license by the state motor vehicle commission in order to have standing.  The court held that the state's argument "ignores the negative impact that the Kentucky statute is having on New Chrysler's ability to attract [new] dealers on competitive terms in these markets."  *Id.*  Requiring New Chrysler to actually contract with a new dealership in violation of the statute was too high of a bar.  The fact that the state statute negatively impacted New Chrysler's bargaining position was an injury by itself.  The court concluded that "[t]he issues are fit for judicial determination and withholding consideration will cause plaintiffs hardship as New Chrysler seeks new dealers."  *Id.*; *see also Branson School Dist. RE-82*, 161 F.3d at 630–31, n.9 (potential loss of future income is judicially cognizable injury for purposes of Article III standing); *Russian Standard Vodka (USA), Inc.*, 523 F. Supp. 2d at 383–84 (plausible claim of high risk of harm due to future conduct sufficient for Article III standing).

Tweed is injured in the same way as New Chrysler.  Tweed's inability to lengthen Runway 2/20 places it at an insurmountable disadvantage with regard to competing with other airports for new commercial service.  Mr. DeCoster explained that Tweed cannot compete with other airports that have runways long enough to accommodate the new commercial service that airlines want to provide.  Trial Tr. at 97–98.  Because of the current length of Runway 2/20 and Tweed's inability to lengthen it, Tweed cannot "even get a seat at the table" to negotiate with commercial air carriers.  *Id.* at 98.  Thus, the

defendant's argument ignores the "negative impact" that General Statutes § 15-120j(c) is having on Tweed's ability to negotiate with airlines and attract new commercial service. *In re Carco LLC*, 470 B.R. at 698.

Moreover, Mr. DeCoster explained that, if General Statutes § 15-120j(c) is eliminated and Tweed is able to move forward with its runway extension project, the project will take several years to complete. *Id.* at 119–20. No airline is going to firmly commit to bring service to Tweed several years before Runway 2/20 is actually lengthened, and where a state statute <u>expressly</u> <u>prohibits</u> Tweed from lengthening the runway. As counsel for Tweed stated during closing arguments, the state statute is the <u>sine</u> <u>qua</u> <u>non</u> with regard to moving ahead with a runway extension project.[6] Trial Tr. at 156.

With respect to all of these issues, the defendant offered no evidence to the contrary.

    iv.    <u>Tweed cannot comply with federal grant requirements due to General Statutes § 15-120j(c)'s restriction on the length of Runway 2/20</u>

Tweed has established that it currently is unable to comply with federal grant requirements due to General Statutes § 15-120j(c)'s restriction on the length of the runway. The evidence establishes the following:

---

[6] Tweed recognizes that there are other hurdles to overcome once the statute is invalidated, including the Memorandum of Agreement ("MOA"); Def. Exh. C; permitting issues and negotiations with the FAA. However, this does not impact the injuries being inflicted by General Statutes § 15-120j(c). It is unreasonable to expect the Department of Energy and Environmental Protection to expend time and effort on analyzing an application from Tweed for the runway extension project while the state statute expressly prohibits that project from moving forward. Further, the FAA has already stated, on several occasions, that it will not negotiate with Tweed or review the Preliminary Environmental Assessment while the state statute interferes with its exclusive jurisdiction. *See* Pl. Exh. 8; Def. Exh. A. Finally, if the state statute is preempted, it follows that the provision in the MOA restricting the length of Runway 2/20 would similarly be preempted, and if necessary the City of New Haven can invalidate the MOA. *See* Def. Exh. C at Section IV.

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

Whenever Tweed accepts federal funds, it agrees to various grant assurances which, inter alia, require compliance with a long list of federal statutes and regulations directed to airport facilities and operations. "Upon acceptance of an AIP grant, the grant assurances become a binding contractual obligation between the airport sponsor and the Federal government." *Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 152 F. Supp. 3d 90, 97 (E.D.N.Y. 2015). Under the AAIA, the Secretary of Transportation (the "Secretary") may approve a grant application:

> only if the airport proprietor agrees to certain written assurances regarding airport operations, which are set forth in Section 47107(a) of the AAIA. *See* 49 U.S.C. § 47107(a). The Secretary is responsible for ensuring compliance with these assurances, *see* 49 U.S.C. § 47107(g), and is authorized to approve grant applications only if the airport proprietor's assurances are 'satisfactory to the Secretary,' 49 U.S.C. § 47107(a). Accordingly, the Secretary, through the FAA, has promulgated a more thorough set of standardized grant assurances with which a recipient of AIP funding must comply.

*Id.* Non-compliance by an airport such as Tweed can result in an enforcement action by the FAA. *See* 49 U.S.C. § 47101 et seq.; Stipulation at ¶ 36; Larson Aff. at ¶ 22.

The FAA has identified several federal obligations and grant assurances that Tweed is unable to comply with as a result of General Statutes § 15-120j(c). Def. Exh. A. The FAA has stated that the statutory restriction on the length of Runway 2/20 "raises an immediate compliance issue with Federal Grant Assurance No. 5, Preserving Rights and Powers." *Id.* at 2. Federal Grant Assurance No. 5 states that an airport sponsor "will not take or permit any action which would operate to deprive it of any of its rights and powers necessary to perform any or all of the terms, conditions, and assurances in its grant agreements." *Id.* The FAA has explained that General Statutes § 15-120j(c) violates this grant assurance because it takes away Tweed's proprietary power to control the length of Runway 2/20 and gives it to the state. *Id.*

Updike, Kelly & Spellacy, P.C. 100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

1543861

Furthermore, Mr. DeCoster states that federal grant assurances require the airport operator to be as financially self-sufficient as possible.  Pl. Exh. 13 at 5; *see* also 49 U.S.C. § 47107; Federal Aviation Administration, Assurances for Airport Sponsors, Grant Assurance No. 3, *Sponsor Fund Availability*.  Mr. DeCoster testified that the Airport is operating at an annual $1.5 million deficit due to the chronically low service levels at the Airport.  Trial Tr. at 99.  Mr. DeCoster further testified that additional commercial service is necessary to increase revenue, but that Tweed will not be able to attract new commercial service unless Runway 2/20 is lengthened.  *Id.* at 97.  He also testified that without an increase in commercial service at the Airport, the annual operating deficit "is only going to get larger" and that Tweed will continue to run afoul of federal grant assurances.  *Id.* at 100.  He testified that "the FAA grant assurance requires airports to be as financially self-sufficient as possible.  In this case, it would only be widening the gap, instead of closing the gap, which is what the FAA really does desire airports to have as far as financial plans."  *Id.* (emphasis added).

Mr. DeCoster states that lengthening Runway 2/20 to the proposed 6,601 linear feet would permit the Airport to "safely handle all of the likely commercial and general aviation aircraft that would consider utilizing Tweed.  The increased activity and subsequent revenue will meet the Grant Assurance requirement to be as self-sufficient as possible.  This will likely result in the reduction of the local and state subsidies . . . ."  Pl. Exh. 13 at 5–6.  Mr. DeCoster similarly testified that the increased revenue that would accompany additional commercial service "would meet the intent of that grant assurance."  Trial Tr. at 100–101.

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

1543861

Tweed's inability to comply with federal grant assurances as a result of its inability to control the length of Runway 2/20 is a cognizable injury.  Tweed cannot live up to its contractual obligations with the FAA and currently is at risk of an enforcement action.  As a result, the FAA may decide to eliminate additional federal funding to the Airport.  There is a clear injury to Tweed.

Lastly, the taxiways at the Airport do not currently comply with federal safety standards.  *See* Pl. Exh. 11 and 12.  The taxiway issue highlights another potential benefit of the proposed runway extension project because one or more taxiways may be altered as a part of that project to bring them into compliance with federal law.  *See* Stipulation at ¶ 39.  However, the ultimate configuration of the taxiways is unclear because the FAA has refused to comment on the Preliminary Environmental Assessment.  As Mr. Furey explained, although the "proposed action" in the Preliminary Environmental Assessment calls for a non-standard parallel taxiway, the end result may change based on discussions and negotiations with the FAA because the FAA "prefer[s] standard taxiway separations."  *See* Trial Tr. at 33–34; Pl. Exh. 6.  Further, the FAA has issued a mandate to Tweed to redesign and reconstruct its taxiways to comply with federal safety standards by May 2021.  Pl. Exh. 12 at 1.  However, Tweed cannot move forward with its runway extension project and possible taxiway compliance unless and until General Statutes ¶ 15-120j(c) is invalidated.

The defendant offered no evidence to the contrary.

      v.    <u>The only commercial aircraft currently servicing the Airport will soon be retired, leaving Tweed with no commercial service</u>

Finally, the evidence shows that what little commercial service currently exists at Tweed will soon completely cease unless Tweed is able to lengthen Runway 2/20.  Mr.

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

DeCoster explains in his report that American Eagle has announced that the Dash 8 — the only commercial aircraft operating out of Tweed — will be retired soon.  Pl. Exh. 13 at 3.  The Dash 8 is nearing the end of its useful life and American will not overhaul those aircraft because the cost is not economically justifiable.  *Id.*  The Dash 8 is already being phased out and is no longer manufactured.  *Id.*; Trial Tr. at 86.  Although there is not a definitive "end date" for the Dash 8, Mr. DeCoster testified that American has stated in publications that the Dash 8 likely will be retired by the end of this decade. Trial Tr. at 70, 114.

The logical replacement for the Dash 8 is a fifty-seat regional jet, either the Bombardier CJ200 or the Embraer 145.  However, these aircraft are also nearing the end of their lifecycles and will be retired soon, likely by the end of this decade, and Mr. DeCoster indicated that American has no other aircraft that can operate on a 5,600 foot runway.  *Id.* at 70, 87–88.  Like the Dash 8, the Bombardier CJ200 and Embraer 145 are no longer being manufactured.  *Id.* at 87.  Thus, there is a real and distinct possibility that the Dash 8, Bombardier CJ200 and Embraer 145 will be retired at or around the same time, leaving Tweed with absolutely no commercial service.

Furthermore, if the Bombardier CJ200/Embraer 145 replace the Dash 8, Mr. DeCoster's report states that the desired minimum runway length for that aircraft is 6,200 linear feet and that the "lowest allowable condition" is a 5,600 linear foot runway. Pl. Exh. 13 at 3.  Thus, while the replacement aircraft could theoretically operate out of the Airport, there would be regular payload hits, making the service less profitable.  *Id.* Accordingly, there is no guarantee that American would choose to operate the Bombardier CJ200 or Embraer 145 out of Tweed once the Dash 8 is gone because it

1543861

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

may very well be unprofitable to do so, and Tweed would be powerless to alter American's decision to summarily terminate service.[7]

After the Dash 8, Bombardier CJ200 and Embraer 145 are retired, there is no replacement aircraft that can service Tweed due to the runway length.  Mr. DeCoster explained that the next size aircraft is a 70/76 seat regional jet.  Pl. Exh. 13 at 4.  This jet requires a <u>minimum</u> runway length of 6,200 linear feet, and 6,600 linear feet is preferred to maximize performance and profitability.  *Id.*  Thus, this jet cannot operate commercial service out of Tweed.

The defendant argues that the lack of a definitive "end date" for the Dash 8 means that current commercial service is not currently jeopardized at the Airport because the status quo may be maintained for a few years.  However, <u>the status quo is not a viable option because it is not sustainable</u>.  Trial Tr. at 98.  Tweed is hemorrhaging money every year even with its current service.  If the current situation is maintained, it does not mean that Tweed will survive.  It means only that Tweed will bleed to death.

Moreover, the lack of a definitive "end date" for the Dash 8 does not affect Tweed's injury because Tweed needs to get started on a runway extension project <u>now</u> in order to be in a position to attract new commercial service to replace the Dash 8.  The defendant essentially argues that Tweed must wait until the Dash 8 is gone before Tweed would be injured by the statute.  However, Mr. DeCoster explained that a runway extension project will take several years to complete.  *Id.* at 119–20.  Waiting for the Dash 8 or the replacement aircraft to retire before bringing suit is not a viable option.

---

[7] Mr. DeCoster testified that "[i]f an airline cannot make money on a flight, they will simply eliminate the flight. . . .  [T]hey'll take that asset and relocate it to a market that will be profitable for them."  Trial Tr. at 90–91.

1543861

The defendant offered no evidence to the contrary.

In sum, Tweed is suffering several legally cognizable injuries and has standing to bring this action.  Tweed only needs to prove a <u>single</u> injury to have standing.  Here, Tweed has proven several.  Aside from the FAA, Tweed is the only party that can challenge the constitutionality of General Statutes § 15-120j(c).  The statute is preventing Tweed from moving forward with a runway extension project, and the FAA will not even comment on the Preliminary Environmental Assessment while the statute interferes with its exclusive jurisdiction.  *See* Stipulation at ¶¶ 24–25; Larson Aff. at ¶ 21; Pl. Exh. 8.  The statute has caused all of the aforementioned injuries and will continue to harm Tweed as long as it is in force.

**B.    General Statutes § 15-120j(c) is Preempted by the FAAct, ADA and AAIA**

Tweed has proven that General Statutes § 15-120j(c) is preempted by three federal statutes: the FAAct, ADA and AAIA.[8]

The Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to, federal law.'"  *Air Transport Assoc. of Am. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008) (hereinafter "*ATA*").  Federal preemption may be express or implied.  *See id.* at 220–21.  Express preemption arises when "a federal statute expressly directs that state law be ousted."  *Id.* at 220 (internal quotation marks omitted).  Implied preemption takes two forms: field preemption and conflict preemption.  *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007).  Field preemption arises when "in the absence of explicit statutory language . . . Congress intended the Federal Government to occupy [a field]

---

[8] Tweed has already extensively briefed the preemption issues with respect to the FAAct, ADA and AAIA in its Memorandum of Law in Opposition to the Defendant's Motion to Dismiss.  *See* ECF # 44.  Tweed expressly incorporates all of those arguments into this Post-Trial Brief.

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

exclusively . . . ."  *ATA*, 520 F.3d at 220 (internal quotation marks omitted).  As stated by the Second Circuit in *ATA*:

> preemption is implied when the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where the object sought to be obtained by the federal law and the character of obligations imposed by it . . . reveal the same purpose.

*Id.* at 221 (internal quotation marks omitted).  Conflict preemption arises when compliance with both federal and state law is "a physical impossibility" or "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hillsborough County v. Automated Med. Laboratories, Inc.*, 471 U.S. 707, 713 (1985) (internal quotation marks omitted).

General Statutes § 15-120j(c) is expressly preempted by the ADA, and impliedly preempted by the FAAct and AAIA.

i.   <u>The FAAct impliedly preempts General Statutes § 15-120j(c) because the FAAct regulates the entire field of air safety and General Statutes § 15-120j(c) impedes the FAAct's objectives</u>

This Court has already determined that General Statutes § 15-120j(c) is impliedly preempted by the FAAct, 49 U.S.C. § 40101 et seq., under a theory of field preemption. Memorandum of Decision at 20–21 [ECF # 53].  As this Court noted, General Statutes § 15-120j(c) "attempts to regulate runway length, which is a component part of the field of airline safety, and is therefore part of a field completely occupied by the federal government."  *Id.* at 21; *see also Tweed-New Haven Airport Auth. v. Town of East Haven*, 582 F. Supp. 2d 261, 268 (D. Conn. 2008) (FAAct impliedly preempted local regulations that interfered with the Airport's runway project).  The evidence at trial establishes that runway length is indeed a component part of the field of airline safety. *See, e.g.,* Trial Tr. at 53–55 (runway length impacts whether an aircraft can operate

26

1543861

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

safely out of an airport); *id.* at 85 (Dash 8 is the only aircraft that can operate safely out of Tweed with the current runway length); *id.* at 87–88 (airlines calculate safety factor for each aircraft based in part on runway length).  Thus, General Statutes § 15-120j(c) is impliedly preempted by the FAAct.

Section 15-120j(c) is also preempted by the FAAct under conflict preemption.  This Court previously declined to find conflict preemption with the FAAct because there was no "direct conflict between a federal law and a state law."  Memorandum of Decision at 21 [ECF # 53].  However, conflict preemption does not hinge entirely on whether the state law makes it impossible to comply with a federal law.  Instead, conflict preemption arises when compliance with both federal and state law is <u>either</u> "a physical impossibility" <u>or</u> "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hillsborough County*, 471 U.S. at 713 (internal quotation marks omitted).  Here, Tweed has alleged and proven both.  The evidence shows that the current length of Runway 2/20 "remains too short for almost all commercial aircraft to operate regularly scheduled service in a <u>safe</u> and commercially reasonable manner."  Complaint at ¶ 24 (emphasis added); Pl. Exh. 13 at 3–4.  Tweed further proved that it is unable to comply with federal grant requirements due to the statute's restriction on the length of Runway 2/20.  Finally, Tweed's Master Plan and Airport Layout Plan ("ALP")[9] both call for Runway 2/20 to be extended, and both of these plans have been approved by the FAA and the state of Connecticut.  *See* Pl. Exh. 3 and 5.  Tweed cannot adhere to the Master Plan or the ALP as a result of the

---

[9] Mr. Furey testified that the ALP shows "the proposed improvements to the airport.  So it's sort of a blueprint for the future of the airport, and includes their capital improvement program."  Trial Tr. at 18.  He also testified that FAA approval is required for any construction project within the ALP.  *Id.* at 19.

statute.  Thus, General Statutes § 15-120j(c) stands as an obstacle to Congress'

objectives as stated in the FAAct and, therefore, is in conflict with and preempted by the

FAAct.

    ii.    <u>The ADA expressly preempts General Statutes § 15-120j(c)</u>

The restriction on the length of Runway 2/20 is related to "a price, route or

service of an air carrier" and is therefore preempted by the ADA.  The ADA's express

preemption provision provides:

> Except as provided in this subsection,[10] a State, political subdivision of a State,
> or political authority of at least 2 States may not enact or enforce a law,
> regulation, or other provision having the force and effect of law <u>related to</u>[11] <u>a</u>
> <u>price, route, or service of an air carrier</u> that may provide air transportation under
> this subpart.

49 U.S.C. § 41713(b)(1) (emphasis added).

The defendant claims that the ADA does not apply because the state statute

pertains to an airport and not an air carrier.  However, a state law does not have to

specifically target an air carrier in order to be preempted by the ADA.  Instead, a state

law is preempted if it <u>relates</u> to the price, route or service of an air carrier.  Indeed, the

United States Supreme Court has interpreted this provision broadly to preempt all "State

enforcement actions <u>having a connection with or reference to</u> airline 'rates, routes or

services.'"  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) (emphasis

added).  The Supreme Court "has repeatedly emphasized the breadth of the ADA's

---

[10] The exceptions to which this provision refers are not applicable in this case.

[11] The Supreme Court has defined the phrase "relating to" as "to stand in some relation; to have bearing
on or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World
Airlines, Inc.*, 504 U.S. 374, 383 (1992).  The "relating to" language expresses "a broad pre-emptive
purpose." *Id.*

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

Updike, Kelly & Spellacy, P.C.

preemption provision." *ATA*, 520 F.3d at 222; *see also American Airlines, Inc. v. Wolens*, 513 U.S. 219, 225–26 (1995); *Morales*, 504 U.S. at 383–84.

There is ample uncontradicted evidence that General Statutes § 15-120j(c) relates to the route and service of an air carrier, and thus is preempted by the ADA.  For example, Allegiant Air has indicated that it has identified Tweed as a potential Allegiant airport but that it cannot bring service to Tweed because "runway 02/20 is too short for Allegiant to comfortably operate regularly scheduled commercial service."  Pl. Exh. 10.  Thus, the statute relates to the "service" of an air carrier because it effectively "curtail[s] an air carrier's business decision to offer a particular service in a particular market." *Arapahoe County Public Airport Authority v. Federal Aviation Administration*, 242 F.3d 1213, 1222 (10th Cir. 2001) (ADA preempted airport from banning scheduled air carrier service); *see also Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265–66 (9th Cir. 1998) ("service" refers to such things as "the frequency and scheduling of transportation, and to the <u>selection</u> of <u>markets</u> to or from which transportation is provided . . . .") (emphasis added).  The limitation on the length of Runway 2/20 and its corresponding effect on which air carriers can bring service to Tweed "significantly impacts the scope of services available to public citizens desiring to travel by air" to or from the Airport.  *Arapahoe County Public Airport Authority*, 242 F.3d at 1222.  The objective of the ADA is to enhance "the availability of a variety of adequate, economic, efficient, and low-priced services," 49 U.S.C. § 40101(4), and to "encourag[e] entry into air transportation markets by new and existing air carriers and the continued strengthening of small air carriers to ensure a more effective and competitive airline

1543861

industry." 49 U.S.C. § 40101(13); *see also Arapahoe County Public Airport Authority*, 242 F.3d at 1222.  This objective is thwarted by the state statute.

Moreover, due to the length of Runway 2/20, the Dash 8 is the only commercial aircraft operating out of Tweed.  The Dash 8 flies only <u>one</u> route.  Mr. DeCoster explained that Runway 2/20 needs to be lengthened in order to attract new commercial service and to allow longer stage length flights to locations other than Philadelphia.  Trial Tr. at 88–89, 94.  An air carrier like Allegiant Air cannot conduct regular operations over any route involving Tweed because Runway 2/20 is too short to accommodate almost all commercial service.  *See Arapahoe County Public Airport Authority*, 242 F.3d at 1222 (ADA preempted ban on commercial service because it related to the "routes" of air carriers).  Thus, the state statute relates to the "routes" of air carriers because airlines currently cannot fly to and from Tweed due to the length of the runway.  Runway regulation by individual states would incapacitate the National Plan of Integrated Air Systems.  *See* Pl. Exh. 2; 49 U.S.C. § 47103.  A state restriction on any one airport can have an adverse effect on the entire national system.  The FAA cannot be powerless to ensure that commercial aircraft can land and takeoff at any Part 139 airport.

Simply stated, a longer runway leads to heavier loads, greater capacity, more airplane options and more efficient service.  Control over service levels in the national system is the sole province of the FAA and the nexus in our case between runway length and the service and routes of air carriers is clear.

Section 15-120j(c) is expressly preempted by the ADA.

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

1543861

**JA124**

iii.    The AAIA impliedly preempts General Statutes § 15-120j(c)

Finally, the AAIA, 49 U.S.C. § 47101 et seq., impliedly preempts General Statutes § 15-120j(c) because the comprehensive statutory scheme of the AAIA demonstrates the supremacy of federal interest in commercial air service expansion, particularly with regard to development of airport facilities.  General Statutes § 15-120j(c) directly conflicts with the AAIA because it serves as an impediment to the federal government's and Tweed's objective of expanding service, the implementation of the Master Plan adopted by the FAA (and the state) that contemplates the extension of Runway 2/20, and increasing compliance with federal safety standards.

Congress authorized the FAA, pursuant to the AAIA, to provide grants for public-use airports under the Airport Improvement Program.  *See* 49 U.S.C. § 47101 et seq. The FAA may approve a grant application only if it receives written assurances about airport operations, and only on terms necessary to carry out the various federal regulations for airport improvement.  *See* 49 U.S.C. §§ 47107, 47108.  The assurances include compliance with FAA requirements as to the layout of the airport, including runways and taxiways.  *See* 49 U.S.C § 47107.

The AAIA, in conjunction with the FAAct and ADA, demonstrates the dominance of the federal interest in aviation safety and airport improvement projects and requires the FAA to develop and maintain a national plan of integrated airport systems.  Indeed, the AAIA declares that "airport construction and improvement projects that increase the capacity of facilities . . . be undertaken to the maximum feasible extent so that safety and efficiency increase and delays decrease"; 49 U.S.C. § 47101(a)(7); and that "artificial restrictions on airport capacity are not in the public interest" and should not be

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

31

tolerated.  49 U.S.C. § 47101(a)(9); *see also City of Oceanside v. AELD, LLC*, 740 F. Supp. 2d 1183, 1190 (S.D. Cal. 2010).

