# 17-3481(L)
# 17-3918(Con)

United States Court of Appeals
For The Second Circuit

TWEED-NEW HAVEN AIRPORT AUTHORITY,
*Plaintiff-Appellant*

CITY OF NEW HAVEN
*Plaintiff-Appellant*

v.

GEORGE JEPSEN, in his official capacity as
Attorney General for the State of Connecticut,
*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR CONNECTICUT (HARTFORD)

**BRIEF FOR PLAINTIFF-APPELLANT
TWEED-NEW HAVEN AIRPORT AUTHORITY**

HUGH I. MANKE, ESQ.
JOHN C. KING, ESQ.
CHRISTOPHER A. KLEPPS, ESQ.
Updike, Kelly & Spellacy, P.C.
100 Pearl Street
P.O. Box 231277
Hartford, CT 06103
860-548-2600

# TABLE OF CONTENTS

Table of Authorities ........................................................................ iii

Corporate Disclosure Statement ................................................. vi

Jurisdictional Statement ............................................................... vii

Statement of the Issues Presented for Review ........................... viii

Statement of the Case.................................................................... 1

    a.  Introduction .................................................................. 1

    b.  Stipulated Facts ........................................................... 4

Summary of Argument.................................................................. 9

Argument........................................................................................ 12

I.      Tweed has Standing to Challenge the Constitutionality of General Statutes § 15-120j(c).................................................... 12

    A. Legal principles applicable to standing.................................... 12

    B. Tweed has standing to challenge a state law that conflicts with federal law and hinders Tweed's ability to extend the length of Runway 2/20 ............................................................................. 15

    C. The length of the runway, as restricted by the statute, has directly led to inadequate revenue at the Airport and chronically low service levels ............................................................................. 22

    D. Tweed is unable to attract new commercial service to the Airport as a result of the length of Runway 2/20 as restricted by General Statutes § 15-120j(c) ................................................................. 26

    E. Tweed cannot comply with federal grant assurances due to General Statutes § 15-120j(c) .............................................................. 32

i

F. The only commercial aircraft currently servicing the Airport will soon be retired, leaving Tweed with no commercial service ........... 36

II. General Statutes § 15-120j(c) is Preempted by the ADA, FAAct and AAIA ........................................................................................ 40

A. The ADA expressly preempts General Statutes § 15-120j(c).. 41

B. The FAAct impliedly preempts General Statutes § 15-120j(c) because the FAAct regulates the entire field of air safety and General Statutes § 15-120j(c) impedes the FAAct's objectives.......................... 46

C. The AAIA impliedly preempts General Statutes § 15-120j(c) .... ................................................................................................. 51

Conclusion ................................................................................. 54

# TABLE OF AUTHORITIES

## Cases

*Air Transport Ass'n of Am. v. Cuomo*,
520 F.3d 218 (2d Cir. 2008)............................................................ 40, 41, 42, 46, 47

*Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591 (2d Cir. 1988)...........................18

*American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995)........................................42

*Arapahoe County Public Airport Authority v.*
*Federal Aviation Administration*, 242 F.3d 1213 (10th Cir. 2001).................. 43, 44

*Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) .......................14

*Burbank-Glendale-Pasadena Airport Auth. v. City of Los Angeles*,
979 F.2d 1338 (9th Cir. 1992) ............................................................ 20, 48, 49, 51

*Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259 (9th Cir. 1998) ....................44

*City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624 (1973)............. 45, 51

*City of Oceanside v. AELD, LLC*, 740 F. Supp. 2d 1183 (S.D. Cal. 2010).............53

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*,
152 F. Supp. 3d 90 (E.D.N.Y. 2015) .................................................... 32, 33, 37, 38

*Goldman v. West*, 2007 WL 1989291 (S.D.N.Y. July 6, 2007) .............................16

*Goodspeed Airport, LLC v. East Haddam Inland Wetlands & Watercourses*
*Commission*, 681 F. Supp. 2d 182 (D. Conn. 2010)................................................45

*Hays v. City of Urbana*, 104 F.3d 102 (7th Cir. 1997) ..........................................18

*Hillsborough County v. Automated Med. Laboratories, Inc.*,
471 U.S. 707 (1985)........................................................................................ 41, 50

*In re Combustion Equipment Associates, Inc.*, 838 F.2d 35 (2d Cir. 1988)............13

*In re Old Carco LLC*, 470 B.R. 688 (S.D.N.Y. 2012).....................................30, 31

*Int'l Fabricare Inst. v. U.S. EPA*, 972 F.2d 384 (D.C. Cir. 1992) ..........................20

*Lepelletier v. FDIC*, 164 F.3d 37 (D.C. Cir. 1999) ...................................................31

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................... 14, 20

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ....................... 13, 16, 17

*Montalvo v. Spirit Airlines*, 508 F.3d 464 (9th Cir. 2007)................................ 40, 46

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ..................................42

*N. Shore Gas Co. v. EPA*, 930 F.2d 1239 (7th Cir. 1991) ......................................20

*Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341 (2d Cir. 2008) .. 14, 18, 20

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ...................................................18

*Regional Rail Reorganization Act Cases*, 419 U.S. 102 (1974)..............................19

*Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364 (2008)................42

*Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*,
523 F. Supp. 2d 376 (S.D.N.Y. 2007) ....................................................................13

*Steffel v. Thompson*, 415 U.S. 452 (1974) ..............................................................16

*Tweed-New Haven Airport Auth. v. Jepsen*,
Case No. 3:15-cv-01731 (RAR), 2017 WL 4400751 (D. Conn. Oct. 3, 2017)........4

*Tweed-New Haven Airport Auth. v. Town of East Haven*,
582 F. Supp. 2d 261 (D. Conn. 2008).................................................. 45, 46, 47, 49

*United States v. City of New Haven*, 447 F.2d 972 (2d Cir. 1971).................. 47, 49

*Vermont Mutual Right to Life Committee, Inc. v. Sorrell*,
19 F. Supp. 2d 2014 (D. Vt. 1998)...........................................................................17

*Vermont Right to Life Committee, Inc. v. Sorrell*,
221 F.3d 376 (2d Cir. 2000)................................................ 12, 13, 14, 16, 17, 18, 19

## **Statutes**

49 U.S.C. § 40101 ........................................................................... xi, 2, 43

49 U.S.C. § 40102 ............................................................................ 47, 49

49 U.S.C. § 40103 ................................................................................47

49 U.S.C. § 41713 ........................................................................... xi, 2, 41

49 U.S.C. § 44706 ................................................................................6

49 U.S.C. § 47101 .................................................................... xii, 2, 32, 51, 52, 54

49 U.S.C. § 47103 ................................................................................45

49 U.S.C. § 47107 .......................................................................... 6, 33, 52

Connecticut General Statutes § 15-120j ........................................................ passim

## **Regulations**

14 C.F.R. Part 139................................................................................6

## **Other Authorities**

65 Fed. Reg. 136, 43815 (Jul. 14, 2000)...................................................... 43, 47, 53

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Tweed-New Haven Airport Authority states that it has no parent company and that no publicly held corporation owns 10% or more of its stock.

# JURISDICTIONAL STATEMENT

The District Court, Magistrate Judge Robert A. Richardson, possessed jurisdiction of this action pursuant to 28 U.S.C. § 1331, because the issue of whether Connecticut General Statutes § 15-120j(c) is unconstitutional under Article VI, clause 2, of the United States Constitution raises a federal question. The District Court also had authority to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

This appeal is from a final judgment entered under Federal Rule of Civil Procedure Rules 54, 57 and 58 that disposed of all parties' claims in this action. The District Court rendered final judgment in favor of the defendant in its Memorandum of Decision dated September 30, 2017. Tweed timely filed its notice of appeal on October 27, 2017. *See* Joint Appendix at 219 ("JA__"). This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.  Did the District Court, Magistrate Judge Richardson, improperly conclude that Tweed lacks standing to challenge the constitutionality of Connecticut General Statutes § 15-120j(c) where the uncontested and uncontroverted evidence shows that, due to the length of Runway 2/20 as now restricted by § 15-120j(c): (1) the state statute injures Tweed because the statute prevents Tweed from extending the length of Runway 2/20 in accordance with a state and federally approved master plan; (2) the statute's restriction on the length of Runway 2/20 is a bar to increased revenue at Tweed-New Haven Airport (the "Airport") and has perpetuated the Airport's operational deficits; (3) Tweed is unable to attract new commercial service due to the length of Runway 2/20 as now restricted by the statute; (4) Tweed cannot comply with federal grant requirements due to the statute's restriction on the length of Runway 2/20; and (5) commercial service at the Airport will completely cease unless Tweed is able to lengthen Runway 2/20?

2.  Did the District Court improperly conclude that § 15-120j(c) is not preempted by the Airline Deregulation Act, 49 U.S.C. § 41713?

3.  Did the District Court improperly conclude that § 15-120j(c) is not preempted by the Federal Aviation Act, 49 U.S.C. § 40101 et seq.?

4.      Did the District Court improperly conclude that § 15-120j(c) is not preempted by the Airport and Airway Improvement Act, 49 U.S.C. § 47101 et seq.?

## STATEMENT OF THE CASE

### A.    Introduction

The plaintiff/appellant Tweed-New Haven Airport Authority ("Tweed") is the lessee and operator of the Tweed-New Haven Airport (the "Airport").  The City of New Haven (the "City") owns the Airport, and leases it to Tweed.[1]  In 2009, the State of Connecticut (the "State") enacted legislation, Connecticut General Statutes § 15-120j(c), which expressly prohibits Tweed from extending the length of Runway 2/20, the primary runway at the Airport.  Tweed has commenced a project to extend the runway, but cannot move forward due to the state statute. The length of the runway, as restricted by the statute, has led to the Airport's precarious financial position.  Tweed cannot survive as a commercial airport without extending the runway.  Runway 2/20 is one of the shortest runways in the nation for airports where commercial service is provided.  Due to the length of Runway 2/20, only one commercial airline provides service out of Tweed, and flies only to Philadelphia.  Larger aircraft cannot service the Airport because they cannot safely takeoff from or land on Runway 2/20.

