# 17-3481 (L)
# 17-3918 (Con)

*To Be Argued By:*
Drew S. Graham
Assistant Attorney General

### IN THE
## 𝔘nited 𝔖tates 𝔠ourt of 𝔄ppeals
### FOR THE SECOND CIRCUIT

---

**TWEED-NEW HAVEN AIRPORT AUTHORITY,**
*Plaintiff-Appellant,*

**CITY OF NEW HAVEN,**
*Intervenor Plaintiff-Appellant,*

v.

**GEORGE JEPSEN, in his official capacity as
Attorney General for the State of Connecticut,**
*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (HARTFORD)

**BRIEF OF DEFENDANT-APPELLEE GEORGE JEPSEN
WITH ATTACHED SUPPLEMENTAL APPENDIX**

GEORGE JEPSEN
ATTORNEY GENERAL

Drew S. Graham
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel. (860) 808-5330
Fax (860) 808-5384
Email: Drew.Graham@ct.gov

*Attorney for Defendant-Appellee*

# TABLE OF CONTENTS

Table of Authorities .................................................................. iii

Counter-Jurisdiactional Statement ........................................ 1

Counter-Statement Of The Issues Presented For Review ...................... 1

Statement Of The Case ............................................................ 2

Statement Of The Relevant Facts ............................................. 2

The Relevant Procedural History And Rulings Presented For Review ... 7

Summary Of The Argument ...................................................... 9

    Standing ............................................................................. 9
    Preemption ........................................................................ 12

Argument .............................................................................. 13

    I. Tweed Does Not Have Standing To Challenge The
       Constitutionality Of Conn. Gen. Stat. § 15-120j(c) ..................... 13

      A. Legal Standard For Article III Standing ........................... 13
      B. Tweed Does Not Have Standing Due To Its Fear Of
         Enforcement Of Conn. Gen. Stat. § 15-120j(c) Or Due
         To Its Mere Existence .................................................... 21
      C. The District Court Correctly Held That Conn. Gen. Stat.
         § 15-120j(c) Is One Of Several Factors Preventing The
         Runway Project From Moving Forward ............................ 26
         1. Plaintiffs Have Failed To Comply With FAA
            Mandates Issued In 2015. ....................................... 27
         2. Tweed Has Admitted That It Is In Violation Of
            Several Federal Grant Assurances. ......................... 30
         3. Tweed Has Failed To Show That FAA Funding For
            Its Proposed Airport Improvement Project Is Justified ... 31
      D. The District Court Correctly Denied Tweed's Claim
         Of An Imminent Threat Of Losing All Commercial
         Service Due To Conn. Gen. Stat. § 15-120j(c) ..................... 34
      E. The District Court Correctly Denied Tweed's Claim That
         It Is Unable To Attract New Commercial Service To The
         Airport Due To Conn. Gen. Stat. § 15-120j(c). ..................... 38

F. The District Court Correctly Denied Tweed's Claim That Conn. Gen. Stat. § 15-120j(c) Has Led Directly To Inadequate Revenue And Chronically Low Service Levels .................................................... 43

G. The District Court Correctly Denied Tweed's Claim That It Cannot Comply With Federal Grant Assurances Due To Conn. Gen. Stat. § 15-120j(c). ......................................... 47

    1. Current Noncompliance:  Nonstandard Taxiway Proposal.......................................................... 48

    2. Past Noncompliance:  Memorandum Of Agreement....... 49

II. The District Court Correctly Held That Conn. Gen. Stat. § 15-120j(c) Is Not Preempted By The FAAct, The ADA Or The AAIA. ................................................................... 53

A. The District Court Correctly Held That The FAAct Does Not Preempt Conn. Gen. Stat. § 15-120j(c). ............... 54

    1. Implied Preemption ......................................... 54

      a. Conflict Preemption.................................... 54

      b. Field Preemption ...................................... 55

B. The District Court Correctly Held That The ADA Does Not Preempt Conn. Gen. Stat. § 15-120j(c)......................... 61

    1. Express Preemption.......................................... 61

C. The District Court Directly Held That The AAIA Does Not Preempt Conn. Gen. Stat. § 15-120j(c)......................... 66

    1. Implied Preemption ......................................... 66

      a. Conflict Premption..................................... 67

      b. Field Preemption. ...................................... 70

III. The District Court Erred In Holding That A Political Subdivision Can Sue Its Creator State. .................................. 71

# TABLE OF AUTHORITIES

## Cases

*Abdu–Brisson v. Delta Air Lines,*
  128 F.3d 77 (2d Cir. 1997)................................................................64

*Aguayo v. Richardson,*
  473 F.2d 1090 (2d Cir. 1973)........................................................74-76

*Air Transp. Ass'n of Am., Inc. v. Cuomo,*
  520 F.3d 218 (2d Cir. 2008)......................................................53, 66

*Alliance of Am. Insurers v. Cuomo,*
  854 F.2d 591 (2d Cir. 1988).............................. 10, 24, 25, 46

*American Airlines, Inc. v. Town of Hempstead,*
  272 F.Supp. 276 (E.D.N.Y. 1966) ......................................60

*Arapahoe County Public Airport Authority v. Federal Aviation
  Administration,*
  242 F.3d 1213 (10th Cir. 2001) ........................................65

*Branson Sch. Dist. RE-82 v. Romer,*
  161 F.3d 619 (10th Cir. 1998) .....................................76-77

*Burbank-Glendale-Pasadena Airport Authority v. City of Burbank,*
  136 F.3d 1360 (9th Cir. 1998) .....................................75-77

*Burbank-Glendale-Pasadena Airport Authority v. City of Los Angeles,*
  979 F.2d 1338 (9th Cir. 1992) ........................................57

*Charas v. TransWorld Airlines, Inc.,*
  160 F.3d 1259 (9th Cir. 1998) ........................................65

*City of Burbank v. Lockheed Air Terminal, Inc.,*
  411 U.S. 624 (1973) .......................................................60

*City of Cleveland, Ohio v. City of Brook Park, Ohio,*
  893 F. Supp. 742 (N.D. Ohio 1995) .............................58, 67

*City of Oceanside v. AELD, LLC,*
  740 F. Supp. 2d 1183 (S.D. Cal. 2010) .............................71

*City of South Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency,*
  625 F.2d 231 (9th Cir.1980) .........................................74, 76

*City of Trenton v. New Jersey,*
  262 U.S. 182 (1923) ...............................................72-73, 77

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ................................................. passim

*Ex Parte Young,*
  209 U.S. 123 (1908) .......................................................8

*Gill v. Whitford,*
  138 S.Ct. 1916 ........................................................... 25
*Gomillion v. Lightfoot,*
  364 U.S. 339 (1960) ..................................................... 72
*Goodspeed Airport LLC v. East Haddam Inland Wetlands &*
  *Watercourses, Comm'n*
  634 F.3d 206 (2d Cir. 2011) ........................................ 57, 58
*Goodspeed Airport, LLC v. E. Haddam Inland Wetlands &*
  *Watercourses Comm'n,*
  681 F.Supp. 2d 182 (D.Conn. 2010) ............................... 62, 64
*Goodspeed Airport, LLC v. East Haddam Inland Wetland &*
  *Watercourses Comm'n,*
  632 F.Supp. 2d 185 (D.Conn. 2009) ................................... 61
*Hedges v. Obama,*
  724 F.3d 170 (2d Cir. 2013) ........................................ 21-22
*Henry v. Champlain Enters., Inc.,*
  445 F.3d 610 (2d Cir. 2006) ........................................... 27
*In re Old Carco LLC,*
  470 B.R. 688 (S.D.N.Y. 2012) ...................................... 41-42
*Knife Rights, Inc. v. Vance,*
  802 F.3d 377 (2d Cir. 2015) ........................................ 22, 24
*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................... passim
*MedImmune, Inc. v. Genentech, Inc.,*
  549 U.S. 118 (2007) ................................................ 22-23
*Monsanto Co. v. Geertson Seed Farms,*
  130 S.Ct. 2743 (2010) ................................................. 15
*Morales v. Trans World Airlines, Inc.,*
  504 U.S. 374 (1992) ............................................ 62, 63, 65
*New York SMSA Ltd. P'ship v. Town of Clarkstown,*
  612 F.3d 97 (2d Cir. 2010) ............................................ 53
*New York v. Richardson,*
  473 F.2d 923 (2d Cir. 1973) ........................................ 73-74
*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ............................................ 19, 20, 35
*Pac. Capital Bank, N.A. v. Connecticut,*
  542 F.3d 341 (2d Cir. 2008) ........................................ 17, 22

iv

*Raines v. Byrd,*
   521 U.S. 811 (1997) ................................................. 13

*Rogers v. Brockette,*
   588 F.2d 1057 (5th Cir. 1979) ................................. 76

*Rowe v. New Hampshire Motor Transp. Ass'n,*
   552 U.S. 364 (2008) ................................................. 66

*Shain v. Ellison,*
   356 F.3d 211 (2d Cir. 2004) ..................................... 20, 38, 41

*Steffel v. Thompson,*
   415 U.S. 452 (1974) ................................................. 23

*Terrance v. Thompson,*
   26 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 (1923) ........ 23

*Tweed-New Haven Airport Auth. v. Town of E. Haven, Conn.,*
   582 F. Supp. 2d 261 (D. Conn. 2008) .................. 9, 55, 56, 58

*Tweed-New Haven Airport Authority v. Jepsen,*
   Civil Action No. 3:15-cv-01731-RAR, 2017 WL 4400751
   (D.Conn. Oct. 3, 2017) ......................................... passim

*United States v. City of New Haven,*
   447 F.2d 972 (1971) ................................................. 60-61

*Vermont Right to Life Comm., Inc. v. Sorrell,*
   221 F.3d 376 (2d Cir. 2000) ..................................... 17, 21, 22

*Virginia v. Am. Booksellers Ass'n, Inc.,*
   484 U.S. 383 (1988) ................................................. 18, 23

*Wang v. Pataki,*
   396 F.Supp. 446 (S.D.N.Y. 2005) ........................... 24

*Weiss v. El Al Airlines,*
   309 Fed.Appx. 483 (2d Cir. 2009) ........................... 66

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990) ................................................. passim

*Whittington v. U.S.,*
   99 Fed.Appx. 56 (6th Cir. 2004) ............................. 68

*Williams v. Mayor,*
   289 U.S. 36 (1933) ................................................. 72-75

*Ysursa v. Pocatello Educ. Ass'n,*
   555 U.S. 353 (2009) ............................................. 12, 73, 74, 77

## Statutes

49 U.S.C. § 1305(a)(1)...................................................................63
49 U.S.C. § 40101 ..................................................................1, 7
49 U.S.C. § 40103(a) and (b)...................................................59
49 U.S.C. § 40116 .....................................................................52
49 U.S.C. § 41713 ...................................................................1, 7
49 U.S.C. § 41713(b)(1)..........................................................62
49 U.S.C. § 47101 ..............................................................1, 7, 47
49 U.S.C. § 47101(g) ...............................................................69
49 U.S.C. § 47521 .....................................................................51
49 U.S.C. § 47524(e) ................................................................51
49 U.S.C. §§ 40102(2), (5), (23) and (25) ...............................62
50 U.S.C. § 1881a......................................................................14
Conn. Gen. Stat. § 15-120j ........................................................3
Conn. Gen. Stat. § 15-120j(c) ...........................................passim
Conn. Gen. Stat. § 22a-92(c)(1)(H) .........................................29
Conn. Gen. Stat. § 15-120i ..........................................................2

## Regulations

14 C.F.R. Part 139......................................................................2
14 C.F.R. § 158.29 ....................................................................51

## Other Authorities

Article III of the United States Constitution.................................passim
U.S. Const., Art. VI, cl. 2.........................................................53

## COUNTER-JURISDICTIONAL STATEMENT

Defendant is satisfied with Plaintiffs' jurisdictional statements, however, as set forth below, contends that Plaintiffs have failed to satisfy standing requirements under Article III of the United States Constitution.

## COUNTER-STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the district court correctly held that Plaintiffs lack standing to challenge the constitutionality of Conn. Gen. Stat. § 15-120j(c)?

2. Whether the district court correctly held that Conn. Gen. Stat. § 15-120j(c) is not preempted by the Federal Aviation Act, 49 U.S.C. § 40101 *et seq.*?

3. Whether the district court correctly held that Conn. Gen. Stat. § 15-120j(c) is not preempted by the Airline Deregulation Act, 49 U.S.C. § 41713?

4. Whether the district court correctly held that Conn. Gen. Stat. § 15-120j(c) is not preempted by the Airport and Airway Improvement Act, 49 U.S.C. § 47101 *et seq.*?

5. Whether the district court improperly denied Defendant's motion to dismiss claiming that Plaintiff Tweed-New Haven Airport Authority, a political subdivision of the State of Connecticut, lacks standing to sue its creator state?

## STATEMENT OF THE CASE
## STATEMENT OF THE RELEVANT FACTS

The Tweed-New Haven Airport Authority ("Tweed" or "Authority") is a public instrumentality and political subdivision of the State of Connecticut, pursuant to Connecticut General Statutes § 15-120i, *et seq.* Joint Appendix ("JA__") JA51. The airport property ("Airport") is owned by the City of New Haven and leased to Tweed. JA52. Under Federal Aviation Administration ("FAA") Regulation Part 139 (14 C.F.R. Part 139), the Airport is required to have runway safety areas on its main runway acceptable to the FAA. JA54.