Tweed has alleged and proven that the FAA has approved its Master Plan and ALP, which call for extending the length of Runway 2/20 up to 7,200 linear feet. Complaint at ¶¶ 18–21; Pl. Exh. 3 and 5.  Tweed has also executed FAA Airport Improvement Program grant assurances that require it to make the Airport as self-sustaining as possible, including increasing the level of regularly scheduled commercial service and general aviation usage at the Airport.  Complaint at ¶ 30; Def. Exh. A; Pl. Exh. 13 at 5–6; Trial Tr. at 99–101.  General Statutes § 15-120j(c), however, has prevented Tweed from extending the length of Runway 2/20 and attracting new commercial service, which has directly led to the Airport's precarious and unsustainable financial condition.  The FAA has refused to provide funding to Tweed's runway extension project and has refused to allow the project to proceed even with non-federal funding as long as the state statutory prohibition is in place.  Trial Tr. at 19–20; Pl. Exh. 7 and 8; Def. Exh. A.  FAA approval, therefore, is necessary even if Tweed forgoes federal funding.  *See* Stipulation at ¶ 28.  Thus, the evidence demonstrates that General Statutes § 15-120j(c) "directly conflicts" with the AAIA because the state statute impermissibly regulates the use of land in the ALP and, therefore, is an obstacle to the FAA's goal of ensuring aviation safety.  *See City of Oceanside*, 740 F. Supp. 2d at 1190.  The AAIA impliedly preempts the state statute.

## IV.    <u>CONCLUSION</u>

The injuries caused by General Statutes § 15-120j(c) are clear.  The current runway length has prevented Tweed from attracting new commercial service.  The

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

1543861

status quo is not a viable option.  The Airport is losing money, and will continue down this death spiral so long as the statute prevents Runway 2/20 from being extended.  Tweed is a prototypical market for Allegiant Air, but Allegiant cannot and will not bring commercial service to Tweed unless and until the runway is lengthened.  Increased commercial service would result in additional revenue.  Subsidies would be diminished and Tweed would be able to comply with its federal grant assurances.

The Dash 8 and possible replacement aircraft that can operate safely at Tweed will soon be retired, and Tweed will not have a single commercial air carrier servicing the Airport.  Waiting for these aircraft to retire before bringing suit is not an option.  The runway extension project will take several years to complete.  The project needs to commence <u>now</u> in order for Tweed to be able to attract new commercial service.  These injuries are concrete, and Tweed feels the effects of General Statutes § 15-120j(c) every day.  On all of these issues, the defendant has offered no evidence to the contrary.  Tweed cannot lack standing.  If that were so, there would be no check on the state's ability to pass this type of unconstitutional statute.

Finally, this Court has already determined that General Statutes § 15-120j(c) is impliedly preempted by the FAAct.  The evidence shows that this is still the case.  The statute is also preempted by the ADA and AAIA.

For all of the foregoing reasons, Tweed respectfully requests that the Court render judgment in Tweed's favor and grant it the relief that it seeks: a declaration that Connecticut General Statutes § 15-120j(c) violates the Supremacy Clause of the United States Constitution and is therefore unconstitutional and invalid.

Updike, Kelly & Spellacy, P.C. · 100 Pearl Street · P.O. Box 231277 · Hartford, Connecticut 06123-1277 · Tel. (860) 548-2600 · Fax (860) 548-2680 · Juris No. 65040

1543861

Respectfully submitted,
PLAINTIFF,
TWEED-NEW HAVEN AIRPORT
AUTHORITY


By:  /s/ Christopher A. Klepps, Esq.
JOHN C. KING (ct09570)
HUGH I. MANKE (ct05250)
CHRISTOPHER A. KLEPPS (ct29463)
UPDIKE, KELLY & SPELLACY, P.C.
100 Pearl Street
Hartford, CT 06123
Tel. No. (860) 548-2600
Fax No. (860) 548-2680
jking@uks.com
hmanke@uks.com
cklepps@uks.com

Updike, Kelly & Spellacy, P.C.
100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

34

1543861

**<u>CERTIFICATION</u>**

THIS IS TO CERTIFY that on May 19, 2017, a copy of the foregoing Plaintiff's Post-Trial Brief was electronically filed.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  The undersigned did cause to be sent, by U.S. Mail, first-class, postage prepaid, a copy of the foregoing to all counsel and pro-se parties that do not have access to the Court's electronic filing system.

<u> /s/ Christopher A. Klepps, Esq.</u>
Christopher A. Klepps, Esq.
Updike, Kelly & Spellacy, P.C.

Updike, Kelly & Spellacy, P.C.

100 Pearl Street • P.O. Box 231277 • Hartford, Connecticut 06123-1277 • Tel. (860) 548-2600 • Fax (860) 548-2680 • Juris No. 65040

1543861

**JA129**

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TWEED-NEW HAVEN AIRPORT | : | |
| AUTHORITY | : | CIVIL ACTION NO. 3:15-cv-01731-RAR |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| GEORGE JEPSEN, IN HIS OFFICIAL | : | |
| CAPACITY AS ATTORNEY GENERAL | : | |
| FOR THE STATE OF CONNECTICUT | : | |
| *Defendant* | : | May 19, 2017 |

### DEFENDANT'S POST-TRIAL MEMORANDUM

The plaintiff Tweed-New Haven Airport Authority ("plaintiff" or "Authority"), joined by the Intervenor City of New Haven, has brought this declaratory judgment action against the State of Connecticut Attorney General George Jepsen ("defendant" or "State") seeking to have the Court issue an order declaring that Conn. Gen. Stat. 15-120j(c), which limits the length of the runway at Tweed Airport ("Airport") to 5,600 linear feet, is preempted by the Supremacy Clause of the United States Constitution, and therefore is unconstitutional and invalid.

The parties have previously filed a Joint Trial Memorandum ("JTM") containing an extensive Stipulation of Facts, a List of Exhibits, and accompanying affidavits provided by the plaintiff, all of which were admitted into evidence at a hearing held before this Court on March 22, 2017. At the hearing, the Court received testimony from two plaintiff witnesses, including one expert witness. The defendant did not present any witnesses because its request for testimony from FAA personnel pursuant to federal law was denied by FAA counsel.

As shown in this Post-Trial Memorandum, evidence admitted at trial, particularly the trial testimony and report of the plaintiff's expert witness, shows that the plaintiff has not sustained its burden of establishing an "injury in fact" necessary to establish standing, thereby depriving this

**JA130**

Court of subject matter jurisdiction over this action.  Further, in accordance with relevant federal case law, the plaintiff's underlying claim that Conn. Gen. Stat. § 15-120j(c) is preempted by either the Federal Aviation Act ("FAAct"), the Airline Deregulation Act ("ADA"), or the Airport and Airways Improvement Act ("AAIA") must fail.

Prior to addressing the issue of whether the plaintiff has standing to pursue this action in federal court, the defendant below sets forth specific legal principles governing the issue of Article III standing.

### Article III Standing Requirements

The Court has previously set forth the well-established elements for standing in its prior decision denying the defendant's Motion to Dismiss Plaintiff's lawsuit:

> Article III, § 2 of the United States Constitution restricts federal courts to deciding "'Cases" and 'Controversies.'" *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 559 (1992). The "case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008).  "Three elements comprise the 'irreducible constitutional minimum' of standing:  (1) the plaintiff must have suffered an injury-in-fact -- an invasion of legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the  injury will be redressed by a favorable decision." *All. For Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 228 (2d Cir. 2011), *aff'd sub non.  Agency for Int'l Dev v. All for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 186 L. Ed. 2d 398 (2013).

> The party invoking federal jurisdiction bears the burden of stabling these elements." *Lujan*, 504 U.S. at 561.

*Tweed-New Haven Airport Authority v. Jepsen*, Civil Action No. 3:15-cv-01731-RAR, dated December 9, 2016, at pp. 6-7; see *Lujan*, supra, 504 U.S. at 560-61.

In its ruling determining that the plaintiff's allegations had satisfied Article III standing requirements at the pleading stage, the Court concluded that "the plaintiff alleged a concrete and direct injury, including the current and future loss of business and an inability to comply with

2

**JA131**

federal grant requirements. The plaintiff has also shown that that this injury is both actual and

imminent, because the plaintiff is already experiencing its effects." *Id.*, at p. 9. Compared to the

burden of proof necessary at the pleading stage, however, the burden of proof for establishing

Article III standing is higher following a trial:

> [E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56e, which for purposes of the summary judgment motion will be taken to be true. **And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."**

*Lujan*, supra, 504 U.S. at 561 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889,

110 S.Ct. 3177, 2189, 111 L.Ed.2d 695 (1990) and *Gladstone, Realtors v. Village of Bellwood*,

441 U.S. 91, 115, n. 31, 99 S.Ct. 1601, 1616, n.31, 60 L.Ed.2d 66 (1979))(emphasis added).

In *Lujan*, the defendant environmental group brought an action against the United States

Secretary of the Interior ("Department") challenging the promulgation of a rule by the

Department that changed its interpretation of a provision of the Endangered Species Act of 1973

("ESA"). *Lujan*, supra, 504 U.S. at 557-59. Specifically, a particular provision of the ESA

prohibits all federal agencies from taking any action that would threaten the existence of an

endangered species. *Id.*, at 558. In 1978, two federal agencies passed a joint regulation stating

that such language in the ESA extended to action in foreign nations. *Id.* A year later, however,

the agencies issued a revised joint regulation limiting the reach of the ESA provision to the

United States and the high seas. *Id.*, at 558-59. The defendant filed a declaratory judgment and

injunction action against the Department seeking to enforce the original interpretation of the

ESA provision. *Id.*, at 559. The district court granted the Department's motion to dismiss for

3

**JA132**

lack of standing, but the Eighth Circuit reversed such ruling. *Id.* Subsequently, the district court denied the Department's motion for summary judgment for lack of standing, and the Eighth Circuit affirmed. *Id.*

The United States Supreme Court reversed, holding that the defendant had failed to make "the requisite demonstration of . . . injury" to show standing. *Id.*, at 562. In reaching its decision, the Court determined that affidavits submitted by two defendant members failed to contain any facts "showing how damage to the species will produce 'imminent' injury'" to them. *Id.*, at 564. One member, who had previously traveled to Egypt to observe the endangered Nile crocodile, claimed that she "intend[s] to do so again and hope[s] to observe the crocodile directly," and further, that she "will suffer harm in fact" due to the "American . . . role . . . in overseeing the rehabilitation of the Aswan High Dam on the Nile." *Id.*, at 563. Another member, who on a previous trip observed the Asian elephant and the leopard in Sri Lanka, averred that a development project funded by the U.S. Agency for International Development "will seriously reduce endangered . . . species habitat . . . that I visited" and "may severely shorten the future of these species." *Id.* The member admitted, however, that though she intended to return to the country, she had no current plans, stating, "I don't know [when] . . . Not next year . . . In the future." *Id.*, at 564. Based on such evidence, the Court concluded that "[s]uch 'some day' intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, supra, 504 U.S. at 564. According to the Court, "[w]here there is no actual harm . . . its imminence (though not its precise extent) must be established." *Id.* n. 2.

4

**JA133**

The Court further observed that "[a]lthough 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is '"certainly impending."' *Id.* n. 2 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 1725, 109 L.Ed.2d 135 (1990)). In *Whitmore*, the petitioner death row inmate sought to intervene in the proceeding of another death row inmate (Simmons) who had waived all future appeals of his death sentence. *Id.*, at 152-54. The petitioner claimed injury in fact on grounds that were contingent on the possible occurrence of a series of events. Specifically, the petitioner claimed that if he were granted federal habeas corpus relief in the future, and if he were convicted and sentenced again to death, and if he sought review of his sentence by the Supreme Court of Arkansas, which is required to compare death penalty cases to a data base of other capital cases to avoid arbitrary imposition of the death penalty, his comparative review would be "arbitrarily skewed" because Simmons' death sentence would be omitted from the data base due to Simmons' waiver of appeals. *Id.*, at 156-57. The Court determined that the petitioner's alleged injury was "too speculative" to invoke Article III jurisdiction, finding his claim of possible habeas relief "problematic" and his claim of avoiding the death sentence if the comparative review process included the Simmons case as "conjecture." *Id.*, at 157-58.

Additionally, the Court in *Whitmore* compared the speculative nature of the petitioners' claim to multiple cases in which it had previously concluded that a claimed injury was too speculative to establish an injury in fact under Article III. See *id.* For example, in *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), town residents sought an injunction against a Magistrate and Circuit Court Judge who were allegedly engaged in a scheme of "illegal bondsetting, sentencing and jury-fee practices." *Id.*, 496 U.S. at 157-58; see *O'Shea*,

5

**JA134**

414 U.S. at 495. The plaintiff's claimed injury in fact on the grounds that "*if* [they] were to proceed to violate an unchallenged law and *if* they were charged, held to answer, and tried in any proceedings before petitioners, they will be subjected to the discriminatory practices that petitioners are alleged to have followed." *Id.*, 496 U.S. at 158 (citing *O'Shea*, 414 U.S. at 497, 94 S.Ct. at 676-77)(emphasis added in *Whitmore*). The Court noted that such a claim "took us 'into the area of speculation and conjecture,' and beyond the bounds of our jurisdiction." *Id.*, 496 U.S. at 158 (citing *O'Shea*, 414 U.S. at 497, 94 S.Ct. at 676-77). As a result, the Court's holding in *Whitmore* was analogous to its decision in *O'Shea*, *id.*, 496 U.S. at 158, which recognized that "[t]he injury or threat of injury must be both real and immediate, not 'conjectural' or 'hypothetical.'" *O'Shea,* 414 U.S. at 494 (citations omitted).

Examples of other similar holdings based on "inadequate allegations" cited by the Court in *Whitmore* include *Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 1666-67, 75 L.Ed.2d 675 (1983)("future injury contingent on a plaintiff having an encounter with police wherein police would administer an illegal "chokehold[d]"), *Golden v. Zwickler*, 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969)("prospective future candidacy of a former Congressman"), and *Ashcroft v. Mattis*, 431 U.S. 171, 172, n. 2, 97 S.Ct. 1729, 1740, n.2, 52 L.Ed.2d 219 (1977)("police using deadly force against a person fleeing from an as yet unaffected arrest"). See *Whitmore*, supra, 496 U.S. at 158. The principle derived from such cases is that "[a]llegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Id.* (citations omitted).

The Second Circuit has similarly observed that a plaintiff "must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir.

6

**JA135**

2004)(citing *Los Angeles*, supra, 461 U.S. at 101-02). In *Shain*, the plaintiff, who had previously been strip searched at the county correctional institution following a misdemeanor arrest, challenged the policy after the initial case against him was withdrawn. *Id.*, at 213. The Second Circuit rejected his claim of standing, concluding that to establish harm the plaintiff "would have to show that *if* he is arrested in Nassau County and *if* the arrest is for a misdemeanor and *if* he is not released on bail and *if* he is remanded to NCCC and *if* there is no particularized reasonable suspicion that he is concealing contraband, he will again be strip searched." *Id.*, at 216 (emphasis in original). The Court found "[s]uch an accumulation of inferences [] simply too speculative and conjectural to supply a predicate for prospective injunctive relief." *Id.* (citing *O'Shea*, supra, 414 U.S. at 495-96).

A.   **THE PLAINTIFF HAS NOT SATISFIED TRADITIONAL ARTICLE III STANDING REQUIREMENTS BECAUSE ITS ALLEGATIONS OF INJURY ARE NOT ADEQUATELY SUPPORTED BY TRIAL EVIDENCE.**

As stated earlier, the plaintiff bears a higher burden of supporting its claim of standing based on an injury in fact than it did at the pleading stage in that it must now show that its claim is "supported adequately by the evidence adduced at trial." *Lujan*, supra, 504 U.S. at 561 (citation omitted). Because the plaintiff has failed to meet its burden of showing an imminent injury in fact with adequate evidence either in the Joint Stipulation of Facts and Exhibits or in the form of trial testimony, it lacks Article III standing to pursue declaratory relief from this Court.

1.   **The Plaintiff Has Failed To Show That The Dash 8 Will Be Phased Out "In The Near Future," That A Replacement Plane "Will Need A Longer Runway" Or That Regularly Scheduled Commercial Service At The Airport Is "Jeopardized" And "May Be Terminated."**

In its Complaint, the plaintiff alleges, *inter alia*, that it "understands" that the single type of aircraft presently providing commercial service at the Airport will be phased out *in the near future* and replaced with an aircraft that will need a longer runway. Complaint, at ¶ 26 (emphasis

added). Similarly, the plaintiff alleges that "regularly scheduled commercial service at the Airport *is not only jeopardized*" but "*may* be terminated in the future" if the runway isn't lengthened. *Id.*, at ¶ 27 (emphasis added).  These two allegations form the core of the plaintiff's claim of injury in fact, for without them, the plaintiff lacks an "actual or imminent" injury that would constitute standing in this action. The evidence at trial has patently shown, however, that these allegations of a "possible future injury" are "conjectural" and "hypothetical" rather than "actual or imminent," and therefore fail to constitute standing as a matter of law.  See *Whitmore*, supra, 496 U.S. at 158; see also *O'Shea*, supra, 414 U.S. at 495-96.

   At trial, the plaintiff's expert, John DeCoster, who was disclosed as having "personal knowledge of aircraft used by commercial airlines,"[1] not only testified on cross-examination that he does not know when the American Airlines ("American") Dash 8 will be retired, but also that his knowledge on the issue is limited to the following characterization: "someday in the future the Dash 8 will be phased out."  Trial Transcript, dated March 22, 2017, Testimony of John DeCoster ("DeCoster Test."), p. 119, lines 9-11; p. 69, lines 4-8.  In the meantime, according to Mr. DeCoster, "the current runway length is sufficient to accommodate [the Dash 8] in most weather conditions without a payload hit (i.e. the requirement to keep seats empty in order to provide for additional lift due to a shorter than required runway length.").  P. Exh. 13, Report of John DeCoster ("DeCoster Report"), Trillion Aviation, dated February 22, 2017, at p. 3.  Even with an occasional payload hit, Mr. DeCoster agrees that American has still found it profitable to use the Dash 8 to service the Airport.  Trial Transcript, DeCoster Test., p. 107, lines 10-15.  Similarly, Mr. DeCoster's report indicates that demand in the New Haven market "has allowed American to operate the Dash 8 at an acceptable profitability level."  P. Exh. 13, DeCoster

---

[1] P. Expert Disclosure, dated April 1, 2016,

Report, at p. 3.  In fact, Mr. DeCoster is not aware of any time American has discontinued Dash 8 service at the Airport for any reason since he started working with the Authority in 2009.  *Id.*, DeCoster Test., p. 105, lines 18-23.  As a result, evidence produced at trial shows that American could continue to service the Airport with the Dash 8 "at an acceptable profitability level" for the indefinite future.

In addition, Mr. DeCoster stated in his report that the "logical aircraft that will replace the Dash 8 is the 50 seat regional jet, either the Bombardier CJ200 or the Embraer 145." *Id.*, DeCoster Report, at p. 3.  Mr. DeCoster's report also states that "according to the manufacturer's specifications, 5,600 linear feet" -- which is the current length of Runway 2/20 at the Airport -- "is the lowest allowable condition" upon which the regional jets can operate.  See *id.*  At trial, Mr. DeCoster testified that American could service the Airport with either regional jet after the Dash 8 is retired in light of the fact that "[b]ased on the manufacturer's specifications, the runway length would meet the minimal requirement as stated."  Trial Transcript, DeCoster Testimony, p. 113, lines 23-25 through p. 114, lines 1-3.  Mr. DeCoster further testified that American has as many as 125 Bombardier CJ200s and Embraer 145s combined as of 2017, any of which American could dedicate to service the Airport.  *Id.*, p. 107, line 25 through p. 108, lines 1-25 through p. 109, lines 1-3; see also P. Exh. 13, DeCoster Report, at p. 3.  Moreover, Mr. DeCoster testified that the he does not know when American will retire either of the two regional jets. *Id.*, p. 118, lines 17-20; p. 119, lines 12-18.  As a result, based on his lack of knowledge as to when the Dash 8 or the two regional jets will be retired, Mr. DeCoster agreed at trial that he "cannot conclude that regularly scheduled commercial service at Tweed is jeopardized at this moment." *Id.*, p. 119, lines 18-23 ("At this moment, no."); p. 120, lines 2-5 ("[I]t is not jeopardized at this moment.").

9

Based on such "evidence adduced at trial," the plaintiff has failed to "adequately support" its claim of injury in fact to constitute standing in this action. The plaintiff's assertion that the Dash 8 will be phased out "in the near future" is merely a ""some day' intention[] – without any description of concrete plans, or indeed even any specification of when the some day will be," and therefore "do[es] not support a finding of the 'actual or imminent' injury that our cases require." See *Lujan*, supra, 504 U.S. at 564.  Even if the Dash 8 is retired, the plaintiff's own expert has admitted that either of two regional jets that are "logical" replacement aircraft can operate at the Airport indefinitely into the future until some unspecified and unknowable date. See Trial Transcript, DeCoster Test., p. 118, lines 17-20; p. 119, lines 12-18.  As a result, the plaintiff's claim of "a possible future injury" arising from an unknown phase out date of both the Dash 8 and the two regional replacement jets does not satisfy Article III requirements necessary to establish injury in fact since such future possible events are not "threatened injur[ies]" that are ""certainly impending.'" *Whitmore*, supra, 496 U.S. at 158 (citations omitted).  Rather, the claimed injury in fact -- that the Authority will "need a longer runway" because the Dash 8 "will be phased out in the near future" and that "regularly scheduled commercial service at the Airport is not only jeopardized but also may be terminated in the future" -- is not "real and immediate" but "conjectural," "hypothetical" and "too speculative" to establish Article III standing. See *O'Shea,* supra, 414 U.S. at 494 (citations omitted); see also *Whitmore*, supra, 496 U.S. at 157-58; see Complaint, at ¶¶ 26-27.

Accordingly, like the United States Supreme Court's rejection of standing claims based on the hypothetical injuries alleged in *Whitmore, O'Shea, Los Angeles, Golden* and *Ashcroft* and the Second Circuit Court's similar rejection of  a speculative claim in *Shain*, the plaintiff's hypothetical scenario in this case -- that *if* the only type of aircraft currently providing service to

10

**JA139**

the Airport will soon be phased out, and *if* there are no replacement planes that can operate on

the existing runway, and *if* new planes will need a longer runway, and *if* that development

jeopardizes commercial service at the Airport, the consequence will be that enforcement of

Conn. Gen. Stat. § 15-120j(c) *may* terminate all commercial service "someday" in the future --

must be similarly rejected as improperly hypothetical, speculative and conjectural to meet Article

III injury in fact standing requirements.  "The requirements for a justiciable case or controversy

are no less strict in a declaratory judgment proceeding than in any other type of suit.  [The

United States Supreme] Court is without power to give advisory opinions.  It has long been its

considered practice not to decide abstract, hypothetical or contingent questions." *Alabama State

Federation of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945).

   **2.  The Plaintiff Has Failed To Show Specific Lost Business Opportunities Due To
        The Existence Of Conn. Gen. Stat. § 15-120j(c).**

   Similarly, the evidence does not support the plaintiff's contention that it has incurred

specific lost business opportunities due to the runway limitation in Conn. Gen. Stat. § 15-120j(c).