---

[1] On April 18, 2016, the District Court granted the City's motion to intervene.  The City participated at trial, and submitted a post-trial brief.  On November 17, 2017, the court granted the City's motion for extension of time to appeal.  The City appealed on December 4, 2017, *see* Case No. 17-3918, and the appeal was consolidated with this case.  The City's appeal was dismissed on January 9, 2018, but was reinstated on February 14, 2018.

In an era of deregulation, airlines determine where to bring service. Commercial aircraft are getting larger, and smaller aircraft, like the sole aircraft servicing Tweed, are being phased out. A longer runway is necessary for Tweed to attract new commercial service and maintain its place in the national network of commercial service airports.

In 2015, Tweed brought this declaratory judgment action contending that the state statute was preempted by the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713, the Federal Aviation Act ("FAAct"), 49 U.S.C. § 40101 et seq., and the Airport and Airway Improvement Act ("AAIA"), 49 U.S.C. § 47101 et seq., and, thus, violates the Supremacy Clause of the United States Constitution.

The defendant/appellee, Attorney George Jepsen in his official capacity as Attorney General for the State of Connecticut, moved to dismiss, arguing that Tweed lacked standing to challenge the state statute. The District Court, *Richardson, J.*, denied the motion to dismiss, holding that Tweed had demonstrated several "direct" injuries as a result of the state statute. *See* JA36. The court held that Tweed had sufficiently alleged that the length of the runway, as restricted by the statute, had caused low services levels at the Airport, current and future loss of business at the Airport, and Tweed's inability to comply with federal grant requirements. The court also held that the state statute was impliedly preempted by the FAAct because the statute impermissibly regulates runway length, "which is

a component part of the field of airline safety, and is therefore part of a field completely occupied by the federal government." JA47–48. The court did not reach the issue of whether the statute was preempted by either the ADA or AAIA.

A bench trial was held on March 22, 2017, before Magistrate Judge Robert A. Richardson. The parties submitted a lengthy joint stipulation of facts and sixteen exhibits. Tweed also submitted testimony from Robert M. Furey, an engineering consultant for Tweed, and expert testimony from John DeCoster, a senior consultant for Trillion Aviation. The defendant submitted only three exhibits and presented <u>no</u> witnesses.

Tweed's uncontroverted evidence proved, inter alia, that: (1) the state statute prevents Tweed from moving forward with its runway extension project; (2) the length of Runway 2/20 is a "significant factor," if not a determinative factor, in the low service levels at the Airport; (3) the low service levels have resulted in the Airport's dire financial condition; (4) the current financial situation at the Airport is not sustainable, and would be alleviated by extending the length of Runway 2/20; and (5) Tweed is unable to attract new service to the Airport without extending the length of Runway 2/20.

Despite his previous holding that Tweed had standing to bring its Supremacy Clause claim, Magistrate Judge Richardson inexplicably changed course after trial and held that Tweed lacks standing to challenge the state statute. The court

ignored the fact that the existence of the state statute, by itself, confers standing upon Tweed by interfering with a federally-approved runway expansion project. Further, although the statute prevents Tweed from extending the length of Runway 2/20, and although the uncontroverted evidence proved that the length of Runway 2/20 had caused Tweed numerous injuries, the court held that there was no "causal connection" between the statute and Tweed's injuries. Additionally, despite its previous holding that, as a matter of law, runway length "is a component part of the field of airline safety, and is therefore part of a field completely occupied by the federal government," JA48, the court concluded that the statute was not preempted by the FAAct, and also was not preempted by the ADA or AAIA. *See Tweed-New Haven Airport Auth. v. Jepsen*, Case No. 3:15-cv-01731 (RAR), 2017 WL 4400751 (D. Conn. Oct. 3, 2017); JA171–218.

Tweed timely appealed from the judgment of the District Court.

**B.    Stipulated Facts**

The following facts are taken from the Joint Stipulation of Facts submitted by the parties for trial. Additional facts will be set forth in the argument section as necessary.

Tweed is the lessee and operator of the Airport. JA51–52. The Airport is situated in both the Town of East Haven and the City of New Haven. JA53.

Defendant George Jepsen is the Attorney General for the State of Connecticut. In his official capacity as Attorney General, Attorney Jepsen has a duty to enforce the laws of the State of Connecticut. JA52.

Tim Larson is the Executive Director of Tweed. As Executive Director, Mr. Larson supervises the professional management company, AFCO AvPorts Management, LLC ("AvPorts"), which operates the Airport under a contract with Tweed. JA52.

The length of Runway 2/20 is approximately 5,600 linear feet. JA53. The Airport has the thirteenth shortest runway out of 348 airports in the nation where commercial service is provided. The twelve airports with shorter runways do not have as large of a catchment area as the Airport. The Airport has the shortest runway in the nation for airports with catchment areas of 1,000,000 or more people. JA62–63.

In 2009, the State amended Connecticut General Statutes § 15-120j by adding subsection (c) which provides: "Notwithstanding the provisions of subsections (a) and (b) of this section, Runway 2/20 of the airport shall not exceed the existing paved runway length of five thousand six hundred linear feet." JA53.

Runway 2/20 is the primary runway at the Airport. JA53. The Airport also contains a number of taxiways, some of which run parallel to Runway 2/20. JA53. All of these structures are within the Airport's boundaries and are part of the

Airport Layout Plan (the "ALP"). The ALP is approved by the Federal Aviation Administration ("FAA") which maintains full control over any modifications to the ALP, including limitations on runway length. JA54; *see also* 49 U.S.C. § 47107.

The Airport is a certificated airport under 49 U.S.C. § 44706. 14 C.F.R. Part 139 establishes the rules governing the certification and operation of airports serving scheduled passenger-carrying operations of an air carrier operating aircraft configured for more than nine passenger seats. As a Part 139 certified airport, Tweed is required to operate and maintain the Airport to specified standards contained in FAA Advisory Circulars. In addition, as a recipient of federal aid under the FAA Airport Improvement Program ("AIP"), the Airport is obligated to comply with AIP grant assurances which require conformance with the standards in FAA Advisory Circulars. JA54.

A Master Plan is required by the FAA for each Part 139 airport outlining future plans for upgrading airport facilities. Tweed has a Master Plan which calls for extending the length of Runway 2/20 up to 7,200 linear feet. The Master Plan was approved by the State and the FAA in 2002. JA54–55.

Current scheduled commercial service at the Airport is entirely provided by a single type of aircraft, the Bombardier DH8-100 (the "Dash 8") operated by

Piedmont Airlines as American Eagle.[2]  JA55.  The Dash 8 only flies to Philadelphia, with only four scheduled flights per day in each direction.

The length of Runway 2/20 has a <u>direct</u> <u>bearing</u> on the weight load and passenger capacity that can be safely handled on any given flight.  JA55 (emphasis added).  Weight penalties are imposed on aircraft for safety reasons.  Runway 2/20, because of its length, does not allow takeoff of the Dash 8 aircraft at maximum capacity.  JA55–56.  A longer Runway 2/20 could reduce or potentially eliminate weight penalties which are imposed on existing flights at the Airport, and allow other larger aircrafts to service the Airport.  JA55–56.

Tweed has commenced planning on a runway extension project to increase the functional length of Runway 2/20, within the existing boundaries of the Airport and the ALP, on land that is currently part of the runway safety areas (the "Project").  JA56.  Federal review and comment is necessary for any construction project located within the ALP.  One of the initial steps in any such project is to submit an Environmental Assessment to the FAA.  JA57.

Tweed has expended private funds to hire Hoyle, Tanner & Associates, Inc. ("HTA"), a consulting engineering firm, in connection with the Project.  In 2014,

---

[2] After the trial in this matter, the Dash 8 has been phased out and has been replaced with a 50 seat jet.  John DeCoster, Tweed's expert witness, testified at trial that this would occur.  *See* Mark Zaretsky, *American Eagle to replace turboprops at Tweed with regional jets, effective Nov. 29*, New Haven Register, September 19, 2017, https://www.nhregister.com/news/article/American-Eagle-to-replace-turboprops-at-Tweed-12239716.php.

HTA produced chapters one through three of an Environmental Assessment (the "Preliminary Environmental Assessment") and submitted it to the FAA. JA56–57. The Preliminary Environmental Assessment included proposals to lengthen Runway 2/20 to 6,601 linear feet. JA57.

The FAA has declined to review and comment on the content of the Preliminary Environmental Assessment for more than two years, and has not provided funding to the Project. JA58. The FAA's decision not to review the Preliminary Environmental Assessment is a direct consequence of, inter alia, the runway length limitation in § 15-120j(c). JA58 (emphasis added).

Notwithstanding marketing efforts, the Airport has failed to attract a single new commercial carrier since 2009. Service is chronically low, with fewer than 35,000 enplanements per year. JA55.

Tom Reich, the Director of Air Service Development at AvPorts, has provided marketing services to the Airport since 2011 and for other airports around the country. JA61. During that time, Mr. Reich has been in close touch with approximately ten different airlines with regard to the possibility of those airlines bringing service to the Airport. JA61.

Based on Mr. Reich's experience, the overriding issue with respect to an airline choosing to provide service to a new destination is economic viability. Runway length is an integral part of an airline's economic viability analysis due to

the weight restrictions a shorter runway can cause and the resulting limit to the number of passengers that can be carried on the flight. JA62.