In 2002, the FAA approved federal funding of Tweed's proposed improvements to its runway safety areas ("RSAs") on Runway 2/20. See JA406, P. Exh. 3. In 2008, Tweed received approximately $24 million from the FAA for its RSA project. JA66.

In 2009, Plaintiff Tweed and Intervenor Plaintiff City of New Haven ("City") voluntarily entered into a Memorandum of Agreement

2

("MOA") stating that both parties "agree Runway 2-20 shall be limited to the existing paved runway length of 5,600 linear feet." JA488. Later that same year, the Connecticut Legislature amended Conn. Gen. Stat. § 15-120j to include subsection (c), which states that "Notwithstanding the provisions of subsections (a) and (b) of this section, Runway 2/20 of the airport shall not exceed the existing paved runway length of five thousand six hundred linear feet." JA53, at ¶ 9.[1]

After the MOA was executed, the FAA informed Tweed that it might be in violation of Federal Grant Assurances 5 and 25, concerning proprietary power and revenue expenditure, respectively, as well as federal law that provides conditions for allowing imposition of Passenger Facility Charges. JA484-85. There is no evidence in the record that Tweed has addressed these FAA concerns.

Merely six years after signing the Memorandum of Agreement and agreeing to a 5,600 linear foot runway at the Airport, Tweed and the City have filed this declaratory judgment action against Defendant Connecticut Attorney General, challenging the constitutionality of Conn. Gen. Stat. § 15-120j(c). JA11, Tweed Complaint.

---

[1] Defendant will also refer to Conn. Gen. Stat. § 15-120j(c) as "the runway statute."

Federal review and comment is necessary for any construction project located within Tweed's Airport Layout Plan ("ALP"). JA57. The initial customary procedure is for an airport authority to submit a Preliminary Environmental Assessment ("PEA Report") to the FAA for review and comment before drafting a full report. JA58. In addition, as a Part 139 certified airport and as a recipient of federal aid under the FAA Airport Improvement Program ("AIP"), Tweed is obligated to comply with AIP grant assurances, which require conformance with the standards in FAA Advisory Circulars. JA54. Currently, the FAA is not proceeding with review of Tweed's PEA in part because Tweed is in violation of several federal grant assurances and regulations. JA58.

The Airport is not in compliance with FAA design standards due to the non-standard taxiway geometry. JA60. An FAA Advisory Circular specifies that the runway centerline to the parallel taxiway centerline at the Airport is 400 feet. *Id.* The current locations and dimensions of the taxiways, which are integral to the aircraft landing and takeoff system, are not in compliance with federal regulations in terms of their distance from Runway 2/20. *Id.* The FAA has given the Authority until May 6, 2021 to redesign and reconstruct its taxiways to

bring the Airport into compliance with federal design standards. JA59-JA60. Tweed has proposed a nonstandard 275-foot parallel taxiway in its Preliminary Environmental Assessment. See JA440,

The Airport is located in an environmentally sensitive area, adjacent to coastal wetlands, in a 100-year Flood Plain and partially within residential neighborhoods. JA53. The FAA has indicated to Tweed and the City that if they wish to continue with the proposed runway extension project, they must develop a joint action plan with the Connecticut Department of Energy and Environmental Services ("DEEP") addressing concerns identified in two permits previously issued for the construction of runway safety areas. JA65. The first permit, the tidal permit, specifically states: "At no time shall the permittee modify the surfaces of the RSAs including paving." *Id.* The second permit, for disturbing wetlands and water quality, requires a modification to the permit from the DEEP if the safety areas are altered. *Id.* Plaintiffs did not present any evidence at trial that it has satisfied this request from the FAA.

The FAA also informed Plaintiffs that, to move forward with the runway extension project, they must obtain a letter from the Town of

East Haven indicating a willingness to remove the runway length restriction from the MOA. JA451, P. Exh. 8, at ¶ 2. Plaintiffs failed to produce any such letter at trial.

Tweed's expert witness, John DeCoster, states in his report that although the Dash 8 is currently the only aircraft servicing the Airport, if the Dash 8 were retired, there would be two logical replacement jets that could operate at the Airport at its current runway length. JA478. Mr. DeCoster does not know when American Airlines will retire either of the latter two regional jets, Defendant's Supplemental Appendix, ("SA__") SA10, p. 118, lines 17-20; JA247 p. 119, lines 12-18. In Mr. DeCoster's opinion, regularly scheduled commercial service at Tweed is currently not jeopardized. JA247, p. 119, lines 18-23; JA248, p. 120, lines 2-5.

Tweed has not received a commitment from any airline to provide service at the Airport even if the statutory length restriction on Runway 2/20 is removed. JA63.

There is no current or pending FAA enforcement action against Tweed for noncompliance with any FAA safety standard applicable to Part 139 airports. JA61.

# THE RELEVANT PROCEDURAL HISTORY AND RULINGS PRESENTED FOR REVIEW

In November 2015, Plaintiff Tweed filed this declaratory judgment action against Defendant seeking to have Conn. Gen. Stat. § 15-120j(c) declared unconstitutional as a violation of the Supremacy Clause of the United States Constitution on the grounds that it is preempted by the Federal Aviation Act ("FAAct"), 49 U.S.C. § 40101, *et seq.*, the Airline Deregulation Act ("ADA") 49 U.S.C. § 41713 and the Airport and Airway Improvement Act ("AAIA") 49 U.S.C. § 47101, *et seq.* In April 2016, the district court granted the City of New Haven's motion to intervene.

Subsequently, Defendant filed a motion to dismiss the declaratory injunction on three grounds: (1) that the action was barred by the Eleventh Amendment to the United States Constitution, (2) that Tweed, as a political subdivision of the State, lacked standing to sue its creator state, and (3) that Conn. Gen. Stat. § 15-120j(c) was not preempted by the FAAct, the ADA or the AAIA. In December 2016, Magistrate Judge Robert A. Richardson of the Connecticut District Court denied Defendant's motion, ruling that: (1) Tweed had met federal jurisdiction requirements by demonstrating a direct injury that

is actual and imminent, JA36; (2) Tweed had met Eleventh Amendment jurisdictional requirements under *Ex Parte Young*, 209 U.S. 123 (1908) by alleging an ongoing or threatened violation of federal law that required prospective relief, JA42; (3) Tweed's status as a political subdivision of the state did not deprive it of standing to sue the State, JA45; and (4) Conn. Gen. Stat. § 15-120j(c) was preempted by the FAAct. JA48.

On March 22, 2017, Judge Richardson held a hearing in which Tweed and Defendant submitted a Joint Stipulation of Facts, JA51-67, and Tweed presented two witnesses for testimony, including an engineering consultant as a fact witness (Robert M. Furey) and a senior consultant for Trillion Aviation as an expert witness (John DeCoster). No witnesses testified for Defendant or the City of New Haven. Tweed and Defendant also agreed to enter sixteen exhibits into evidence. JA Volume II. In July 2017, Judge Richardson heard oral argument on the post-trial briefs filed by all parties.

On September 30, 2017, Magistrate Richardson issued a decision dismissing Plaintiffs' action on the following grounds: (1) Tweed does not have standing because it failed to show a causal connection or

relationship between Conn. Gen. Stat. § 15-120j(c) and Tweed's alleged injuries, and because Tweed failed to show an imminent threat of losing all commercial service due to the existence of the statute; and (2) the FAAct, the ADA, and the AAIA do not preempt the runway statute. See JA171-218, *Tweed-New Haven Airport Authority v. Jepsen*, Civil Action No. 3:15-cv-01731-RAR, 2017 WL 4400751 (D.Conn. Oct. 3, 2017) ("Memorandum of Decision" or "MOD").

Both Tweed and the City of New Haven timely appealed the district court's decision.[2]

## SUMMARY OF THE ARGUMENT

### Standing

The district court properly determined that Plaintiffs failed to produce facts at trial necessary to establish standing under Article III of the United States Constitution. Plaintiffs' claims that the existence of the runway statute has placed Tweed in a precarious financial position, has limited Tweed's ability to keep and attract commercial service, and has raised safety concerns at the Airport, were not shown to have satisfied clearly established standing requirements. Plaintiffs did not

---

[2] Defendant agrees to Tweed's chronology that ultimately led to the Second Circuit reinstating the City's appeal. Tweed Brief, at p. 1.

prove that Tweed's alleged injuries were "certainly impending" rather than speculative, or that there was a "causal connection between the injury and the challenged conduct." See *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990); see JA17, MOD. Having failed to meet these standards, Plaintiffs now contend that a lower standard applies to their standing claim -- one based on a legitimate fear of a threat of enforcement of the statute -- contrary to Supreme Court precedent. Under either standard, however, Plaintiffs fail to satisfy Article III standing requirements.

First, Plaintiffs do not have standing to sue based on the mere existence of the runway statute and the possibility of its enforcement by Defendant. The record does not reflect any "imminent threat" of prosecution and similarly does not show that the threatened injury claimed is "certainly impending" or "realistic and immediate," which is necessary for standing. See *id.*; see also *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 596-97 (2d Cir. 1988).

Second, the district court properly held that the runway statute is not the sole factor preventing Tweed's proposed runway project from progressing, as Tweed contends, but rather one of multiple factors.

Tweed's failure to comply with FAA mandates, obtain state environmental permits, rectify violations of federal grant assurances and convince the FAA that its project is a national priority eligible for FAA funding, all support the court's conclusion that no causal connection lies between the alleged injury -- Plaintiffs' inability to extend the runway -- and the statute. Similarly, the court's rejection of the claim that inadequate revenue and chronically low service at the Airport have been caused by Conn. Gen. Stat. § 15-120j(c) is supported by an absence of evidence showing that a downturn in either category occurred after passage of the statute.

Lastly, the district court's rejection of Plaintiffs' claim that the runway statute poses an "imminent threat" to current and future commercial airline service at the Airport is supported by Tweed's own expert who testified that such service is not jeopardized at the moment, and by the Joint Stipulation stating that no airline has committed to providing service to the Airport even if the runway is lengthened.

Alternatively, the district court erred in failing to grant Defendant's motion to dismiss on the ground that Tweed lacks standing because "a political subdivision . . . has no privileges or immunities . . .

which it may invoke in opposition to the will of its creator." See *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362-64 (2009).

## **Preemption**

The district court's conclusion that Conn. Gen. Stat. § 15-120j(c) is not preempted by the FAAct, the ADA or the AAIA is consistent with federal caselaw. The district court correctly determined that there is no evidence in the record showing that it is impossible for Tweed to comply with both the FAAct and the runway statute, or that the latter statute interferes with Tweed's ability to comply with federal aviation standards. JA209, JA211. Additionally, the court properly concluded that the ADA does not preempt the runway statute because the ADA "applies specifically to air carriers, not airports." JA213. Finally, the district court correctly held that the AAIA does not preempt the runway statute because Tweed can comply with both statutes and the AAIA does not occupy the field of aviation safety and airport improvement projects. JA216.

# ARGUMENT

## I. Tweed Does Not Have Standing To Challenge The Constitutionality Of Conn. Gen. Stat. § 15-120j(c).

## A. Legal Standard For Article III Standing.

It is well established that "Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The Article III standing requirement "is built on separation-of-powers principles," and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.*

The Supreme Court has made clear that

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury-in-fact -- an invasion of legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

The party invoking federal jurisdiction bears the burden of establishing these elements.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)(quotations and citations omitted).

With regard to the first element, the Supreme Court has made clear that imminence may be "a somewhat elastic concept," but that "it cannot be stretched beyond its purpose . . . to ensure that the alleged injury is not too speculative for Article III purposes -- that the injury is *certainly* impending." *Id.* at 565 n.2. As a result, "[a]llegations of possible future injury do not satisfy the requirements of Art. III," rather, "'[a] threatened injury must be certainly impending to constitute injury in fact," *Whitmore*, 495 U.S. at 158 (citations and internal quotations omitted).

The Supreme Court recently expounded on these principles in *Clapper,* which involved a First Amendment challenge. In *Clapper*, the plaintiffs claimed that a federal statute (the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1881a)("FISA"), infringed on their First Amendment rights by allowing the government to intercept future sensitive communications between the plaintiffs and other individuals

whom the plaintiffs believed were targets of federal surveillance. *Id.* at 401. The plaintiffs advanced a number of theories to establish standing, including that: (1) there was an "objectively reasonable likelihood" that their communications would be intercepted in the future; and (2) they were suffering a present injury insofar as their fear of that future injury had already "chilled" their conduct. *Id.* at 401-02. The Supreme Court denied both claims.

With regard to the first theory, the Supreme Court emphatically rejected the notion that standing could be established based on a mere "objectively reasonable likelihood" of future harm. The Court concluded that such a low standard "is inconsistent with our requirement that 'threatened injury must be certainly impending to constitute injury in fact.'" *Id.* at 410 (citing *Whitmore*, 495 U.S. at 185). Although the Supreme Court did not go so far as to hold that the risk of future harm must be a literal certainty, it made clear the risk must be "clearly impending" and must be more than a mere reasonable probability. *Id.* at 414 n.5.[3]

_____

[3] In enunciating this standard, the Supreme Court acknowledged prior cases in which it "found standing based on a 'substantial risk' that the harm will occur . . . ." *Id.* at 414 n.5, citing *Monsanto Co. v. Geertson*

Applying the "certainly impending" standard, the *Clapper* Court addressed the plaintiffs' fear that: (1) the government would actually target the plaintiffs' communications; (2) the government would invoke its authority under FISA rather than use another method of surveillance; (3) the Federal Intelligence Surveillance Court would rule that interception of those communications was authorized by the statute; (4) the government would then succeed in actually intercepting the plaintiffs' own contacts; and (5) the plaintiffs would be parties to communications intercepted by the government. *Id.* at 410. The Court held that such a claim of standing "relies on a highly attenuated <u>chain of possibilities</u>," and therefore "does not satisfy the requirement that threatened injury must be certainly impending." *Id.* (emphasis added).