   Though the plaintiff in its Complaint alleges that "[n]umerous airlines have notified the

Authority that they would like to bring regularly scheduled service to the Airport, but they

cannot do so until Runway 2/20 is lengthened," Complaint, at ¶ 28, evidence adduced at trial

shows otherwise.  Significantly, the plaintiff did not present any testimony from any witnesses

from any airlines to support its claim of specific lost business opportunities.  Instead, the

plaintiff's only expert witness, Mr. DeCoster, admitted at trial that his report did not rely on or

include any references to market demand studies conducted by third parties or himself of any

potential commercial service from the Airport to other destinations, or vice-versa.  Trial

Transcript, DeCoster Test., p. 128, lines 4-20.  Similarly, though the DeCoster Report states that

an ultra low-cost carrier, Allegiant Air, "represents a real opportunity for adding service short

11

**JA140**

term," the report does not include any attached letters from Allegiant or any other airline to the Authority stating or suggesting interest in servicing the Airport if the runway were lengthened. See P. Exh. 13, DeCoster Report. at p. 5; see JTM ¶ 59 ("Notwithstanding marketing efforts, the Authority has not received a commitment from any airline to provide service at the Airport if the statutory length restriction on Runway 2/20 is removed.").

The only letter in evidence that the plaintiff contends represents interest from another airline in providing service to the Airport is from Allegiant Air to Federal Aviation Administration ("FAA") Administrator Huerta in 2015. See P. Exh. 10, Allegiant Travel Company to Michael Huerta, dated December 21, 2015 ("Allegiant Letter"). Mr. DeCoster denied ever having seen this letter and further testified that to his knowledge Allegiant had not indicated any commitment to the Authority to begin regularly scheduled commercial service at the Airport following a runway extension. Trial Transcript, DeCoster Test., p. 73, lines 2-8.

The Allegiant letter itself contains too many contingencies to show a specific lost business opportunity for the plaintiff based on the limited length of the runway. First, the letter references the fact that the Airport "is in all planning stages of infrastructure improvements with the FAA that would include an extension of runway 2/20," and that Allegiant "supports the *possibility* of these improvements." *Id*., at ¶ 1 (emphasis added). Next, Allegiant makes it clear that it does not have any planes in its fleet that can service the Airport due to the length of the runway. *Id*., at ¶ 3. Thereafter, the letter states that *"[i]f* the proposed improvements are implemented, Allegiant *would eagerly reopen* our analysis of HVN's viability for regularly scheduled commercial service." *Id*. (emphasis added). Lastly, the letter indicates that *"[a]fter* establishing confidence in the operating conditions at HVN, Allegiant *would seriously consider* beginning regularly scheduled commercial air service." *Id*., at ¶ 4 (emphasis added).

12

**JA141**

Taken together, these statements show that *if* the possible infrastructure improvements at the Airport were implemented, and *if* Allegiant's new analysis showed viability for regularly scheduled commercial service, and *if* Allegiant was confident in the operating conditions at the Airport, it *would then seriously consider* commencing commercial service at the Airport.  Such language filled with so many contingencies is analogous to the fact patterns with multiple contingencies rejected as insufficient for Article III standing by the U.S. Supreme Court and the Second Circuit in the cases addressed above.  See e.g. Discussion of *Whitmore, O'Shea, Los Angeles, Golden, Ashcroft and Shain*, Sections A.1. and A.2, supra.   Moreover, the inquiries do not end there: how many variables go into an airline's decision to determine whether a particular market is viable for service?  How many considerations are undertaken by an airline in determining whether it is confident in operating conditions at an airport *before* that airline *seriously* considers whether a particular airport is a viable market for service?   Accordingly, the plaintiff's claim of specific lost business opportunity with Allegiant stretches the concept of "imminence" "beyond its purpose" since the evidence overwhelmingly shows that such a loss is not "certainly impending" as required for standing under Article III.  See *Whitmore*, supra, 496 U.S. at 158 (citations omitted).

### 3.   The Plaintiff Has Failed To Show That It Has Incurred Current And Future Loss of Business Due To Chronically Low Service Levels Caused By Conn. Gen. Stat. § 15-120j(c).

The parties have stipulated that "[s]ince 2009, the Airport has failed to attract a single new scheduled commercial carrier.  Service remains low, less than 35,000 enplanements per year." See JTM at ¶ 18 (citing Affidavit of Tom Reich ¶ 20).  The existence of chronically low service levels at the Airport ostensibly supports the plaintiff's claim that it has sustained a current and future loss of business due to the runway length limitation in  Conn. Gen. Stat. § 15-120j(c).

The evidence has not shown, however, that the statute has caused the plaintiff a loss of current and future business, and therefore the plaintiff's claim of injury in fact on this ground must fail.

First, the plaintiff has failed to meet its burden of showing a current loss of business due to Conn. Gen. Stat. § 15-120j(c).  While evidence presented at trial shows that the runway was 5,600 linear feet prior to the passage of Conn. Gen. Stat. § 15-120j(c) in 2009, no evidence has been presented suggesting that service levels at the Airport have become chronically low or lower since then. See D. Exh. C, Memorandum of Agreement, dated March 16, 2009, at ¶ III,1.a. (referencing "existing paved runway length of 5,600 linear feet").  Mr. Reich, who has only provided marketing services to the Airport since December 2011, does not provide any information in his affidavit about service levels at the Airport prior to 2009.  See JTM ¶ 46. Furthermore, neither Mr. Reich nor any other witness including the plaintiff's expert witness has provided any evidence to the Court in the form of marketing studies showing whether there ever has been or currently is a market demand for any new type of commercial service to or from the Airport.  This is not surprising in light of the fact that there are no fewer than eight airports within a reasonable driving distance of the Airport, including four New York airports (JFK International, Newark, LaGuardia and Westchester), three Connecticut airports (Bradley International, Sikorski Memorial and Brainard), and one Rhode Island airport (T.F. Green).  See Trial Transcript, DeCoster Test., p. 129, lines 9-25.[2]  As a result, the plaintiff has failed to show that Conn. Gen. Stat. § 15-120j(c) has caused chronically low service levels at the Airport that have allegedly resulted in a current loss of business to the Authority.

---

[2] Mr. DeCoster testified that he did not know the location of Sikorsky Airport in Bridgeport or Westchester Airport in New York.  The Court may take judicial notice that both airports are closer in driving distance to the Airport than Newark Airport, which Mr. DeCoster deemed to be within a "reasonable driving distance" of the Airport.  See *id.*; see F.R.E. Rule 201(b).  Brainard Airport in Hartford, Connecticut is similarly within a reasonable driving distance of the Airport. See F.R.E. Rule 201(b).

**JA143**

Second, the plaintiff's claim of loss of future business is equally unsustainable.  Since the plaintiff has failed to provide sufficient evidence that it will incur future loss of business from Allegiant Air or any other airline since the passage of the statute in 2009, the plaintiff cannot sustain its burden of showing "a causal connection between [its] injury and the challenged conduct," or in this case between chronically low service levels and the existence of the runway statute.  See *Tweed-New Haven Airport Authority*, supra, at pp. 6-7 (citations omitted); see *Lujan*, supra, 504 U.S. at 560-61.  There is a complete dearth of evidence showing that any airline has even considered whether regularly scheduled commercial service to the Airport could or would be economically feasible with a lengthened runway, and the only airline that has even approached the topic has merely indicated that it would "eagerly reopen its analysis" of the Airport's viability if proposed improvements were realized.  See P. Exh.10, Allegiant Letter, at ¶ 3; see JTM ¶ 51 ("Based on Mr. Reich's experience, the overriding issue with respect to an airline choosing to provide service to a new destination is economic viability.")(citing Reich Aff. ¶ 51).  Mr. Reich's affidavit is even more speculative, stating that he has contacted ten airlines "with regard to the *possibility* of those airlines bringing service to the Airport," which falls far short of showing if any of those unnamed airlines have even considered whether it would financially feasible to provide commercial service to the Airport.  See JTM ¶¶ 47-48 (citing Reich Aff. ¶¶ 7-8).   Due to such speculation and conjecture that has not been supported by evidence at trial, Mr. Reich's statement that "based upon his knowledge . . .  the length of the runway is a significant factor in the low service levels at the Airport" should be assigned little weight by the Court.  See JTM at ¶ 18.

Lastly, the evidence has not shown that the plaintiff will incur an "imminent" future loss of business due to the retirement of planes capable of servicing the Airport.  To the contrary, the

15

**JA144**

evidence has shown that American could continue to operate the Dash 8 for the indefinite future, and, upon its retirement, replace it with the Bombardier CJ200 for an indefinite amount of time until it is retired, at which time American could be replace that plane with the Embraer 145 to provide service to the Airport for yet another undetermined length of time. "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes -- that the injury is 'certainly impending.'" *Id.* n. 2 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 1725, 109 L.Ed.2d 135 (1990)).  Here, the plaintiff's claim of an imminent future loss of business is not "certainly impending" as required for standing under Article III, but instead has not been shown to be "imminent" at all, or at a minimum stretches the concept of "imminence" "beyond its purpose."  See *Whitmore*, supra, 496 U.S. at 158 (citations omitted).

**4. The Plaintiff Is Responsible For Its Inability To Comply With Federal Grant Assurances.**

Whenever the Authority accepts federal funds, it agrees to various grant assurances which, *inter alia*, require compliance with a long list of federal statutes and regulations directed to airport facilities and operations.  Non-compliance by an airport such as Tweed can result in enforcement action by the FAA.  JTM ¶ 36 (citing 49 U.S.C. §§ 47101 *et seq*.).  The evidence shows that the Authority, not the State, has been the party responsible for the Authority's failure to comply with federal grant assurances and related federal statutes since the enactment of Conn. Gen. Stat. § 15-120j(c) in 2009.

**a. Current Noncompliance: Nonstandard Taxiway Proposal.**

In accordance with FAA Advisory Circular 150/5300-13A, the standard distance from a runway centerline to a parallel taxiway for a C-III runway such as Tweed's Runway 2/20 is 400 feet.  See JTM ¶¶ 37-38 (citing Table 3-5, Runway Design Standards Matrix, P. Exh. 11 and

16

**JA145**

Kurtz Aff. ¶¶ 6-7). It is undisputed that the current locations and dimensions of the taxiways are not in compliance with federal regulations in terms of their distance to Runway 2/20. JTM ¶ 39. Specifically, the Airport is not in compliance with FAA design standards due to non-standard taxiway geometry. *Id.*, ¶ 43. The FAA has given the Authority until May 6, 2021 to redesign and reconstruct its taxiways, including realignment of Taxiway A, to bring the Airport into compliance with federal design standards. *Id.* (citing Merck Memo, P. Exh. 12).

Notwithstanding the FAA's order, the Authority has proposed a nonstandard 275-foot parallel taxiway as part of its operational safety improvements at Tweed. See P. Exh. 6, Preliminary Environmental Assessment ("PEA Report"), p. 7, Proposed Action ("[T]his proposed action would be non-standard and require an FAA Modification of Design Standards"); see also Trial Transcript, dated March 22, 2017, Testimony of Robert Furey ("Furey Testimony"), p. 31, lines 6-10. Not only does the PEA Report include a nonstandard taxiway proposal that "directly contradicts" the FAA directive to the Authority in the Merck Memo, see *id.*, p. 38, lines 25-39 and p. 39, lines 1-5, but the Report also concludes that a standard taxiway alternative proposal "would significantly impact both freshwater and tidal waters, as well as FEMA Floodplains," and therefore "would not be considered reasonable or feasible enough to merit additional analysis." *Id.*, PEA Report, p. 13.

No evidence has been offered at trial to show that the runway length limitation in Conn. Gen. Stat. § 15-120j(c) created a nonstandard taxiway condition at the Airport. It is therefore disingenuous for the plaintiff to claim that the runway limitation statute has prevented it from complying with federal grant assurances such as FAA Advisory Circular 150/5300-13A when the plaintiff itself has proposed a nonstandard taxiway in direct contradiction of the FAA's

17

**JA146**

requirement to create standard taxiways by 2021. Accordingly, due to a lack of causation, there is insufficient evidence for the plaintiff to establish Article III standing on this particular claim.

### b. Past Noncompliance: Memorandum Of Agreement

Trial evidence shows that the plaintiff voluntarily entered into an agreement with the City of New Haven and the Town of East Haven agreeing to a 5,600 linear foot length limitation on Runway 2/20 at the Airport *before* the Connecticut Legislature enacted Conn. Gen. Stat. § 15-120j(c). See D. Exh. C, Memorandum of Agreement. That agreement, not the subsequent statute, resulted in the FAA identifying multiple violations of federal grant assurances and statutes based on its terms and conditions.

On March 16, 2009, a Memorandum of Agreement ("MOA") was established among the City of New Haven, the Town of East Haven, the Authority, and certain members of the General Assembly. JTM ¶ 60; D. Exh. C. The MOA limits Runway 2/20 to the existing paved runway length of 5,600 linear feet. JTM ¶ 61; *id.*, ¶ II,1. The MOA further set forth "Legislative Initiatives" that included amending then-Conn. Gen. Stat. § 15-120j to limit the length of Runway 2/20 to "the existing paved runway length of 5,600 linear feet." *Id.*, ¶ III,1a.

Shortly after the City of New Haven, the Town of East Haven and the Authority signed the MOA, the FAA informed the Authority that the MOA "may violate key Federal obligations which the Airport Authority is required to uphold," including several Federal Grant Assurances. D. Exh. A, Letter from Randall S. Fiertz, FAA Director Airport Compliance and Field Operations, March 20, 2009, p. 1. For example, the FAA identified noncompliance with Federal Grant Assurance 5,[3] Preserving Rights and Powers, due to the Authority ceding control of the

---

[3] Federal Grant Assurance 5 states, in relevant part, that an airport sponsor "will not take or permit any action which would operate to deprive it of any of its rights and powers necessary to perform any or all of the terms, conditions and assurances in its grant agreements." *Id.*, p. 1.

18

**JA147**

length of the runway to the State, ceding proprietary power over the runway to the City of New Haven and the Town of East Haven, and ceding its limited proprietary power to control the number of departures and enplanements to the City and Town. *Id.*, p. 2 (citing Sections III(1)(a), II(1) and II(8) of the MOA, D. Exh. C). In addition, the FAA identified non-compliance with Federal Grant Assurance 25,[4] due to the Authority's distribution of increased passenger fees to the City and Town, rather than for the limited use of airport revenue, such as "the capital or operating costs of the airport." *Id.*, p. 3 (citing Section II(10)[5] of the MOA, D. Exh. C).

The FAA also identified potential violations of federal statutory law. For example, Passenger Facility Charges ("PFCs") are permitted only if an airport sponsor has complied with the Airport Noise and Capacity Act of 1990 ("ANCA"), which requires "the adoption of airport noise or access restriction that affects State 2 or Stage 3 aircraft." *Id.*, p. 2 (citing 49 U.S.C. § 47521, 49 U.S.C. § 47524(e) and 14 C.F.R. § 158.29). According to the FAA, the Authority "appears to be ineligible for PFCs" since the Authority "did not comply with ANCA in adopting the restrictions on future access set forth in section II(8)" of the MOA. *Id.*, p. 3. Additionally, the FAA noted that the proposed increased passenger charges in the MOA "raise an issue under the Anti-Head Tax Act," which prohibits a political subdivision of the state from collecting a fee,

---

[4] Federal Grant Assurance 25 states, in relevant part:
> All revenues generated by the airport . . . will be expended [for] the capital or operating costs of the airport; the local airport system; or other local facilities which are owned or operated by the owner or operator of the airport and which are directly and substantially related to the actual air transportation of passengers or property; or for noise mitigation purposes on or off the airport.

*Id.*, p. 2
[5] Section II(10) of the MOA, Increase in Passenger Charges, states: "The City, the Town and the Airport Authority shall pursue an imposition of additional passenger fees to be distributed equally to the City and to the Town in a manner consistent with federal law and regulations concerning such charges."

19

**JA148**

tax or head charge on, inter alia, "an individual traveling in air commerce." *Id.*, pp. 2-3 (citing 49 U.S.C. § 40116).

Based on such concerns raised by the terms of the MOA, the FAA concluded that the "[t]here are ways to move forward and address the safety and capacity issues and reach community consensus without jeopardizing your contractual obligations and continued Federal funding for the Airport." *Id.*, p. 3. To date, the Authority has not offered any evidence showing that it has addressed any of the FAA's concerns regarding noncompliance with federal grant assurances or potential violations of ANCA or the Anti-Head Tax Act, which could potentially have an impact on the FAA's determination whether to allocate millions of dollars of funding to the Authority for its proposed airport improvement project.

### 5. The Plaintiff Has Failed To Comply With FAA Instructions Issued In 2015.

Although the parties have stipulated that *one* of the reasons that the FAA has decided not to review the plaintiff's PEA Report is the existence of the runway limitation in Conn. Gen. Stat. § 15-120j(c), the FAA has identified other reasons why it has not reviewed the PEA Report or authorized funding for potential expansion of the Airport in accordance with its ALP. See JTM ¶ 35 (FAA decision not to respond to the Authority's preliminary report "is a direct consequence of, *inter alia*, the existence of the runway length limitation" in Conn. Gen. Stat. § 15-120j(c))(emphasis added). For instance, in December 2014, members of Connecticut's congressional delegation sent a letter to the FAA Administrator Michael Huerta requesting a "modest investment in facility improvements" in the amount of $8-$10 million to pave the runway safety areas at Tweed. P. Exh. 7. Mr. Huerta's response in April 2015 identified "several documents that restrict Runway 2/20 to 5,600 feet" that needed to be addressed by the

**JA149**

Authority,[6] which included Conn. Gen. Stat. § 15-120j but also included the Memorandum of Agreement between the City of New Haven and the Town of East Haven, as well as permits issued by the Department of Energy and Environmental Protection ("DEEP"). P. Exh. 8, Letter from Michael Huerta, FAA Administrator, to the Honorable Richard Blumenthal, dated April 14, 2015 ("Huerta Letter").

First, as previously noted, the MOA contained a provision limiting Runway 2/20 to the existing paved runway length of 5,600 linear feet. JTM ¶ 61; D. Exh. C, ¶ II.1. The Huerta Letter stated that the Authority "needs to provide us a letter from the town of East Haven showing its willingness to remove the restriction." P. Exh. 8, ¶ 2. To date, no such letter or evidence of any attempt to obtain such a letter has been produced by the Authority at trial.

Second, regarding the DEEP permits, the Connecticut Coastal Management Act discourages "the substantial expansion of existing airports within the coastal boundary . . . ." See Connecticut General Statutes § 22a-92(c)(1)(H). The planned extension of Runway 2/20 is within the existing boundaries of the Airport and the ALP, on land that is currently part of the runway safety areas. JTM ¶ 23. The Authority proposes to pave a portion of Runway 2/20 runway safety areas, which would be considered a runway extension. JTM ¶ 24. Two permits from DEEP were previously issued to the Authority for the construction of runway safety areas. JTM ¶ 66. One, the tidal permit, specifically states: "At no time shall the permittee modify the surfaces of the RSAs including paving." *Id.* The second permit, for disturbing wetlands and water quality, requires a modification to the permit from the DEEP if the safety areas are altered. *Id.* In April 2015, FAA Administrator Huerta informed the Authority that if it wishes to

---

[6] The parties agree that the reference to the "city of New Haven" throughout Plaintiff's Exhibit 8 refers to both the City of New Haven and the Authority, both of which are referenced by the Congressional delegation in Plaintiff's Exhibit 7.

**JA150**

continue with its proposed runway extension project, the Authority must develop a "joint action plan" with DEEP addressing the agency's concerns identified in the two previously issued permits. P. Exh. 8, ¶ 3; JTM ¶ 67.

To date, the Authority has not proffered any evidence that it has developed or attempted to develop a "joint action plan" with DEEP addressing the agency's prohibition on paving the RSAs or modification requirement for disturbing wetlands and water quality should any alteration of the RSAs occur.  Such inaction is in direct conflict with instructions from the FAA Administrator and could explain why the agency has not reviewed the PEA Report or provided funding for the currently proposed improvements to the Airport.

### 6.  FAA Funding For The Plaintiff's Proposed Airport Improvement Proposal Is Not Justified.

The normal approval process for a runway extension requires (a) careful planning, including review of feasible alternatives; (b) proper environmental analysis, consistent with federal regulations; and (c) sufficient funding, including federal, state and/or local sources. JTM ¶ 70.  Projects utilizing federal funding must be both eligible and justified at the time of the investment (FAA Order 5100.38D).  JTM ¶ 73.  In addition, runway extensions must be shown to be cost-effective and justifiable, per Executive Order 12893, *Principles for Federal Infrastructure Investments. Id*.  The Airport Improvement Program ("AIP") provides about $3.5 billion annually versus an estimated need of over $40 billion over the next five years. JTM ¶ 71. As a consequence, dollars must be allocated to the highest national priorities that are eligible and justified. *Id.*

According to the plaintiff's own expert, the FAA distributes funds in a discretionary manner according to a ranking system "with safety being the first criteria."  Trial Transcript, DeCoster Testimony, p. 134, lines 15-25, p. 135, line 1.  However, there is no current or pending

FAA enforcement action against the Authority for noncompliance with any FAA safety standard applicable to 49 U.S.C. Part 139 airports or any standard contained in FAA Advisory Circular 150/5300-13A. JTM ¶ 44. As a consequence, the FAA has the discretion to consider allocating funds to the Authority based on a need comparison with other airports nationwide. Significantly, the Authority received approximately $24 million from the FAA in 2008 for its Runway Safety Area project and has received over $40 million from the FAA in the past twenty years. JTM ¶ 72. Coupled with the fact that there is no evidence that any airline has identified the Airport as an economically viable service destination *even if* the runway were lengthened at the Airport, there is consequently no justification for the FAA to allocate funds for such improvements.

Lastly, there is no evidence to suggest that once the FAA has approved an ALP or a Master Plan for an airport, as it has for the Authority, see JTM ¶¶ 13, 16, the agency is required to provide funding to all such airports to realize their proposed improvement plans. Instead, the FAA's discretion to fund airport improvements remains subject to a ranking in which safety concerns have the highest priority. See Trial Transcript, DeCoster Test., p. 134, lines 15-17, 25, p. 135, line 1.[7] At the time the FAA approved the Authority's ALP and Master Plan in 2002, the foremost safety issue raised in the ALP concerned safety improvements to the RSAs on Runway 2/20. See P. Exh. 3, FAA Approval of Airport Layout Plan, p. 1, Section I. As noted above, the FAA provided $24 million to the Authority for construction of the RSAs in 2008. JTM ¶ 72. Currently, the circumstances are not comparable because there is no current or pending enforcement action concerning the safety of the runways at the Airport. See JTM ¶ 44. As a consequence, the plaintiff has not demonstrated at trial that FAA funding of its proposed

---

[7] "The FAA will support funding and provide a high ranking for prioritization of that company. The highest ranking for airports is related to safety . . . [the ranking is] created by the FAA with safety being the first criteria." *Id.*

improvement project should be one of its "highest national priorities."  See JTM ¶ 71; see also Trial Transcript, DeCoster Test., p. 134, lines 15-17.  Accordingly, the plaintiff has failed to provide sufficient evidence at trial to support its claim of standing based on an inability to secure funding from the FAA for its proposed airport improvements.

**B.    CONN. GEN. STAT § 15-120j(c) IS NOT PREEMPTED BY THE FAAct, THE ADA OR THE AAIA.**

The 5,600 linear foot limitation for Runway 2/20 at the Airport contained in Conn. Gen. Stat. § 15-120j(c) is not preempted by either the Federal Aviation Act ("FAAct"), the Airline Deregulation Act ("ADA"), or the Airport and Airways Improvement Act ("AAIA").

Federal preemption claims rely on the United States Constitution's Supremacy Clause, U.S. Const., Art. VI, cl. 2, which "invalidates state laws that interfere with, or are contrary to, federal law." *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir.2008) (internal quotation marks and citation omitted) (hereinafter "ATA"). In assessing a federal preemption claim, a court's primary concern is determining whether Congress intended to displace state authority. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000).