Allegiant Air, LLC ("Allegiant") has prepared this type of economic analysis for the Airport and has declined to bring service to the Airport because "runway 02/20 is too short for Allegiant to comfortably operate regularly scheduled commercial service." JA63, 465. Allegiant has stated that it would "eagerly reopen [its] analysis of [Tweed's] viability for regularly scheduled commercial service" if the runway is lengthened. JA465.

Over the past eight years Tweed has been operating the Airport at a loss which has required annual subsidies from the State in the amount of $1,500,000 and from the City in the amount of $325,000. The subsidy from the State was reduced to $1,480,000 for fiscal year 2016–2017. JA63.

## SUMMARY OF ARGUMENT

**Overview:** The boundaries of Tweed were established many years ago. There has always been a healthy market for commercial service in the catchment area in the southern part of Connecticut. Tweed has been certified for commercial service in that area by the FAA as a feeder airport to hubs in the national system that link the catchment area to the global network. As a result, the FAA has invested many millions of dollars in efforts to upgrade the safety and service capacity at the Airport. A Master Plan approved by the FAA and the State calls for

further upgrades, including extending Runway 2/20, to accommodate the needs of the larger aircraft now used by the commercial carriers. The bottom line issue in this case is whether a state can, over FAA objections, undermine the FAA plan for continued service in one of the most underserved catchment areas in the country and negate the federal investment already made, especially where the proposed improvement is within the existing boundaries of the airport.

**Standing:** The District Court improperly concluded that Tweed lacks standing to challenge the constitutionality of a state statute that expressly prohibits Tweed from lengthening the primary runway at an airport that it operates. The mere existence of the statute confers standing upon Tweed because the statute regulates Tweed, and Tweed faces a potential enforcement action if it violates the statute and extends the runway. The statute is an absolute obstruction to Tweed's ability to extend the runway, and invalidating the statute is the sine qua non for moving forward with the Project. Contrary to the District Court's unsupported conclusion to the contrary, JA191, there is a direct causal relationship between the statute and Tweed's injury.

Additionally, Tweed proved, without the defendant presenting any evidence to the contrary, several direct injuries as a result of the statute's restriction on the length of Runway 2/20. Specifically, Tweed has proven that the current length of the runway, and the statute's prohibition on extending the runway, has caused: (1)

current chronically low service levels resulting in inadequate revenue and financial instability at the Airport; (2) lost business opportunities, i.e., Tweed's inability to attract new commercial service to the Airport; and (3) an inability for Tweed to comply with federal grant requirements.  In addition, the only commercial aircraft servicing Tweed will soon be retired (indeed, the Dash 8 has been phased out since the trial in this matter), resulting in no commercial service at Tweed unless the runway is extended.  Thus, Tweed has standing to bring this declaratory judgment action.

**Preemption:**     General Statutes § 15-120j(c) is expressly preempted by the ADA, and impliedly preempted by the FAAct and the AAIA.  The statute is expressly preempted by the ADA because the restriction on the length of Runway 2/20 is related to "a price, route or service of an air carrier."

The statute is preempted by the FAAct because the FAAct regulates the entire field of air safety, and the statute impedes the FAAct's objectives by impermissibly regulating the length of Runway 2/20, which is a component part of the field of air safety.  Indeed, the District Court concluded in its decision denying the defendant's motion to dismiss that, as a matter of law, the FAAct preempts the statute because runway length is a "component part of the field of airline safety, and is therefore part of a field completely occupied by the federal government," only to reverse its own legal decision after trial.

Finally, the statute is preempted by the AAIA because the comprehensive statutory scheme of the AAIA demonstrates the supremacy of the federal interest in commercial air service expansion in this era of deregulation, particularly with regard to the development of airport facilities to meet the needs of commercial airlines. General Statutes § 15-120j(c) directly conflicts with the AAIA because it serves as an impediment to the federal government's and Tweed's objective of expanding service, the implementation of the Master Plan adopted by the FAA (and the State) that contemplates the extension of Runway 2/20 and an increase in service capacity and compliance with federal safety standards.

The judgment of the Magistrate Judge concluding that Tweed lacks standing, and that the statute is not preempted, should be reversed with direction to render judgment in favor of Tweed.

## ARGUMENT

### I. TWEED HAS STANDING TO CHALLENGE THE CONSTITUTIONALITY OF GENERAL STATUTES § 15-120j(c)

#### A. Legal principles applicable to standing

Legal questions relating to standing are subject to de novo review, while a District Court's factual findings are reviewed for clear error. *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000). This appeal involves almost exclusively legal questions, as the facts are largely stipulated to and undisputed. Thus, the standard of review is de novo.

The Declaratory Judgment Act was enacted to enable parties to adjudicate disputes _before_ they suffer great harm. *See In re Combustion Equipment Associates, Inc.*, 838 F.2d 35, 36 (2d Cir. 1988); *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 381 (S.D.N.Y. 2007). The key inquiry is whether the facts alleged, considering all of the circumstances, "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007). To put it another way, the threshold inquiry is whether "a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Vermont Right to Life Committee, Inc.*, 221 F.3d at 381.

Article III, § 2 of the United States Constitution restricts federal courts to deciding "Cases" and "Controversies." "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant. The threat of suit under the questioned statute _may be injury enough_. A plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has an actual and well-founded fear that the

law will be enforced against it." *Vermont Right to Life Committee, Inc.*, 221 F.3d at 382 (emphasis added; internal quotation marks and citations omitted). "If a plaintiff's interpretation of a statute is reasonable enough and under that interpretation the plaintiff may legitimately fear that it will face enforcement of the statute, then the plaintiff has standing to challenge the statute." *Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) (internal quotation marks omitted).

Thus, a litigant must have suffered an actual or threatened injury ("injury in fact"), which can fairly be traced to the challenged action ("causation"), and is likely to be redressed by a favorable decision ("redressability"). *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Standing is denied only when the court is faced with an "abstract question," *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297 (1979), or when a plaintiff seeks to vindicate the interests of a third party, rather than its own. *Lujan*, 504 U.S. at 562.

Finally, "[a] plaintiff does not lack standing simply by virtue of the indirectness of his or her injury. A plaintiff may satisfy the causation requirement if the complaint aver[s] the existence of [an] <u>intermediate</u> <u>link</u> between the state regulations and the injury." *Pacific Capital Bank, N.A.*, 542 F.3d at 350 (emphasis added; internal quotation marks omitted; alterations in original).

**B.** **Tweed has standing to challenge a state law that conflicts with federal law and hinders Tweed's ability to extend the length of Runway 2/20**

General Statutes § 15-120j(c) prevents Tweed from extending the length of its primary runway. Tweed is the operator of the Airport, and thus is directly impacted by the statute. Tweed has commenced a runway extension project to increase safety and service capacity, but cannot proceed any further while § 15-120j(c) remains in force. Tweed would face an enforcement action by the State if it extended the runway in violation of the statute. That is all that Tweed needs to show to have standing in this case.

Indeed, the State legislature enacted a statute aimed specifically at restricting the length of Runway 2/20. As the District Court found, "[i]t seems counterintuitive that the legislature would make such a specific and exacting statutory change if the state did not intend to enforce it." JA41. Yet, the District Court held, without citing to any supporting authority, that Tweed lacks standing because Tweed has to obtain additional permits and funding before it can break ground on the Project and, thus, there is no "direct causal relationship" between the statute and Tweed's injury. JA191. The court ignored the uncontroverted evidence that Tweed cannot obtain those permits, or move forward with the Project, while the statute is in place. A repeal of the statute is the sine qua non in

the permitting process. The decision runs counter to binding precedent in the United States Supreme Court and this Circuit.

The Supreme Court has made clear that Tweed need not actually extend the length of Runway 2/20 in the face of the statute and expose itself to prosecution in order to have standing, and that there is a lower standard to find a case or controversy in a declaratory judgment action. In *MedImmune, Inc. v. Genentech, Inc.*, a case that is completely ignored by the District Court, the Court held that "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, <u>but</u> <u>nonetheless</u> <u>does</u> <u>not</u> <u>eliminate</u> <u>Article</u> <u>III</u> <u>jurisdiction</u>." *MedImmune, Inc.*, 549 U.S. at 129 (emphasis added); *see also Steffel v. Thompson*, 415 U.S. 452, 480 (1974) ("the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity.") (*Rehnquist, J.,* concurring); *Goldman v. West*, 2007 WL 1989291, at *3 (S.D.N.Y. July 6, 2007) (recognizing that recent Supreme Court and Circuit Court decisions have "lower[ed] the bar for a plaintiff to bring a declaratory judgment action.").

This Court has reached the same conclusion. In *Vermont Right to Life Committee v. Sorrell*, 221 F.3d 376 (2d Cir. 2000), the plaintiff sought a

declaration that sections of a Vermont campaign finance law establishing disclosure and reporting requirements for political advertising and mass media expenditures were unconstitutional under the First Amendment. The defendants argued that the plaintiff lacked standing because the plaintiff was in compliance with the disclosure requirements and did not engage in mass media activities and, thus, any injury was "speculative" or "imaginary" because there was no threat that the plaintiff would be prosecuted. *See Vermont Mutual Right to Life Committee, Inc. v. Sorrell*, 19 F. Supp. 2d 2014 (D. Vt. 1998). The District Court disagreed, holding that "[i]t is well established that a credible threat of present or future prosecution will confer standing," *id.* at 210, and that the plain language of the statutes "suggests that the statutes could be applied to [the plaintiff's] described activities." *Id.* at 211. Thus, the plaintiff had standing because it intended to engage in conduct in apparent violation of the challenged statutes. *Id.*

On appeal, this Court agreed that the plaintiff had standing to challenge the constitutionality of the statutes because it faced a "credible threat" of prosecution if it violated the statutes. *Vermont Right to Life Committee, Inc.*, 221 F.3d at 382. The Court held that the State's assertion that it had no intention of suing the plaintiff was irrelevant because, "[w]hile that may be so, there is nothing that prevents the State from changing its mind." *Id.* at 383. "In light of this uncertainty, the State's representation cannot remove [the plaintiff's] reasonable

fear that it will be subjected to penalties for its planned expressive activities." *Id.*; *see also Pacific Capital Bank, N.A.*, 542 F.3d at 350–51 (plaintiff had standing to challenge constitutionality of state statute even though there was no enforcement action and statute would not have been enforced directly against plaintiff).