In addressing the possibility of the government targeting the plaintiffs' communications for surveillance, the Court stated that "because [the FISA statute] at most *authorizes* – but does not *mandate or direct* – the surveillance that respondents fear, respondents' allegations are necessarily conjectural." *Id.* at 411-12 (emphasis

---

*Seed Farms,* 130 S.Ct. 2743, 2754–2755 (2010). Because the Supreme Court determined that the plaintiffs lacked standing under either standard, it did not decide whether even a "substantial risk" of future harm is enough to satisfy the "clearly impending" standard. *Id.*

original).  As a result, the Court concluded that "respondents can only speculate as to how the Attorney General and the Director of National Intelligence will exercise their discretion in determining which communications to target." *Id.* at 412.

Significantly, the Supreme Court similarly rejected the plaintiffs' alternative theory of standing based on alleged ongoing injuries that they claimed to suffer from their fears of future enforcement "because the harm . . . is not certainly impending." *Id.* at 416.  The Court concluded that such a standard "improperly waters down the fundamental requirements of Article III" and would permit plaintiffs to "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.*

Plaintiffs rely on two of this Court's standing cases, *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376 (2d Cir. 2000) ("VRTL") and *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341 (2d Cir. 2008), and specifically the statement in the latter case that "[i]f a plaintiff's interpretation of a statute is reasonable enough and under that interpretation the plaintiff may legitimately fear that it will face

enforcement of the statute, then the plaintiff has standing to challenge the statute." *Id.* at 350. Both cases were decided prior to *Clapper* and are in conflict with its holdings.[4]

Other Supreme Court and Second Circuit cases further emphasize the necessity that the plaintiff allege or show "actual or imminent harm" that is "certainly impending" to establish standing. In *Lujan*, the defendant environmental group filed a declaratory judgment and injunction action against the federal government seeking worldwide application of a provision of the Endangered Species Act. *Id.*, 504 U.S. at 559. The defendant purported to show standing through the affidavits of two members stating their "hope" and "intention" to visit endangered species abroad "in the future." *Id.* at 563-64. The Court held that "[s]uch 'some day' intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* According to the Court, "[w]here there is no actual harm . . . its imminence (though not its precise extent) must be

_____

[4] *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (finding standing where plaintiffs had an "actual and well-founded fear that the law will be enforced against them"), also falls into this category of cases. See City of New Haven Brief, at pp. 12-13.

established" and that "imminence" requires "that the injury is 'certainly impending." *Id.* n. 2 (quoting *Whitmore*, 495 U.S. at 158).

In *Whitmore*, the petitioner death row inmate sought to intervene in the proceeding of another death row inmate, Simmons, who had waived all future appeals of his death sentence. *Id.*, 495 U.S. at 152-54. The petitioner claimed injury in fact on grounds that were contingent on the possible occurrence of a series of events. Specifically, the petitioner claimed that *if* he were granted federal habeas corpus relief in the future, and *if* he were convicted and sentenced again to death, and *if* he sought review of his sentence by the Supreme Court of Arkansas, which is required to compare death penalty cases to a data base of other capital cases to avoid arbitrary imposition of the death penalty, his comparative review would be "arbitrarily skewed" because Simmons' death sentence would be omitted from the data base due to Simmons' waiver of appeals. *Id.* at 156-57 (emphasis added). The Court determined that the petitioner's alleged injury was "too speculative" to invoke Article III jurisdiction, finding such claims "problematic" and based on "conjecture." *Id.* at 157-58; see also *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)(Court rejected standing claim based on

contingencies, stating that "threat of injury must be both real and immediate, not 'conjectural' or 'hypothetical.'")(citations omitted).

This Court has similarly observed that a plaintiff "must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (citation omitted). In *Shain*, the plaintiff, who had previously been strip searched at the county correctional institution following a misdemeanor arrest, challenged the policy after the initial case against him was withdrawn. *Id.* at 213. This Court rejected his claim of standing, concluding that to establish harm the plaintiff "would have to show that *if* he is arrested in Nassau County and *if* the arrest is for a misdemeanor and *if* he is not released on bail and *if* he is remanded to NCCC and *if* there is no particularized reasonable suspicion that he is concealing contraband, he will again be strip searched." *Id.* at 216 (emphasis in original). The Court found that "[s]uch an accumulation of inferences is simply too speculative and conjectural to supply a predicate for prospective injunctive relief." *Id.* (citing *O'Shea*, 414 U.S. at 495-96).

**B.** **Tweed Does Not Have Standing Due To Its Fear Of Enforcement Of Conn. Gen. Stat. § 15-120j(c) Or Due To Its Mere Existence.**

Tweed's claim that "the mere enactment, and potential enforcement, of § 15-120j(c) alone permits Tweed to challenge the statute" is misplaced for several reasons. See Tweed Brief, at p. 18.

First, contrary to this Court's holding in *VRTL*, whether there is a "credible threat of enforcement" of Conn. Gen. Stat. § 15-120j(c) underlying Tweed's alleged "legitimate fear" of enforcement is not the proper standard to apply to Plaintiffs' claim of standing. The Supreme Court rejected such a standing theory in *Clapper* as "improperly water[ing] down the fundamental requirements of Article III" and held that alleged harm must be "certainly impending." *Id.*, 568 U.S. at 416.

Second, even if the VRTL standard applied in this case, it is only generally appropriate to presume enforcement of a *"traditionally punitive statute,"* which Conn. Gen. Stat. § 15-120j(c) is not. See *Hedges v. Obama*, 724 F.3d 170, 201-02 (2d Cir. 2013)(denying standing where statute granted Presidential authority to use military force abroad and where enforcement action against plaintiffs was remotely likely) (emphasis added). Since *Hedges*, this Court has further stated that "in

the context of pre-enforcement challenges to *criminal* statutes," a plaintiff can establish imminent harm if a "credible threat of prosecution" exists that would affect engagement in conduct that carried a constitutional interest. See *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384-85 (2d Cir. 2015)(finding credible fear of prosecution where enforcement action pursued against plaintiff company)(citations omitted)(emphasis added).

Here, Conn. Gen. Stat. § 15-120j(c) is not a criminal statute, a "traditionally punitive statute," or even a civil statute containing a civil penalty. See *Knife Rights*, 802 F.3d at 384; see *Hedges*, 724 F.3d at 201. In contrast, the campaign ad disclosure statute in *VRTL* imposed a civil penalty of up to $10,000 for a violation, while the interest statute in *Pacific Capital* subjected an offender to a $500 fine. See *VRTL*, 221 F.3d at 380; *Pacific Capital*, 542 F.3d at 346. Thus, the *VRTL* "legitimate fear" or "credible threat of enforcement" standard is inapplicable to an analysis of Plaintiffs' claim of standing.

Third, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) does not stand for the proposition that enforcement is presumed by the mere existence of a statute. In *MedImmune*, the defendant issued a

letter to the petitioner stating an expectation of payment of royalties, based upon a patent agreement, which the petitioner "considered . . . to be a clear threat" of enforcement. *Id.* at 121-22. The Supreme Court stated that "where *threatened* action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the *threat* – for example, the constitutionality of a law *threatened* to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the *imminent threat* of prosecution but nonetheless does not eliminate Article III jurisdiction." *Id.* at 128-29 (emphasis added); Tweed Brief, at p. 16.[5] In reaching its conclusion, the Court cited two cases where it found standing, both of which involved overt threatened state action. See *id.*, at 129; see *Terrance v. Thompson*, 26 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 (1923) (state threatened farm forfeiture) and *Steffel v. Thompson*, 415 U.S. 452 (1974)(state police warned plaintiff twice to stop handbilling).[6]

---

[5] The Court ultimately found Article III jurisdiction for the petitioner's claim. *Id.* at 131.

[6] See also *Virginia v. Am. Booksellers Ass'n*, where the Court found standing based on plaintiffs' "actual and well-founded fear" of a criminal prosecution against them. *Id.*, 484 U.S. at 392.

In this case, there is no equivalent "imminent threat" of prosecution by Defendant, thereby making Tweed's claim speculative. See *Clapper*, 568 U.S. at 411-12 ("[R]espondents can only speculate as to how the Attorney General . . . will exercise [his] discretion" in enforcing statute); see also *Wang v. Pataki*, 396 F.Supp. 446, 454 (S.D.N.Y. 2005)(dismissing standing claim on Eleventh Amendment grounds because the plaintiff's claims of future criminal prosecution by the Attorney General were "a wholly speculative threat of future prosecution."). Absent a credible threat of prosecution, Tweed must show its alleged injuries are certainly impending. See *Knife Rights*, 802 F.3d at 389 (citing *Clapper*, 568 U.S. at 409-10).

Lastly, contrary to Tweed's assertion in its Brief, *Alliance of Am. Insurers* does not stand for the proposition that the mere existence of a statute "confers standing." See Tweed Brief, at p. 18. In *Alliance*, the statute at issue stabilized state insurance rates and prohibited liquidation of insolvent medical malpractice insurers who themselves were insured by a state fund that received contributions from state liability insurers. *Id.*, 854 F.2d at 593. The plaintiffs claimed that the law would increase insolvencies, resulting in a depletion of the fund,

which would in turn cause them to increase their obligations to pay into it. *Id.* at 596. The district court granted the defendant's motion to dismiss for lack of standing because the plaintiffs' claims of harm were "far too speculative." *Id.*

This Court reversed, ruling that the district court "did not base its holding on whether there was sufficient immediacy and realty to plaintiffs' claims of harm," which it should have done by "examining the financial data presently available and determining whether plaintiffs have alleged a realistic claim that they are likely to be injured by the operation" of the statute. *Id.* at 596-97. This Court concluded that implementation of the statute "presents a realistic threat to plaintiffs by inexorably forcing insurance company contribution in the future and passing on such costs to individual policy holders." *Id.* at 598. As a result, the statute alone did not establish standing in *Alliance*. Instead, this Court based standing on the fact that the threatened injury was "sufficiently realistic and immediate." See *id.*

The Supreme Court has recently reaffirmed the principle that '[t]he facts necessary to establish standing . . . must not only be alleged at the pleading stage, but also proved at trial." *Gill v. Whitford*, 138

S.Ct. 1916, 1931, -- U.S. -- (2018)(citing *Lujan*, 504 U.S. at 561). As shown below, Tweed failed to prove at trial that its alleged injuries are "certainly impending," or even that a "substantial risk of harm will occur," or that there is a "direct causal relationship between the statute and [its] alleged injury." Accordingly, Plaintiffs' claim of standing does not satisfy Article III requirements.

**C.    The District Court Correctly Held That Conn. Gen. Stat. § 15-120j(c) Is One Of Several Factors Preventing The Runway Project From Moving Forward.**

Tweed repeatedly maintains in its brief that repeal of the runway statute is essential for moving forward with its runway improvement project at the Airport. Evidence in the record shows, however, that there are several other indispensable reasons why Plaintiffs have been unable to move forward with their plans, including: (1) their failure to comply with FAA requirements issued in 2015, (2) their failure to satisfy several federal grant assurances, and (3) their failure to show that FAA expenditure on the proposed runway improvement project is justified.

Accordingly, the district correctly concluded that "there does not appear to be a direct causal relationship between the statute and the

plaintiff's alleged injury . . . in light of the fact that the Airport would have to remedy its violation of several federal grant assurances and obtain DEEP approval before proceeding with any runway expansion project." JA191, MOD. Similarly, facts stipulated to by Tweed and Defendant support the district court's conclusion that "even if the Authority were to overcome these obstacles, it is uncertain that the FAA would provide the necessary funding for plaintiff to complete the proposed runway project." *Id.*

"Under the clear error standard, factual findings by the district court will not be upset unless we are left with the definite and firm conviction that a mistake has been committed." *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 617 (2d Cir. 2006). No such mistake has been committed here.

### 1. Plaintiffs Have Failed To Comply With FAA Mandates Issued In 2015.

Although the parties have stipulated that *one* of the reasons that the FAA has decided not to review the plaintiff's Preliminary Environmental Assessment is the existence of the runway limitation in Conn. Gen. Stat. § 15-120j(c), the FAA has identified several other critical reasons why it has not reviewed the PEA Report or authorized

funding for potential expansion of the Airport in accordance with its Airport Layout Plan ("ALP"). See JA58, at ¶ 35 (FAA decision not to respond to the Authority's preliminary report "is a direct consequence of, *inter alia*, the existence of the runway length limitation" in Conn. Gen. Stat. § 15-120j(c))(emphasis added).

For instance, in December 2014, members of Connecticut's congressional delegation sent a letter to the FAA Administrator Michael Huerta requesting a "modest investment in facility improvements" in the amount of $8-$10 million to pave the runway safety areas at Tweed. JA449, P. Exh. 7. Mr. Huerta's response in April 2015 (the "Huerta Letter") identified "several documents that restrict Runway 2/20 to 5,600 feet" that needed to be addressed by the Authority,[7] which included Conn. Gen. Stat. § 15-120j(c), but also included a Memorandum of Agreement between the Authority, the City of New Haven and the Town of East Haven, as well as permits issued by the Connecticut Department of Energy and Environmental Protection. JA451.