Federal preemption may be express or implied. *ATA*, supra, 520 F.3d at 220.  "Express preemption arises when a federal statute expressly directs that state law be ousted." *Id.* (internal quotation marks and citation omitted). Implied preemption comes in two forms: field preemption or conflict preemption. *Id.*  "Field preemption . . . is present under circumstances where it is clear that Congress intended for its regulation of a particular area (or 'field') to be the *only* regulation, to which states and localities may not add or detract." *Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 681 F. Supp. 2d 182, 199 (D. Conn. 2010), *aff'd sub nom. Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d

24

**JA153**

206 (2d Cir. 2011).  "Conflict preemption arises when state law 'actually conflicts with federal law,' such that it is not possible to comply with both and 'state law stands as an obstacle to the accomplishment' of the congressional objective." *Id.* (internal citation omitted) (citing *Hillsborough County v. Automated Med. Labs. Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)).

  1.   **The FAAct Does Not Preempt Conn. Gen. Stat. § 15-120j(c).** [8]

    a.   **Implied Preemption**

      i.   **Conflict Preemption**

This Court previously ruled at the pleading stage that the defendant failed to allege sufficient facts to support its claim that Conn. Gen. Stat. § 15-120j(c) is in actual conflict with the Federal Aviation Act, finding that it could not infer impossibility of compliance based on such allegations. *Tweed-New Haven*, supra, at p. 21.  The plaintiff has not provided any evidence at trial that would justify a different conclusion.

Specifically, no evidence has been presented showing that Conn. Gen. Stat. § 15-120j(c) directly or indirectly has caused or will cause the plaintiff to fail to comply with any federal safety regulations affecting the Airport.  See Complaint, at ¶ 31 ("Runway 2/20 needs to be extended . . . to comply with federal safety regulations and FAA construction standards."); see JTM ¶ 44 ("There is no current or pending FAA enforcement action against the Authority for noncompliance with any FAA safety standard applicable to 49 U.S.C. Part 139 airports or any standard contained in FAA Advisory Circular 150/5300-13A.").  Currently, only the parallel

---

[8] Due to the fact that the parties are filing post-trial briefs in this matter simultaneously, counsel for the plaintiff has represented to counsel for the defendant that limited areas of preemption will be addressed in the plaintiff's brief, i.e., FAAct – Implied Preemption, ADA – Express Preemption, and AAIA – Implied Preemption.  The defendant has therefore only addressed those designated areas of preemption in its brief, and reserves the right to supplement its brief if additional areas of preemption are addressed in the plaintiff's brief.

taxiway is considered noncompliant by the FAA, but there is no evidence showing that the runway limitation statute created such noncompliance. Instead, the evidence shows that the plaintiff itself has proposed to continue such noncompliance despite an FAA order to resolve the issue by 2021. See P. Exh. 12, Merck Letter; see also P. Exh. 6, PEA Report, p. 7 (proposed 275-foot taxiway offset). As a result, the plaintiff's claim that the Court can infer impossibility of compliance with both the FAAct and Conn. Gen. Stat. § 15-120j(c) is baseless and should again be denied. See *Goodspeed*, supra, 681 F.Supp.2d at 199.

### ii.       Field Preemption

The plaintiff's claim that Conn. Gen. Stat. § 15-120j(c) attempts to regulate a field occupied by the federal government, aviation safety and service capacity, is misplaced. See Complaint, at ¶ 57. No evidence has been presented showing that the runway limitation statute interferes with the Authority's ability to comply with federal aviation safety standards.

In *Tweed-New Haven Airport Auth. v. Town of E. Haven, Conn.*, 582 F. Supp. 2d 261 (D. Conn. 2008), the City of New Haven filed a declaratory judgment action against the Town of East Haven seeking to have town wetland regulations deemed preempted by federal law so as not to obstruct federally funded improvements to the RSAs at the Airport. *Id*, at 263. The district court ruled that the local regulations were impliedly preempted by the FAAct, stating that "Congress intended to regulate, i.e., to fully occupy, the field of airline safety within which the Runway Project lies." *Id*., at 267. The court further concluded:

> Under the FAAct, "the United States has asserted that it possesses and exercises 'complete and exclusive national sovereignty in the airspace of the United States.'" *United States v. City of New Haven,* 447 F.2d 972, 973 (2d Cir.1971)(quoting the FAAct, 49 U.S.C. § 1508(a), as amended 49 U.S.C. § 40103(a)). The FAAct defines navigable airspace as "including airspace needed to ensure safety in the takeoff and landing of aircraft." 49 U.S.C. 40102(32); *see also City of New Haven,* 447 F.2d at 973. "This power extends to grounded planes and airport runways." *Id* (citing 14 C.F.R. §§ 91.123 and

## JA155

139.329). Thus, by the passage of the FAAct, Congress intended to occupy the entire field of airline safety, including runways.

*Id.*, at 268 (Footnote and further citations omitted).

In its ruling denying the defendant's motion to dismiss in this case, this Court cited the above passage as "provid[ing] strong support for the plaintiff's argument that the FAAct impliedly preempts Connecticut General Statutes § 15-120j(c). Section 15-120j(c) attempts to regulate the runway length, which is a component part of the field of airline safety, and is therefore part of a field completely occupied by the federal government." Order 53, Ruling on Motion to Dismiss, Case, dated 12/09/16,

The current case can be distinguished from *Tweed-New Haven*. The district court in *Tweed-New Haven* determined that the town ordinances were preempted by the FAAct because "the Runway Project will put Tweed-New Haven Airport in compliance with the FAA's current RSA requirements." *Tweed-New Haven*, supra, at 270. More specifically, the court ruled in favor of preemption because "[t]he defendants' regulations would have prevented Tweed from meeting FAA *safety* standards and the Runway Project will be undertaken within the bounds of Authority property." *Tweed-New Haven*, supra, at 270 (emphasis added) and at 272 *("[B]ecause the runway project's purpose is airline safety* and will take place within the Airport boundaries, the [] defendants' regulations as applied to the Runway Project are preempted by federal law.") (emphasis added).

By contrast, in this case there is no evidence that Conn. Gen. Stat. § 15-120j(c) is preventing the Authority from complying with any FAA safety standards or that the Authority's proposed lengthening of Runway 2/20 is related in any way to airline safety. See JTM ¶ 44 ("There is no current or pending FAA enforcement action against the Authority for noncompliance with any FAA safety standards. . . "). The district court in *Tweed-New Haven*

27

**JA156**

described the Runway Project as "a federally-mandated, federally-funded, and state- and federally-approved, aviation safety and air navigation project." *Tweed-New Haven*, supra, at 263. By comparison, no evidence has been presented in this case to suggest that the plaintiff's proposed runway lengthening project is federally-mandated by the FAA to comply with federal aviation safety standards. Furthermore, the district court in *Tweed-New Haven* concluded that the Authority's Runway Project was "not an effort to expand the Airport" because the Authority "explicitly stated" that [the Project] is being undertaken to comply with the FAA safety standards." *Tweed-New Haven*, supra, at 271 (citing Authority's Reply Brief stating that "the runways at the airport are not being extended . . ."). Here, the opposite is true: the Authority alleged in multiple counts that a longer runway is necessary to comply with federal safety standards,[9] but the evidence shows that the proposed runway extension plans are aimed at expanding commercial service at the Airport rather than meeting such standards.[10] As a result, unlike the local ordinances in *Tweed-New Haven*, Conn. Gen. Stat. § 15-120j(c) does not interfere with the federal government's occupation of the field of aviation safety because it does not prevent the Authority from complying with any federally-mandated safety standards.

The absence of any safety concern affecting Runway 2/20 at the Airport distinguishes this case from *Burbank-Glendale-Pasadena Airport Authority v. City of Los Angeles*, 979 F.2d 1338 (9th Cir. 1992) and *Township of Tinicum v. City of Philadelphia*, 737 F.Supp.2d 367

---

[9] See Complaint, at ¶ 24 ("The current length of Runway 2/20 of 5,600 linear feet remains too short for almost all commercial aircraft to operate regularly scheduled commercial service in a safe and commercially reasonable manner."); at ¶ 31 ("Runway 2/20 needs to be extended . . . to comply with federal safety regulations and FAA construction standards."); at ¶ 35 ("The restriction imposed by Conn. Gen. Stat. § 15-120j(c) is . . . negatively affecting the Authority's compliance with federal safety regulations.")

[10] See e.g. JTM ¶ 22 ("Lengthening of Runway 2/20 would allow the Dash 8 and other larger aircrafts to potentially service the Airport, hold more passengers and service additional destinations."); see also Complaint, at ¶ 31 ("Runway 2/20 needs to be extended . . to attract new air service"),

28

**JA157**

(E.D.Pa.2010), previously relied upon by the plaintiff in its brief in opposition to the defendant's motion to dismiss.  In *Burbank*, the Ninth Circuit held that a local ordinance requiring a permit prior to the reconstruction of runways and taxiways at an airport was preempted by the FAAct. *Id.*, at 1339-41.  Unlike the proposed runway extension in this case, the taxiway at issue in *Burbank* "posed a safety risk" and the proposed taxiway extension plan was "expected to produce significant safety improvements." *Id.*, at 1339.[11]  In *Tinicum*, a Pennsylvania district court held that a state law that obstructed implementation of an FAA-initiated airport improvement plan designed to reduce congestion and delays at the airport was preempted by the FAAct for the same reasons identified by the Ninth Circuit in *Burbank*. *Id.*, at 369, 379.  Unlike the plaintiff's proposed ALP and Master Plan in this case, which seeks to expand the Airport's service capabilities, the district court in *Tinicum* determined that "the promotion of air safety is a central ingredient" of the proposed improvement plan at issue in that case. *Id.*, at 375.

The Second Circuit has similarly held that a local ordinance was not preempted by Congress' occupation of the field of aviation safety in the absence of a federal mandate that affected the subject matter of the ordinance.  In *Goodspeed Airport LLC v. East Haddam Inland Wetlands & Watercourses,* 634 F.3d 206 (2d Cir. 2011), the plaintiff sought a declaratory judgment that would allow it to cut down trees at its airport without obtaining permits from the town Inland Wetlands and Watercourses Commission ("IWWC") as authorized under the Connecticut Environmental Protection Act ("CEPA"). *Id,* at 207-09. Although the court determined that Congress intended to occupy the field of air safety under the FAAct, it narrowed

---

[11] In addition, the Ninth Circuit concluded that "a non-proprietor municipality may not exercise police power to prohibit, delay, or otherwise condition the construction of runways and taxiways at a non-city-owned airport." *Id.*, at 1341.  In contrast, pursuant to Conn. Gen. Stat. § 15-120i , the Authority is a "public instrumentality and political subdivision of the State that," under § 15-120j, "shall have full control of the operation and management of the airport, including land . . .".

29

**JA158**

its inquiry by examining "at what point the state regulation sufficiently interferes with federal regulation that it should be deemed pre-empted." *Id.*, at 210-11. In determining that the IWWC and CEPA were not preempted by the FAAct, the Second Circuit characterized the regulations at issue in *Tweed* as constituting "a much more direct intrusion of local authority on the preempted field of air safety than . . . the regulatory actions challenged here." *Id.*, at 211.  Further, the court emphasized the fact that, unlike *Tweed*, where "the construction project was approved, indeed, required, by the federal authority," in *Goodspeed,* "no federal agency has approved or mandated the removal of trees from its property." *Id.*

Moreover, the Connecticut federal district court in *Goodspeed* recognized the distinction "between state laws that directly affect aeronautical safety, on the one hand, and facially neutral laws of general application that have merely an incidental impact on aviation safety." *Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 681 F. Supp. 2d 182, 202 (D. Conn. 2010), *aff'd sub nom. Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206 (2d Cir. 2011).  The court further noted the limit of federal preemption law "even in an area like aeronautical safety, where Congress has expressed an intention to occupy the 'entire' field." *Id.*  "Otherwise," according to the district court, "a virtually unlimited number of state and local laws and regulations that might conceivably touch upon the operation of airports, even to a negligible degree, could be said to have *some* impact on aviation safety . . ." *Id.* (emphasis original).

Other district and circuit courts have reached a similar conclusion, and even ruled against preemption where an opposite ruling would infringe on local governmental control over land use or "ground space."  In *City of Cleveland, Ohio v. City of Brook Park, Ohio*, 893 F. Supp. 742, 748 (N.D. Ohio 1995), the city of Cleveland sought to expand its existing runway onto land that

it intended to purchase from an adjacent city, Brook Park. *Id.*, at 745-46.  Cleveland filed for a declaratory judgment from an Ohio district court stating that Brook Park land use ordinances prohibiting the construction of new runways in that city violated the Supremacy Clause. *Id.*, at 745.  The district court distinguished cases involving laws "directly related to aircraft operations" that were found to be preempted by the FAAct from the Brook Park ordinances that had no such connection. *Id.*, at 750-51.  In finding against preemption, the court determined that though the United States has exclusive jurisdiction over the nation's airspace and occupies the field of aircraft operations, "nothing in the Aviation Act or the regulations promulgated under it provides the FAA the authority to construct runways or airports." *Id.,* at 750 (citing 49 U.S.C. § 40103(a) and (b))(further citations omitted).  The court further stated that "[w]hile it is certainly true that runway placement will have some tangential effect on flight operations, the question of whether and where to construct a runway does not substantially affect the use of airspace." *Id.*, at 751. As a result, the court rejected the idea that "localities are no longer free to regulate the use of land within their borders, even where land use regulations may have some tangential impact on their use of airspace." *Id.*, at 751.

In *Gustafson v. City of Lake Angelus*, 76 F.3d 778 (6th Cir. 1996), the Sixth Circuit held that the FAAct did not preempt local ordinances that prohibited the use of a lake as a landing site. *Id.*, at 789. In reaching its decision, the court looked to the FAAct, its legislative history and relevant regulations to determine if there was Congressional intent to preempt such a law. The court found it significant that when the FAA provides an advisory determination of an airport proposal under 14 C.F.R. § 157.7(a), the proponent seeking approval is not "relieve[d] . . . of responsibility for compliance with any local law, ordinance or regulation, or state or other

31

**JA160**

Federal regulation." *Id.*, at 784-85.[12]  As a result, the Court determined that "the FAA does not intend to pervasively regulate the designation of the location of airports." *Id.*, at 785.

In addition, an examination of the legislative history of the FAAct showed that the United States Senator who authored the bill that ultimately became the FAAct "specifically stated that the FAA would not have control *'over the ground space of airports.'*" *Id.*, at 787 (citing *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 1865, 36 L.Ed.2d 547 (1973)(Rehnquist, J., dissenting)(emphasis original).  The court thus stated that "[a] prohibition against landing on a body of water falls in the category of 'control over ground space.'" *Id.* Lastly, in concluding that "there is a distinction between the regulation of navigable airspace and the regulation of ground space to be used for aircraft landing sites," the court cited *City of Cleveland's* statement that the authority to regulate airspace granted to the FAA by the FAAct "does not necessarily lead to the conclusion that localities are no longer free to regulate the use of land within their borders, even where land use regulations may have some tangential impact on the use of airspace." *Id.*, at 789-90.

In *Tweed-New Haven*, the Connecticut district court determined that it was not appropriate to shift the preemption analysis from airport safety to land use regulation.  The court

---

[12] 14 C.F.R. § 157.7(a) states in full:

> (a) The FAA will conduct an aeronautical study of an airport proposal and, after consultations with interested persons, as appropriate, issue a determination to the proponent and advise those concerned of the FAA determination.... While determinations consider the effects of the proposed action on the safe and efficient use of airspace by aircraft and the safety of persons and property on the ground, *the determinations are only advisory.... A determination does not relieve the proponent of responsibility for compliance with any local law, ordinance or regulation, or state or other Federal regulation. Aeronautical studies and determinations will not consider environmental or land use compatibility impacts.*

*Id.*, at 784-84 (emphasis original).

32

**JA161**

determined that the Town of East Haven's regulations interfering with improvements to the Airport's RSAs were not analogous to a local land ordinance seeking to prevent a resident from obtaining a permit for a helicopter pad. *Tweed-New Haven*, supra, 582 F.Supp. 2d at 271 (discussing *Hoagland v. Town of Clear Lake Indiana*, 344 F.Supp.2d 1150 (N.D.Ind.2004)). Critical to that determination in *Tweed-New Haven*, however, was that the Authority was "engaged in activity on an already existing, federally-regulated airport. It is not creating an airport or expanding the Runway. Instead it is creating a safer airport within its preexisting boundaries." *Id.*

Here, the runway length limitation in Conn. Gen. Stat. § 15-120j(c) is not "directly related to flight operations," has at best an "incidental" or "tangential impact on the use of airspace," and is a prohibition that "falls in the category of *'control over ground space.'*" See *City of Cleveland*, at 750-51; *Goodspeed*, at 202; *Gustafson*, at 787 (citation omitted). The statute has no more than an "incidental" or "tangential impact" on the navigation of air space because the plaintiff failed to produce evidence at trial showing that currently scheduled or future service at the airport cannot comply with the length limitation imposed by the statute. See *City of Cleveland*, at 750-51; *Goodspeed*, at 202. In addition, considering the plaintiff's expressed intention to expand the scope of commercial air service at the Airport by extending the length of Runway 2/20,[13] Conn. Gen. Stat. ¶ 15-120j(c) qualifies as a quintessential land use regulation in which the State seeks to exert control over its "ground space." See *Gustafson*, at 787 (citation omitted). It would be odd indeed if the State did not have a right as the sovereign who created the Authority to determine the size of its airports, including having a smaller airport that is restricted to smaller planes. Lastly, no evidence has been presented at trial to show that the FAA

---

[13] See Complaint, at ¶ 31 ("Runway 2/20 needs to be extended . . to attract new air service").

33

**JA162**

has indicated to the Authority in any way that the Airport's federal certification is jeopardized by the length limitation imposed by Conn. Gen. Stat. § 15-120j(c).

As a result, finding Conn. Gen. Stat. § 15-120j(c) as impliedly preempted by the federal government's occupation of the field of aviation safety would require the Court to read the FAAct's scope as being "broader than that implied in any reasonable reading of the statute." See *City of Cleveland*, supra, 893 F. Supp. at 751.  Instead, this Court should view the runway limitation in Conn. Gen. Stat. ¶ 15-120j(c) as either a regulation that is not "directly related to flight operations," that has an "incidental" or a "tangential impact on the use of airspace," or that qualifies as a land use regulation that states and localities are "free to regulate" under the FAAct. See *id.*, at 750-51; *Goodspeed*, supra, 681 F. Supp. 2d at 202; *Gustafson*, at 789-90.

### 2.     The ADA Does Not Preempt Conn. Gen. Stat. § 15-120j(c).

#### a.     Express Preemption.

Congress intended for the Airline Deregulation Act ("ADA") to help improve the efficiency of air service and increase competition between air carriers, all through the process of deregulation. See *Goodspeed*, supra, 681 F. Supp. 2d at 206 (citing *Morales, supra,* 504 U.S. at 378).  To help ensure that states would not roll back this deregulation, Congress included an express preemption clause. *Id.*, 504 U.S. at 378-79.  Specifically, the express preemption clause in the ADA prohibits states from enacting or enforcing laws "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).  "It is worth emphasizing that it is the effect on the 'price, route or service' of an air *carrier*—not an airport—that is prohibited by the ADA." *Goodspeed*, supra, 681 F. Supp. 2d at 207 (emphasis original).  "The act defines an 'air carrier' as 'a citizen of the United States undertaking by any means, directly or indirectly, to provide air

34

**JA163**

transportation' as a common carrier for compensation." *Id.* (citing 49 U.S.C. §§ 40102(2), (5), (23) and (25)).

In *Morales*, the Court considered whether state guidelines governing airline advertising and frequent flyer programs were preempted under the ADA. *Morales*, supra, 504 U.S. at 378-79. Finding the definition of "relating to" in Black's Law Dictionary as meaning "to stand in some relation to; to have bearing or concern; to pertain; to refer; bring into association with or connection with," the Court held that "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' are preempted under 49 U.S.C. § 1305(a)(1)." *Id.*, at 383-84. Noting the express reference to "fares" in the guidelines, the Court ultimately ruled that they had a "forbidden significant effect" upon them. *Id.*, at 388. However, the Court maintained that the impact of a state law may be "too tenuous, remote, or peripheral . . . to have pre-emptive effect." *Id.* at 390 (citation and internal quotation marks omitted). Further, "[i]n applying the Supreme Court's precedent on the ADA's express preemption clause, the Second Circuit has cautioned that there is no bright-line test for determining which state laws are permissible and which are not; rather, the inquiry should proceed 'on a case-by-case basis.'" *Goodspeed*, supra, 681 F. Supp. 2d at 207 (citing *Abdu–Brisson v. Delta Air Lines,* 128 F.3d 77, 85–86 (2d Cir.1997)).

In this case, the plaintiff has failed to provide evidence at trial showing that Conn. Gen. Stat. § 15-120j(c) is having or will have a "forbidden significant effect" upon "the price, route, or service" of the commercial air carrier that currently serves the airport. Instead, the plaintiff's expert witness, Mr. DeCoster, testified that both the Dash 8 currently servicing the Airport and its two "logical" replacement planes, the Bombardier CJ200 and the Embraer 145, could continue operating there for the indefinite future. See Sections A1 to A2, supra. In addition, Mr.

**JA164**

DeCoster testified that regularly scheduled commercial service at the Airport is "not jeopardized at the moment." See Trial Transcript, DeCoster Test., p. 119, lines 18-23; p. 120, lines 2-5 Further, evidence shows that there are no airlines that are interested in commencing service at the Airport even if the runway is lengthened. See Section A2c, supra   Thus, the runway limitation statute has had and will continue to have no effect upon "price, route or service" provided by American or any other airline at the Airport for the foreseeable future.  Even if this Court does infer some possible impact on "the price, route, or service" provided by American to the Airport because "someday" all planes capable of using the current 5,600 linear foot runway will be retired, that impact would surely be "too tenuous, remote, or peripheral to have pre-emptive effect." See *Morales*, supra, 504 U.S. at 390.  Accordingly, the plaintiff has failed to show that Conn. Gen. Stat. ¶ 15-120j(c) is expressly preempted under the ADA.

### 3.   The AAIA Does Not Preempt Conn. Gen. Stat. § 15-120j(c).

#### a.   Implied Preemption.

##### i.   Conflict Preemption.

The plaintiff alleges that Conn. Gen. Stat. § 15-120j(c) is in actual conflict with the AAIA, and that state law makes it impossible for the plaintiff to comply with the AAIA. Complaint at ¶¶ 58, 61. "Conflict preemption arises when state law 'actually conflicts with federal law,' such that it is not possible to comply with both and 'state law stands as an obstacle to the accomplishment' of the congressional objective." *Goodspeed*, supra, 681 F. Supp. 2d at 199 (citation omitted).

There is no such conflict in this case because the AAIA does not set regulatory requirements for the construction of airport runways; it only sets requirements for those wishing to secure federal funding for that type of project. See *City of Cleveland, Ohio v. City of Brook*

36

**JA165**

*Park, Ohio*, 893 F. Supp. 742, 748 (N.D. Ohio 1995).  In *City of Cleveland*, the court determined

that no impossibility of compliance with both state and federal law existed because an airport

owner could simply forego federal funding under the AAIA and comply with a competing local

ordinance.  *Id.*, at 748. The court concluded that "[w]hile such a decision may be less than

practical, compliance with both the AAIA and Brook Park's zoning laws is not legally

impossible." *Id.*   Likewise, the plaintiff in this case has the capacity to comply with both Conn

Gen. Stat. § 15-120j(c) and the AAIA by not seeking federal funding under the AAIA.

   The plaintiff also alleges that § 15-120j(c) "frustrates the essential federal purpose" of the

AAIA. Complaint, at ¶ 59.  In support of its conclusory allegation, the plaintiff identifies such

purpose as "accelerating the upgrading of airports" and further declares that under the AAIA

"'artificial restriction on airport capacity' is not in the public interest and should not be tolerated."