Tweed has standing for the same reasons. It seeks to extend the length of Runway 2/20, but would face an enforcement action if it does so while § 15-120j(c) is in effect. The effect of the statute on Tweed is even more direct than the statutes in *Vermont Right to Life Committee, Inc.* and *Pacific Capital Bank, N.A.* because the statute directly regulates Tweed.

Although Tweed would face an enforcement action if it extended the runway in the face of the statute, Tweed's standing to sue does not depend on whether Connecticut takes action to enforce its laws. "Long ago, the Supreme Court held that a person who must comply with a law or face sanctions has standing to challenge its application to him, even if the threat of prosecution is not immediate – indeed <u>even</u> <u>if</u> <u>the</u> <u>law</u> <u>is</u> <u>not</u> <u>yet</u> <u>in</u> <u>effect</u>." *Hays v. City of Urbana*, 104 F.3d 102, 103 (7th Cir. 1997) (*citing Pierce v. Society of Sisters*, 268 U.S. 510 (1925)) (emphasis added). Thus, the mere enactment, and potential enforcement, of § 15-120j(c) alone permits Tweed to challenge the statute. *See Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 599 (2d Cir. 1988) (existence of statute confers standing).

Pursuant to the holding in *Vermont Right to Life Committee, Inc.*, Tweed has standing because it has "an actual and well-founded fear that the law will be enforced against' it." *Vermont Right to Life Committee, Inc.*, 221 F.3d at 382. Although Tweed needs to take additional steps to extend the runway once the statute is invalidated, this Court "will be in no better position . . . than it is now" to decide the constitutionality of the statute. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 145 (1974); *Cuomo*, 854 F.2d at 599.

Thus, Tweed has classic pre-enforcement standing. The statute expressly prohibits Tweed from extending the length of its primary runway. Tweed has commenced the Project, but cannot proceed further while the statute is in effect. Tweed is, in this case, the advocate for the supremacy of federal law. Other than the FAA and the City, there is no one else who could have standing to bring this case, and the FAA Administrator has made it clear that Tweed is on its own to remedy this conflict. JA451–52.

The District Court incorrectly held that there was no "direct causal relationship between the statute and [Tweed's] alleged injury" simply because Tweed has to take additional steps before it can extend the runway. JA191. The court ignored the fact that the evidence proved that invalidating the statute is the sine qua non to address these additional steps. Tweed cannot proceed further with the Project while the statute is in force. The FAA and state agencies will not

engage in a vain review of a project that is prohibited by state law. Tweed's injury is clear, direct, and is much more than is required to have standing. Indeed, as this Court has stated, "[a] plaintiff does not lack standing simply by virtue of the indirectness of his or her injury." *Pacific Capital Bank, N.A.*, 542 F.3d at 350. It is sufficient for standing purposes if there is an "intermediate link between the state regulations and the injury." *Id.* Here, the link between the statute and Tweed's inability to extend the runway is direct because Tweed cannot proceed with an FAA approved Master Plan that calls for extending the runway.

Put simply, as the entity directly affected by § 15-120j(c), Tweed is in the best position to challenge it. *See Int'l Fabricare Inst. v. U.S. EPA*, 972 F.2d 384, 390 (D.C. Cir. 1992) (standing exists where there is some indicia, "however slight," that the challenged statute was intended to regulate the plaintiff); *see also Lujan*, 504 U.S. at 560–61 (1992) (standing conferred when it is likely that plaintiffs will be redressed by favorable decision); *N. Shore Gas Co. v. EPA*, 930 F.2d 1239, 1242 (7th Cir. 1991) (standing exists where plaintiff would derive a benefit from winning the suit). Many of the applicable preemption cases never even raised a standing question because the state or local regulation at issue conflicted with airport operations on the ground and in the air. *See, e.g., Burbank-Glendale-Pasadena Airport Auth. v. City of Los Angeles*, 979 F.2d 1338 (9th Cir.

1992) (city ordinance requiring city approval of plans for development of airport runways and taxiways on airport land preempted by FAAct).

Additionally, Tweed has a legal right under federal and state law to "maintain and improve Tweed-New Haven Airport as an important economic development asset for the south central Connecticut region" and "to make plans and studies in conjunction with the Federal Aviation Administration[3] or other state or federal agencies." General Statutes § 15-120j(a). Pursuant to those mandates, after extensive public hearings Tweed obtained approval from the FAA and the State of the Master Plan which calls for extending the runway. *See* JA423, 425. The trial record indicates that the FAA views the statute as being an impediment to carrying out that Master Plan provision and an encroachment on federal authority. *See* JA451–52, 482–85. Michael Huerta, an administrator at the FAA, stated that, if Tweed wishes to move forward with the Project, it would have to provide the FAA with "credible documentation demonstrating the willingness of the State legislature to remove any runway length restrictions." JA451. Thus, Tweed's

---

[3] The Report to Congress, National Plan of Integrated Airport Systems, 2017-2021, provides, in relevant part:
- "Airports should be flexible and expandable and able to meet increased demand and accommodate new aircraft types."
- "The [national] airport system should be extensive, providing as many people as possible with convenient access to air transportation, typically by having most of the population within 20 miles of a NPIAS airport."
JA 335.

injury is concrete, particularized and actual in that the state law prevents Tweed from engaging in specific conduct approved by the FAA.

The judgment that Tweed lacks standing should be reversed.

**C.** **The length of the runway, as restricted by the statute, has directly led to inadequate revenue at the Airport and chronically low service levels**

Aside from the sheer existence of the statute, Tweed has proven that the current length of Runway 2/20 and Tweed's inability to lengthen it due to the statute have resulted in: (1) chronically low service levels, and (2) the Airport's dire financial condition. Tweed is operating at an annual loss and requires significant subsidies from the State and the City in order to survive. The current financial situation at the Airport is not sustainable and is due to the chronically low service levels at the Airport. The low service levels are inextricably tied to the current length of Runway 2/20. These injuries can only be redressed by invalidating the state statute. The uncontroverted evidence at trial established the following.

Runway 2/20 is one of the shortest in the nation at airports where commercial service is provided, and the Airport has the _shortest_ runway in the nation for airports with catchment areas of 1,000,000 or more people. JA62–63, 75 (emphasis added).

Due to the length of the runway, there is only one commercial airline and aircraft, the Dash 8, providing service to Tweed. JA55. The only route flown by the Dash 8 out of Tweed is to Philadelphia. JA55. There are only four scheduled flights per day in each direction and passenger capacity of no more than thirty seven passengers on each flight. JA55.

Service at the Airport is low, with fewer than 35,000 enplanements per year. JA55. Tweed's expert witness, John DeCoster, testified that "[t]he 35,000 enplanement level is by far the lowest enplanement level that our company has dealt with, as far as a commercial service airport, outside of essential air service cities. It's an extremely low number and does not generally generate enough direct and indirect revenue[4] to make the airport economically or financially self-sustaining." JA242 (emphasis added). This evidence is uncontradicted, as the defendant offered no expert witness or any witnesses whatsoever.

The chronically low service levels are caused by the length of Runway 2/20, which does not permit even the small Dash 8 to takeoff from the Airport at full capacity and does not allow larger commercial aircraft to service the Airport. The

---

[4] Mr. DeCoster stated in his report that, for commercial service, revenue is generated directly "through airline rates and charges and Passenger Facility Charges ("PFC's") and indirectly through car rental concessions, fuel flowage fees, advertising revenue, parking revenue, and other concessions such as food and beverage and vending." JA480.

length of the runway has a direct bearing on the weight load and passenger capacity that can be safely handled on any given flight. JA55.

The low service levels have had a severe financial impact on the Airport. Tweed has been operating the Airport at a loss which has required annual subsidies of over $1,000,000 from the State and the City of New Haven. JA63. Without an increase in commercial service and general aviation activity provided by larger aircraft, state and local subsidies and the average annual operating loss for the Airport will increase. JA244–45. Tweed <u>cannot</u> attract new commercial service if the runway is not lengthened. JA242 (emphasis added). Indeed, Mr. DeCoster testified that "[t]he lengthening of the runway is the absolute door opener in order to have a chance at improving the financial condition of the airport" because, without a longer runway, Tweed will be unable to attract or safely accommodate larger aircraft "that require a longer runway length." JA244.

Extending the runway would redress these injuries. Mr. DeCoster's report states that a 6,601 linear foot runway "will afford the opportunity for Tweed to <u>safely</u> handle all of the likely commercial and general aviation aircraft that would consider utilizing Tweed." JA480–81 (emphasis added). Moreover, Mr. DeCoster stated that the increased revenue that would accompany new commercial service would "likely result in the reduction of the local and state subsidies," JA481, because additional service would "increase direct and indirect revenue and make a

major impact on the [current] deficit" at the Airport. JA245. The defendant did not proffer any rebuttal expert testimony or evidence to these points.