---

[7] The parties agree that the reference to the "city of New Haven" throughout Plaintiff's Exhibit 8 refers to both the City of New Haven and the Authority, both of which are referenced by the Congressional delegation in Plaintiff's Exhibit 7.

The Memorandum of Agreement contains a provision limiting Runway 2/20 to the existing paved runway length of 5,600 linear feet. JA64, at ¶ 61; JA488, D. Exh. C, at ¶ II.1. The Huerta Letter states that Plaintiffs "need[ ] to provide us a letter from the town of East Haven showing its willingness to remove the restriction." JA451, P. Exh. 8, at ¶ 2. At trial, Plaintiffs failed to produce any such letter or any evidence of any attempt to obtain such a letter from the town of East Haven.

Regarding the DEEP permits, Tweed currently proposes to pave a portion of Runway 2/20 runway safety areas, which would be considered a runway extension. JA56, at ¶ 24.[8] Tweed and Defendant have stipulated that two permits from the DEEP were previously issued to Tweed for the construction of runway safety areas. JA65, at ¶ 66. The first permit -- the tidal permit -- specifically states: "At no time shall the permittee modify the surfaces of the RSAs including paving." *Id.*

---

[8] The Connecticut Coastal Management Act discourages "the substantial expansion of existing airports within the coastal boundary.." See Conn. Gen. Stat. § 22a-92(c)(1)(H). The planned extension of Runway 2/20 is within the existing boundaries of the Airport and the Airport Layout Plan on land that is currently part of the runway safety areas. JA56, at ¶ 23.

The second permit, for disturbing wetlands and water quality, requires a permit modification from the DEEP if the safety areas are altered. *Id.*

The Huerta Letter states that if Plaintiffs wish to continue with the proposed runway extension project, they must develop a "joint action plan" with the DEEP addressing the agency's concerns identified in the two previously issued permits. JA451, at ¶ 3; JA65, at ¶ 67. At trial, Plaintiffs did not offer any evidence that they have developed or attempted to develop a "joint action plan" with the DEEP addressing the agency's prohibition on paving the runway safety areas or the agency's modification requirement for disturbing wetlands and water quality should any alteration of the RSAs occur. Such inaction is in direct conflict with the Huerta Letter and provides a further basis for the agency's inaction on the PEA Report or lack of funding for the currently proposed improvements to the Airport.

## 2. Tweed Has Admitted That It Is In Violation Of Several Federal Grant Assurances.

The district court's conclusion that "there does not appear to be a direct causal relationship between the statute and the plaintiff's alleged injury . . . in light of the fact that the Airport would have to remedy its violation of several federal grant assurances" is substantiated in the

Joint Stipulation. JA191. Specifically, "[t]he FAA is not proceeding with review of the Environmental Assessment in part because the Authority is in violation of several federal grant assurances and regulations. JA58, at ¶ 34. This fact coupled with Plaintiffs' failure to comply with FAA mandates issued in the Huerta Letter support the district court's conclusion that "the existence of Conn. Gen. Stat. § 15-120j(c) represents one of several factors preventing the FAA from reviewing the Preliminary Environmental Assessment." JA190.[9]

### 3. Tweed Has Failed To Show That FAA Funding For Its Proposed Airport Improvement Project Is Justified.

Plaintiffs' claim that the runway statute alone prevents them from obtaining FAA funding for its runway improvement plan is equally meritless. The FAA has the discretion to provide funding to projects at airports nationwide, and does so according to the highest national priorities, of which safety concerns are of utmost importance. In the absence of any safety concerns at the Airport, Plaintiffs have not shown that its improvement plan is eligible and justified for FAA funding.

---

[9] Plaintiffs' failure to comply with federal grant assurances is more fully addressed in Section I.F., infra.

The Airport Improvement Program provides about $3.5 billion annually to airports nationwide versus an estimated need of over $40 billion over the next five years. *Id.*, at ¶ 71. As a result, dollars must be allocated to the highest national priorities that are eligible and justified. *Id.*, at ¶ 71, ¶ 73. Runway extensions must be shown to be cost-effective and justifiable, per Executive Order 12893, *Principles for Federal Infrastructure Investments. Id.* The normal FAA approval process for a runway extension requires (a) careful planning, including review of feasible alternatives; (b) proper environmental analysis, consistent with federal regulations; and (c) sufficient funding, including federal, state and/or local sources. JA66, at ¶ 70.

There is no evidence to suggest that once the FAA has *approved* an Airport Layout Plan or a Master Plan for an airport, as it has for Tweed, see JA54-55, at ¶¶ 13, 16, the agency is *required* to provide funding to all such airports to realize their proposed improvement plans. As a consequence, the FAA has the discretion to consider allocating funds to Tweed based on a need comparison with other airports nationwide.

According to Tweed's own expert witness John DeCoster, the FAA distributes funds in a discretionary manner according to a ranking system "with safety being the first criteria." SA13, p. 134, lines 15-25, SA14, p. 135, line 1.[10] In 2002, at the time the FAA approved the Authority's ALP and Master Plan, the foremost safety issue raised in the ALP concerned safety improvements to the runway safety areas on Runway 2/20. See JA406, P. Exh. 3. In 2008, Tweed received approximately $24 million from the FAA for its RSA project and has received over $40 million from the FAA in the past twenty years. JA66, at ¶ 72. Present circumstances are not comparable because there is no current or pending enforcement action concerning the safety of the runways at the Airport. See JA61, at ¶ 44. Absent any safety concern, the proposed improvements at the Airport are not a national priority and thus there is no justification for the FAA to now allocate further funding to Tweed so soon after its recent outlay.

In addition, there is no evidence that any airline has identified the Airport as an economically viable service destination *even if* the runway were lengthened at the Airport. See Section 1.E., infra. Paradoxically,

---

[10] "The highest ranking for airports is related to safety . . . [the ranking is] created by the FAA with safety being the first criteria." See *id*.

then, Tweed wants FAA funding before any demand for increased service exists.

In view of such facts, the district court did not err in concluding that "it is uncertain that the FAA would provide the necessary funding for plaintiff to complete the proposed runway project." JA191. Accordingly, Plaintiffs' claim that Conn. Gen. Stat. § 15-120j(c) has prevented Tweed from obtaining funding from the FAA for its proposed airport improvement project is unfounded because such funding is not justified. Thus, Plaintiffs' claim of standing on this ground is meritless.

## D. The District Court Correctly Denied Tweed's Claim Of An Imminent Threat Of Losing All Commercial Service Due To Conn. Gen. Stat. § 15-120j(c).

The district court properly rejected Tweed's claim that it would lose all commercial service upon the retirement of the only commercial aircraft operating at the Airport. The district court's findings that Tweed "failed to offer a definitive end date . . . for the useful life of the Dash 8 . . . [or] of the likely replacement jets," and that Plaintiffs' contention that ""there is real and distinct possibility that the Dash 8, Bombardier CJ200 and Embraer 145 will be retired at or around the same time' falls short without actual evidence," JA205-06, are all based

34

on trial evidence provided by Tweed's own expert witness. As a result, the district court properly determined that Tweed "failed to prove . . . an imminent threat of losing all commercial service," *id.*, and therefore lacks standing.

At trial, Tweed failed to prove that the Dash 8 will be phased out "in the near future," that a replacement plane "will need a longer runway," or that regularly scheduled commercial service at the airport is "jeopardized" and "may be terminated in the future." JA16, Tweed Complaint, at ¶¶ 26-27.[11] Instead, evidence at trial showed that such allegations of a "possible future injury" are "conjectural" and "hypothetical" rather than "actual or imminent" or "certainly impending," and therefore failed to establish standing as a matter of law. See *Whitmore*, 495 U.S. at 158; *O'Shea*, 414 U.S. at 495-96; *Clapper*, 568 U.S. at 409-10.

At trial, Tweed's expert, John DeCoster, did not provide any documentary evidence from any airline (including American Airlines) or provide any independent analysis indicating the retirement date of the

---

[11] After trial, the Dash 8 was phased out and replaced with the Canadair CJ200 50-seat jet that is currently providing commercial service at the Airport.

Dash 8. SA3-SA4; JA205, MOD, n.7. Instead, he testified on cross-examination that he did not know when the Dash 8 would be retired, only that "someday in the future the Dash 8 will be phased out." JA247, p. 119, lines 9-11; SA4, p. 69, lines 4-8. Until such time, according to Mr. DeCoster's report, "the current runway length is sufficient to accommodate [the Dash 8] in most weather conditions without a payload hit (i.e. the requirement to keep seats empty in order to provide for additional lift due to a shorter than required runway length."). JA478. Even with an occasional payload hit, Mr. DeCoster agreed that American has still found it profitable to use the Dash 8 to service the Airport. SA7, p. 107, lines 10-15. Consequently, evidence shows that American could continue to service the Airport with the Dash 8 "at an acceptable profitability level" for the indefinite future. See JA478; see SA5.

In addition, Mr. DeCoster stated in his report that the "logical aircraft that will replace the Dash 8 is the 50 seat regional jet, either the Bombardier CJ200 or the Embraer 145," and testified that "[b]ased on the manufacturer's specifications, the runway length would meet the minimal requirement as stated" for both jets. See id.; see SA9, p. 113,

lines 23-25 and SA10, p. 114, lines 1-3. Mr. DeCoster further testified that American has as many as 125 Bombardier CJ200s and Embraer 145s combined as of 2017, any one of which American could dedicate to service the Airport. SA7-SA8, see also JA478. Moreover, Mr. DeCoster testified that he did not know when American will retire either of the two regional jets, SA11, p. 118, lines 17-20; JA247 p. 119, lines 12-18, and did not provide any documentary evidence from any airline (including American Airlines) or provide any independent analysis indicating when the jets might be retired. SA4, p. 69; JA205, MOD, n.9. Based on this lack of information, Mr. DeCoster agreed at trial that he "cannot conclude that regularly scheduled commercial service at Tweed is jeopardized at this moment." JA247, p. 119, lines 18-23; JA248, p. 120, lines 2-5.

Thus, Tweed has failed to adequately support its claim of injury in fact to constitute standing in this action. Mr. DeCoster's testimony that the Dash 8 will be phased out "someday in the future" and that he has no knowledge when the two replacement jets will be retired "do[es] not support a finding of the 'actual or imminent' injury that our cases require." See *Lujan*, 504 U.S. at 564. Similarly, Tweed's hypothetical

scenario in this case -- that *if* the only type of aircraft currently providing service to the Airport will soon be phased out, and *if* there are no replacement planes that can operate on the existing runway, and *if* new planes will need a longer runway, and *if* that development jeopardizes commercial service at the Airport, the consequence will be that enforcement of Conn. Gen. Stat. § 15-120j(c) *may* terminate all commercial service "someday" in the future -- is purely hypothetical, speculative and conjectural, akin to the "chain of possibilities" in *Clapper, Whitmore* and *Shain,* and far short of the injury in fact necessary to satisfy Article III standing requirements. See Sec. 1.A., supra. As the district court properly concluded, "[a]bstract injury is not enough . . . [i]t must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct." JA206 (citation omitted).

**E. The District Court Correctly Denied Tweed's Claim That It Is Unable To Attract New Commercial Service To The Airport Due To Conn. Gen. Stat. § 15-120j(c).**

The district court properly rejected Tweed's claim that the runway statute prevents it from attracting new commercial aircraft service to the Airport. The district court's findings that "there is no evidence in

38

the record that any airline, including Allegiant [Air], has indicated that it would commit to bringing service to Tweed if the runway is lengthened," and that "plaintiff has failed to show a direct causal relationship between the length of the runway and the Airport's inability to attract new commercial service," are amply supported by evidence presented at trial. As a result, Plaintiffs' claim of standing on this ground must fail.

At trial, Tweed failed to present evidence to support its allegation that "[n]umerous airlines have notified the Authority that they would like to bring regularly scheduled service to the Airport, but they cannot do so until Runway 2/20 is lengthened." JA16, Tweed Complaint, at ¶ 16. To the contrary, Tweed stipulated at trial that "[n]otwithstanding marketing efforts, the Authority has not received a commitment from any airline to provide service at the Airport if the statutory length restriction on Runway 2/20 is removed." JA63, at ¶ 59. In addition, Plaintiffs did not present any testimony from any witnesses from any airlines to support its claim of specific lost business opportunities. Instead, Tweed's only expert witness, Mr. DeCoster, admitted at trial that his report did not rely on or include any references to market

demand studies conducted by third parties or himself concerning any potential commercial service from the Airport to other destinations, or vice-versa. SA12, p. 128, lines 4-20.

The only letter in evidence that Tweed contends represents interest from another airline in providing service to the Airport is from Allegiant Air ("Allegiant") to FAA Administrator Huerta in 2015. See JA465, ("Allegiant Letter"). Mr. DeCoster denied ever having seen the letter and further testified that to his knowledge Allegiant had not indicated any commitment to Tweed to begin regularly scheduled commercial service at the Airport following a runway extension. SA5, p. 73, lines 2-8.

The Allegiant Letter itself contains too many contingencies to show a specific lost business opportunity for Tweed based on the limited length of the runway. First, Allegiant states that it "supports the *possibility* of" proposed Airport improvements. JA465, at ¶ 1 (emphasis added). Next, Allegiant states that it does not have any planes in its fleet that can service the Airport due to the length of the runway. *Id.* at ¶ 3. Thereafter, Allegiant states that *"[i]f* the proposed improvements are implemented, Allegiant *would eagerly reopen* our analysis of [the

Airport's] viability for regularly scheduled commercial service." *Id.* (emphasis added). Lastly, the letter indicates that *"[a]fter* establishing confidence in the operating conditions at [the Airport], Allegiant *would seriously consider* beginning regularly scheduled commercial air service." *Id.* at ¶ 4 (emphasis added).