Complaint at ¶¶ 47, 50, 59.  The purpose of the AAIA, however, is much broader than the

plaintiff indicates.

   In *City of Cleveland*, the district court recognized that federal funding of airport

construction projects furthered a "wide variety of public policy goals," and that the statute sought

"to promote environmental protection, noise control, reduction of non-compatible land uses in

areas surrounding airports, consistency with the Federal Aviation Act, and the development of a

national intermodal transportation system." *City of Cleveland*, 893 F.Supp. at 749. In addition,

the AAIA statute identifies the need for "cooperation" between the federal government and state

and local officials "in developing airport plans and programs that are based on overall

transportation needs." *Id.*, at 749 (citing 49 U.S.C. § 47101(g)).[14]  The court found that the Brook

---

[14] 49 U.S.C. § 47101(g) states:

Park ordinance requiring a conditional use permit prior to any runway expansion onto its land was consistent with local land use goals and that "it would be inconsistent with AAIA's stated goal of fostering cooperation to substitute the FAA's authority for the traditional power of states and localities to regulate land use within their boundaries." *Id.*

Consequently, if respect for state policy furthered under Conn. Gen. Stat. § 15-120j(c) results in the failure of the plaintiff to secure federal funding, that would not be a frustration of the law's essential purpose but instead would be the necessary result of cooperative consistency between state and federal policy.  The plaintiff therefore has not and cannot demonstrate that alleged Conn. Gen. Stat. § 15-120j(c) frustrates the essential federal purpose of the AAIA.

### ii.    Field Preemption.

As described in the previous section on the ADA, the plaintiff alleges that "[b]y restricting the length of Runway 2/20, Conn. Gen. Stat. § 15-120j(c) attempts to regulate aviation safety and the service capacity at the Airport, a field occupied by the United States Government." Complaint at ¶ 11. The AAIA, however, does not fully occupy the field of aviation safety and service capacity.  Instead, as noted in *City of Cleveland*, "the AAIA provides a mechanism through which the FAA is to determine whether to provide federal funding to airport development and improvement projects." *City of Cleveland*, 893 F.Supp. at 752.  As a result, the district court in that case determined that since Brook Park's ordinances "did not purport to

---

To carry out the policy of subsection (a)(5) of this section[2], the Secretary of Transportation shall cooperate with State and local officials in developing airport plans and programs that are based on overall transportation needs. The airport plans and programs shall be developed in coordination with other transportation planning and considering comprehensive long-range land use plans and overall social, economic, environmental, system performance, and energy conservation objectives. The process of developing airport plans and programs shall be continuing, cooperative, and comprehensive to the degree appropriate to the complexity of the transportation problems.

**JA167**

address the eligibility of the proposed project . . . for federal funding," it did not fall under the AAIA. *Id.*, at 752.

Similarly, Conn. Gen. Stat. § 15-120j(c) does not claim to "address the eligibility" of the plaintiff's allegedly proposed improvement project for federal funding.  In addition, the plaintiff's repeated assertions that the AAIA is "not subject to usurpation or supplementation by state laws" or that it "provide[s] overwhelming evidence of Congressional intent to prohibit the exercise of state or local regulation of . . . the length of airport runways" are patent legal conclusions unsubstantiated by evidence at trial.   See Complaint at ¶¶ 42, 46, 51, 55.  As a result, there is no legal basis to conclude that the AAIA fully occupies the field designated by the plaintiff, especially when a purpose of the statute is to foster cooperation among federal, state and local officials "in developing airport plans and programs that are based on overall transportation needs." See *id.*, at 749.

Lastly, should the plaintiff cite to *City of Oceanside v. AELD, LLC*, 740 F. Supp. 2d 1183 (S.D. Cal. Sept. 28, 2010), as it did in its memorandum in opposition to the defendant's motion to dismiss, to support the notion that Conn. Gen. Stat. § 15-120j(c) serves as an "obstacle to the federal government in bringing the airport into compliance with federal safety standards," such reliance is misplaced.  As previously addressed, since the Airport is not out of compliance with federal safety standards, see JTM ¶ 44, the plaintiff cannot show that the statute has prevented the Authority from complying with any such standards in the first place.

**C.**   **CONCLUSION**

For the foregoing reasons, the defendant respectfully requests that the Court deny the plaintiff's declaratory judgment action.

**JA168**

DEFENDANT

GEORGE JEPSEN
ATTORNEY GENERAL FOR THE
STATE OF CONNECTCUT

GEORGE JEPSEN
ATTORNEY GENERAL

BY: _____

Drew S. Graham
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
Tel:  (860) 808-5090
Fax:  (860) 808-5384
Federal Bar No. ct16741
E-mail: drew.graham@ct.gov

40

**JA169**

## CERTIFICATION

I hereby certify that on May 19, 2017, a copy of the foregoing Reply Memorandum of

Law In Support of Motion to Dismiss was filed electronically.  Notice of this filing will be sent

by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access

this filing through the Court's system.

      John C. King, Esq.
      Hugh I. Manke, Esq.
      Christopher A. Klepps, Esq.
      Updike, Kelly & Spellacy, P.C.
      100 Pearl Street
      Hartford, CT 06123
      P: (860) 548-2600
      jking@uks.com
      hmanke@uks.com
      cklepps@uks.com