Moreover, the defendant has stipulated to the following: The lighter an aircraft is, the less runway it needs to get airborne safely. This basic principle of flight is the driving force behind weight restrictions that are placed on aircraft when a runway is not long enough for that aircraft to safely takeoff at its maximum allowable takeoff weight. Lengthening a runway could eliminate safety concerns and could reduce the need for these weight restrictions at a given airport, allowing an aircraft to carry more passengers while increasing the profit potential of the flight to an acceptable level for the airline. JA62. The length of Runway 2/20 is a significant factor in the current low service levels at the Airport JA55.[5]

The injury suffered by Tweed is clear. Enplanements are severely restricted due to the length of Runway 2/20 and will not change significantly without a longer runway.

Despite the uncontradicted evidence cited above, the District Court ignored the injuries caused by low service levels and concluded that, because Tweed did not account for the financial status of the Airport prior to the passage of the state statute, it failed to show a causal relationship between the statute and Tweed's

---

[5] This stipulation, by itself, establishes a causal connection between the statute and Tweed's injury. Despite citing to almost every stipulated fact in its decision, the District Court failed to reference this crucial stipulation.

injuries. JA193. The court incorrectly held that Tweed "must prove that the downturn in the Airport's financial situation is a direct result of the passage of [the state statute]." JA193.

However, the court completely missed the point. It is the length of the runway, as now restricted by the state statute, which directly causes the injuries to Tweed.

Tweed did not allege or argue that income or business suddenly decreased upon the passage of the state statute in 2009. It does not matter whether the Airport's financial situation prior to 2009 was better or worse than it is now. What matters is that Tweed now suffers from chronically low service levels and inadequate revenue as a result of the current length of Runway 2/20, and the state statute guaranteed that the financial injury would never be improved and prohibits Tweed from rectifying that injury. Thus, these financial injuries confer standing upon Tweed.

**D.** **Tweed is unable to attract new commercial service to the Airport as a result of the length of Runway 2/20 as restricted by General Statutes § 15-120j(c)**

Tweed further established that the length of Runway 2/20 is inextricably linked to the chronically low service levels at the Airport, as discussed above, and Tweed's inability to attract new commercial service. The uncontradicted evidence proves that the length of Runway 2/20 has already deterred at least one commercial

air carrier from bringing service to Tweed, and that Tweed will be unable to attract new commercial service if Runway 2/20 is not lengthened.

Despite marketing efforts and various attempts to attract new service, Tweed has failed to attract a single new scheduled commercial carrier since 2009. JA55. Tom Reich has provided marketing services to the Airport since December 2011. JA61. Mr. Reich has been in close touch with approximately ten different airlines with regard to the possibility of new service at the Airport. JA61. However, notwithstanding these efforts, Mr. Reich has been unable to convince a new airline to commence service at Tweed. JA63.

Based on Mr. Reich's experience, the overriding issue with respect to an airline choosing to provide service to a new destination is economic viability. Runway length is an integral part of an airline's economic viability analysis due to the weight restrictions a shorter runway can cause and the resulting limit to the number of passengers that can safely be carried on a flight. JA62.

Mr. DeCoster testified, without contradiction, that the length of Runway 2/20 is the primary reason why Tweed has failed to attract new commercial service, and that Tweed cannot compete with other airports that have runways long enough to accommodate new commercial service. JA242–43. Because of the current length of Runway 2/20 and Tweed's inability to lengthen it, Tweed cannot "even get a seat at the table" to negotiate with commercial air carriers because

airlines are in a buyer's market and other airports in the same region as Tweed "have the facilities and the runway length that's necessary for [commercial airlines] to project a strong performance at that airport." JA243. It is unrealistic to expect a commercial airline to negotiate with Tweed to bring service to the Airport if Runway 2/20 is inadequate to permit the airline to operate safely and economically, and where there is a statutory bar to lengthening the runway.

Still, despite having almost no negotiating power with its current runway length, Tweed has received substantial interest from Allegiant in terms of bringing commercial service to the Airport. JA465. Allegiant is a low cost commercial air carrier which offers nonstop jet service to more than 100 airports throughout the country. *Id.* In December 2015, Eric Fletcher, Allegiant's manager of airport planning, wrote to Michael Huerta, the administrator of the FAA, advising him that Allegiant is seeking to expand its network of airports and that it has identified Tweed as a potential Allegiant airport. *Id.* Mr. Fletcher stated, however, that Allegiant's analysis of Tweed as a potential market cannot go forward specifically because "runway 2/20 is too short for Allegiant to comfortably operate regularly scheduled commercial service" with its current fleet. *Id.* (emphasis added). Mr. Fletcher stated that Allegiant would "eagerly reopen [its] analysis of [Tweed's] viability for regularly scheduled commercial service" if Runway 2/20 is

lengthened. *Id.* (emphasis added). Mr. DeCoster agrees and testified, without contradiction, that Tweed is a "prototypical market for Allegiant." JA249.

One analysis, completed by AvPorts, shows that Tweed's South-Central Connecticut market is the largest catchment area in the United States in terms of existing passenger demand without nonstop flights to Orlando, Florida. JA62, 453–64. Mr. DeCoster testified, without contradiction, that, if Allegiant brings service to Tweed, Tweed could compete with other regional airports, including JFK in New York City, with respect to flights to Florida. JA249.

Being able to compete with other regional airports for commercial service is paramount. In the deregulated airline world, the FAA cannot require airlines to provide service where it is not profitable for an airline to do so. JA63. An airline will not bring service to an airport if it cannot safely takeoff from and land on its runway.

The District Court again ignored this uncontradicted evidence and held that Tweed could not prove injury without obtaining a "clear commitment" from an air carrier that it would definitively bring service to Tweed if Runway 2/20 is lengthened. JA198. This holding conflicts with the stipulated facts and the evidence that Tweed has been unable to obtain a commitment from an airline for the past six years despite marketing efforts. The court raised the bar for standing to unreasonable heights.

Mr. DeCoster – the only expert witness in this case – testified that, because of the current length of the runway, Tweed cannot even negotiate with commercial air carriers. JA243. Tweed's inability to lengthen Runway 2/20 places it at an insurmountable disadvantage with regard to competing with other airports for new commercial service. This type of negative impact on bargaining power is injury by itself.

In *In re Old Carco LLC*, 470 B.R. 688 (S.D.N.Y. 2012), the plaintiffs obtained a declaration that a state statute aimed at protecting certain car dealerships that were jettisoned by a federal bankruptcy court order was preempted by federal law. Plaintiff Chrysler Group LLC ("New Chrysler") acquired certain debtors' assets and liabilities pursuant to a purchase agreement under which some of the debtors' contracts with existing dealerships were not assumed by New Chrysler. *Id.* at 693–94. The Bankruptcy Court approved the purchase agreement. *Id.* The state of Kentucky subsequently enacted a statute to undermine the purchase agreement and aimed at protecting the rejected dealers by requiring New Chrysler to either forego selling its products within ten miles of a rejected dealer for ten years or offer to contract with the rejected dealers whose previous contracts were voided by the Bankruptcy Court. *Id.* at 697.

The plaintiffs brought suit alleging that the statute was preempted. *Id.* at 695. The state argued that the plaintiffs lacked standing because, among other

things, there was no injury because New Chrysler had not yet obtained firm contractual commitments from any new dealerships in Kentucky and, thus, New Chrysler had not violated the statute. The court held that the plaintiffs had standing because the state's argument "ignores the negative impact that the Kentucky statute is having on New Chrysler's ability to attract [new] dealers on competitive terms in these markets." *Id.* at 698. Thus, the fact that the state statute negatively impacted New Chrysler's bargaining position was an injury by itself. *See also Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C. Cir. 1999) (denial of a business opportunity is injury sufficient for standing).

Tweed is injured in the same way as New Chrysler. The District Court erred in concluding otherwise and ignored this crucial holding. JA196 – 98.

Eliminating the state statute is the <u>sine qua non</u> with regard to moving ahead with a runway extension project and any other obstacles cited by the District Court. JA191, 250. Mr. DeCoster testified that, if the statute is eliminated, the Project will take several years to complete. JA247–48. No airline is going to firmly commit to bring service to Tweed several years before Runway 2/20 is actually lengthened, and where a state statute expressly prohibits Tweed from lengthening the runway. This Court should therefore reverse the judgment of the District Court because Tweed has standing based upon its injuries due to lost business

opportunities and the negative impact to its negotiating power caused by the state statute.

### E. Tweed cannot comply with federal grant assurances due to General Statutes § 15-120j(c)

Tweed established that it currently is unable to comply with federal grant requirements due to the length of Runway 2/20 as restricted by General Statutes § 15-120j(c). The uncontradicted evidence at trial established the following.

Whenever Tweed accepts federal funds, it agrees to various grant assurances which require compliance with a long list of federal statutes and regulations directed to airport facilities and operations. "Upon acceptance of an [Airport Improvement Program] grant, the grant assurances become a binding contractual obligation between the airport sponsor and the Federal government." *Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 152 F. Supp. 3d 90, 97 (E.D.N.Y. 2015). Non-compliance by an airport such as Tweed can result in an enforcement action by the FAA. *See* 49 U.S.C. § 47101 et seq.; JA58–59.