Taken together, these statements show that *if* the possible infrastructure improvements at the Airport were implemented, and *if* Allegiant's new analysis showed viability for regularly scheduled commercial service, and *if* Allegiant was confident in the operating conditions at the Airport, it *would then seriously consider* commencing commercial service at the Airport. As noted by the district court, "there is nothing in the record which establishes what factors Allegiant would want to analyze or how Tweed would likely fare with respect to each such factor." JA195, n.2. The Allegiant Letter thus presents another "chain of possibilities" that is speculative and not "certainly impending," and is therefore insufficient for Article III standing. See e.g. Discussion of *Clapper, Whitmore and Shain*, Sec. 1.A., supra.

Based on such evidence, the district court properly distinguished *In re Old Carco LLC*, 470 B.R. 688 (S.D.N.Y. 2012) from the present

case. Tweed cites *Old Carco* for the proposition that a plaintiff can establish standing to challenge a statute if the statute prevents it from attracting new business, thereby causing injury. Tweed Brief, at p. 31. In this case, however, there is no evidence that any airline has committed to bringing commercial airline service to Tweed even if the runway were lengthened. JA63. Additionally, there is a complete dearth of evidence showing that any airline has even considered whether regularly scheduled commercial service to the Airport could or would be economically feasible with a lengthened runway. Further, as the district court recognized, Tweed's own expert testified that "he had not conducted any independent market demand studies that analyzed other potential destinations for commercial service from Tweed, or that analyzed Tweed as a potential destination from other airports." JA198, n.3. Accordingly, unlike the plaintiffs in *Old Carco*, Plaintiffs here "cannot show a causal connection between the statute and the alleged injury." See JA199, MOD.

**F.** **The District Court Correctly Denied Tweed's Claim That Conn. Gen. Stat. § 15-120j(c) Has Led Directly To Inadequate Revenue And Chronically Low Service Levels.**

The district court properly denied Tweed's claim that the runway statute has caused it to incur inadequate revenue and chronically low service levels. The district court's finding that Tweed failed to prove that "the downturn in the Airport's financial situation is a direct result of the passage of Conn. Gen. Stat. § 15-120j(c) in order to show a causal relationship between the statute and the alleged injury" was well-supported by the evidence presented at trial. As a result, Plaintiffs do not have standing based on this claim either.

As reflected by the Joint Stipulation, since 2009, the Airport has provided "less than 35,000" flight boardings per year, JA55, at ¶ 18, and incurred an annual operating loss requiring annual subsidies from the State ($1,500,000) and City of New Haven ($325,000). JA63, at ¶ 58. However, Plaintiffs' claim that such operating losses due to "chronically low service levels" have been caused by the runway statute and therefore constitute an injury in fact is misplaced.

First, Tweed has failed to meet its burden of showing a *current* loss of business due to Conn. Gen. Stat. § 15-120j(c). While evidence

presented at trial showed that the runway was 5,600 linear feet prior to the passage of Conn. Gen. Stat. § 15-120j(c) in 2009, see JA488, Exh. C, no evidence was presented suggesting that revenue or service levels at the Airport have become chronically low or lower since then. An affidavit provided to Tweed by Tom Reich, the Director of Air Service Development at AvPorts, states that he has provided marketing services to the Airport only since December 2011 and does not include any information about revenue or service levels at the Airport prior to 2009. See JA73, at ¶ 6. As aptly summarized by the district court, "plaintiff's failure to account for the financial status of the airport prior to the passage of the state statute in 2009 constitutes a significant problem." JA193.

In addition, neither Mr. Reich nor Mr. DeCoster, Tweed's expert witness, provided any evidence to the district court in the form of marketing studies showing whether there ever has been or currently is a market demand for any new type of commercial service to or from the Airport. As a consequence, Plaintiffs have failed to show that Conn. Gen. Stat. § 15-120j(c) has caused chronically low service levels at the

Airport that have allegedly resulted in inadequate revenue or a current loss of business to Tweed.

Second, Plaintiffs' claim of loss of *future* business is equally unsustainable. Since Tweed has failed to provide sufficient evidence that it will incur future loss of business from Allegiant or any other airline since the passage of the statute in 2009, Plaintiffs cannot sustain their burden of showing "a causal connection between the injury and the challenged conduct." See *Lujan*, 504 U.S. at 560-61. There is no evidence in the record showing that any airline has even considered the economic feasibility of providing regularly scheduled commercial service to the Airport if the runway were lengthened, and the only airline that has even approached the topic has merely indicated that it would "eagerly reopen its analysis" of the Airport's viability if proposed improvements were realized. See JA465, Allegiant Letter. Mr. Reich's affidavit is equally as speculative as the Allegiant Letter because he states that he has contacted ten airlines "with regard to the *possibility* of those airlines bringing service to the Airport," which falls far short of showing if any of those unnamed airlines have even considered whether it would be financially feasible to provide commercial service to the

Airport.  See JA61, at ¶¶ 47-48 (emphasis added).  Due to such speculation and conjecture, Mr. Reich's statement that "[i]n [his] experience . . . the length of the runway is a significant factor in the low service levels at the Airport" carried little weight with the district court. See JA55, at ¶ 18.

Lastly, the evidence has not shown that Tweed will incur an "imminent" future loss of business due to the retirement of planes capable of servicing the Airport.  To the contrary, the evidence has shown that American could continue to operate the Dash 8 for the indefinite future, and, upon its retirement, replace it with the Bombardier CJ200 for an indefinite amount of time until it is retired, at which time American could replace that plane with the Embraer 145 to provide service to the Airport for yet another undetermined length of time.  Accordingly, since Plaintiffs' claim of an imminent future loss of business is not "certainly impending" or "realistic" and "immediate," it cannot constitute standing.  See *Clapper*, 568 U.S. at 409-10; see *Alliance of Am. Insurers*, 854 F.2d at 596-97.

## G. The District Court Correctly Denied Tweed's Claim That It Cannot Comply With Federal Grant Assurances Due To Conn. Gen. Stat. § 15-120j(c).

The district court properly rejected Tweed's claim that the runway statute has prevented it from being able to comply with federal grant assurances. The record not only supports the district court's finding that Tweed "failed to provide evidence of a causal relationship" between Conn. Gen. Stat. § 15-120j(c) and such lack of compliance, but it also supports the district court's conclusion that "the Authority's failure to comply with federal grant requirements is for the most part self-imposed." JA201. As a result, Plaintiffs have not sufficiently alleged an injury that constitutes standing on this ground.

Whenever Tweed accepts federal funds, it agrees to various grant assurances that, *inter alia*, require compliance with a long list of federal statutes and regulations directed to airport facilities and operations. JA58, at ¶ 36. Non-compliance by an airport such as Tweed can result in enforcement action by the FAA. *Id.* (citing 49 U.S.C. §§ 47101 *et seq.*). The evidence shows that Tweed, not the State, has been the party responsible for Tweed's failure to comply with federal grant assurances

and related federal statutes since the enactment of Conn. Gen. Stat. § 15-120j(c) in 2009.

### 1. Current Noncompliance: Nonstandard Taxiway Proposal.

In accordance with FAA Advisory Circular 150/5300-13A, the standard distance from a runway centerline to a parallel taxiway for a C-III runway such as Tweed's Runway 2/20 is 400 feet. See JA59, at ¶¶ 37-38. It is undisputed that the Airport is not in compliance with FAA design standards due to non-standard taxiway geometry. JA60-61, at ¶ 43. The FAA has given the Authority until May 6, 2021 to redesign and reconstruct its taxiways to bring the Airport into compliance with federal design standards. *Id.* (citing JA467, Merck Memo, P. Exh. 12).

In its Preliminary Environmental Assessment, Tweed has proposed a nonstandard 275-foot parallel taxiway as part of its operational safety improvements at the Airport that "directly contradicts" the FAA directive. See JA440, PEA Report; see SA2, Furey Test., p. 31, lines 6-10. The PEA Report concludes that a standard taxiway alternative proposal would not be "reasonable" or "feasible" because it "would significantly impact both freshwater and tidal waters, as well as FEMA Floodplains." JA446.

Since Plaintiffs did not offer any evidence to show that the runway statute created a nonstandard taxiway condition at the Airport, and Tweed itself has proposed a nonstandard taxiway as part of its operational safety improvements plan, Plaintiffs cannot prove that the runway statute caused the Airport's current noncompliance with the FAA Advisory Circular 150/5300-13A. Accordingly, due to a lack of causation, there is insufficient evidence for Plaintiffs to establish Article III standing on this particular claim.

## 2. Past Noncompliance: Memorandum Of Agreement

Tweed voluntarily entered into a Memorandum of Agreement with the City of New Haven and the Town of East Haven agreeing to a 5,600 linear foot length limitation on Runway 2/20 at the Airport *before* the Connecticut Legislature enacted Conn. Gen. Stat. § 15-120j(c). See JA488, MOA. That agreement, not the subsequent statute, resulted in the FAA identifying multiple violations of federal grant assurances and statutes based on its terms and conditions.

Shortly after execution of the MOA, the FAA informed Tweed that it "may violate key Federal obligations which the Airport Authority is required to uphold," including several Federal Grant Assurances.

JA483, D. Exh. A.  For example, the FAA identified noncompliance with Federal Grant Assurance 5,[12]  Preserving Rights and Powers, due to the Authority ceding control of the length of the runway to the State, ceding proprietary power over the runway to the City of New Haven and the Town of East Haven, and ceding its limited proprietary power to control the number of departures and enplanements to the City and Town. JA484 (citing JA488, Sections III(1)(a), II(1) and II(8) of the MOA).  In addition, the FAA identified non-compliance with Federal Grant Assurance 25,[13] due to Tweed's distribution of increased passenger fees to the City and Town, rather than for the limited use of airport revenue,

---

[12] Federal Grant Assurance 5 states, in relevant part, that an airport sponsor "will not take or permit any action which would operate to deprive it of any of its rights and powers necessary to perform any or all of the terms, conditions and assurances in its grant agreements." *Id.*
[13] Federal Grant Assurance 25 states, in relevant part:

> All revenues generated by the airport . . . will be expended [for] the capital or operating costs of the airport; the local airport system; or other local facilities which are owned or operated by the owner or operator of the airport and which are directly and substantially related to the actual air transportation of passengers or property; or for noise mitigation purposes on or off the airport.

JA484.

such as "the capital or operating costs of the airport." JA485 (citing Section II(10)[14] of the MOA).

The FAA also identified potential violations of federal statutory law. For example, Passenger Facility Charges ("PFCs") are permitted only if an airport sponsor has complied with the Airport Noise and Capacity Act of 1990 ("ANCA"), which requires "the adoption of airport noise or access restriction that affects State 2 or Stage 3 aircraft." JA484 (citing 49 U.S.C. § 47521, 49 U.S.C. § 47524(e) and 14 C.F.R. § 158.29). According to the FAA, Tweed "appears to be ineligible for PFCs" since it "did not comply with ANCA in adopting the restrictions on future access set forth in section II(8)" of the MOA. JA485. Additionally, the FAA noted that the proposed increased passenger charges in the MOA "raise an issue under the Anti-Head Tax Act," which prohibits a political subdivision of the state from collecting a fee,

---

[14] Section II(10) of the MOA, Increase in Passenger Charges, states:

The City, the Town and the Airport Authority shall pursue an imposition of additional passenger fees to be distributed equally to the City and to the Town in a manner consistent with federal law and regulations concerning such charges.

JA490.

tax or head charge on "an individual traveling in air commerce." JA484-85 (citing 49 U.S.C. § 40116).

Based on such concerns raised by the terms of the MOA, the FAA concluded that the "[t]here are ways to move forward and address the safety and capacity issues and reach community consensus without jeopardizing your contractual obligations and continued Federal funding for the Airport."  JA485.  Tweed did not offer any evidence at trial showing that it has corrected potential violations of ANCA or the Anti-Head Tax Act, which could potentially have an impact on the FAA's determination whether to allocate millions of dollars of funding to Tweed for its proposed airport improvement project.  Accordingly, the district court's conclusion that Tweed's non-compliance with federal grant assurances is "for the most part self-imposed" is substantiated by the undisputed evidence in the record.  See JA201.

## II. The District Court Correctly Held That Conn. Gen. Stat. § 15-120j(c) Is Not Preempted By The FAAct, The ADA Or The AAIA.

The district court further properly held that Conn. Gen. Stat. § 15-120j(c) is not preempted by the FAAct, the ADA or the AAIA.

Preemption claims rely on the United States Constitution's Supremacy Clause, U.S. Const., Art. VI, cl. 2, which "invalidates state laws that interfere with, or are contrary to, federal law." *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir.2008)(internal quotation marks and citation omitted)(hereinafter "ATA").

Federal preemption may be express or implied. *Id.* "In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010).

## A. The District Court Correctly Held That The FAAct Does Not Preempt Conn. Gen. Stat. § 15-120j(c).

### 1. Implied Preemption

#### a. Conflict Preemption

The district court properly determined that "there is no evidence in the record showing that it is impossible for the Authority to comply with both Conn. Gen. Stat. § 15-120j(c) and the FAAct." JA211, MOD. At trial, evidence showed that only the parallel taxiway is considered noncompliant by the FAA, but there is no evidence showing that the runway limitation statute created such noncompliance, see JA467, Merck Letter, see JA440, PEA Report, or that the issue cannot be resolved without lengthening the runway. Instead, the evidence shows that Tweed itself has proposed to continue such noncompliance despite an FAA order to resolve the issue by 2021. See *id*.