Drew S. Graham
Assistant Attorney General

41

**JA170**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
TWEED-NEW HAVEN AIRPORT        :
AUTHORITY,                     :
                               :
     Plaintiff,                :
                               :
v.                             : CASE NO. 3:15cv01731 (RAR)
                               :
GEORGE JEPSEN, IN HIS          :
OFFICIAL CAPACITY AS ATTORNEY  :
GENERAL FOR THE STATE OF       :
CONNECTICUT                    :
                               :
     Defendant.                :
```

**MEMORANDUM OF DECISION**

Plaintiff, Tweed-New Haven Airport Authority (hereinafter "Plaintiff" or "the Authority"), brings this suit against George Jepsen in his official capacity as Attorney General for the State of Connecticut ("Defendant"), seeking declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.* (Dkt. # 1). Plaintiff alleges that Conn. Gen. Stat. 15-120j(c) violates the Supremacy Clause of the United States Constitution.

For the reasons set forth below, the Court finds that the plaintiff lacks standing to bring this action and that Conn. Gen. Stat. 15-120j(c) is not preempted by the Supremacy Clause.

1

## PROCEDURAL BACKGROUND

Plaintiff filed this action on November 24, 2014 in federal court.  (Dkt. # 1).  On June 30, 2016, the defendant filed a Motion to Dismiss.  (Dkt. # 39).  On August 8, 2016, plaintiff filed a memorandum in opposition to defendant's motion to dismiss.  (Dkt. # 44).  On August 22, 2016, the defendant filed a reply memorandum in support of its motion to dismiss.  (Dkt. # 45).  On September 29, 2017, the Court held oral argument on the motion to dismiss.  (Dkt. # 49).  On December 9, 2016, the undersigned denied the motion to dismiss.  (Dkt. # 53).

A bench trial was held on March 22, 2017 before the undersigned.  (Dkt. # 67).  On May 19, 2017, the parties submitted simultaneous post-trial briefs.  (Dkt. #'s 73-74).  On July 19, 2017, at the request of the parties, oral argument was held on the post-trial briefs.  (Dkt. # 77).

## FACTUAL BACKGROUND

The following facts, drawn from the parties' Stipulation of facts in their Joint Trial Memorandum, are undisputed.  (Dkt. # 59, Stipulation of Facts).[1]

Tweed-New Haven Airport Authority is a public instrumentality and political subdivision of the state of Connecticut, pursuant to Conn. Gen. Stat. 15-120i, et seq.

---

[1] The stipulated facts are hereafter referred to as "Stip. #."

(Stip. # 2).  The airport property is owned by the City of New Haven and leased to the Authority pursuant to the terms of a Lease and Operating Agreement, dated July 1, 1998.  (Stip. # 7).

The length of Runway 2/20 is currently approximately 5,600 linear feet.  (Stip. # 9).  In 2009, the state of Connecticut, through Public Act 09-7, amended Conn. Gen. Stat. §15-120j by adding subsection (c) which provides, in relevant part: "Runway 2/20 of the airport shall not exceed the existing paved runway length of five thousand six hundred linear feet."  (Stip. # 9).

The Airport is among the public-use airports included in the National Plan of Integrated Airport Systems.  (Stip. # 10). The Airport consists of numerous structures, including an airport terminal building and an air-rescue and fire-safety facility, Runway 2/20, which runs essentially North/South on the site, crosswind Runway 14/31, which runs Northwest/Southeast, and a number of taxiways.  (Stip. # 12).  All of these structures are within the Airport's boundaries and are part of the Airport Layout Plan ("ALP").  (Stip # 13).  The ALP is approved by the FAA, which maintains full control over any modifications to the ALP, including limitations on runway length.  (Stip. # 13).

The Airport is classified by the United States Department of Transportation Federal Aviation Administration ("FAA") as a primary, commercial service airport in that it provides

3

**JA173**

regularly scheduled commercial passenger air service.  (Stip. #
14).  As a result of this classification, the Airport is
currently required to, and does, hold an operating certificate
under FAA regulation part 139 (14 C.F.R. Part 139), which
currently requires the Airport to have runway safety areas on
its main runway that are acceptable to the FAA.  (Stip. # 14).

    Part 139 establishes the rules governing the certification
and operation of airports serving scheduled passenger-carrying
operations of an air carrier operating aircraft configured for
more than 9 passenger seats.  (Stip. # 15).  The Airport is
required under Part 139 to operate and maintain the Airport
according to standards contained in the FAA Advisory Circulars.
(Stip. # 15).  Additionally, as a recipient of federal aid under
the FAA Airport Improvement Program ("AIP'), the Airport is
required to comply with AIP grant assurances.  (Stip. # 15).

    The FAA requires a master plan that outlines future plans
for upgrading airport facilities for each Part 139 airport.
(Stip. # 16).  The Airport's updated master plan for the
Airport, which included extending the length of Runway 2/20 up
to 7,200 linear feet, was approved by the state and by the FAA
in 2002.  (Stip. # 16).

    There is one commercial airline providing service to the
Airport from Philadelphia, with four scheduled flights per day
in each direction and a capacity of no more than 37 passengers

on each flight.  (Stip. # 17).  The length of the runway has a
direct bearing on the weight load and passenger capacity that
can be safely handled on any given flight.  (Stip. # 17).

Since 2009, the Airport has failed to attract a single new
scheduled commercial carrier, and service remains low, with
fewer than 35,000 emplanements per year.  (Stip. # 18).  Weight
penalties are imposed on aircraft for safety reasons, and a
longer runway could potentially reduce or eliminate the weight
penalties that are imposed on existing flights at the Airport.
(Stip. # 19).  Current scheduled commercial service at the
Airport is entirely provided by a single type of aircraft, the
Bombardier DH8-100 (the "Dash 8").  (Stip. # 20).

Runway 2/20, because of its length, does not allow the Dash
8 to takeoff at maximum capacity.  (Stip. # 21).  The Dash 8 has
capacity for 37 passengers, but generally only 33 passengers are
allowed on the plane.  (Stip. # 6).  Lengthening Runway 2/20
would allow the Dash 8 and other larger aircrafts to potentially
service the Airport, hold more passengers and service additional
destinations.  (Stip. # 22).

The Airport has commenced planning on a runway extension
project to increase the functioning length of Runway 2/20,
within the existing boundaries of the Airport and the ALP, on
land that is currently part of the runway safety areas.  (Stip.
# 23).  The planning documents describe several alternatives for

lengthening Runway 2/20 up to 6,601 linear feet and modifying
related taxiways.  (Stip. # 23).  The initial step in the
Project is to perform an Environmental Assessment of the various
layout and construction options.  (Stip. # 23).  The Authority
has expended private funds to hire Hoyle, Tanner & Associates,
Inc. ("Hoyle"), a consulting engineering firm, which has
conducted a preliminary environmental assessment.  (Stip. # 23).

Robert M. Furey is Senior Vice President at Hoyle, which is
located in Manchester, NH.  (Stip. # 25).  Hoyle specializes in
airport planning, design and construction administration and has
performed engineering work for the Authority since 1999.  (Stip.
# 27).  Mr. Furey has personal knowledge regarding the
Preliminary Environmental Assessment at the Airport and the
environmental assessment process.  (Stip. # 26).
Federal review and comment is necessary for any construction
project located within the ALP, and one of the initial steps in
any such project under the applicable federal regulations is to
submit an Environmental Assessment to the FAA.  (Stip. # 28).

Hoyle looked at a number of alternatives for lengthening
Runway 2/20 ranging from 6,601 linear feet up to 7,000 linear
feet.  (Stip. # 29).  The Authority proposes to pave a portion
of the Runway 2/20 runway safety areas and this paved section
would be considered a runway extension.  (Stip. # 24).

**JA176**

In 2014, Hoyle completed the first three chapters of an Environmental Assessment, as the customary procedure is to submit a Preliminary Environmental Assessment to the FAA for review and comment before drafting the full Environmental Assessment.  (Stip. #'s 30-31).  The ultimate document that the Authority submitted to the FAA for review included only runway alternatives that were not longer than 6,601 linear feet. (Stip. # 29).

The FAA has declined to review and comment on the content of the Preliminary Environmental Assessment for more than two years.  (Stip. # 32).  The FAA has not provided funding to the Project and has not reviewed the alternative layouts presented in the Preliminary Environmental Assessment.  (Stip. # 32).  FAA review of the Preliminary Environmental Assessment is a necessary step in the Environmental Assessment process.  (Stip. # 33).

The FAA is not proceeding with review of the Environmental Assessment in part because the Authority is in violation of several federal grant assurances and regulations.  (Stip. # 34). The FAA's decision not to respond to the Authority's request for review of the Preliminary Environmental Assessment is in part because of the runway length limitation in Connecticut General Statutes §15-120j(c).  (Stip. # 35).

Whenever the Authority accepts federal funds, it agrees to various grant assurances which, among other things, require compliance with a long list of federal statutes and regulations directed to airport facilities and operations.  (Stip. # 36).  Non-compliance by an airport such as Tweed can result in enforcement action by the FAA.  (Stip. # 36).

FAA Advisory Circular 150/5300-13A, Airport Design, establishes criteria for the separation of runways and parallel taxiways.  (Stip. # 37).  The runway to taxiway separation distance is a function of the Airport Reference Code.  (Stip. # 37).  The ALP approved by the FAA for the Airport identifies the primary runway, Runway 2/20, as a C-III runway.  (Stip. # 37).  The designation C-III includes aircraft with approach speeds of 121 knots or more but less than 141 knots, and wingspans greater than 79 feet but less than 118 feet.  (Stip. # 37).

The interactive runway design standard matrix (Table 3-5) in FAA Advisory Circular 150/5300-13A specifies that the runway centerline to parallel taxiway centerline for C-III aircraft is 400 feet.  (Stip. # 38).  The current locations and dimensions of taxiways, which are integral to the aircraft landing and takeoff system, are not in compliance with federal regulations in terms of their distance from Runway 2/20.  (Stip. # 39).  This non-standard separation between the taxiway and the runway

8

**JA178**

could be brought into compliance as part of the proposed runway extension project.  (Stip. # 39).

Hoyle prepared drawings depicting improvements to Taxiways A, F and G at the Airport.  (Stip. # 40).  The primary safety improvement alternative is to extend the runway with a taxiway centerline separation to the required distance of 400 feet, in accordance with FAA Advisory Circular 150/5300-13A, Table 5. (Stip. # 40).  This would provide the Airport and FAA with safer runway and taxiway ground  maneuvering as well as greater separation between active takeoff and landing operations and aircraft which are either holding short or maneuvering adjacent to the runway.  (Stip. # 40).

The alternatives identified in the Preliminary Environmental Assessment include the extension of the parallel taxiway.  (Stip. # 41).  A full length parallel taxiway is required for runways with instrument approach procedures with visibility minimums below one mile. (Stip. # 41).  The existing Runway 2/20 instrument landing system approach has visibility minimums of ¾ mile. (Stip. # 41).  Construction of the parallel taxiway at the standard 400 foot runway centerline to taxiway separation would bring the airport into compliance with FAA standards.  (Stip. # 41).

Although there is no enforcement action pending by the FAA against the Authority due to the non-standard separation between

9

**JA179**

the taxiway and the runway, the FAA has issued notice to the
Authority that the Authority is not in compliance with all of
the requirements of CV.F.R/ part 139, the Airport Certification
Manual and the Airport Operating Certificate.  (Stip. # 42).
The FAA expects the Authority to achieve the standard 400 foot
separation between Taxiway A and Runway 2/20 and the 400 foot
separation has been included in the Preliminary Environmental
Assessment.  (Stip. # 42).

The Authority is not in compliance with FAA design
standards due to the non-standard taxiway geometry.  (Stip. #
43).  The FAA has given the Authority until May 6, 2021 to
redesign and reconstruct its taxiways, including realignment of
Taxiway A, to bring the Airport into compliance with federal
design standards.  (Stip. # 43).  There is no current or pending
FAA enforcement action against the authority for noncompliance
with any FAA safety standard applicable to 49 U.S.C. Part 139
airports or any standard contained in FAA Advisory Circular
150/5300-13A.  (Stip. # 44).

Tom Reich, the Director of Air Service Development at AFCO
AvPorts Management, LLC, has provided marketing services to the
Tweed-New Haven Airport and for other airports around the
country. (Stip. # 45).  He was previously employed as a market
analyst for Independent Air and as the Manager of Market
Planning for Colgan Air's United Express and US Airways Express

branded operations.  (Stip. # 45).  Mr. Reich has provided marketing services for the Airport since December 2011.  (Stip. # 46).  During the time that he has provided marketing services to the Airport, Mr. Reich has been in touch with approximately ten different airlines with regard to the possibility of those airlines bringing service to the airport.  (Stip. # 46).

From 2012 to 2016, Mr. Reich attended the Airports Council International—North America JumpStart Air Service Development Conference, where airlines and airport administrators convene annually.  (Stip. # 48).  Mr. Reich has met with numerous airline representatives at the JumpStart conferences with regard to the possibility of those airlines bringing service to the Airport, and has remained in steady contact with airline representatives throughout the years, even outside of JumpStart conferences.  (Stip. # 48).

In Mr. Reich's experience, there are three primary factors that determine whether or not an airline will choose to provide service to a given destination: (1) market size; (2) equipment performance; and (3) economic viability.  (Stip. # 49).  One analysis, completed by AvPort, shows that the South-Central Connecticut market is the largest catchment area in the United States in terms of existing passenger demand without nonstop flights to Orlando, Florida.  (Stip. # 50).

In Mr. Reich's experience, the overriding issue with respect to an airline choosing to provide service to a new destination is economic viability.  (Stip. # 51).  Runway length is an integral part of an airline's economic viability analysis due to the weight restrictions a shorter runway can cause and the resulting limit to the number of passengers that can be carried on the flight.  (Stip. # 51).  Lengthening a runway could eliminate safety concerns and could reduce the need for these weight restrictions at a given airport, allowing aircraft to carry more passengers while increasing the profit potential of the flight to an acceptable level for the airline.  (Stip. # 52)

In Mr. Reich's experience, weight restrictions can impose economic impediments at airports, such as Tweed, with short runways.  (Stip. # 53).  The Airport has the thirteenth shortest runway out of 348 airports where commercial service is provided, and according to the AvPorts analysis, the twelve airports with shorter runways do not have as large a catchment area as Tweed-New Haven Airport.  (Stip. # 53).  Tweed-New Haven Airport has the shortest runway in the nation for catchment areas with $1,000,000 or more people.  (Stip. # 53).

Allegiant Air has prepared this type of economic analysis for the Airport and has declined to service the Airport because "runway 2/20 is too short for Allegiant to comfortably operate

12

**JA182**

regularly scheduled commercial service." (Stip. # 55). Over his last five years providing marketing services to the Airport, Mr. Reich has been unable to convince any new airlines to commence service at Tweed. (Stip. # 57).

Over the past eight years the Authority has been operating the Airport at a loss which has required annual subsidies from the state of Connecticut in the amount of $1,500,000 and from the City of New Haven in the amount of $325,000. (Stip. # 58). The subsidy from the State was reduced to $1,480,000 for fiscal year 2016-2017. (Stip. # 58). Notwithstanding marketing efforts, the Authority has not received a commitment from any airline to provide service at the Airport if the statutory restriction on the length of Runway 2/20 is removed. (Stip. # 59).

In 2009, a Memorandum of Agreement ("MOA") was established among the City of New Haven, the Town of East Haven, the Authority and certain members of the General Assembly. (Stip. # 60). The MOA limits Runway 2/20 to the existing paved runway length of 5,600 feet. (Stip. # 61). It also limits daily commercial departures to thirty and annual emplanements to 180,000. (Stip. # 61).

Section III of the MOA references a bill for adoption in the 2009 Legislative Session that limited the length of the runway, increased the number of members of the Authority's Board

of Directors to be appointed by the Town of East Haven and City
of New Haven related to the airport property.  (Stip. # 62),
Section III also called for additional appropriations for the
Authority in the two fiscal year budgets being considered in the
2009 Legislative Session that would have reduced the capital
bond commitment of the State to the Airport.  (Stip. # 62)

The bill reducing the capital bond authorization was
defeated and the restriction on the runway and the change in
board membership in the designated bill were adopted, but the
payment in lieu of taxes portion of the bill was not adopted and
$1.5 million of additional appropriations were approved, whereas
the MOA called for $2 million.  (Stip. # 62).  The items that
were not adopted in the 2009 Legislative Session have not been
adopted by subsequent General Assembly action.  (Stip. # 62).

Section IV of the MOA provides in pertinent part: "[T]his
agreement may be terminated by written notice by either the City
or the Town in the event  . . . (c) the State of Connecticut
fails to enact the Legislative Initiatives contained in Section
III of this Agreement in the 2009 Legislative Session."  (Stip.
# 63).  To date, the City of New Haven has not taken steps to
invalidate the MOA.  The Authority does not appear to have the
power, pursuant to the MOA, to unilaterally terminate the MOA.
(Stip. # 64).

The Connecticut Coastal Management Act discourages the substantial expansion of existing airports within the coastal boundary. (Stip. # 64). Two permits from the Connecticut Department of Energy and Environmental Protection ("DEEP") were previously issued to the Authority for the construction of runway safety areas. One of the permits, the tidal permit, states: "At no time shall the permittee modify the surfaces of the RSAs including paving." The second permit, for disturbing wetlands and water quality, requires a modification to the permit from the DEEP if the safety areas are altered. (Stip. # 66).

The FAA has indicated to the Authority that if it wishes to continue with its proposed runway extension project, the Authority must develop a joint action plan with DEEP addressing the Agency's concerns identified in the two previously issued permits. (Stip. # 67).

If Conn. Gen. Stat. §15-120j(c) is removed or invalidated, the Authority intends to file an application seeking DEEP approval to remove the conditions in the permits mentioned above. (Stip. # 68). Increasing the length of Runway 2/20 would require the Authority to ensure that all new approach surfaces are clear for approaching aircraft. (Stip. # 69). The Authority is currently in the process of ensuring that such surfaces are clear for a 6,601 foot runway. (Stip. # 69). The

15

**JA185**

normal approval process for a runway extension requires: (a) careful planning, including review of feasible alternatives; (b) proper environmental analysis, consistent with federal regulations; and (c) sufficient funding, including federal, state and/or local sources.  (Stip. # 70).

The Airport Improvement Program ("AIP") provides about $3.5 billion annually versus an estimated need of over $40 billion over the next five years.  Accordingly, dollars must be allocated to the highest national priorities that are eligible and justified.  (Stip. # 71).  The Authority received approximately $24 million from the FAA in 2008 for its runway safety area project and has received over $40 million from the FAA in the past twenty years.  (Stip. # 72).

**DISCUSSION**

I.   **Article III Standing**

The defendant argues that the plaintiff has not sustained its burden of establishing the "injury in fact" necessary to confer standing, thereby depriving the Court of jurisdiction over this matter.  (Dkt. # 74 at 2).  Plaintiff argues, in response, that it has sustained multiple legally cognizable injuries, any one of which alone would satisfy the injury in fact requirement of standing.  (Dkt. # 73 at 6).

In the Court's ruling on the motion to dismiss, the undersigned found that the plaintiff's pleadings had satisfied the burden of establishing an injury in fact sufficient to confer standing.  However the standard of proof for establishing Article III standing is higher following a trial.  *See* Lujan v. Defs. of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137, 119 L. Ed. 2d 351 (1992)("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'")

Article III, § 2 of the United States Constitution restricts federal courts to deciding "'Cases' and 'Controversies.'"  Lujan, 504 U.S. at 559.  The "case-or-controversy requirement is satisfied only where a plaintiff has standing."  Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 273 (2008).  "Three elements comprise the 'irreducible constitutional minimum' of standing: (1) the plaintiff must have suffered an injury-in-fact—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision."  All. for Open Soc'y Int'l, Inc. v. U.S. Agency for
Int'l Dev., 651 F.3d 218, 228 (2d Cir. 2011), aff'd sub nom.
Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 133 S.
Ct. 2321, 186 L. Ed. 2d 398 (2013).  "The party invoking federal
jurisdiction bears the burden of establishing these elements."
Lujan, 504 U.S. at 561.

Plaintiff first argues that the Airport is injured by
virtue of the mere existence of Conn. Gen. Stat. §15-120j(c).
(Dkt. # 73 at 6-8).  Specifically, plaintiff argues that the
"statute's existence is sufficient to confer standing on Tweed
because Tweed is currently injured by its inability to proceed
with an FAA and state approved runway extension project."  (Dkt.
# 73 at 7).  Plaintiff further contends that this "injury can be
redressed by a decision declaring General Statutes §15-120j(c)
unconstitutional.  (Dkt. # 73 at 7).

The defendant does not reply directly to plaintiff's
argument.  However, the defendant describes several obstacles to
lengthening Runway 2/20, apart from Conn. Gen. Stat. §15-
120j(c).  The defendant notes that the normal approval process
for a runway extension requires three things: "(a) careful
planning, including review of feasible alternatives; (b) proper
environmental analysis, consistent with federal regulations; and
(c) sufficient funding, including federal, state and/or local
sources."  (Dkt. # 74 at 22).

While the Authority had taken significant steps in planning the proposed runway, including hiring Hoyle, Tanner & Associates at its own expense to conduct a Preliminary Environmental Assessment, plaintiff faces serious hurdles to securing FAA approval as well as adequate funding.  (*See* Dkt. # 59, Stip. # 23).

Federal review and comment is necessary for any construction project located within the ALP.  (Dkt. # 59, Stip. # 28).  One of the initial steps under the applicable federal regulations in such a project is to submit an Environmental Assessment.  (Dkt. # 59, Stip. # 28).  The FAA has declined to review and comment on the content of the Authority's Preliminary Environmental Assessment for more than two years.  (Dkt. # 59, Stip. # 32).

The FAA is not proceeding with review of the Environmental Assessment for a variety of reasons, including because the Authority is in violation of several federal grant assurances and regulations.  (Dkt. # 59, Stip. # 34).  Additionally, two permits were previously issued by the DEEP for the construction of runway safety areas.  (Dkt. # 59. Stip. # 66).  The FAA has indicated to the Authority that if it wishes to continue with its proposed runway extension project, the Authority must develop a joint action plan with the DEEP addressing the agency's concerns identified in the two previously existing

19

permits.  (Dkt. # 59, Stip. # 67).  Thus, the existence of Conn. Gen. Stat. §15-120j(c) represents one of several factors preventing the FAA from reviewing the Preliminary Environmental Assessment.

Additionally, projects utilizing federal funding must be both eligible and justified at the time of the investment, including runway extensions.  (Dkt. # 59, Stip. # 73).  The Airport Improvement Program provides about $3.5 billion annually versus an estimated need of over $40 billion over the next five years.  (Dkt. # 59, Stip. # 71).  Accordingly, dollars must be allocated to the highest national priorities that are eligible and justified.  (Dkt. # 59, Stip. # 71).

The Authority received approximately $24 million dollars from the FAA in 2008 for its runway safety area project and it has received approximately $40 million from the FAA in the past twenty years.  (Dkt. # 59, Stip. # 73).  The defendant emphasizes that the current circumstances are not equivalent to those that existed in 2008, when the Authority received funding for a project concerned with safety and where there was a current enforcement action by the FAA pending against the Airport.  (Dkt. # 74 at 23).

The defendant also notes that just because the FAA has approved an ALP or Master Plan for an airport, as it has in this case, it does not follow that the agency must provide funding to

20

**JA190**

that airport to make that plan a reality.  (Dkt. # 74 at 23).
The defendant states that "the FAA's discretion to fund airport
improvements remains subject to a ranking in which safety
concerns have the highest priority."  (Dkt. # 74 at 23; trial
transcript at 134-35).

The Court is persuaded by the defendant's arguments.  In light
of the fact that the Airport would have to remedy its violation
of several federal grant assurances and obtain DEEP approval
before proceeding with any runway expansion project, there does
not appear to be a direct causal relationship between the
statute and the plaintiff's alleged injury.

Additionally, even if the Authority were to overcome these
obstacles, it is uncertain that the FAA would provide the
necessary funding for plaintiff to complete the proposed runway
project. For these reasons, the Court finds plaintiff's argument
that it is injured by the mere existence of the statute to be
unpersuasive.

Plaintiff next argues that the statute has directly led to
inadequate revenue at the airport and chronically low service
levels, and that the evidence presented at trial proves this.
(Dkt. # 73 at 8).  Plaintiff contends that the dire financial
situation of the airport is tied to the chronically low services
levels and that the low service levels are "inextricably tied to
the current length of Runway 2/20."  (Dkt. # 73 at 8).

21

**JA191**

Plaintiff claims that these injuries can be redressed by invalidating Conn. Gen. Stat. §15-120j(c). (Dkt. # 73 at 8).

Plaintiff states that over the last eight years the Authority has been operating at a loss which has required annual subsidies from the state and the City of New Haven. (Dkt. # 73 at 10; Exhibit B). Since 2009, the Airport has experienced an average annual operating loss of $1,800,000. (Dkt. # 73 at 10; Dkt. # 59, Stip. # 58; Exhibit B). According to the testimony of Mr. DeCoster, "the lengthening of the runway is the absolute door opener in order to have a chance at improving the financial condition of the airport." (Trial transcript at 99).

Mr. DeCoster also testified that if additional service were brought to Tweed, "[i]t would absolutely increase direct and indirect revenue and make a major impact on the deficit that occurs today." (Trial transcript at 100). According to plaintiff, "[a] longer runway would permit Tweed to accommodate new commercial service which would result in additional revenue for the Airport, alleviate its annual operating losses and significantly reduce state and local subsidies." (Dkt. # 73 at 12).

The defendant argues that the evidence fails to show that the state statute has caused plaintiff the loss of current business, and therefore plaintiff fails to show that it has suffered an injury. (Dkt. # 74 at 14). The defendant notes

that "[w]hile evidence presented at trial shows that the runway was 5,600 linear feet prior to the passage of Conn. Gen. Stat. §15-120j(c) in 2009, no evidence has been presented suggesting that service levels at the Airport have become chronically low or lower since then."  (Dkt. # 74 at 14).  Defendant also notes that plaintiff's witnesses failed to account for the service levels at the Airport prior to 2009 or indicate whether there has been or currently is a market demand for any new type of commercial service to or from the airport.  (Dkt. # 74 at 141; trial transcript at 129).

The Court finds that plaintiff's failure to account for the financial status of the airport prior to the passage of the state statute in 2009 constitutes a significant problem. Plaintiff must prove that the downturn in the Airport's financial situation is a direct result of the passage of Conn. Gen. Stat. §15-120j(c) in order to show a causal relationship between the statute and the alleged injury.

Plaintiff next argues that Tweed is unable to attract new commercial services to the Airport as a result of Conn. Gen. Stat. §15-120j(c).  (Dkt. # 73 at 12).  Plaintiff claims that the evidence adduced at trial shows that the length of Runway 2/20 has already deterred at least one commercial carrier from bringing service to Tweed, and that the Airport will be unable

23

**JA193**

to attract new commercial service if Runway 2/20 is not
lengthened.

The parties stipulated to the fact that despite marketing
efforts and various attempts to attract new service, the
Authority has failed to attract a single new scheduled
commercial carrier since 2009.  (Stip. # 18).  The parties also
stipulated that during the six years that Mr. Reich has been
providing marketing services to the Airport, he has been in
touch with approximately ten different airlines with regard to
the possibility of bringing service to the Airport.  (Stip. #
47).  Nonetheless, Mr. Reich has been unable to convince a
single airline to commence service at the Airport.  (Stip. #
57).

Plaintiff argues that there is a direct link between the
Authority's inability to attract new commercial service and the
length of Runway 2/20.  (Dkt. # 73 at 14).  Plaintiff notes that
in Mr. Reich's experience, "the overriding issue with respect to
an airline choosing to provide service to a new destination is
economic viability."  (Dkt. # 73 at 14).  Plaintiff claims that
runway length is an integral part of an airline's economic
viability analysis, and that Tweed is effectively handicapped by
its inability to lengthen the runway because it prevents the
Airport from even getting a place at the table to negotiate with

commercial air carriers.  (*See* Dkt. # 73 at 14-15; Dkt. # 59, Stip. # 51; Reich Affid. at ¶11).

Nonetheless, plaintiff notes that it has received "real and substantial interest from Allegiant Air, LLC in terms of bringing commercial service to the airport."  (Dkt. # 73 at 15; *see* Exhibit 10).  Mr. DeCoster testified that Allegiant Air is one of the fastest growing, ultra-low cost fares in the industry. (Trial transcript at 57). Plaintiff alleges Allegiant cannot proceed with its analysis of Tweed as a potential market specifically because Runway 2/20 is too short for Allegiant to comfortably operate regularly scheduled commercial service with its current fleet of planes.[2]  (Dkt. # 73 at 15-16).

The defendant argues that "the evidence does not support the plaintiff's contention that it has incurred specific lost business opportunities due to the runway limitation in Conn. Gen. Stat. § 15-120j(c)."  (Dkt. # 74 at 11).  The defendant argues that Plaintiff's Exhibit 10 does not prove a lost business opportunity.  Exhibit 10 is a letter from Allegiant to the FAA, in which Allegiant indicated its willingness to reopen its analysis of whether it would be economically viable to bring

---

[2] Mr. DeCoster gave his opinion on whether Allegiant Air might be willing to bring service to Tweed if the runway is lengthened (trial transcript at 94-95), it would have been helpful had Tweed called a representative from Allegiant to testify on this subject. As Exhibit 10 indicates, Allegiant has not yet gone forward with its analysis of Tweed as a potential market. There is nothing in the record which establishes what factors Allegiant would want to analyze or how Tweed would likely fare with respect to each such factor.

25

**JA195**

regularly scheduled commercial service to Tweed if the runway were lengthened.  The defendant notes that the "Allegiant letter itself contains too many contingencies to show a specific lost business opportunity for the plaintiff based on the length of the runway."  (Dkt. # 74 at 12; *see* Exhibit 10).  The defendant also argues that "there is a complete dearth of evidence showing that any airline has even considered whether regularly scheduled commercial service to the Airport could or would be economically feasible with a lengthened runway."  (Dkt. # 74 at 15; trial transcript at 73, 128-30). The Court agrees.

Citing In re Old Carco LLC, 470 B.R. 688, 692 (S.D.N.Y. 2012) (hereinafter "In re Old Carco"), the plaintiff argues that it has standing to seek prospective declaratory relief before exposing itself to actual injury.  (Dkt. # 73 at 17-19). Plaintiff also argues that it does not have to show an actual commitment from an air carrier in order to establish standing. (See Dkt. # 73 at 17-19).  In *In re Old Carco*, a Chapter 11 debtor and a new entity that assumed liabilities of debtors and their debtor-affiliates brought an action for declaratory and injunctive relief against Colorado and Kentucky state officials responsible for enforcing state automobile dealer laws.  In re Old Carco, 470 B.R. at 688.  The plaintiffs alleged that certain state statutes violated and were preempted by the Supremacy Clause.  Id.  The state argued that the plaintiffs lacked

standing because they had not yet suffered an injury.  Id. at 697.

In finding that the plaintiffs established standing, the Court noted that "[e]nforcement of the Kentucky statute would cause New Chrysler to sustain an injury that could be redressed by this decision."  In re Old Carco LLC, 470 B.R. at 697.  The Court quoted MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007), in which that Court held that "the Declaratory Judgment Act permits a plaintiff to seek prospective declaratory relief rather than face exposure to liability or injury before seeking remedial relief."  Id.

The Court finds that this case is distinguishable from *In re Old Carco*.  In *In re Old Carco*, the Court was able to precisely identify the likely injury.  More specifically, the Court stated that "New Chrysler will either have to forego selling its products within ten miles of a rejected dealer for ten years or will have to contract with the dealers whose previous contracts were rejected during the bankruptcy proceeding."  *In re Old Carco*, 470 B.R. at 697.  In this case, plaintiff argues that the statute is preventing the Airport from attracting new commercial service, but there is no evidence in the record that any airline, including Allegiant, has indicated that it would commit to bringing service to Tweed if the runway

is lengthened.  (Dkt. # 59 at 14; trial transcript at 73, 77, 128-30).

In *In re Old Carco*, there was also a direct causal relationship between the injury and the state statute, and the court explicitly found that the injury could be redressed by invalidating the statute.  Id. at 697. ("Enforcement of the Kentucky statute would cause New Chrysler to sustain an injury that could be redressed by this decision).  In this case, plaintiff has failed to show a direct causal relationship between the length of the runway and the Airport's inability to attract new commercial service.[3]  (See trial transcript at 128). Likewise, without a clear commitment from any air carrier that it will bring service to the Airport if the runway is lengthened, it is not clear that plaintiff's alleged injury would be redressed in the absence of Conn. Gen. Stat. § 15-120j(c).  (See Exhibit 10).  For these reasons, the Court finds that *In Re Old Carco* is distinguishable from the current case.

The Court finds the defendant's arguments to be persuasive. The parties stipulated that notwithstanding marketing efforts, the Authority has not received a commitment from any airline to provide service at the Airport if the statutory restriction on

---

[3]Mr. DeCoster testified that he had not conducted any independent market demand studies that analyzed other potential destinations for commercial service from Tweed, or that analyzed Tweed as a potential destination from other airports.  (Trial transcript at 128).

the length of Runway 2/20 is removed.  (Dkt. # 59 at 14).  The
Court finds that without an express commitment that a carrier
will bring service to the airport if the runway length is
increased, the plaintiff cannot show a causal connection between
the statute and the alleged injury.

Plaintiff next argues that the airport cannot comply with
federal grant requirements due to the state statute's
restriction on the length of Runway 2/20.  (Dkt. # 73 at 19).
Plaintiff notes that whenever Tweed accepts federal funds, it
agrees to various grant assurances which, among other things,
require compliance with a long list of federal statutes and
regulations directed to airport facilities and operations.
(Dkt. # 73 at 20).  Non-compliance by an airport such as Tweed
can result in an enforcement action by the FAA.  (Dkt. # 73 at
20, *See* Dkt. # 59, Stip. # 36).  The defendant argues that "the
Authority, not the state, has been the party responsible for the
Authority's failure to comply with federal grant assurances and
related federal statutes since the enactment of Conn. Gen. Stat.
§15-120j(c) in 2009."  (Dkt. # 74 at 16).

Plaintiff notes that the "FAA has identified several
federal obligations and grant assurances that Tweed is unable to
comply with as a result of General Statutes § 15-120j(c)."
(Dkt. # 73 at 20).  In fact, the FAA has not commented directly
on Conn. Gen. Stat. § 15-120j(c), but it has commented on a

Memorandum of Agreement ("MOA") that was established among the City of New Haven, the Town of East Haven, the Authority and certain members of the Connecticut General Assembly.  (Dkt. # 59, Stip. # 60).

The FAA noted its concern regarding the runway length limitation in the MOA[4], but it also noted its concern regarding potential violations of the Airport Noise and Capacity Act of 1990 ("ANCA") and the Anti-Head Tax Act.  (Def. Ex. A).  The defendant emphasizes that this agreement was entered into voluntarily by the Authority and that no evidence was presented at trial that the Authority has taken any actions to address any of the FAA's concerns regarding federal grant assurances or violations of the ANCA or the Anti-Head Tax Act.  (Dkt. # 74 at 20).

The FAA has also expressed concern with the taxiways at the Airport.  The parties stipulated in their joint trial memorandum that the current locations and dimensions of the taxiways are not in compliance with federal regulations in terms of their distance to Runway 2/20.  (Dkt. # 59, Stip. # 39).  The FAA has given the Authority until May 6, 2021 to redesign and reconstruct its taxiways, including realignment of Taxiway A, to bring the Airport into compliance with federal design standards.

---

[4] The MOA limits Runway 2/20 to the existing paved runway length of 5,600 linear feet.  (Dkt. # 59, Stip. # 61).

**JA200**

(Dkt. # 59, Stip. # 43).  Plaintiff suggests that the taxiways
might be altered as a part of the proposed runway extension
project so that they are in compliance with federal law.  (Dkt.
# 59, Stip. # 39).  But the Authority had proposed a nonstandard
parallel taxiway as part of its operation safety improvements.
(Dkt. # 74 at 17; See also trial transcript at 31).

The defendant argues that it is "disingenuous for the
plaintiff to claim that the runway limitation statute has
prevented it from complying with federal grant assurances . . .
when the plaintiff itself has proposed a nonstandard taxiway in
contradiction of the FAA's requirement to create standard
taxiways in 2012.  (Dkt. # 74 at 18).

The Court finds that the plaintiff has failed to provide
evidence of a causal relationship between Conn. Gen. Stat. §15-
120j(c) and the Authority's alleged inability to comply with
federal grant requirements.  The evidence suggests, instead,
that the Authority's failure to comply with federal grant
requirements is for the most part self-imposed.

Finally, plaintiff argues that the only commercial aircraft
currently servicing the Airport will soon be retired, leaving
Tweed with no commercial service.  (Dkt. # 73 at 22).  Plaintiff
cites to a report prepared by John DeCoster, an expert witness

who testified on behalf of the plaintiff.[5]  (Pl. Ex. # 13).  Mr DeCoster indicates in his report that the Dash-8 is "nearing the end of its useful life" at which point "a major overhaul of the airport is required."  (Pl. Ex. # 13 at 3).  However, he opined that since the "economics for such an overhaul [are] no longer supportable," the aircraft will be retired from service.  (Pl. Ex. # 13 at 3).

According to Mr. DeCoster's report, the "logical aircraft that will replace the Dash 8 is the 50 seat regional jet, either the Bombardier CJ200 or the Embraer 145."  (Pl. Ex. # 13 at 3). However, according to Mr. DeCoster, these aircraft are also reaching their "cycle limits" and are being phased out.  (Pl. Ex. 13).  According to Mr. DeCoster's report, American, Delta and United have all indicated that once their 50 seat jets "reach their maximum cycles or if fuel increases significantly, the aircraft will be retired because the flights will no longer be profitable."  (Pl. Ex. # 13 at 3).

Mr. DeCoster also noted that the desired minimum runway length for the 50 seat regional jets is 6,200 linear feet in order to avoid payload hits (according to the manufacturer's specifications, 5,600 linear feet is the lowest allowable

---

[5] The defendant objected to Mr. DeCoster's testimony, arguing it was based on insufficient and unreliable evidence. (Trial transcript at 76-77).  In the interest of caution and because this was a bench trial, the Court overruled the objection and allowed the testimony.

condition).  (Pl. Ex. # 13 at 3).  According to Mr. DeCoster, once the 50 seat regional jet is no longer available, the next size aircraft is the 70/76 regional jet, which likely requires a minimum runway length of 6,220 to 6,600 linear feet.  (Pl. Ex. # 13 at 4).  Thus, plaintiff argues that "there is a real and distinct possibility that the Dash 8, Bombardier CJ200 and Embraer 145 will be retired at or around the same time, leaving Tweed with absolutely no commercial service."  (Dkt. # 73 at 23).

The defendant argues in response that the plaintiff has failed to show that the Dash 8 will be phased out in the near future, that a replacement plane will need a longer runway, or that regularly schedule commercial service at the airport is jeopardized and may be terminated.  (Dkt. # 74 at 7).  The defendant notes that on cross examination, Mr. DeCoster testified that he does not know when the American Airlines Dash 8 will be retired.[6]  (Dkt. # 74 at 8, *See* trial transcript at 119).  The defendant further notes that "Mr. DeCoster agreed at trial that he 'cannot conclude that regularly scheduled commercial service is jeopardized at the moment.'"  (Dkt. # 74 at 9; trial transcript at 119-20).

---

[6] On cross examination, Mr. DeCoster also testified that American Airlines could service Tweed with either the Bombardier CJ 200 or the Embraer 145 after the Dash 8 is retired and nothing in his report indicates that the use of those two jets would not be profitable for American Airlines.  (Trial transcript at 112-14; 122-23).

The defendant argues that "the plaintiff's claim of a 'possible future injury' arising from an unknown phase out date of both the Dash 8 and the two regional replacement jets does not satisfy Article III requirements necessary to establish injury in fact since such future possible events are not 'threatened injur[ies]' that are 'certainly impending.'" (Dkt. # 74 at 10).  Relying upon the Second Circuit's ruling in <u>Shain v. Ellison</u>, 356 F.3d 211, 216 (2d Cir. 2004), the defendant argues that plaintiff's argument is based upon "an accumulation of inferences" and is "too speculative and conjectural."

As a result, the defendant urges the Court to reject the "plaintiff's hypothetical scenario that if the only type of aircraft currently providing service to the Airport will soon be phased out, and if there are no replacement planes that can operate on the existing runway, and if new planes will need a longer runway, and if that development jeopardizes commercial service at the Airport, the consequence will be that enforcement of Conn. Gen. Stat. § 15-120j(c) may terminate all commercial service 'someday' in the future."  (Dkt. # 74 at 11).

While the Court is quite sympathetic to plaintiff's potential situation, the Court is not persuaded that Tweed faces an imminent threat that the only commercial aircraft currently servicing the airport will be retired, thereby leaving Tweed with no commercial service.  Plaintiff's witness, Mr. DeCoster,

**JA204**

testified on cross-examination that American Airlines has been servicing Tweed since 2009 with no interruptions, and that American Airlines finds this service to be profitable.  (Trial transcript, p. 105, lines 18-23; p. 107, lines 10-14).  Mr. DeCoster also testified that he does not know when the Dash 8 would be retired.  (Trial transcript at 118-19). On cross examination, Mr. DeCoster testified that in publications that he has "read from airlines, they are speculating, …, that by the end of the decade, they will have reached their cycle lives."[7]

Thus, plaintiff has failed to offer a definitive end date, or even a definite time frame, for the useful life of the Dash 8.[8] (*See* Dkt. # 73 at 23; trial transcript at 69-70). (Trial transcript at 114).  Plaintiff also cannot identify a definitive end date for the useful life of the likely replacement jets.[9] (*See* Dkt. # 73 at 23; trial transcript at 69-70, 117-19).

––––––––––––––––––––

[7] Mr. DeCoster's report did not contain or attach any written information from American Airlines or any other airlines discussing when the Dash 8 will be retired. (Trial transcript at 68). Additionally, Mr. DeCoster has not conducted any independent analysis on the subject. (Trial transcript 69).

[8] During the trial, defense counsel asked Mr. DeCoster, "[s]o isn't it true that the facts that you have to offer this court on the Dash 8 phaseout are that someday in the future the Dash 8 will be phased out but you don't know when, correct?"  Mr. DeCoster replied, "Correct."  Defense counsel then asked about the two logical replacement jets, "[a]nd isn't it true that your report does not identify exactly when [the Bombardier CJ200 and the Embraer 145] will reach the end of their useful lives?"  Mr. DeCoster replied, "Yes." (Trial transcript at 69).

[9] Mr. DeCoster's report did not contain any written information from any of the airlines indicating when the two replacement jets will be retired from service and Mr. DeCoster did not conduct any independent analysis on that subject. (Trial transcript at 69-70).

Plaintiff's argument that "there is a real and distinct possibility that the Dash 8, Bombardier CJ200 and Embraer 145 will be retired at or around the same time," falls short without actual evidence.  "Abstract injury is not enough . . . [i]t must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct."  O'Shea v. Littleton, 414 U.S. 488, 494 (1974).

For these reasons, the Court finds that the Authority has failed to prove that it faces an imminent threat of losing all commercial service.

## II.  Preemption

Plaintiff argues that Conn. Gen. Stat. §15-120j(c) violates the Supremacy Clause of the United States Constitution.  (Dkt. # 75 at 10).  Specifically, plaintiff argues that the statute is preempted by three federal statutes: the Federal Aviation Act ("FAAct"), the Airline Deregulation Act ("ADA"), and the Airport and Airways Improvement Act ("AAIA").  (Dkt. # 73 at 25).  The defendant argues, in response, that the runway limitation in Conn. Gen. Stat. §15-120j(c) does not violate the FAAct, the ADA or the AAIA.  (Dkt. # 74 at 24).

"It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law."

Hillsborough Cty., Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 712 (1985) (citations omitted).  "Preemption can be either express or implied."  Air Transp. Ass'n of Am., Inc. v. Cuomo, 520 F.3d 218, 220 (2d Cir. 2008).

"In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, 'where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." New York SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010).  "The key to the preemption inquiry is the intent of Congress."  Id.

### A.   The FAAct

Plaintiff does not argue in its post-trial brief that Conn. Gen. Stat. §15-120j(c) is directly preempted by the FAA, and there is no evidence in the record to support direct preemption. Plaintiff instead argues that Conn. Gen. Stat. §15-120j(c) is impliedly preempted by the FAAct under a theory of field preemption.  (Dkt. # 73 at 26).  Plaintiff contends that the "evidence at trial establishes that runway length is indeed a component part of the field of airline safety," and is therefore

part of a field that is completely occupied by the federal government.  (Dkt. # 73 at 26).

The defendant argues that the plaintiff's "claim that Conn. Gen. Stat. §15-120j(c) attempts to regulate a field occupied by the federal government, aviation safety and service capacity is misplaced," and that "[n]o evidence has been presented showing that the runway limitation statute interferes with the Authority's ability to comply with federal aviation safety standards."   (Dkt. # 74 at 26).  The defendant also attempts to distinguish the current case from Tweed-New Haven Airport Auth. v. Town of East Haven, Conn., 582 F. Supp. 2d 261 (D. Conn. 2008)(Hall, J.)(hereinafter "*Tweed v. Town of East Haven*"), a case that is integral to plaintiff's argument.

In *Tweed v. Town of East Haven*, the plaintiff brought an action against the Town of East Haven, seeking a declaratory judgment that the Town's regulations, which interfered with the Airport's "runway project," were preempted by federal law.  The purpose of the runway project was to put Tweed-New Haven Airport in compliance with the FAA's current runway safety area ("RSA") requirements.  Id. at 270.

The district court found that "Congress intended to occupy and regulate the field of airline safety," and that this power extends to "grounded planes and airport runways."  Id. at 268. The court ruled that "because the TSAs are being created for the

purpose of meeting the FAA safety standards and the Runway Project is being done within Authority property, the court finds that the East Haven defendants' regulations, as applied to the Runway project, are preempted by the FAAct."  Id.

The Court agrees defendant's argument that Conn. Gen. Stat. §15-120j(c) does not interfere with plaintiff's ability to comply with federal aviation safety standards.  The Court also finds that the current case is distinguishable from *Tweed v. Town of East Haven*.

The "runway project" in *Tweed v. Town of East Haven* was undertaken in response to an FAA enforcement action for the purpose of complying with FAA safety standards.  In the current case, there is no pending FAA enforcement action.  (Dkt. 59, Stip. # 42).  While the airport is not in compliance with FAA standards due to non-standard taxi-way geometry, there is no evidence that extending the runway is necessary to fix this problem or for the Authority to come into compliance with FAA safety guidelines.  (Dkt. # 59, Stip. ¶43).

Thus, plaintiff's argument that the "non-standard separation between the taxi-way and the runway could be brought into compliance as part of the proposed runway extension project," is unavailing.  (Dkt. 59, Stip. # 39).  Plaintiff has failed to present evidence that the runway length in this instance is a component part of the field of airline safety.

39

**JA209**

Plaintiff also argues that Conn. Gen. Stat. §15-120j(c) is preempted by the FAAct under a theory of conflict preemption. (Dkt. # 73 at 27).  Plaintiff argues that "conflict preemption does not just hinge entirely on whether the state law makes it impossible to comply with the federal law," but it also arises when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. (Dkt. # 73 at 27, *citing* Hillsborough County, 471 U.S. at 713; *see also* California v. ARC Am. Corp., 490 U.S. 93, 100-01 (1989).

Plaintiff contends that Runway 2/20 "remains too short for almost all commercial aircraft to operate regularly scheduled service in a safe and commercially reasonable manner."  (Dkt. # 73 at 27).  Plaintiff also argues that Conn. Gen. Stat. §15-120j(c) prevents it from complying with federal grant requirements.  (Dkt. # 73 at 27).  In response, the defendant argues that there is no evidence showing that the statute has directly or indirectly caused the plaintiff to fail to comply with any federal safety regulations.  (Dkt. # 74 at 25).

As noted above, "[c]onflict preemption arises when "local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives."  New York SMSA Ltd. P'ship, 612 at 104.  There is no pending enforcement action by the FAA

against the Authority. (Dkt. # 59, Stip. ¶ 42). The current locations and dimensions of the taxiways are not in compliance with regulations in terms of their distance from Runway 2/20, but this problem can be fixed without extending the length of Runway 2/20. (Dkt. 59, Stip. # 39). Thus, there is no evidence in the record showing that it is impossible for the Authority to comply with both Conn. Gen. Stat. §15-120j(c) and the FAAct.

There is also no evidence in the record that Conn. Gen. Stat. §15-120j(c) stands as an obstacle to the achievement of federal objectives. Plaintiff argues that the runway "remains too short for almost all commercial aircraft to operate regularly scheduled service in a safe and commercially reasonable manner." (Dkt. # 73 at 27). However, the airport is currently served by American Airlines with a Dash 8 turboprop aircraft that seats between 37 and 40 passengers. (Pl. Ex. 13). According to a letter written by Mr. DeCoster, who testified on behalf of the plaintiff, "[t]he current runway length is sufficient to accommodate that aircraft in most weather conditions without a payload hit." (Pl. Ex. 13). American's continued service shows that it is possible to operate regularly scheduled service in a safe and commercially reasonable manner. (Trial transcript at 105-7, 122-23).

For the aforementioned reasons, the Court finds that Conn. Gen. Stat. §15-120j(c) is not preempted by the FAAct.

**B.    The ADA**

The Airline Deregulation Act "ADA" was enacted in 1978 based on Congress's determination that "'maximum reliance on competitive market forces' would best further 'efficiency, innovation, and low prices' as well as 'variety [and] quality ... of air transportation services.'"  Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378, 112 S. Ct. 2031, 2033, 119 L. Ed. 2d 157 (1992).  The ADA includes an express preemption provision that prohibits states from enforcing any law "'relating to rates, routes, or services' of any air carrier." Morales, 504 U.S. at 378-79.  Under the ADA, "'air carrier' means a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation."  49 U.S.C.A. § 40102(2) (West).  Airport is defined separately as "a landing area used regularly by aircraft for receiving or discharging passengers or cargo.  49 U.S.C.A. § 40102(9) (West).

Plaintiff argues that Conn. Gen. Stat. §15-120j(c) is expressly preempted by the ADA because the "restriction on the Length of Runway 2/20 is related to 'a price, route or service of an air carrier.'"  (Dkt. # 73 at 28).  The defendant argues that the ADA does not apply because the express preemption clause in the ADA specifically applies to an "air carrier" as

opposed to an airport.  (Dkt. # 74 at 34).[10]   Plaintiff contends
that a state law does not have to specifically target an air
carrier in order to be preempted by the ADA, as long as it is
related to the price, route or service of an air carrier.  (Dkt.
# 73 at 28).

Based upon the plain language of the ADA, the Court finds
that the express preemption provision at issue applies
specifically to air carriers, as opposed to airports, which are
defined separately in the statute.  The Court further finds that
the Authority lacks standing to bring this claim on behalf of a
third party.  "[A] party 'generally must assert his own legal
rights and interests, and cannot rest his claim to relief on the
legal rights or interests of third parties.'"  Kowalski v.
Tesmer, 543 U.S. 125, 129, (2004).  Therefore, plaintiff cannot
assert legal rights on behalf of Allegiant, or any other
hypothetical air carrier who might bring service to the Airport.

Even if the preemption provision applied in this case,
plaintiff still has not shown that Conn. Gen. Stat. §15-120j(c)
relates to rates, routes or services.  "State enforcement

---

[10] "It is worth emphasizing that it is the effect on the 'price, route
or service' of an air carrier — not an airport—that is prohibited by
the ADA." Goodspeed Airport, LLC v. E. Haddam Inland Wetlands &
Watercourses Comm'n, 681 F. Supp. 2d 182, 207 (D. Conn. 2010)(Kravitz,
J.), aff'd, 634 F.3d 206 (2d Cir. 2011).

actions having a connection with or reference to airline 'rates, routes, or services' are pre-empted" under the ADA.  Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384, 112 S. Ct. 2031, 2037, 119 L. Ed. 2d 157 (1992).  However, the Court is hard pressed to find any clear connection between Conn. Gen. Stat. §15-120j(c) and air carrier rates, routes or services.

Plaintiff argues that the statute relates to the route and service of an air carrier because it is preventing Allegiant from bringing service to the Airport and it is preventing the Authority from attracting new service.  (Dkt. # 73 at 30).  This argument is not supported by the evidentiary record.  Allegiant has not committed to bringing service to the Airport, even if the runway is extended.  (See P. Ex. # 10, "Allegiant letter").  And, American Airlines continues to operate the same service that it operated prior to the passage of Conn. Gen. Stat. §15-120j(c).  (Trial transcript at 119).  There is no evidence in the record to suggest that American Airlines would expand its service if the runway were extended.  Furthermore, the Court cannot find preemption based upon hypothetical future carriers who might want to bring service to Tweed at some undisclosed future date.

For these reasons, the Court finds that the express preemption provision in the ADA does not apply in this case, and

even if it did apply, the Court finds that Conn. Gen. Stat. §15-120j(c) is not preempted by the ADA.

### C.   The AAIA

The Airport and Airway Improvement Act ("AAIA") "serves the purpose of providing federal funding to airport construction projects to promote a wide variety of policy goals." City of Cleveland, Ohio v. City of Brook Park, Ohio, 893 F. Supp. 742, 749 (N.D. Ohio 1995). "The Act imposes no requirements, nor does it authorize the promulgation of any regulations, that govern airports generally or that govern projects for which no federal funding is being sought." Id. at 752.

Plaintiff argues that Conn. Gen. Stat. §15-120j(c) is impliedly preempted by the AAIA under theories of field and conflict preemption. Plaintiff notes that the "comprehensive statutory scheme of the AAIA demonstrates the supremacy of federal interest in commercial air service expansion, particularly with regard to development of airport facilities. (Dkt. # 73 at 31). Plaintiff states that "the AAIA, in conjunction with the FAAct and ADA, demonstrates the dominance of the federal interest in aviation safety and airport improvement projects and requires the FAA to develop and maintain a national plan of integrated airport systems." (Dkt. # 73 at 31).

Plaintiff also argues that Conn. Gen. Stat. §15-120j(c) directly conflicts with the AAIA because it serves as an impediment to the federal government's and Tweed's objective of expanding service, to the implementation of the Master Plan adopted by the FAA that contemplates the expansion of Runway 2/20 and to increasing compliance with federal safety standards. (Dkt. # 73 at 31).

The defendant argues that the AAIA does not fully occupy the field of aviation safety and service capacity.  (Dkt. # 74 at 38).  Instead, "the AAIA provides a mechanism through which the FAA is to determine whether to provide federal funding to airport development and improvement projects."  (Dkt. # 74, *quoting* City of Cleveland, 893 F.Supp. at 752).  The defendant also argues that there is no actual conflict between Conn. Gen. Stat. §15-120j(c) and the AAIA.  This is because "the AAIA does not set regulatory requirements for the construction of airport runways; it only sets requirements for those wishing to secure federal funding for that type of project."  (Dkt. # 74 at 36).

The Court does not find that Conn. Gen. Stat. §15-120j(c) is preempted by the AAIA under a theory of field preemption. Plaintiff does not offer any case law in support of its legal conclusion that the AAIA occupies the field of aviation safety and airport improvement projects.  Unlike the FAAct, which "was enacted to create a 'uniform and exclusive system of federal

46

**JA216**

regulation' in the field of air safety," the AAIA does not impose any requirements or authorize the promulgation of federal regulations, unless funding is being sought.  *See* Air Transp. Ass'n of Am., Inc., 520 F.3d at 224.

Regarding the issue of conflict preemption, the Court again finds that the AAIA does not impose affirmative obligations unless an Airport is seeking federal funding.  Plaintiff is not obligated to seek federal funding.  Thus, plaintiff has not demonstrated that it is impossible to adhere with Conn. Gen. Stat. §15-120j(c) and the AAIA.

For the reasons set forth above, the undersigned finds that Conn. Gen. Stat. §15-120j(c) is not preempted by the AAIA.

## CONCLUSION

For the reasons set forth herein, defendant's declaratory judgment action is DENIED.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States court of appeals from this judgment. See 28 U.S.C. § 636(c)(3).

SO ORDERED at Hartford, Connecticut, this 30th day of September, 2017.

_____/s/_____
Robert A. Richardson
United States Magistrate Judge

**JA218**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---------------------------------------------------

| | | |
|---|---|---|
| TWEED-NEW HAVEN AIRPORT | : | |
| AUTHORITY | : | CIVIL ACTION NO. 3:15-cv-01731-RAR |
|     Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| GEORGE JEPSEN, in his official | : | |
| capacity as Attorney General for the | : | |
| State of Connecticut | : | OCTOBER 27, 2017 |
|     Defendant | : | |

---------------------------------------------------

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Tweed-New Haven Airport Authority, the plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Second Circuit from the final judgment entered by the District Court in this action on September 30, 2017 (Entry Nos. 78 and 79).

Respectfully submitted,
PLAINTIFF,
TWEED-NEW HAVEN AIRPORT
AUTHORITY


By:  /s/ Christopher A. Klepps, Esq.
JOHN C. KING (ct09570)
HUGH I. MANKE (ct05250)
CHRISTOPHER A. KLEPPS (ct29463)
UPDIKE, KELLY & SPELLACY, P.C.
100 Pearl Street
Hartford, CT 06123
Tel. No. (860) 548-2600
Fax No. (860) 548-2680
jking@uks.com
hmanke@uks.com
cklepps@uks.com

1684545

**JA219**

## **CERTIFICATION**

THIS IS TO CERTIFY that on October 27, 2017, a copy of the foregoing was electronically filed.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  The undersigned did cause to be sent, by U.S. Mail, first-class, postage prepaid, a copy of the foregoing to all counsel and pro-se parties that do not have access to the Court's electronic filing system.

 /s/ Christopher A. Klepps, Esq.
Christopher A. Klepps, Esq.
Updike, Kelly & Spellacy, P.C.

,

1684545

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3

4        ------------------------------x

5    TWEED-NEW HAVEN AIRPORT
     AUTHORITY,
6                          Plaintiff,     3:15CV1731 (RAR)

7              vs.

8    GEORGE JEPSEN, in his official    March 22, 2017
     capacity as Attorney General
9    for the State of Connecticut
                         Defendant
10       ------------------------------x

11                                    Federal Building
                                      450 Main Street
12                                    Hartford, Connecticut

13

14                         **BENCH TRIAL**

15

16

17   Held Before:
           The Honorable Robert A. Richardson
18              U.S.D.C. Magistrate Judge

19

20

21

22

23

24              FALZARANO COURT REPORTERS, LLC
                      4 Somerset Lane
25                   Simsbury, CT 06070
                      860.651.0258