The FAA has identified several federal obligations and grant assurances that Tweed is unable to comply with due to General Statutes § 15-120j(c). JA482–85. In particular, the FAA has stated that the statutory restriction on the length of Runway 2/20 "raises an immediate compliance issue with Federal Grant Assurance No. 5, Preserving Rights and Powers." JA484. Federal Grant Assurance No. 5 states that an airport sponsor "will not take or permit any action which would

operate to deprive it of any of its rights and powers necessary to perform any or all of the terms, conditions, and assurances in its grant agreements." *Id.* The FAA has explained that General Statutes § 15-120j(c) violates this grant assurance because it takes away Tweed's proprietary power to control the length of Runway 2/20 and gives it to the State. *Id.*

Furthermore, Mr. DeCoster explained that federal grant assurances require the airport operator to be as financially self-sufficient as possible. JA480; *see* 49 U.S.C. § 47107. Mr. DeCoster testified, without contradiction, that the Airport is operating at an annual $1.5 million deficit due to the chronically low service levels at the Airport. JA244. Mr. DeCoster further testified that Tweed's annual operating deficit will "get larger" without an increase in commercial service and that Tweed will continue to run afoul of federal grant assurances. JA245. He testified that "the FAA grant assurance requires airports to be as financially self-sufficient as possible. In this case, it would only be widening the gap, instead of closing the gap, which is what the FAA really does desire airports to have as far as financial plans." *Id.*

Mr. DeCoster stated that lengthening Runway 2/20 to the proposed 6,601 linear feet would permit the Airport to "<u>safely</u> handle all of the likely commercial and general aviation aircraft that would consider utilizing Tweed. The increased activity and subsequent revenue will meet the Grant Assurance requirement to be

as self-sufficient as possible.  This will likely result in the reduction of the local and state subsidies . . . ."  JA480–81 (emphasis added).

Tweed's inability to comply with federal grant assurances as a result of its inability to control the length of Runway 2/20 is a cognizable injury.  Tweed cannot live up to its contractual obligations with the FAA and currently is at risk of an enforcement action.  As a result, the FAA may decide to eliminate additional federal funding to the Airport.  There is a clear injury to Tweed.

Notwithstanding all of the evidence cited above, the District Court erroneously held that Tweed failed to prove any "causal relationship" between the state statute and Tweed's inability to comply with federal grant assurances, citing to two primary reasons.  JA199–201.

First, the court pointed to a 2009 Memorandum of Agreement among Tweed, the City of New Haven and the Town of East Haven (the "MOA").  The MOA was adopted prior to the enactment of the state statute, and limits Runway 2/20 to the existing paved runway length of 5,600 feet.  This case is about Tweed trying to right a wrong, and to comply with FAA directives arising subsequent to the MOA.  The MOA states that it can be terminated by either the City of New Haven or Town of East Haven if the State of Connecticut fails to enact certain legislation contemplated in the MOA.  The State failed to enact the required legislation, JA64, and thus the MOA is subject to termination by the City at any

time.  Furthermore, if the state statute's restriction on the length of Runway 2/20 is preempted under federal law (as discussed *infra*), then the MOA's restriction would similarly be preempted.  Finally, the MOA is irrelevant because parties cannot enter into an agreement to avoid the Supremacy Clause.  Thus, the MOA cannot stand as a barrier to Tweed's ability to challenge the state statute.

Second, the District Court noted that the current taxiways at the Airport are not in compliance with federal regulations and that, as part of its Preliminary Environmental Assessment, Tweed had proposed non-standard parallel taxiways as part of the proposed runway extension project and, therefore, failed to address this issue.  JA200–201.  However, the ultimate configuration of the taxiways is unclear because the FAA has refused to comment on the Preliminary Environmental Assessment.  As Mr. Furey explained, although the "proposed action" in the Preliminary Environmental Assessment calls for a non-standard parallel taxiway, the end result may change based on discussions and negotiations with the FAA because the FAA "prefer[s] standard taxiway separations."  JA225–26.  Further, the FAA has issued a mandate to Tweed to redesign and reconstruct its taxiways to comply with federal safety standards by May 2021.  JA467.  Due to the existence of the state statute, however, the FAA has refused to comment on the Preliminary Environmental Assessment, and thus discussions and negotiations on taxiways

have terminated. Tweed cannot lack standing to challenge the statute where it is the <u>statute</u> that is preventing the taxiway issue from being resolved.

Accordingly, Tweed's failure to comply with federal grant requirements is not "self-imposed." JA201. If the state statute is invalidated, Tweed would have the opportunity to comply with the federal grant requirements. A judgment that the state statute is preempted would similarly apply to the restriction in the MOA and would permit Tweed to continue negotiations with the FAA and reach an agreement on the locations of the taxiways at the Airport. Thus, there is a clear causal connection between the state statute and Tweed's injuries related to noncompliance with grant assurances.

### F. The only commercial aircraft currently servicing the Airport will soon be retired, leaving Tweed with no commercial service

Finally, the uncontradicted evidence shows that what little commercial service currently exists at Tweed will soon completely cease unless Tweed is able to immediately move forward with the Project. Mr. DeCoster explains in his report that American Eagle has announced that the Dash 8 will be retired soon. JA478. The Dash 8 is nearing the end of its useful life and American will not overhaul those aircraft because the cost is not economically justifiable. JA478. The Dash 8 is already being phased out and is no longer manufactured.[6] JA231, 478.

---

[6] The Dash 8 has been phased out since trial in this matter and has been replaced with a 50 seat jet. *See* footnote 2, *supra.*

The expected replacement for the Dash 8 is a fifty-seat regional jet, either the Bombardier CJ200 or the Embraer 145. However, these aircraft are also nearing the end of their lifecycles and will likely be retired by the end of this decade. JA230–33. Like the Dash 8, the Bombardier CJ200 and Embraer 145 are no longer being manufactured and are being phased out. JA232. Mr. DeCoster indicated that American Airlines has no other aircraft that can operate on a 5,600 foot runway. JA233. Thus, Tweed will soon be left with no commercial service.

Furthermore, if the Bombardier CJ200/Embraer 145 replace the Dash 8, Mr. DeCoster's report states that the desired minimum runway length for that aircraft is 6,200 linear feet and that the "lowest allowable condition" is a 5,600 linear foot runway. JA478. Thus, while the replacement aircraft could theoretically operate out of the Airport, there would be regular payload hits, making the service less profitable. *Id.* There is no guarantee that American would choose to operate the Bombardier CJ200 or Embraer 145 out of Tweed for very long once the Dash 8 is gone, and Tweed would be powerless to alter American's decision to summarily terminate service.[7]

After the Dash 8, Bombardier CJ200 and Embraer 145 aircraft are retired, there is no replacement aircraft that can service Tweed due to the length of

_____

[7] Mr. DeCoster testified that "[i]f an airline cannot make money on a flight, they will simply eliminate the flight. . . . [T]hey'll take that asset and relocate it to a market that will be profitable for them." JA235–36.

Runway 2/20. Mr. DeCoster explained that the next size aircraft is a 70/76 seat regional jet. JA479. This jet requires a minimum runway length of 6,200 linear feet, and 6,600 linear feet is preferred to maximize performance and profitability. *Id.* Thus, this jet cannot operate commercial service out of Tweed with the current runway length.

The defendant offered no testimony or evidence to the contrary.

The District Court nonetheless concluded that there is no imminent threat that Tweed will be left with no commercial service because Tweed failed to prove precisely when the Dash 8 or the replacement jets will be retired. JA205. The court further concluded that the status quo will be maintained for the immediate future because American Airlines profits off of the current Dash 8 service at the Airport. *Id.* However, the uncontroverted evidence definitively established that the status quo is not a viable option because it is not sustainable. JA243. The current service may at this moment be marginally profitable for American Airlines, but as Mr. DeCoster stated, if the runway is not extended, this dependence on small aircraft poses a "real threat to the existing service" at the Airport.[8] JA479.

Moreover, the District Court ignored the fact that Tweed needs to move forward on the Project now in order to be in a position to attract new commercial

---

[8] Air carriers fine-tune their business models to minimize financial losses by lowering operating costs, eliminating unprofitable routes and grounding older, less efficient aircraft. JA381, 398.

service to replace the Dash 8 and any replacement aircraft. Under the court's rationale, Tweed would need to wait until commercial service ceases entirely in order to have standing. However, Mr. DeCoster explained that the Project will take several years to complete. JA247–48. Waiting for the Dash 8 or the replacement aircraft to retire before bringing suit is not a viable option. Tweed is, therefore, currently injured by the state statute's restriction on the length of Runway 2/20.

In sum, Tweed is suffering several legally cognizable injuries and has standing to bring this action. Tweed only needs to prove a single injury to have standing, and Tweed has proven several. Tweed is one of the few parties that can challenge the constitutionality of § 15-120j(c). The statute is preventing Tweed from moving forward with the Project, and the FAA will not comment on the Preliminary Environmental Assessment while the statute interferes with its exclusive jurisdiction. *See* JA58, 451. The statute has caused all of the aforementioned injuries and will continue to harm Tweed as long as it is in force. Invalidating the statute would redress Tweed's injuries.

The judgment that Tweed lacks standing should therefore be reversed.

## II. GENERAL STATUTES § 15-120j(c) IS PREEMPTED BY THE ADA, FAAct AND AAIA

A determination regarding preemption is a conclusion of law subject to de novo review. *Air Transport Ass'n of Am. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008) (hereinafter "*ATA*").

General Statutes § 15-120j(c) is preempted by three federal statutes: the ADA, FAAct and AAIA.

The Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to, federal law.'" *ATA*, 520 F.3d at 220. Federal preemption may be express or implied. *See id.* at 220–21. Express preemption arises when "a federal statute expressly directs that state law be ousted." *Id.* at 220 (internal quotation marks omitted). Implied preemption takes two forms: field preemption and conflict preemption. *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007). Field preemption arises when "in the absence of explicit statutory language . . . Congress intended the Federal Government to occupy [a field] exclusively . . . ." *ATA*, 520 F.3d at 220 (internal quotation marks omitted). As stated by this Circuit in *ATA*:

> preemption is implied when the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where the object sought to be obtained by the federal law and the character of obligations imposed by it . . . reveal the same purpose.

*Id.* at 221 (internal quotation marks omitted). Conflict preemption arises when compliance with both federal and state law is "a physical impossibility" or "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough County v. Automated Med. Laboratories, Inc.*, 471 U.S. 707, 713 (1985) (internal quotation marks omitted).