Similarly, the district court accurately concluded that "there is no evidence in the record showing that Conn. Gen. Stat. § 15-120j(c) stands as an obstacle to the achievement of federal objectives." JA210, MOD. Tweed and Defendant have stipulated that "[t]here is no current or pending FAA enforcement action against the Authority for noncompliance with any FAA safety standard" applicable to the Airport.

See JA61, at ¶ 44. Further, as noted by the district court, "American's continued service shows that it is possible to operate regularly scheduled service in a safe and commercially reasonable manner" at the Airport. JA211, MOD (citing DeCoster Testimony).

### b. Field Preemption

The district court properly denied Tweed's claim that the runway statute attempts to regulate the field of aviation safety and service capacity occupied by the federal government. The district court properly concluded that "Conn. Gen. Stat. § 15-120j(c) does not interfere with the plaintiff's ability to comply with federal aviation safety standards." JA209, MOD. No evidence has been presented showing that the runway statute interferes with Tweed's ability to comply with such safety standards.

Plaintiffs' reliance on *Tweed-New Haven Airport Auth. v. Town of E. Haven, Conn.*, 582 F. Supp. 2d 261 (D. Conn. 2008) is misplaced. As noted by the district court, "[t]he 'runway project' in *Tweed-New Haven* was undertaken in response to an FAA enforcement action for the purpose of complying with FAA safety standards. In the current case, there is no pending FAA enforcement action." JA209, MOD. In fact,

even though Tweed has alleged in multiple counts that a longer runway is necessary to comply with federal safety standards,[15] the evidence shows that the proposed runway extension plans are aimed instead at expanding commercial service at the Airport rather than meeting such standards.[16] In addition, there is no evidence that the runway must be lengthened for the Airport to bring its non-standard taxiway into compliance with FAA safety standards. See JA11, at ¶ 43 ("The Airport is not in compliance with FAA *design* standards due to the non-standard taxiway geometry.")(emphasis added). As a result, unlike the local ordinances in *Tweed-New Haven*, Conn. Gen. Stat. § 15-120j(c) does not interfere with the federal government's occupation of the field of aviation safety because it does not prevent Tweed from complying

---

[15] See JA15, Tweed Complaint, at ¶ 24 ("The current length of Runway 2/20 of 5,600 linear feet remains too short for almost all commercial aircraft to operate regularly scheduled commercial service in a safe and commercially reasonable manner."); JA16, at ¶ 31 ("Runway 2/20 needs to be extended . . . to comply with federal safety regulations and FAA construction standards."); JA7, at ¶ 35 ("The restriction imposed by Conn. Gen. Stat. § 15-120j(c) is . . . negatively affecting the Authority's compliance with federal safety regulations.")

[16] See e.g. JA56, Tweed Complaint, at ¶ 22 ("Lengthening of Runway 2/20 would allow the Dash 8 and other larger aircrafts to potentially service the Airport, hold more passengers and service additional destinations."); see also JA16, at ¶ 31 ("Runway 2/20 needs to be extended . . to attract new air service"),

with any federally-mandated safety standards. Thus, as stated by the district court, Tweed "has failed to present evidence that the runway length in this instance is a component part of the field of airline safety." JA209, MOD.

The absence of any safety concern affecting Runway 2/20 at the Airport distinguishes this case from *Burbank-Glendale-Pasadena Airport Authority v. City of Los Angeles*, 979 F.2d 1338 (9th Cir. 1992). In *Burbank*, the Ninth Circuit held that a local ordinance requiring a permit prior to the reconstruction of runways and taxiways at an airport was preempted by the FAAct. *Id.* at 1339-41. Unlike the proposed runway extension in this case, the taxiway at issue in *Burbank* "posed a safety risk" and the proposed taxiway extension plan was "expected to produce significant safety improvements." *Id.* at 1339.

This Court has similarly held that a local ordinance was not preempted by Congress' occupation of the field of aviation safety. In *Goodspeed Airport LLC v. East Haddam Inland Wetlands & Watercourses Comm'n,* 634 F.3d 206 (2d Cir. 2011), the plaintiff sought a declaratory judgment that would allow it to cut down trees at its airport without obtaining permits from the town Inland Wetlands and

Watercourses Commission ("IWWC") as authorized under the Connecticut Environmental Protection Act ("CEPA"). *Id*. at 207-09. In determining that the IWWC and CEPA were not preempted by the FAAct, this Court characterized the regulations at issue in *Tweed-New Haven* as constituting "a much more direct intrusion of local authority on the preempted field of air safety than . . . the regulatory actions challenged here." *Id*. at 211. Further, this Court emphasized the fact that, unlike *Tweed-New Haven*, where "the construction project was approved, indeed required, by the federal regulatory authority," in *Goodspeed,* no similar mandate existed. *Id*. Likewise, the proposed runway improvement project in this case is not required by the FAA.

Other district and circuit courts have reached a similar conclusion and ruled against preemption where a contrary ruling would infringe on local governmental control over land use or "ground space." In *City of Cleveland, Ohio v. City of Brook Park, Ohio*, 893 F. Supp. 742, 748 (N.D. Ohio 1995), the city of Cleveland sought to expand its existing runway onto land that it intended to purchase from an adjacent city, Brook Park. *Id*. at 745-46. Cleveland filed for a declaratory judgment from an Ohio district court, stating that Brook Park land use ordinances

prohibiting the construction of new runways in that city violated the Supremacy Clause. *Id.* at 745. The district court distinguished cases involving laws "directly related to aircraft operations," which were found to be preempted by the FAAct, from the Brook Park ordinances that had no such connection. *Id.* at 750-51.

In finding against preemption, the court concluded that "nothing in the Aviation Act or the regulations promulgated under it provides the FAA the authority to construct runways or airports." *Id.* at 750 (citing 49 U.S.C. § 40103(a) and (b))(other citations omitted). The court further stated that "[w]hile it is certainly true that runway placement will have some tangential effect on flight operations, the question of whether and where to construct a runway does not substantially affect the use of airspace." *Id.* at 751. As a result, the court rejected the idea that "localities are no longer free to regulate the use of land within their borders, even where land use regulations may have some tangential impact on their use of airspace." *Id.* at 751.

Similarly, due to Plaintiffs' failure to show that the runway statute jeopardizes any currently scheduled or future commercial

service at the Airport, Conn. Gen. Stat. § 15-120j(c) does not have a "tangential impact on the use of airspace." See *id.*

The statute therefore does not raise the same concerns of increased congestion and decreased safety that provided the basis for the Supreme Court's holding in *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 638-39 (1973), that a city ordinance that limited takeoffs and landings to certain hours was preempted by the FAAct. See Tweed Brief, at p. 51. Nor is the statute analogous to the local ordinance in *American Airlines, Inc. v. Town of Hempstead*, 272 F.Supp. 276 (E.D.N.Y. 1966), or the state court order in *United States v. City of New Haven*, 447 F.2d 972 (1971), both of which directly affected flights. In reaching its holding that the local ordinance in *Town of Hempstead* was preempted by federal regulation of navigable airspace, the district court stated that it "does not forbid noise <u>except by restricting flights</u>." *Town of Hempstead*, 272 F.Supp. at 230-231 (emphasis added); see City of New Haven Brief, at pp. 17-18. Similarly, in *City of New Haven*, this Court concluded that "the interference created by the state court order <u>closing a part of the runway</u> and thus halting jet service constitutes an irreparable public injury and

interference with commercial use of navigable air space." *City of New Haven*, 447 F.2d at 974 (emphasis added); see City of New Haven Brief, at pp. 18-19.[17] That is not the case with Conn. Gen. Stat. § 15-120j(c).

Lastly, no evidence has been presented at trial to show that the FAA has indicated to Tweed in any way that the Airport's federal certification is jeopardized by the length limitation imposed by the runway statute. Accordingly, the FAAct does not render Conn. Gen. Stat. § 15-120j(c) unconstitutional by either conflict or field preemption.

## B. The District Court Correctly Held That The ADA Does Not Preempt Conn. Gen. Stat. § 15-120j(c).

### 1. Express Preemption.

The district court's conclusion that the Airline Deregulation Act ("ADA") does not preempt Conn. Gen. Stat. § 15-120j(c) is in accordance with controlling precedent.

First, Congress intended for the ADA to help improve the efficiency of air service and increase competition between air carriers,

---

[17] The City of New Haven further references *Goodspeed Airport, LLC v. East Haddam Inland Wetlands and Watercourses Comm'n*, 632 F.Supp. 2d 185 (D.Conn. 2009), in the preemption section of its Brief to contend that this case is not barred by the Eleventh Amendment. Defendant does challenge that ruling on appeal and therefore does not respond to that portion of Intervenor Plaintiff's argument. See City of New Haven Brief, at pp. 21-25.

all through the process of deregulation. See *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). To help ensure that states would not roll back this deregulation, Congress included an express preemption clause. *Id.* at 378-79. Specifically, the ADA expressly prohibits states from enacting or enforcing laws "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). This Court has emphasized that "[i]t is the effect on the 'price, route or service' of an air *carrier*—not an airport—that is prohibited by the ADA." *Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 681 F.Supp. 2d 182, 207 (D.Conn. 2010), *aff'd*, 634 F.3d 206 (2d Cir. 2011)(emphasis original). "The act defines an 'air carrier' as 'a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation' as a common carrier for compensation." *Id.* (citing 49 U.S.C. §§ 40102(2), (5), (23) and (25)). As a result, the district court properly concluded that "the express preemption provision" in the ADA "applies specifically to air carriers, as opposed to airports, which are defined separately in the statute." JA213, MOD.

Second, in *Morales*, the Supreme Court considered whether state guidelines governing airline advertising and frequent flyer programs were preempted under the ADA. *Morales*, 504 U.S. at 378-79. Finding that Black's Law Dictionary states "relating to" means "to stand in some relation to; to have bearing or concern; to pertain; to refer; bring into association with or connection with," the Court held that "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' are preempted under 49 U.S.C. § 1305(a)(1)." *Id.* at 383-84. Noting the express reference to "fares" in the guidelines, the Court ultimately ruled that the guidelines had a "forbidden significant effect" upon them. *Id.* at 388. In so holding, however, the Court stressed that not all state laws relating to fares would be similarly preempted because some would affect airline fares in "too tenuous, remote, or peripheral a manner to have pre-emptive effect." *Id.* at 390 (citation and internal quotation marks omitted).

Following a review of Supreme Court precedent on the ADA's express preemption clause, this Court "has cautioned that there is 'no bright line' test for determining which state laws are permissible and which are not; rather, the inquiry should proceed 'on a case-by-case

basis.'" See *Goodspeed*, 681 F.Supp.2d at 207 (citing *Abdu–Brisson v. Delta Air Lines,* 128 F.3d 77, 85–86 (2d Cir.1997)).

In this case, Plaintiffs have failed to provide evidence at trial showing that Conn. Gen. Stat. § 15-120j(c) is having or will have a "forbidden significant effect" upon "the price, route, or service" of the commercial air carrier that currently serves the airport.  Instead, Tweed's expert witness, John DeCoster, testified that both the Dash 8 currently servicing the Airport and its two "logical" replacement planes, the Bombardier CJ200 and the Embraer 145, could continue operating there for the indefinite future.  See Section I.D., supra.  In addition, Mr. DeCoster testified that regularly scheduled commercial service at the Airport is "not jeopardized at the moment." See JA247, p. 119, lines 18-23; JA248, p. 120, lines 2-5  Further, evidence shows that there are no airlines that are interested in commencing service at the Airport even if the runway is lengthened, including Allegiant Air.  See Section I.E. Based on such evidence, the  district court properly rejected Tweed's claim that the runway statute relates to the route and service of an air carrier. See JA214, MOD.

The runway statute therefore has had and will continue to have no effect upon "price, route or service" provided by American or any other airline at the Airport for the foreseeable future. Even if this Court does infer some possible impact on "the price, route, or service" provided by American to the Airport because "someday" all planes capable of using the current 5,600 linear foot runway will be retired, that impact would surely be "too tenuous, remote, or peripheral to have pre-emptive effect." See *Morales*, supra, 504 U.S. at 390. For these reasons, the district court correctly held that "the Court cannot find preemption based upon hypothetical future carriers who might want to bring service to Tweed at some undisclosed future date." JA214, MOD.

Lastly, *Arapahoe County Public Airport Authority v. Federal Aviation Administration*, 242 F.3d 1213 (10th Cir. 2001), cited by Tweed, is inapposite to this case since the state law at issue in that case concerned a *complete ban* on all air carrier passenger service that the Tenth Circuit held "affirmatively curtailed an air carrier's business decision to offer a particular service in a particular market." See *id*. at 1216, 1222; Tweed Brief, at pp. 43-44. Similarly, *Charas v. TransWorld Airlines, Inc.*, 160 F.3d 1259 (9th Cir. 1998), also cited by Tweed, in

which the Ninth Circuit declined to extend the term "service" in the ADA to include on-board services provided by flight attendants, was, according to this Court in *Weiss v. El Al Airlines*, 309 Fed.Appx. 483 (2d Cir. 2009), overturned by the Supreme Court in *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364 (2008). See *Weiss*, 309 Fed.Appx. at 485, citing *ATA*, 520 F.3d 218, 220 (2d Cir.2008); see Tweed Brief, at p. 44. Moreover, at trial Plaintiffs failed to prove that the runway statute restricts Tweed's ability to bring commercial airline service to the airport because, as the district court noted, "American Airlines continues to operate the same service that it operated prior to the passage of Conn. Gen. Stat. § 15-120j(c)." JA214, MOD.