```
 1                    THE COURT:  Yes.
 2   BY MR. KLEPPS:
 3        Q.    All right.  Mr. Furey, I'm now going to
 4   direct you're attention to another enlargement that we
 5   have, which is an excerpt from Exhibit 6, which is
 6   also a stipulated full exhibit.
 7                    MR. KLEPPS:  And your Honor, I believe
 8             this is page 11 from Exhibit 6.
 9                    THE COURT:  Thank you.
10   BY MR. KLEPPS:
11        Q.    Mr. Furey, is this enlarged diagram part of
12   the purpose and need and alternatives analysis that
13   was prepared by Hoyle Tanner and Associates for the
14   runway extension project?
15        A.    Yes.
16        Q.    Going back quickly for a moment.  What is
17   an airport layout plan?
18        A.    Sure.  An airport layout plan is a
19   graphical depiction of the airport and its facilities.
20   When I say facilities, the pavements, the buildings,
21   the surrounding environment.  So it shows the airport,
22   and more importantly, it will show the proposed
23   improvements to the airport.  So it's sort of a
24   blueprint for the future of the airport, and includes
25   their capital improvement program.
```

1       Q.    And is an airport layout plan sometimes

2 referred to as an ALP?

3       A.    Yes.

4       Q.    If there is a construction project within

5 the ALP is FAA approval required?

6       A.    Yes.

7       Q.    And do certain construction projects within

8 an ALP require the submission of an environmental

9 assessment?

10      A.    Yes.

11      Q.    Was an environmental assessment drafted and

12 submitted for the runway extension project at Tweed?

13      A.    Yes, portions of it.

14      Q.    Can you explain what you mean by portions

15 of it?

16      A.    Sure.  So we prepared what we refer to as

17 chapters one through three of the environmental

18 assessment, which includes the stating the purpose of

19 the project, the need for the project, and showing the

20 various alternatives.

21      Q.    And is that sometimes referred to as a

22 preliminary environmental assessment?

23      A.    Yes.

24      Q.    Why was only a preliminary environmental

25 assessment prepared for the runway extension project

1    and submitted to the FAA?

2        A.    It's typical for us to basically put a

3    pause in the project at that point because at that

4    point you're soliciting the FAA's input.  So they can

5    look at the alternatives.  Sometimes they will ask for

6    more information on certain aspects of the document,

7    or they may say less is required for this portion or

8    they may ask for more alternatives.

9        Q.    And has the FAA provided that type of

10   response or commentary to the preliminary

11   environmental assessment?

12       A.    No.

13       Q.    And what role did Hoyle Tanner play with

14   regard to the preparation of the preliminary

15   environmental assessment?

16       A.    We were the authors of that.

17       Q.    And you were hired by the Tweed-New Haven

18   Airport Authority to prepare that?

19       A.    Yes.

20       Q.    All right.  Turning again to the enlarged

21   excerpt from Exhibit 6, which is the purpose and need

22   analysis prepared by HTA, and using the laser pointer,

23   can you please describe how Runway 2-20 is proposed to

24   be extended.

25       A.    Yes.  Your Honor and other members, just to

1          Q.     Okay.  And it also states that

2     approximately 5.3 acres of tidal wetlands would be

3     impacted, including a significant intrusion into a

4     tidal wetlands that was designed as mitigation for

5     previous airport development?

6          A.     Yes.

7          Q.     Okay.  And further, bear with me, it also

8     says, "For such a large impact to be permissible by

9     the Connecticut DEEP," which is the Connecticut Office

10    of Energy and Environmental Protection -- "for such a

11    large impact to be considered permissible by CT DEEP

12    Office of Long Island Sound Programs and ACOE, Tweed

13    Airport would need to show that this is the only

14    alternative that could be constructed and met the

15    purpose and need for the project."  It says that too,

16    right?

17         A.     Yes.

18         Q.     Okay.  And because of -- based on those

19    observations, this report concludes the following:

20    Because the proposed action and the term panel

21    alternative both present reduced impacts to these

22    important resources, this alternative would not be

23    considered reasonable or foreseeable enough to merit

24    additional analysis, right?

25         A.     Yes.

1      Q.      So Hoyle Tanner in this purpose and need

2  report has declined to engage in any further analysis

3  of having the alternative of a standard parallel

4  taxiway at the airport?  That's accurate?

5      A.      I would say that one could anticipate that

6  we would get some pushback from FAA and they would

7  request us to analyze it more, which we would.  I

8  wouldn't say that we closed the book on that

9  alternative.

10      Q.      Why do you think you would get pushback

11  from the FAA?

12      A.      Because they'd prefer standard taxiway

13  separations.

14      Q.      Are you aware if the FAA has informed the

15  Authority of any obligation to construct standard

16  taxiways at the airport within the next five years,

17  for example?

18      A.      Yes, I'm secondarily aware of it.

19      Q.      What are you aware of?

20      A.      That they had been told to fix the taxiway

21  issue.  I don't know by what date.  I heard this

22  secondhand, not directly.

23      Q.      And what is your understanding of how the

24  Authority has been directed to fix the taxiways,

25  according to the FAA?

1      Q.    Okay.  And what type of work have you done

2    or performed for the Authority?

3      A.    My work is really focused on increasing

4    revenues and reducing expenses to try and reduce the

5    operating deficit at the airport.

6      Q.    And have you, at the request of Tweed,

7    reviewed the complaint in this case and specifically

8    certain paragraphs of the complaint to provide an

9    expert opinion regarding the current length of

10    Runway 2-20, the potential for termination of

11    currently scheduled commercial service at the airport,

12    future commercial service options at the airport if

13    the runway is lengthened, and the nexus between runway

14    length and safety?

15      A.    Yes, I have.

16      Q.    Going back to your prior airline employment

17    experience.  If you could describe what particular

18    experience has provided you with the expertise to

19    provide an opinion on runway length and its nexus to

20    safety and commercial service?

21      A.    As I mentioned before, one of the primary

22    tasks that I had as the regional director of airport

23    affairs for Northwest was to work with the airports to

24    make sure that Northwest could operate properly and

25    safely at the airports.  Part of that process was to

1    look at capital projects, as they came up, on a

2    regular basis.  Runways need to be fixed, runways need

3    to be replaced and repaired.  So one of the major

4    tasks was to make sure that in my portfolio if there

5    any projects that were going to impact service, that I

6    was in front of it.  We were looking at ways of

7    affecting our service minimally, so we can continue to

8    have the maximum number of passengers on the airplane,

9    and match the correct airplane with the runway

10   capabilities we had.

11       My probably the most complex example I had was

12   when I had the Midwest region for Northwest, I had

13   Minneapolis-St. Paul, and that airport is my primary

14   airport.  At that time it was the second largest hub

15   for Northwest, there was a major runway project.  The

16   airport has two runways.  They needed to shorten one

17   of the runways in order to replace an intersection.

18   It was taking it down to less than 5,500 feet.  So I

19   had to work with our performance engineering staff our

20   revenue planning staff and the metropolitan airport

21   commission, which administers the airport, to really

22   look at how we reconfigured the airport during that

23   time with regard to service, so that we can still

24   maximize our revenue opportunities and re-fleet as

25   necessary in order to get the maximum productivity,

1    because our overall operating characteristics were

2    going to be reduced during that construction project.

3         Q.    While you were at Northwest were you

4    involved with any runway extension projects?

5         A.    Yes.   The major project that I was involved

6    with was at Minneapolis-St. Paul also.   Northwest was

7    granted nonstop service and rights to Beijing, China,

8    and they did not have a runway capable of sufficiently

9    handling the 747 400 aircraft, which was the designed

10   aircraft for that flight.   So we ended up having to

11   work with the Metropolitan Airport Commission to

12   lengthen the runway by 1000 feet in order to give

13   Northwest the ability to operate that flight with full

14   functional -- functional and financial capability, in

15   other words, they would not have to take restrictions

16   on seats in order to complete it.

17        Q.    How many airports were under your portfolio

18   at Northwest?

19        A.    During my time I had three different

20   regions, and overall over 100 airports.

21        Q.    And turning to your employment at Trillion.

22   How many airports or airlines have you personally

23   performed work or provided services for?

24        A.    Our company has a portfolio of over 60

25   airports.   I'm personally involved in approximately 35.

1   written information provided by the network airlines

2   indicating when those jets will be retired from service?

3       A.      Correct.

4       Q.      And you haven't conducted any independent

5   analysis of your own to determine or opine on when

6   those jet wills be retired?

7       A.      Correct.

8       Q.      So, isn't it true that the facts you have

9   to offer this court on the phaseout of those two

10  regional jets, the Bombardier CJ200 and the Embraer

11  145, are as follows:  Some day in the future the

12  Bombardier CJ 200 and the Embraer 145 will be phased

13  out but you don't know when?

14      A.      Based on information that's been published

15  by the airlines, they are speculating that those

16  aircraft will be retired by the end of this decade,

17  but they have not given definitive plans on a specific

18  date.

19      Q.      Okay.  But that statement that you're

20  referring to by the airlines that could change; isn't

21  that correct?

22      A.      Yes.

23      Q.      Okay.  Another one of your opinions in your

24  report addresses the issue of whether Tweed will be

25  able to attract ULCCs, the ultra low cost carriers,

1    smaller aircraft are less profitable than larger

2    aircraft because the economies of scale, the smaller

3    aircraft are being phased out.  The Dash 8 falls into

4    that category.

5         Also, the Dash 8 is not currently manufactured

6    any longer, and there is no similarly sized aircraft

7    that is being produced that would be an economical

8    replacement for the Dash 8.

9         Q.    And do you have any opinion on what the

10   likely replacement aircraft would be at Tweed when the

11   Dash 8 is phased out?

12        A.    For the network carriers, including

13   American Airlines, the next logical aircraft that they

14   would use would be the 50-seat aircraft, which would

15   be either a Bombardier CRJ 200 or an Embraer E145.

16        The interesting thing about those aircraft is

17   that they are also, since they have been the

18   workhorses in the industry since the 1990s, they're

19   also nearing the completion of their cycle limit.  By

20   that, I mean that each aircraft has a certain number

21   of takeoffs and landings, each being considered a

22   cycle.  Once they reach that limit, they can no longer

23   operate.  They have to be completely reconstructed.

24        Those aircraft, because of the heavy reliance

25   upon them during the 1990s and 2000s are nearing that

cycle. And the fact that the fuel costs associated with operating those aircraft are very high and the maintenance costs are very high, they are being phased out by all of the network airlines.

Q.      And are those 50-seat aircraft manufactured at the present time?

A.      No.

Q.      And do you know what the desired minimum runway length would be for the 50-seat airlines -- aircraft?

A.      In researching the manufacturer's recommended minimum length, it's 5600 going up to 6200 for that size aircraft. It should also be noted though that each airline performs their own safety specification and calculation as to what their specific requirements are. So the manufacturer's is one data point, and 5600 to 6200 is what has been published.

Q.      And would there be payload hits for the 50-seat aircraft on the 5600 foot runway?

A.      Yes.

Q.      And can you describe a bit what a payload hit is?

A.      As each airline, as I mentioned, calculates what their allowable safety factor is, and what the

1    atmospheric conditions are, in other words, the winds,

2    the heat, the humidity, they'll determine what is the

3    maximum amount of weight they can take on that

4    aircraft.  And with that, they will decide, if the

5    runway is too short.  They will literally have to

6    either displace people who have purchased tickets or

7    restrict the sale of tickets to get to that proper

8    weight because the airline will not compromise safety

9    and carry a heavier plane than could possibly not make

10   it on a short runway.

11        Q.    So payload hits are imposed for safety

12   reasons?

13        A.    Yes.

14        Q.    And do you have an opinion on what the

15   likely replacement aircraft would be once the 50-seat

16   aircraft are retired?

17        A.    All three of the legacy airlines, including

18   American, are switching to the 70 to 76-seat aircraft,

19   again, depending upon configuration.  That's why

20   there's a variation in seats.  That aircraft is --

21   it'll provide enough seats for them to economically

22   make the flight profitable at full capacity.  Also,

23   the performance characteristics of that aircraft are

24   improved with lighter weights, and allows it a longer

25   stage length.  Stage length being the distance they

1    could fly without refueling.

2         Q.    And what is the minimum runway length for

3    the 70 or 76-seat aircraft?

4         A.    Based on the manufacturer's data that I've

5    seen, again, excluding how each airline would

6    calculate that, 6200 feet to 6600 feet are the

7    recommended distance.

8         Q.    So if the proposed runway extension project

9    at Tweed were to move forward resulting in a

10   functional Runway 2-20 length of 6,600, would the 70

11   and 76-seat aircraft be able to operate out of Tweed?

12        A.    Yes.

13        Q.    Moving to paragraph 25, Mr. DeCoster.

14   Tweed alleges in that paragraph, "There is one

15   commercial airline providing service to Tweed from

16   Philadelphia, with four scheduled flights per day in

17   each direction, and passenger capacity of no more than

18   39 passengers on each flight.  The length of the

19   runway has a direct bearing on the weight load and

20   passenger capacity that can be safely handled on any

21   given flight."

22        What are your opinions regarding those

23   allegations?

24        A.    They are correct.  The 39-seat aircraft is

25   limited on what it can provide as far as capacity to

1    the airport.

2        Q.    And you may have said this -- I'm sorry if

3    you have -- but is the Dash 8 one of the smallest

4    aircraft operated by any of the network airlines?

5        A.    Yes.

6        Q.    Is it the smallest or one of the smallest?

7        A.    There are still some 30-seat aircraft

8    operated by a couple of airlines.

9        Q.    Do the -- does the Dash 8 currently take

10    payload hits while operating out of Tweed?

11        A.    It is my understanding that yes it does.

12        Q.    And in your opinion, what effect can those

13    payload hits have on service at an airport?

14        A.    As I mentioned before, when the economic

15    recession hit in 2008, the airlines reduced capacity

16    quite a bit in order to drive up profitability and

17    fares.  The airlines have now achieved a level of

18    profitability over the last few years that they have

19    -- Wall Street, frankly, has become accustomed to.

20        The airlines in all of their communications

21    with the investing group have stated that they will

22    not go back to a situation where they're not

23    profitable.  If an airline cannot make money on a

24    flight, they will simply eliminate the flight.

25    They'll take that asset -- and you're competing in a

1    national market.  So, they'll take that asset and

2    relocate it to a market that will be profitable for

3    them.

4         So if you have to take payload hits, it's going

5    to affect the profitability of that flight, and so you

6    run the risk that that aircraft will be used in

7    another city.

8        Q.    And in terms of payload hits, assuming that

9    the length of the runway remains static or remains the

10    same, what effect does the size of a plane have on

11    payload hits?

12        A.    The bigger the airplane, with no additional

13    length, the bigger the payload hit, which will reduce

14    the profitability of the flight.

15        Q.    And I'm focusing on the last sentence in

16    paragraph 25, which says, "the length of the runway

17    has a direct bearing on the weight load and passenger

18    capacity that can be safely handled on a given

19    flight."  You spoke to that a bit.  Can you elaborate

20    a bit on your opinions on that allegation?

21        A.    In order to be able to even have a

22    conversation with an airline about additional service

23    or an enhanced service, you've got to provide for them

24    a safe environment.  And a safe environment is going

25    to require a runway length that is sufficient for them

1     to safely operate the aircraft with full loads.

2        Q.    Thank you.  I'm turning now to paragraph

3     26.  In paragraph 26, Tweed alleges, "Current

4     scheduled commercial service at the airport is

5     entirely provided by a single type of aircraft.  The

6     Authority understands that this type of aircraft will

7     be phased out in the near future and replaced with an

8     aircraft that will require a longer runway than the

9     current Runway 2-20."  What are your opinions

10    regarding those allegations?

11       A.    I completely agree with the statement and

12    it's a certainty that they will need to have

13    additional length in order to attract the larger

14    aircraft.

15       Q.    Will jet service -- if jet service were to

16    be brought to Tweed, would it necessitate a longer

17    runway?

18       A.    Yes.

19       Q.    And is a longer runway at Tweed needed to

20    allow American and other airlines to operate safely at

21    a full load?

22       A.    Yes.

23       Q.    And you said previously that larger

24    aircraft are generally more profitable for airlines?

25       A.    Yes.  All of the legacy airlines are moving

1    to larger aircraft because of the increased

2    profitability of those flights, versus the small

3    aircraft where there are economies of scale that hold

4    down the ability for them to be profitable.

5         Q.   All right.  Thank you.  Moving on to

6    paragraph 27.  Tweed alleges, "Accordingly, regularly

7    scheduled commercial service at the airport is not

8    only jeopardized at the moment but also may be

9    terminated in the future if the length of Runway 2-20

10   is not extended."  What are your opinions regarding

11   those allegations?

12        A.   In my opinion, Tweed is at a crossroads in

13   that in order to be able to attract the aircraft that

14   is likely the aircraft for its future service, which

15   is the 70 to 76-seat aircraft, they have to have a

16   runway that will be sufficient to safely support that

17   aircraft.

18        Q.   So is there a real threat to existing

19   service at Tweed if the Runway 2-20 is not extended?

20        A.   Absolutely.

21        Q.   And based on your over 21 years of

22   experience working with airlines and airports, are

23   airlines assessing -- how often do airlines assess

24   their individual route profitability?

25        A.   Generally, airlines will do somewhere

1    between nine and eleven schedules per year, and they

2    will assess those with the calculation of each

3    schedule or development of each schedule.

4         Q.    All right.  Thank you.  Moving on to

5    paragraph 28.  In that paragraph, Tweed alleges,

6    "Numerous airlines have notified the Authority that

7    they would like to bring regularly scheduled service

8    to the airport but that they cannot do so until Runway

9    2-20 is lengthened."  What is your opinion regarding

10    these allegations?

11         A.    Completely supported.  In order to have

12    discussions with American Airlines, the incumbent, for

13    future service, the issue of the runway length has got

14    to be addressed.  In order to go out and solicit

15    service from new legacy airlines, they will have hubs

16    that they would be connecting to, that would be a

17    further distance than Philadelphia.  They would need

18    additional stage length which is going to require a

19    longer runway in order to have the payload and the

20    fuel on board to make those trips.

21         In order to solicit service from the ultra low

22    cost carrier market, primarily Allegiant, and where

23    Allegiant flies, which is primarily the southeast area

24    of Florida, the Panhandle area, they would need

25    additional length in order to operate their equipment

1    safely and at full capacity.

2        Q.    And based on your over 21 years of

3    experience working with airlines and airports

4    throughout the country, is Tweed an attractive airport

5    for airlines to bring potential service to?

6        A.    I personally work a lot with Allegiant

7    because many of our airport clients have Allegiant

8    service to them.  Tweed is literally the prototype of

9    the kind of market they look for where you've got a

10   small airport with relatively low costs that is

11   adjacent to a major metropolitan area, so that they

12   don't have to compete with the legacy airlines

13   directly, but yet they can offer a product that would

14   bring people to Tweed to fly to the destinations.

15   It's literally, as I said before, it's literally the

16   prototypical market for what Allegiant looks for.

17       Q.    In your opinion, is there an opportunity

18   for growth at Tweed if the runway is lengthened?

19       A.    Yes.

20       Q.    And does Trillion perform any work for

21   Allegiant?

22       A.    No.

23       Q.    And based on your familiarity with the

24   financial condition of the airport, if Allegiant were

25   to bring service to Tweed if the runway is lengthened,

1  what is your opinion regarding how that would affect

2  the financial condition?

3      A.    It would be a major enhancement to the

4  financial condition for Tweed.  The direct and

5  indirect revenue that derives from commercial service,

6  which would be the landing fees and the rents from the

7  airlines, as well as the passenger facility charges

8  for each passenger, as well as the indirect revenue

9  coming from non-airline revenue, in other words,

10  parking, rental cars, etcetera, would be a major

11  revenue influx for Tweed.  And would, as we have seen

12  in all of our clients, when Allegiant comes into a

13  market, it's a major financial boost for the economic

14  package for that airport.

15      Q.    And can Allegiant currently operate at

16  Tweed with the current runway length of Runway 2-20?

17      A.    No.

18      Q.    Okay.  Moving to paragraph 29.  Tweed

19  alleges, "Since 2009 the airport has failed to attract

20  a single new scheduled commercial carrier.  Service

21  remains low, less than 35,000 enplanements per year.

22  The length of the runway is a key factor in the low

23  service levels, and the airport's failure to attract

24  new scheduled carriers."  What is your opinion

25  regarding those allegations?

1    A.    I would agree with the allegations.  The

2    35,000 enplanement level is by far the lowest

3    enplanement level that our company has dealt with, as

4    far as a commercial service airport, outside of

5    essential air service cities.  It's an extremely low

6    number and does not generally generate enough direct

7    and indirect revenue to make the airport economically

8    or financially self-sustaining.

9         Q.    If Runway 2-20 is not extended, in your

10    opinion, can Tweed attract new service to the airport?

11         A.    No.

12         Q.    And what is the effect of other communities

13    being able to offer an airline an opportunity to bring

14    service there without restrictions?

15         A.    As I mentioned before, after 2008 and the

16    industry retracted quite a bit, many airports that

17    have full runway lengths of 7,000 and higher that can

18    generally meet all of the requirements of any airline

19    aircraft type have been extremely aggressive in trying

20    to restore that service and have developed very

21    aggressive incentive programs to try and get the

22    airline to either reestablish service or in the case

23    of Allegiant to establish service.

24         Allegiant is probably the most sought after

25    airline in the industry right now, as far as airports

1    being willing to do what is necessary in order to

2    attract their service because they offer a low fare

3    model to the community but also bring in a great deal

4    of revenue.

5         When Tweed has to compete with those airports

6    that already have the facilities, they don't, frankly,

7    even get a seat at the table with the airlines because

8    the airlines have many more options that are known

9    commodities and have the facilities and the runway

10   length that's necessary for them to project a strong

11   performance at that airport.

12        Q.    And in your opinion, is it sustainable for

13   Tweed to continue to operate only from Tweed to

14   Philadelphia or are longer stage length flights required?

15        A.    In my opinion, longer stage length flights

16   are required and additional destinations are required.

17        Q.    All right.  And lastly, Mr. DeCoster, we'll

18   turn to paragraph 30.  It's a few sentences so bear

19   with me.  "Tweed alleges the Authority has executed

20   assurances as part of the federal airport improvement

21   grant process that inter alia require the airport

22   owner or operator to make the airport as

23   self-sustaining as possible.  To accomplish that goal,

24   it is necessary for the Authority to generate

25   additional revenue by increasing the level of

1    regularly scheduled commercial service and general

2    aviation usage at the airport by, among other things,

3    extending Runway 2-20."

4        I know that was a lot.  And you have your

5    report in front of you, so you can reference it if you

6    need to, but what are your opinions regarding those

7    allegations?

8        A.    The lengthening of the runway is the

9    absolute door opener in order to have a chance at

10    improving the financial position of the airport.

11    You've got to be able to accommodate larger aircraft

12    safely with full payloads.  You've got to be able to

13    accommodate aircraft that can go on longer stage

14    length trips.  And you've got to be able to attract

15    the larger business jets, for instance, the Gulf

16    Stream V, which are out there, that require a longer

17    runway length.  All of those go to growing the revenue

18    stream and the activity level at the airport.  With

19    the current runway length, that is not accomplishable.

20        Q.    And do you have any opinion on Tweed's

21    ability to comply with federal grant assurances, given

22    the current length of Runway 2-20?

23        A.    Currently Tweed has to subsidize the

24    operating cost of the airport to the tune of about

25    $1.5 million.  Without an increase in commercial

1    service and general aviation activity, that number is

2    only going to get larger.  The FAA grant assurance

3    requires airports to be as financially self-sufficient

4    as possible.  In this case, it would only be widening

5    the gap, instead of closing the gap, which is what the

6    FAA really does desire airports to have as far as

7    financial plans.

8         Q.    And in your opinion, if Runway 2-20 is

9    extended to a functional length of 6,600 feet

10   approximately, would that be sufficient to allow Tweed

11   to handle all of the commercial and general aviation

12   aircraft that would consider bringing service to

13   Tweed?

14        A.    Yes.

15        Q.    And if additional service is brought to

16   Tweed, would that increase revenue?

17        A.    It would absolutely increase direct and

18   indirect revenue and make a major impact on the

19   deficit that occurs today.

20        Q.    And what would the effect of that increased

21   revenue be on Tweed's ability to comply with the grant

22   assurance that you just discussed?

23        A.    To the extent that the grant assurance

24   requires financial self-sufficiency to the greatest

25   degree possible, it would meet the intent of that

1    grant assurance.

2         Q.    And what would the effect of increased

3    revenue be, in your opinion, and based on your

4    familiarity with the financial condition of Tweed,

5    with regard to the local and state subsidies that are

6    currently for the airport?

7         A.    They would go to directly decrease the

8    subsidies that are currently provided by the state and

9    the local community.

10                   MR. KLEPPS:  I may be done, your Honor.

11                   Would you just give me one moment to confer

12                   with counsel?

13                   THE COURT:  Yes.

14

15                   (Pause.)

16

17                   MR. KLEPPS:  Your Honor, I have nothing

18                   further.

19                   THE COURT:  Thank you.  Looks like it's

20                   now a little bit after one o'clock.  Before

21                   you start with your cross, Attorney Rose,

22                   let me get a preview as to how much time

23                   everybody has, so I can figure out when we

24                   should take our lunch break.

25                   MR. ROSE:  If I'm two minutes, that is

1    American could operate those two regional jets at

2    Tweed?

3         A.    I don't know the exact time length, that is

4    correct.

5                   MR. GRAHAM:  Just a moment, your Honor.

6    BY MR. GRAHAM:

7         Q.    Okay.  So Mr. DeCoster, since you don't

8    know -- well, let me back up.  We've established that

9    you don't know when the Dash 8 is going to be retired

10   by American, right?

11        A.    Correct.

12        Q.    And we've established that you don't know

13   when the two possible replacement planes, the

14   Bombardier CJ 200 and the Embraer 145 might be retired

15   by American as well?

16        A.    I don't know when the two intermediate

17   airplanes, the CRJ 200 and Embraer 145 will be

18   retired.

19        Q.    Okay.  So in view of those two statements,

20   isn't it fair to say that you cannot conclude that

21   regularly scheduled service at Tweed is jeopardized at

22   this moment?

23        A.    At this moment, no, but it should also be

24   recognized that the runway extension will take a

25   period of time to complete if it goes forward, which

1    is not a short period of time.

2         Q.    But my question was at this moment?

3         A.    At this moment, that's correct.

4         Q.    What is correct?

5         A.    That it is not jeopardized at this moment.

6         Q.    Okay.  Thank you.  Your report goes on to

7    say on top of page 4 that once the 50-seat regional

8    jets are no longer available, the next size aircraft

9    is the 70, 76 regional jet, right?

10        A.    Yes.

11        Q.    And that this will be the likely aircraft

12   type for Tweed which will likely require a minimum

13   runway length of 6200 linear feet, with 6000 linear

14   feet preferred to maximize performance, right?

15        A.    6600 preferred not 6000.

16        Q.    Excuse me.  Excuse me.  You are correct.

17   I'll say that again.  I'm going to quote from your

18   report.  Do you see it in front of you?

19        A.    Yes.

20        Q.    This will be the length of the aircraft

21   type for Tweed which will likely require a minimum

22   runway length of 6200 linear feet, with 6600 linear

23   feet preferred in order to maximize performance;

24   that's what it says, correct?

25        A.    Correct.

1     Q.    Okay.  But is your point that if Tweed

2   lengthens the runway, in your opinion, it could

3   compete with airports such as JFK on longer stage

4   length flights to some destinations?

5     A.    Yes, I do.  And I was referencing the

6   Allegiant service, because Allegiant does a great deal

7   of service to Florida, as do the legacy airlines out

8   of JFK, and could be direct competition to fly out of

9   Tweed to Florida instead of driving to JFK.

10     Q.    Okay.  And your report references

11   information provided by Allegiant that explains the

12   potential demand for service from Allegiant from New

13   Haven to Florida, right?

14     A.    No, it does not.  My report references the

15   fact that Tweed is a prototypical market for

16   Allegiant.

17     Q.    Okay.  How much would making a commitment

18   to infrastructure cost at Tweed?

19     A.    I don't know.

20     Q.    Do you know how much the Authority received

21   from the FAA to improve its RSAs several years ago?

22     A.    No, I do not.

23     Q.    Whatever that sum was, wouldn't you agree

24   that lengthening a runway would cost even more than

25   improvements to RSA at Tweed?

1          more, from its inception to the actual

2          construction, start of construction.

3              And so our position, your Honor, is

4          that the statute is the sine qua no.

5          Without this eliminated, we can't do

6          anything.  I mean, what agency, whether it's

7          DEEP or the FAA or the Army Corps, would

8          ever process an application when there's a

9          statute there that prohibits the

10         construction of what you are applying for?

11             If I may just move on very quickly to

12         touch on the three federal statutes, your

13         Honor.

14            You, after agreement amongst counsel,

15         dealt with one of the three.  And we

16         understood that you did that.  What we're

17         hoping is that you will be able to deal with

18         all three of them in the final decision.

19         Therefore, I'll take a few minutes to just

20         go through those.  And we certainly will

21         have briefs that will identify all of our

22         issues but let's just call it a preview.

23         I'll give you a little preview of where

24         we're headed.

25            With regards to the FAA Act, we believe