General Statutes § 15-120j(c) is expressly preempted by the ADA, and impliedly preempted by the FAAct and AAIA.

## A.   The ADA expressly preempts General Statutes § 15-120j(c)

The restriction on the length of Runway 2/20 is related to "a price, route or service of an air carrier" and is therefore preempted by the ADA. The ADA's express preemption provision provides:

> Except as provided in this subsection,[9] a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law <u>related to a price, route, or service of an air carrier</u> that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1) (emphasis added).

The District Court held that the ADA does not preempt the state statute because the statute pertains to an "airport" rather than an "air carrier" and that Tweed lacks standing to bring a preemption claim on behalf of an air carrier. JA213. However, a state law does not have to target an air carrier in order to be

---

[9] The exceptions to which this provision refers are not applicable in this case.

preempted by the ADA. Instead, a state law is preempted if it <u>relates</u> to the price, route or service of an air carrier. The Supreme Court has defined the phrase "relating to" as "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). The "relating to" language expresses "a broad pre-emptive purpose" to preempt all "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes or services.'" *Id.* at 383–84. The Supreme Court "has repeatedly emphasized the breadth of the ADA's preemption provision." *ATA*, 520 F.3d at 222; *see also American Airlines, Inc. v. Wolens*, 513 U.S. 219, 225–26 (1995). A state statute is preempted by the ADA even if the statute's effect on prices, routes or services "is only indirect." *See Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 370 (2008) (federal law prohibiting states from enacting any law "related to" a motor carrier "price, route or service" preempted state law regulating the delivery of tobacco to customers with the state).

There is ample uncontradicted evidence that General Statutes § 15-120j(c) "relates" to the routes and service of an air carrier, and thus is preempted by the ADA. For example, Allegiant has indicated that it has identified Tweed as a potential Allegiant airport but that it cannot bring service to Tweed because "runway 02/20 is too short for Allegiant to comfortably operate regularly

scheduled commercial service." JA465 (emphasis added). It does not matter that Tweed has not obtained a firm commitment from Allegiant to bring service to the Airport if the runway is extended, JA213–14, because obtaining such a commitment is impossible at this stage. In addition, the statute's restriction on the length of Runway 2/20 "curtail[s] an air carrier's [Allegiant's] business decision to offer a particular service in a particular market." *Arapahoe County Public Airport Authority v. Federal Aviation Administration*, 242 F.3d 1213, 1222 (10th Cir. 2001) (ADA preempted airport from banning scheduled air carrier service). Indeed, the limitation on the length of Runway 2/20 and its corresponding effect on which air carriers can bring service to Tweed "significantly impacts the scope of services available to public citizens desiring to travel by air" to or from the Airport. *Id.*

The ADA has carried national policies regarding air service and safety to new heights in this era of deregulation. The objectives of the ADA are to enhance "the availability of a variety of adequate, economic, efficient, and low-priced services," 49 U.S.C. § 40101(4), and to "encourag[e] entry into air transportation markets by new and existing air carriers and the continued strengthening of small air carriers to ensure a more effective and competitive airline industry." 49 U.S.C. § 40101(13); *see also* 65 Fed. Reg. 136, 43815 (Jul. 14, 2000) (The ADA "was intended to ensure that States would not undo Federal deregulation with regulation

of their own."); JA335. These objectives are thwarted by the state statute. Thus, the statute's restriction on the length of Runway 2/20 plainly relates to the "service" of air carriers. *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265–66 (9th Cir. 1998) ("service" refers to such things as "the frequency and scheduling of transportation, and to the <u>selection</u> <u>of</u> <u>markets</u> to or from which transportation is provided . . . .") (emphasis added).

Moreover, the Dash 8 is the only commercial aircraft operating out of Tweed, and it flies only to Philadelphia. Mr. DeCoster explained, without contradiction, that Runway 2/20 needs to be lengthened in order to attract new commercial service and to allow longer stage length flights to locations other than Philadelphia. JA233–34, 239. An air carrier like Allegiant cannot conduct regular operations over any route involving Tweed because Runway 2/20 is too short for the equipment they use and the destinations for their flights. *See Arapahoe County Public Airport Authority*, 242 F.3d at 1222 (ADA preempted ban on commercial service because it related to the "routes" of air carriers). The state statute relates to the "routes" of air carriers because airlines currently cannot fly to and from Tweed due to the length of the runway. Elimination of routes to and from Tweed, if continued, would jeopardize Tweed's Part 139 certification and its place in the national commercial system.

Runway regulation by individual states would incapacitate the National Plan of Integrated Air Systems. *See* JA327; 49 U.S.C. § 47103. A state restriction on any one airport can have an adverse effect on the entire national system. The FAA cannot be powerless under circumstances like those facing Tweed to ensure that commercial aircraft can land and takeoff at any Part 139 airport.[10]

Simply stated, a longer runway leads to heavier loads, greater capacity, more airplane options and more efficient service. Control over service levels in the national system is the sole province of the FAA. The nexus in this case between runway length and the service and routes of air carriers is clear and the statute has a direct impact on an air carrier. *Contrast Goodspeed Airport, LLC v. East Haddam Inland Wetlands & Watercourses Commission*, 681 F. Supp. 2d 182, 208 (D. Conn. 2010) (state environmental law not expressly preempted under ADA because impact on airport operations was "indirect" and "speculative") *and Tweed-New Haven Airport Auth. v. Town of East Haven*, 582 F. Supp. 2d 261, 268 (D. Conn. 2008) (hereinafter "*Tweed*") (town regulations not preempted by ADA because no impact on "price, routes, and services" at airport).

Thus, the statute is expressly preempted by the ADA. The judgment of the District Court should be reversed.

---

[10] In a case decided under the FAAct, the Supreme Court held that the national character of commercial service supported preemption. *See City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 625 (1973).

**B.** **The FAAct impliedly preempts General Statutes § 15-120j(c) because the FAAct regulates the entire field of air safety and General Statutes § 15-120j(c) impedes the FAAct's objectives**

The District Court initially concluded that the FAAct impliedly preempted the state statute because runway length, as a matter of law, is a "component part of the field of airline safety, and is therefore part of a field completely occupied by the federal government." JA47–48. Despite the purely legal nature of the inquiry, the court changed course at trial and concluded that the statute was not preempted. The court was correct the first time. The judgment should be reversed.

i.    Field Preemption

The restriction on the length of Runway 2/20 frustrates the essential purpose of the FAAct. Indeed, Congress occupies and regulates the <u>entire</u> <u>field</u> of airline safety. *See ATA*, 520 F.3d at 225; *Montalvo*, 508 F.3d at 468; *Tweed*, 582 F. Supp. 2d at 268. The FAAct was enacted "to create a uniform and exclusive system of federal regulation in the field of airline safety." *ATA*, 520 F.3d at 224; *Tweed*, 582 F. Supp. 2d at 268. "Moreover, Congress intended its control of airspace to be 'concentrated at the national level.'" *Tweed*, 582 F. Supp. 2d at 268 (*quoting ATA*, 520 F.3d at 224). "Congress and the Federal Aviation Administration have used this authority to enact rules addressing virtually all areas of air safety." *ATA*, 520 F.3d at 224. Under the FAAct, "the United States has asserted that it possesses and exercises 'complete and exclusive national sovereignty in the airspace of the

United States.'" *United States v. City of New Haven*, 447 F.2d 972, 973 (2d Cir. 1971) (*quoting* the FAAct, 49 U.S.C. § 1508(a), as amended 49 U.S.C. § 40103(a)).

Importantly, and dispositive of the issue before this Court, runway length and placement impacts airline safety as a matter of law. This Circuit has held that the federal government's sovereign power in the FAAct "extends to grounded planes <u>and</u> airport <u>runways</u>. Thus, by the passage of the FAAct, Congress intended to occupy the entire field of airline safety, <u>including</u> <u>runways</u>." *Tweed*, 582 F. Supp. 2d at 268 (emphasis added; internal quotation marks omitted) (*quoting ATA*, 520 F.3d at 225); *see also* 49 U.S.C. § 40102(a)(4) ("air navigation facility" includes "a landing area"); 65 Fed. Reg. 136, 43815 (Jul. 14, 2000) ("Federal authority to control the navigable airspace necessarily encompasses the placement, size, and configuration of runways."). The defendant has stipulated that runway length impacts airline safety, *see* JA55, 59–60, 62, and the evidence at trial supports this conclusion. *See, e.g.,* JA227–29 (runway length impacts whether an aircraft can operate safely out of an airport) (Mr. DeCoster testimony); JA232–33 (airlines calculate safety factor for each aircraft based in part on runway length) (Mr. DeCoster testimony); JA434 (runway extension project would "enhance airport safety and improve airport operational reliability.").

Other courts have reached the same conclusion. In *Burbank-Glendale-Pasadena Airport Authority v. City of Los Angeles*, 979 F.2d 1338 (9th Cir. 1992), the Ninth Circuit concluded that the FAAct preempted a city ordinance requiring the plaintiff airport to obtain prior city approval before developing or modifying its runways or taxiways. The ordinance interfered with the plaintiff's taxiway extension project which was expected to "produce significant safety improvements." *Id.* at 1339. The court held that "[i]t is settled law that non-proprietor municipalities[11] are preempted from regulating airports in any manner that directly interferes with aircraft operations." *Id.* at 1340 (emphasis added). Further, the court rejected the city's argument that the ordinance was a legitimate exercise of its police powers.