Accordingly, Plaintiffs have failed to show that Conn. Gen. Stat. § 15-120j(c) is expressly preempted under the ADA.

## C. The District Court Correctly Held That The AAIA Does Not Preempt Conn. Gen. Stat. § 15-120j(c).

### 1. Implied Preemption.

Tweed last claims that the runway statute is preempted by the AAIA. Because it is not clear to Defendant if this claim is based on conflict or field preemption, Defendant will address both areas below.

### a. Conflict Preemption.

Trial evidence and caselaw support the district court's conclusion that the AAIA does not preempt the runway statute because Tweed "is not obligated to seek federal funding," and "the AAIA does not impose affirmative obligations unless an Airport is seeking federal funding." JA217, MOD. Consequently, the district court correctly determined that Tweed "has not demonstrated that it is impossible to adhere with Conn. Gen. Stat. § 15-120j(c) and the AAIA." *Id.*

There is no such conflict in this case because the AAIA does not set regulatory requirements for the construction of airport runways; it only sets requirements for those wishing to secure federal funding for that type of project. See *City of Cleveland,* 893 F. Supp. at 748. In *City of Cleveland*, the court determined that it was possible to comply with both state and federal law because an airport owner could simply forego federal funding under the AAIA and comply with a competing local ordinance. *Id.* at 748. The court concluded that "[w]hile such a decision may be less than practical, compliance with both the AAIA and Brook Park's zoning laws is not legally impossible." *Id.* Likewise, Tweed has

the capacity to comply with both Conn Gen. Stat. § 15-120j(c) and the

AAIA by not seeking federal funding under the AAIA.

Tweed also alleges that § 15-120j(c) "frustrates the essential

federal purpose" of the AAIA.  JA21, Tweed Complaint, at ¶ 59.  In

support of its conclusory allegation, Tweed identifies such purpose as

"accelerating the upgrading of airports" and further declares that under

the AAIA "'artificial restriction on airport capacity' is not in the public

interest and should not be tolerated."  JA19-21, Tweed Complaint at ¶¶

47, 50, 59; see Tweed Brief, at pp. 52-53.   The purpose of the AAIA,

however, is much broader than the plaintiff indicates.

In *City of Cleveland*, the district court recognized that federal

funding of airport construction projects furthered a "wide variety of

public policy goals," and that the AAIA sought "to promote

environmental protection, noise control, reduction of non-compatible

land uses in areas surrounding airports, consistency with the Federal

Aviation Act, and the development of a national intermodal

transportation system." *City of Cleveland*, 893 F.Supp. at 749.[18]  In

_____

[18] See *Whittington v. U.S.*, 99 Fed.Appx. 56, 59 (6th Cir. 2004)("The
AAIA, according to the statute itself, serves the purpose of providing

68

addition, the AAIA statute identifies the need for "cooperation" between the federal government and state and local officials "in developing airport plans and programs that are based on overall transportation needs." *Id.* at 749 (citing 49 U.S.C. § 47101(g)). The court found that the Brook Park ordinance requiring a conditional use permit prior to any runway expansion onto its land was consistent with local land use goals and that "it would be inconsistent with AAIA's stated goal of fostering cooperation to substitute the FAA's authority for the traditional power of states and localities to regulate land use within their boundaries." *Id.*

Consequently, if respect for state policy furthered under Conn. Gen. Stat. § 15-120j(c) results in Tweed's failure to secure federal funding, that would not be a frustration of the law's essential purpose, but instead would be the necessary result of cooperative consistency between state and federal policy. Tweed therefore has not and cannot demonstrate that Conn. Gen. Stat. § 15-120j(c) frustrates the essential federal purpose of the AAIA.

---

federal funding to airport construction projects to promote a wide variety of policy goals.")(citing *City of Cleveland*, 893 F.Supp. at 749).

## b. Field Preemption.

In denying Tweed's claim that the AAIA preempts the runway statute through field preemption, the district court correctly concluded that "[p]laintiff does not offer any case law in support of its legal conclusion that the AAIA occupies the field of aviation safety and airport improvement projects." JA216, MOD.

Tweed alleges in its Complaint that "[b]y restricting the length of Runway 2/20, Conn. Gen. Stat. § 15-120j(c) attempts to regulate aviation safety and the service capacity at the Airport, a field occupied by the United States Government." JA21, Tweed Complaint at ¶ 57. The AAIA, however, does not fully occupy the field of aviation safety and service capacity. Instead, as noted in *City of Cleveland*, "the AAIA provides a mechanism through which the FAA is to determine whether to provide federal funding to airport development and improvement projects." *City of Cleveland*, 893 F.Supp. at 752. The district court in that case determined that because Brook Park's ordinances "did not purport to address the eligibility of the proposed project . . . for federal funding," they did not fall under the AAIA. *Id.* at 752. Similarly, Conn.

Gen. Stat. § 15-120j(c) does not "address the eligibility" of Tweed's proposed improvement project for federal funding.

In addition, Tweed's reliance on *City of Oceanside v. AELD, LLC*, 740 F. Supp. 2d 1183 (S.D. Cal. 2010), to support the notion that Conn. Gen. Stat. § 15-120j(c) serves as an "obstacle to the FAA's goal of ensuring aviation safety and efficient commercial service" is misplaced. Because the Airport is not out of compliance with federal safety standards, see JA44, at ¶ 44, and "American Airlines continues to operate the same service that it operated prior to the passage of Conn. Gen. Stat. § 15-120j(c)," JA214, MOD, Tweed has failed to show that the statute has prevented it from achieving such FAA objectives.

As a result, Plaintiffs have still not offered any precedent to contradict the district court's holding that the AAIA does not fully occupy the field of aviation and service capacity. See JA217, MOD.

## III. The District Court Erred In Holding That A Political Subdivision Can Sue Its Creator State.

In denying Defendant's motion to dismiss, the district court improperly concluded that, in the absence of any Second Circuit precedent or any direct ruling by the Supreme Court, Tweed, a political subdivision, has standing to sue the State. JA44-45.

Political subdivisions are mere creatures of the state, and have no rights aside from those given to them by their creator states. See *City of Trenton v. New Jersey*, 262 U.S. 182, 187 (1923). Under this doctrine, a political subdivision, "created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." *Williams v. Mayor*, 289 U.S. 36, 40 (1933)(internal citations omitted). In *City of Trenton*, the Court held that the city could not invoke the Fourteenth Amendment Due Process Clause to prevent New Jersey from enforcing a state law imposing licensing fees for diverting water from the Delaware River. *City of Trenton*, 262 U.S. at 192. In *Williams*, the Court held that two cities could not invoke the Fourteenth Amendment Equal Protection Clause to prevent Maryland from exempting a railroad from all local taxes. *Williams*, 289 U.S. at 38-40.

The Supreme Court appeared to limit this doctrine in 1960, noting that "the Court has never acknowledged that the States have power to do as they will with municipal corporations regardless of consequences." *Gomillion v. Lightfoot*, 364 U.S. 339, 344-45 (1960)(Alabama

redistricting law that disenfranchised minority voters violated Fifteenth Amendment).

More recently, however, the Court reverted to its maximalist reading of state control over political subdivisions. See *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009). In *Ysursa*, the Court held that an Idaho law that forbid public employers from making payroll deductions for political activities served the state's interest in separating pubic employment from such activities and did not violate the plaintiff's First Amendment free speech rights . *Id*. at 359-61. The Court applied its holding to public employees at both the state and local level. *Id*. at 362-63. In reaching its decision, the Court rejected the argument that the State's powers over local governmental entities were analogous to a state commissioner's powers over a private utility, stating that "a political subdivision . . . has no privileges or immunities . . . which it may invoke in opposition to the will of its creator," and that such subdivisions are "merely . . . department[s] of the State, and the State may withhold, grant or withdraw powers and privileges as it sees fit." *Id*. at 362-64 (citing *Williams*, 289 U.S. at 40; *City of Trenton,* 262 U.S. at 187).

During the time period between *Gomillion* and *Ysursa*, a split emerged among the Circuit Courts regarding how to interpret the Supreme Court's holdings in these cases. Significantly, this Court held, albeit not in a Supremacy Clause context, that political subdivisions lack standing to sue their creator states. See *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973)( city lacked standing to assert constitutional claims against the state); *New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973)(same). The Ninth Circuit adopted a similar rule. See *City of South Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 233 (9th Cir.1980).

In *Aguayo*, several plaintiffs, including the City of New York Department of Social Services, brought suit under the Equal Protection Clause of the Fourteenth Amendment to prevent state implementation of a work project program that required certain participants in the state welfare program to work. *Aguayo*, 473 F.2d at 1093. The district court, citing *Williams*, held that the City had no standing to assert constitutional claims. *Id.* at 1100. This Court agreed, holding that "[t]he City lacks standing to assert constitutional claims against the State." *Id.* at 1101.

In *Richardson*, this Court upheld dismissal of the city and county

plaintiffs' Fourteenth Amendment claims against the state, holding

that the *Williams* rule "remains controlling authority when the

challenged statue is the work of a State legislature." *Richardson,* 473

F.2d at 929 (citing *Aguayo,* 473 F.2d 1090 (2d Cir. 1973)).  As a result,

this Court has long-embraced the legal principle that a political

subdivision created by the state "has no privileges or immunities under

the Federal Constitution which it may invoke in opposition to the will of

its creator." See *Williams*, 289 U.S. at 40.[19]

An even more apposite case in the Ninth Circuit, *Burbank-*

*Glendale-Pasadena Airport Authority v. City of Burbank*, 136 F.3d 1360

(9th Cir. 1998), addressed the standing of political subdivisions in a

Supremacy Clause case.  In *City of Burbank*, the plaintiff airport

authority sought to prevent the city from reviewing its planned

expansion of terminal and parking facilities at the airport.  *Burbank*,

136 F.3d at 1361.  The court denied the plaintiff's Supremacy Clause

---

[19] In *Tweed-New Haven*, the Connecticut district court did not address the standing issue at all.  Additionally, that litigation was not brought against the state, nor did it concern a state statute. Instead, Tweed's claim was against another political subdivision (the Town of East Haven) regarding that subdivision's own environmental regulations.

claim. *Id*. at 1364 (citing *South Lake Tahoe*, 625 F.3d at 233). In reaching its decision, the court noted that *South Lake Tahoe's* "broad language" precluded a Supremacy Clause exception. See *id*. The broad language from *South Lake Tahoe*, that "'political subdivisions' of a state lack standing to challenge statutes of the state itself . . . on constitutional grounds," is no broader than that stated by this Court in *Aguayo* that "[t]he City lacks standing to assert constitutional claims against the State." See *South Lake Tahoe*, 625 F.2d at 233; see *Aguayo*, 473 F.2d at 1100-01 (affirming district court holding that city "had no standing to assert constitutional claims.").

Although the Fifth and Tenth Circuits have reached contrary holdings in *Rogers v. Brockette*, 588 F.2d 1057, 1060 (5th Cir. 1979) and *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 630 (10th Cir. 1998), both cases involved Supremacy Clause challenges that were not as factually similar to this case as the one brought in *City of Burbank*. In *Rogers*, a school district sought injunctive and declaratory relief in challenging the constitutionality of a state statute that required certain districts to take part in a subsidized breakfast program. *Rogers*, 588 F.2d at 1059-60. In *Branson*, school districts and students sought

injunctive relief to enjoin enforcement and implementation of an amendment to the Colorado Constitution concerning the trusteeship of public lands. *Branson*, 161 F.3d at 625-27. Clearly, *City of Burbank* is the case most factually akin to this action and therefore provides sound guidance for the Court on the political subdivision question.

Lastly, it would be odd indeed if the State did not have a right as the sovereign that created the Tweed-New Haven Airport Authority to determine its size, including whether to have a fixed runway length. After all, the Connecticut Legislature could repeal the statute that created Tweed in the first place. See *Ysursa*, 555 U.S. at 364 ("[T]he state may withhold, grant, or withdraw powers and privileges as it sees fit.")(citing *City of Trenton*, 262 U.S. at 187). Ultimately, although Tweed lacks standing to bring a Supremacy Clause challenge to Conn. Gen. Stat. § 15-120j(c), it could still seek redress through the political process.

Respectfully submitted,

DEFENDANT/APPELLEE

ATTORNEY GENERAL
GEORGE JEPSEN


GEORGE JEPSEN
ATTORNEY GENERAL

BY:    */s/ Drew S. Graham*
       Drew S. Graham
       Assistant Attorney General
       Federal Bar No. ct16741
       55 Elm Street
       P.O. Box 120
       Hartford, CT  06141-0120
       Tel: (860) 808-5090
       Fax: (860) 808-5384
       Drew.Graham@ct.gov

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify that this brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, as modified by Second Circuit Local Rule 32.1(a)(4), in that this brief contains 15,310 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

*/s/ Drew S. Graham*
Drew S. Graham
Assistant Attorney General

Dated: July 18, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of July, 2018, I caused the foregoing brief to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Drew S. Graham*
Drew S. Graham
Assistant Attorney General
*Counsel for Appellees*

# 17-3481 (L)
## 17-3918 (Con)

IN THE

### United States Court of Appeals
FOR THE SECOND CIRCUIT

**TWEED-NEW HAVEN AIRPORT AUTHORITY,**
*Plaintiff-Appellant,*

**CITY OF NEW HAVEN,**
*Intervenor Plaintiff-Appellant,*

v.