```
 1                    CERTIFICATE

 2

 3        I hereby certify that the foregoing 188

 4        pages are a complete and accurate

 5        computer-aided transcription of my original

 6        stenotype notes taken of the proceedings,

 7        which were held in re:  TWEED-NEW HAVEN

 8        AIRPORT AUTHORITY versus GEORGE JEPSEN, in

 9        his official capacity as Attorney General

10        for the State of Connecticut, held before

11        the Honorable Robert A. Richardson, USDC

12        Magistrate Judge, U.S. District Court, 450

13        Main Street, Hartford, Connecticut on

14        March 22, 2017.

15

16

17

18              /s/Irma Sanchez-Farnham

19              IRMA SANCHEZ-FARNHAM
                   Court Reporter
20

21

22

23

24

25
```

**JA251**

## CERTIFICATE OF SERVICE

This is to certify that on March 2, 2018, the foregoing was filed electronically with the U.S. Court of Appeals for the Second Circuit. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

Six copies were sent via overnight delivery via Federal Express to:

U.S. Court of Appeals for the Second Circuit
40 Foley Square, Thurgood Marshall Courthouse
New York, NY 10007

Two copies were also sent via U.S. Mail on the same date to:

Drew S. Graham, Esq.
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

By: /s/ Christopher A. Klepps, Esq.
Christopher A. Klepps, Esq.