> The problem with this Ordinance is that it conditions the construction and reconstruction of taxiways and runways on the prior approval of the City. This the City may not do. The proper placement of taxiways and runways is critical to the safety of takeoffs and landings and essential to the efficient management of the surrounding airspace. The regulation of runways and taxiways is thus a direct interference with the movements and operations of aircraft, and is therefore preempted by federal law.

*Id.* at 1341 (emphasis added). The court went on: "Stated simply, a non-proprietor municipality may not exercise its police power to prohibit, delay, or otherwise condition the construction of runways and taxiways at a non-city-owned airport." *Id.*

---

[11] The same principle applies to a state that does not own an airport.

This is precisely what the State has done by way of General Statutes § 15-120j(c).

The District Court held that the statute is not preempted by the FAAct because the statute does not interfere with Tweed's ability to comply with FAA safety standards, and because there is no current FAA enforcement action against Tweed.  JA209.  However, in *Burbank-Glendale-Pasadena Airport Authority*, 979 F.2d 1338, the court never questioned the need for the airport's taxiway improvement project within the airport's boundaries[12] that a local ordinance sought to prohibit.  The District Court in this case should not have done so.  The State cannot regulate the length of Runway 2/20 because the federal government possesses "complete and exclusive national sovereignty" over navigable airspace, including runways.  *City of New Haven*, 447 F.2d at 973; *see* 49 U.S.C. § 40102(32).  This is especially true in this case, where the FAA has approved a Master Plan[13] calling for the extension of the runway and where the FAA has stated that the statute intrudes upon its sovereign authority.  *See* JA451–52.  Thus,

---

[12]  In *Tweed*, 582 F. Supp. 2d 261, the court indicated that the fact that the improvements at issue were within the airport's boundaries weighed in favor of preemption.

[13] *See* Report to Congress, National Plan of Integrated Airport Systems, 2017-2021 at 57 ("The development needed to provide an adequate national airport system . . . is derived from locally prepared airport master plans . . . .") (JA391).

General Statutes § 15-120j(c) is impliedly preempted by the FAAct because it impermissibly interferes with Congress' exclusive sovereignty over airspace.

    ii.    <u>Conflict Preemption</u>

Section 15-120j(c) is also preempted by the FAAct under conflict preemption. Conflict preemption arises when compliance with both federal and state law is <u>either</u> "a physical impossibility" <u>or</u> "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough County*, 471 U.S. at 713 (internal quotation marks omitted). Tweed has proven both. The current length of Runway 2/20 "remains too short for almost all commercial aircraft to operate regularly scheduled service in a <u>safe</u> and commercially reasonable manner," JA478–79 (emphasis added), and new service with larger aircraft is impossible. Further, the state statute puts Tweed in conflict with federal grant requirements. Finally, Tweed's Master Plan and ALP[14] both call for Runway 2/20 to be extended, and both of these plans have been approved by the FAA and the State. *See* JA405, 423. Tweed cannot implement the Master Plan or the ALP as a result of the statute. *See* JA451–52. Thus, § 15-120j(c) affects air safety and stands as an obstacle to Congress' objectives as stated

---

[14] Mr. Furey testified that the ALP shows "the proposed improvements to the airport. So it's sort of a blueprint for the future of the airport, and includes their capital improvement program." JA222. He also testified that FAA approval is required for any construction project within the ALP. JA223.

in the FAAct. In sum, the statute's runway limitation directly regulates airport operations and runway construction and therefore is in conflict with the FAAct and preempted. *See Burbank-Glendale-Pasadena Airport Auth.*, 979 F.2d at 1340–41 (FAAct preempted ordinance requiring city approval of plans for development of airport runways and taxiways on airport land).

Because of the length of Runway 2/20, Tweed is an inefficient airport on the verge of losing its standing in the integrated national system. *See City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 639 (1973) (city ordinance prohibiting aircrafts from taking off between certain hours preempted because "fractionalized control" of timing of takeoffs and landings would "severely limit the flexibility of FAA in controlling air traffic flow."). Tweed cannot implement the FAA approved runway extension project because of General Statutes § 15-120j(c). The Project would implement the Master Plan and increase safety and operational efficiency at the Airport.

The judgment of the District Court should be reversed.

### C. The AAIA impliedly preempts General Statutes § 15-120j(c)

Finally, the AAIA, 49 U.S.C. § 47101 et seq., impliedly preempts General Statutes § 15-120j(c) because the comprehensive statutory scheme of the AAIA demonstrates the supremacy of federal interest in commercial air service expansion, particularly with regard to development of airport facilities. Section

15-120j(c) directly conflicts with the AAIA because it serves as an impediment to the federal government's and Tweed's objective of expanding service, the implementation of the Master Plan adopted by the FAA (and the State) that contemplates the extension of Runway 2/20, and increasing compliance with federal safety standards.

Congress authorized the FAA, pursuant to the AAIA, to provide grants for public-use airports under the Airport Improvement Program. *See* 49 U.S.C. § 47101 et seq. The FAA may approve a grant application only if it receives written assurances about airport operations, and only on terms necessary to carry out the various federal regulations for airport improvement. *See* 49 U.S.C. §§ 47107, 47108. The assurances include compliance with FAA requirements as to the layout of the airport, including runways and taxiways. *See* 49 U.S.C § 47107.

The AAIA, in conjunction with the FAAct and ADA, demonstrates the dominance of the federal interest in aviation safety and airport improvement projects and requires the FAA to develop and maintain a national plan of integrated airport systems. Indeed, the AAIA declares that "airport construction and improvement projects that increase the capacity of facilities . . . be undertaken to the maximum feasible extent so that <u>safety</u> and efficiency increase and delays decrease," 49 U.S.C. § 47101(a)(7) (emphasis added), and that "artificial restrictions on airport capacity are not in the public interest." 49 U.S.C. §

47101(a)(9); *see also City of Oceanside v. AELD, LLC*, 740 F. Supp. 2d 1183, 1190 (S.D. Cal. 2010); 65 Fed. Reg. 136, 43815 (Jul. 14, 2000) ("The [AAIA] prescribes a dominant role for the FAA in airport development, which encompasses constructing, repairing, or improving public use airports . . . .").

The FAA has approved Tweed's Master Plan and ALP, which call for extending the length of Runway 2/20 up to 7,200 linear feet. JA14–15, 405, 423. Tweed has also executed FAA Airport Improvement Program grant assurances that require it to make the Airport as self-sustaining as possible, including increasing the level of regularly scheduled commercial service and general aviation usage at the Airport. JA244–46, 482–85. Section 15-120j(c), however, has prevented Tweed from extending the length of Runway 2/20 and attracting new commercial service, which has directly led to the Airport's precarious and unsustainable financial condition. The FAA has refused to provide funding to the Project and has refused to allow the Project to proceed even with non-federal funding as long as the state statutory prohibition is in place. JA223–24, 449–52, 482–85. FAA approval, therefore, is necessary even if Tweed forgoes federal funding. *See* JA57. Thus, the evidence demonstrates that General Statutes § 15-120j(c) "directly conflicts" with the AAIA because the state statute impermissibly regulates the use of land within airport boundaries and, therefore, is an obstacle to the FAA's goal of ensuring aviation safety and efficient commercial service. *See City of Oceanside*,

740 F. Supp. 2d at 1190. The AAIA impliedly preempts the state statute. The District Court's judgment should be reversed.

In conclusion, a seriously underserved catchment area arbitrarily restricted by a state statute undermines the desired integrated national commercial system. The three federal statutes discussed herein do not mandate airport improvements such as the extension of Tweed's Runway 02/20 or those at any of the Part 139 airports, but, read together, they reinforce the policy of the United States summarized in 49 U.S.C. § 47101: "that airport construction and improvement projects that increase the capacity of facilities to accommodate passenger . . . traffic be undertaken to the maximum feasible extent so that safety and efficiency increase and delays decrease . . . [and] that artificial restrictions on airport capacity . . . are not in the public interest." 49 U.S.C. 47101(a)(7) and (9). Read in this light, prohibitions such as General Statutes § 15-120j(c) cannot be allowed to override the stated policy of the United States.

## CONCLUSION

This is a critical juncture for Tweed in the national commercial air service system. Airlines are increasing the size of their aircraft and equipment, which necessitates longer runways. If Tweed cannot remove the statutory limit on the length of its primary runway, Tweed will soon drop out of the national network.

For all of the foregoing reasons, Tweed respectfully requests that the judgment of the District Court concluding that Tweed lacks standing, and that General Statutes § 15-120j(c) is not preempted by the ADA, FAAct and AAIA be reversed, and that this matter be remanded with direction to render judgment in favor of Tweed.

Respectfully submitted,
PLAINTIFF,
TWEED-NEW HAVEN AIRPORT
AUTHORITY

By: /s/ Christopher A. Klepps, Esq.
    HUGH I. MANKE (ct05250)
    JOHN C. KING (ct09570)
    CHRISTOPHER A. KLEPPS (ct29463)
    UPDIKE, KELLY & SPELLACY, P.C.
    100 Pearl Street
    Hartford, CT 06123
    Tel. No. (860) 548-2600
    Fax No. (860) 548-2680
    hmanke@uks.com
    jking@uks.com
    cklepps@uks.com

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the word limitation of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,349 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared using 14-point Times New Roman proportional font.

By:  /s/ Christopher A. Klepps, Esq.
Christopher A. Klepps, Esq.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on March 2, 2018, the foregoing was filed electronically with the U.S. Court of Appeals for the Second Circuit.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

Six copies were sent via overnight delivery via Federal Express to:

U.S. Court of Appeals for the Second Circuit
40 Foley Square, Thurgood Marshall Courthouse
New York, NY 10007

Two copies were also sent via U.S. Mail on the same date to:

Drew S. Graham, Esq.
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

By:  /s/ Christopher A. Klepps, Esq.
Christopher A. Klepps, Esq.