**GEORGE JEPSEN, in his official capacity as
Attorney General for the State of Connecticut,**
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (HARTFORD)

**SUPPLEMENTAL APPENDIX**

# SUPPLEMENTAL APPENDIX TABLE OF CONTENTS

Transcript of Bench Trial............................................................ SA1-SA14

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF CONNECTICUT

3

4    -------------------------------x

5    TWEED-NEW HAVEN AIRPORT
     AUTHORITY,
6                    Plaintiff,    3:15CV1731 (RAR)

7         vs.

8    GEORGE JEPSEN, in his official    March 22, 2017
     capacity as Attorney General
9    for the State of Connecticut
                       Defendant
10   -------------------------------x

11                              Federal Building
                                450 Main Street
12                              Hartford, Connecticut

13

14                    **BENCH TRIAL**

15

16

17   Held Before:
         The Honorable Robert A. Richardson
18            U.S.D.C. Magistrate Judge

19

20

21

22

23           FALZARANO COURT REPORTERS, LLC
24                 4 Somerset Lane
                 Simsbury, CT 06070
25                 860.651.0258

1   A.  Yes.

2   Q.  Okay. This report proposes, as its

3 proposed action, a 275 foot parallel taxiway that is

4 nonstandard; isn't that correct?

5   A.  Yes.

6   Q.  So Hoyle Tanner on behalf of the Authority

7 has proposed to the FAA a nonstandard parallel taxiway

8 as part of its operational safety improvements at

9 Tweed, right?

10   A.  Yes.

11   Q.  Okay. And the report addresses standard --

12 the report does address the option or alternative of

13 the standard taxiway geometry, right?

14   A.  Yes.

15   Q.  And it does that on page ten.

16      MR. GRAHAM: Which is the Section 3.3,

17    your Honor.

18      THE COURT: Thank you.

19 BY MR. GRAHAM:

20   Q.  Section 3.3 is entitled, "alternatives

21 reviewed but eliminated from detailed analysis,"

22 correct?

23   A.  Yes.

24   Q.  Okay. And if this standard taxiway

25 standard parallel taxiway alternative is addressed on

SA2

```
1    BY MR. GRAHAM:

2        Q.    Good afternoon, Mr. DeCoster.

3        A.    Good afternoon.

4        Q.    One of the opinions in your report

5    addresses whether Tweed will be able to maintain

6    commercial service at the airport with its current

7    runway length, right?

8        A.    Yes.

9        Q.    And the plane currently operating at Tweed

10   is the Dash 8, right?

11       A.    Yes.

12       Q.    And you've provided information in your --

13   or you've provided an opinion in your letter to

14   support the plaintiff's allegation that the Dash 8 is

15   being phased out in the near future, right?

16       A.    Yes.

17       Q.    But isn't it true that your report does not

18   identify when the Dash 8 will reach the end of its

19   useful life?

20       A.    My report does not identify when the Dash 8

21   will be retired.

22       Q.    Okay.  And your report does not contain or

23   attach any written information provided by American

24   Airlines addressing that subject matter, right?

25       A.    Correct.
```

SA3

1      Q.    And you haven't conducted any independent

2  analysis of when the Dash 8 will be retired, correct?

3      A.    Correct.

4      Q.    So isn't it true that the facts that you

5  have to offer this court on the Dash 8 phaseout are

6  that some day in the future the Dash 8 will be phased

7  out but you don't know when, correct?

8      A.    Correct.

9      Q.    And I'm going to ask similar questions of

10  two planes that you call logical replacements for the

11  Dash 8 at Tweed, the Bombardier CJ 200 and Embraer

12  145.  My question to you initially is do you consider

13  those two planes to be logical replacements for the

14  Dash 8, right?

15      A.    Yes, they're the next size up aircraft in

16  the fleet.

17      Q.    And they're regional jets, right?

18      A.    Yes.

19      Q.    Fifty seaters?

20      A.    Yes.

21      Q.    And isn't it true that your report does not

22  identify exactly when those planes will reach the end

23  of their useful lives?

24      A.    Yes.

25      Q.    And your report does not contain any

BY MR. GRAHAM:

Q.    And do you claim that -- well, withdrawn.

Isn't it true that Allegiant has not indicated that it would commit to begin regularly scheduled commercial service at Tweed if the runway is lengthened?

A.    To my knowledge, they have not made that commitment.

MR. GRAHAM:  Okay.  Thank you, your Honor.  No further questions.  At this point, I sum up my argument regarding objecting to the expert's testimony.

THE COURT:  All right.

MR. GRAHAM:  Shall I do it from here, your Honor, or return to my table?

THE COURT:  Wherever you're most comfortable.

MR. KLEPPS:  Your Honor, I do have maybe three or four questions based on those that go to his qualifications.  I don't know if I should ask those before Attorney Graham makes his final argument on his objection.

THE COURT:  I think it makes more sense to do it before he argues his objection, in case it resolves it.

1  discontinued service at Tweed with the Dash 8 because

2  it was not being operated at an acceptable

3  profitability level, are you?

4     A.    I'm not aware of such.

5     Q.    Let me back up a second.  Your report, on

6  page 3, does say that American's operating -- American

7  Airlines is operating the Dash 8 at a, quote,

8  acceptable profitability level, unquote, in the last

9  paragraph on page 3, right?

10     A.    Yes.

11     Q.    And presumably, if, for any reason, the

12  operation was no longer profitable at Tweed, that

13  service would be discontinued?

14     A.    That would be a decision American would

15  have to make.  But based on their approach to the

16  industry of discontinuing unprofitable flights, I

17  could only speculate that would be the case.

18     Q.    Okay.  Thank you.  And to the best of your

19  knowledge, to date, American has not discontinued its

20  operation at Tweed for any reason while it's had

21  service there?

22     A.    Since I've been engaged with the airport

23  since 2009, that's correct.

24     Q.    Including payload hits?  To the best of

25  your knowledge, American has not discontinued Dash 8

SA6

1    too close to the microphone, sir.

2         A.     Okay.  Is that better?

3         Q.     Well, it's up to the court.

4              MR. GRAHAM:  Can the court hear the

5         witness, your Honor?

6              THE COURT:  I can hear him fine.

7              MR. GRAHAM:  I heard two voices on your

8         last answer.

9    BY MR. GRAHAM:

10        Q.     So is it then fair to say, Mr. DeCoster,

11   that despite occasional payload hits on the Dash 8,

12   it's fair to say that American still finds its service

13   to be profitable at Tweed since it's still operating

14   there?

15        A.     Yes.

16        Q.     Moving on to the regional jets.  We're

17   staying on the same page because you addressed the

18   regional jets in the last paragraph of page 3.  We've

19   gone over the regional jets before.  So my question to

20   you is that your report states that there's a phaseout

21   with the regional jets that you characterize as the

22   two jets as reaching their maximum cycles.  Is that

23   accurate?

24        A.     Yes.

25        Q.     Okay.  And according to your report, the

SA7

1    phaseout program affecting these planes still leaves

2    as many as 125 of each of them at the network airlines

3    by 2017?

4         A.    125 50-seat aircraft, in total.

5         Q.    In total?

6         A.    At the network airlines, correct.

7         Q.    Okay.  So, does that mean American has as

8    many as 125 50-seat aircraft in 2017?

9         A.    Based on their fleet disclosure, yes.

10         Q.    Okay.  So American could have as many as

11   125 Bombardier CJ 200s and Embraer 145s as of this

12   year?

13         A.    A combination thereof, yes.

14         Q.    I'm sorry?

15         A.    A combination of thereof.

16         Q.    A combination of thereof, okay.  And

17   American could decide to use any one of them, of those

18   125 planes to service Tweed, once the Dash 8 is

19   retired, right?

20         A.    They could, but again, they would take the

21   runway length into consideration when making that

22   decision.

23         Q.    Okay.  Well, I mean, you don't know all the

24   considerations they'll make.  The question is is

25   whether they could do that.  They could dedicate one

SA8

1     full capacity on a 5600 linear foot runway?

2          A.    That would be an airline decision.

3          Q.    I'm sorry?

4          A.    That would be an airline decision.

5          Q.    I'm asking if the manufacturer's

6     specifications say that?

7          A.    No.

8          Q.    For either regional jet?

9          A.    No.

10         Q.    And isn't it true that nothing in your

11    report indicates that the use of those two jets at

12    Tweed would not be profitable for American?

13         A.    Correct.

14         Q.    And isn't it true that -- isn't that true

15    that nothing in your report indicates that American

16    has determined that operating either one of those two

17    regional jets at Tweed would not be profitable?

18         A.    That's correct.

19         Q.    Or that operating -- or that American has

20    determined that operating either one of those two jets

21    on a 5600 linear foot runway would not be profitable?

22         A.    That's correct.

23         Q.    So American could service Tweed with either

24    one of those two regional jets after the Dash 8 is

25    retired, correct?

SA9

1        A.    Based on the manufacturer's specifications,

2  the runway length would meet the minimal requirement

3  as stated.

4        Q.    Okay.  And you don't know how -- exactly

5  how long those planes could be used before they reach

6  the end of their useful life, correct?

7        A.    In publications that I've read from

8  airlines, they are speculating, as I said previously,

9  that by the end of the decade, they will have reached

10  their cycle lives.

11       Q.    What publications?

12       A.    Investor reports by the airlines plus

13  industry reports that are published periodically.

14       Q.    And when did you read this?

15       A.    Weekly.

16       Q.    No.  When did you read the information

17  regarding that these two regional jets could

18  potentially be retired by the end of the decade?

19       A.    I was reading the American investor report

20  last week and they suggested that's a possibility.

21       Q.    So is that information that you were

22  familiar with prior to issuing your letter of opinion

23  in this case?

24       A.    As I mentioned before, in our discussions

25  with airlines, including American Airlines, as we meet

SA10

1    say that you have not heard or read in the industry

2    that they, that American, has definitively decided

3    that those regional jets will be retired by the end of

4    this decade?

5        A.    Not definitively decided, correct.

6        Q.    Okay.  And with respect to the publication

7    that you read just last week, what's the name of the

8    publication again?

9        A.    It was the investor's report published by

10   American Airlines for their investor's day

11   presentation last week.

12       Q.    Okay.  Is it fair to say that that report

13   does not state that American has definitively decided

14   to retire the two regional jets that we've been

15   discussing by the end of this decade?

16       A.    Correct.

17       Q.    Okay.  So it's fair to say that you don't

18   know when the two regional jets, the Bombardier CJ 200

19   and the Embraer 145 will be retired by American?

20       A.    Correct.

21       Q.    Okay.  So you don't know -- let me

22   rephrase.

23           If American chooses to replace the Dash 8 with

24   the two regional jets, which you called the logical

25   replacements for the Dash 8, you don't know how long

SA11

1    longer runway, it could attract commercial jet service

2    to destinations other than Philadelphia, right?

3         A.    Yes.

4         Q.    And does your report include any reference

5    to any market demand studies of potential destinations

6    for commercial service from Tweed to other

7    destinations?

8         A.    No.

9         Q.    And you haven't conducted any independent

10   market demand studies of such nature, have you?

11        A.    No.

12        Q.    And your report doesn't include any market

13   studies that analyzed Tweed-New Haven as a potential

14   destination from other airports, correct?

15        A.    Correct.

16        Q.    And you haven't performed any such study

17   yourself, correct?

18        A.    Correct.

19             MR. GRAHAM:   Just have a moment, your

20             Honor.

21   BY MR. GRAHAM:

22        Q.    But market demand does matter, doesn't it?

23        A.    Yes.

24        Q.    And you state that with -- I'm trying to

25   get the right page of this.  Page 5, again, on this

SA12

1    ever funded a similar type of program for a

2    similar type of reason.  It's completely

3    relevant to what was stated on direct, your

4    Honor.

5        THE COURT:  I'll overrule the objection

6    and I'll allow your question.

7        MR. GRAHAM:  I have three.  So, if you

8    want to object to the next two, I have

9    three.

10   BY MR. GRAHAM:

11       Q.    In your experience, does the FAA typically

12   invest into proposed infrastructure improvements like

13   the one at Tweed to allow an airport to compete with

14   other airports in the vicinity of that airport?

15       A.    The FAA will support funding and provide a

16   high ranking for prioritization of that company.  The

17   highest ranking for airports is related to safety.

18       Q.    Okay.  So the FAA has discretion to

19   distribute its fund as it sees fit, right?

20       A.    It has a ranking system and distributes

21   funds based on the ranking by the FAA.

22       Q.    Right.  And the ranking is created by the

23   FAA, according to its discretion and its stance,

24   right?

25       A.    It's created by the FAA with safety being

1    the first criteria.

2         Q.    In your experience, does the FAA approve

3    proposed runway improvement projects where there is an

4    absence of commitment from airlines to provide service

5    to that particular runway after the improvements are

6    made?

7         A.    Yes.

8         Q.    Can you give me an example?

9         A.    Yes.  The FAA regularly approves runway

10   extensions at general aviation airports that have no

11   commercial service at all.

12        Q.    Okay.

13        A.    For safety reasons.

14        Q.    Why would they approve -- well, withdrawn.

15        Are you saying that the FAA approves funding

16   for safety reasons at airports for commercial service

17   that doesn't exist at those airports?

18        A.    They provide funding for improvements that

19   provide a safe environment for the operations of that

20   airport.

21        Q.    In its current form?

22        A.    In current form or justified form in the

23   application.

24        Q.    Okay.  And in your experience, does the FAA

25   -- is the FAA's priority list --

SA14